1                    IN THE UNITED STATES DISTRICT COURT

2                    IN AND FOR THE DISTRICT OF DELAWARE

3                              - - -

4
        VLSI TECHNOLOGY LLC,              :   CIVIL ACTION
5                                         :
                        Plaintiff,        :
6                                         :
            vs.                           :
7                                         :
        INTEL CORPORATION,                :
8                                         :
                        Defendant.    :   NO. 18-966 (CFC)
9

10                             - - -

11                              Wilmington, Delaware
                                Tuesday, June 18, 2019
12                              4:00 o'clock, p.m.

13                             - - -

14      BEFORE:  HONORABLE COLM F. CONNOLLY, U.S.D.C.J.

15                             - - -

16      APPEARANCES:

17
                    FARNAN LLP
18                  BY:  MICHAEL J. FARNAN, ESQ.

19
                            -and-
20

21

22

23

24                                  Valerie J. Gunning
                                    Official Court Reporter
25

1    APPEARANCES (Continued):

2

3              IRELL & MANELLA LLP
               BY:  CHRISTOPHER ABERNETHY, ESQ. and
4                   AMY E. PROCTOR, ESQ.
                    (Los Angeles, California)
5

6                   Counsel for Plaintiff

7

8              MORRIS, NICHOLS, ARSHT & TUNNELL LLP
               BY:  JACK B. BLUMENFELD, ESQ.
9

10                     -and-

11

12             WILMER CUTLER PICKERING HALE AND DORR LLP
               BY:  JORDAN L. HIRSCH, ESQ.,
                    AMANDA L. MAJOR, ESQ. and
13                  ALEXANDRA AMRHEIN, ESQ.
                    (Boston, Massachusetts)
14

15                     -and-

16

17             INTEL CORPORATION.
               BY:  MASHOOD RASSAM, ESQ.

18

19                  Counsel for Defendant

20                     -  -  -

21

22

23

24

25

```
1                    P R O C E E D I N G S

2

3              (Proceedings commenced in the courtroom

4    beginning at 4:00 p.m.)

5

6                    THE COURT:  Good afternoon.

7                    MR. BLUMENFELD:  Good afternoon, Your Honor.

8                    THE COURT:  Mr. Farnan?

9                    MR. FARNAN:  Good afternoon, Your Honor.

10                   THE COURT:  Good afternoon.

11                   MR. FARNAN:  Michael Farnan on behalf of the

12   plaintiff.  With me today is Chris Abernethy and Amy Proctor

13   from Irell.

14                   THE COURT:  Okay.  Mr. Blumenfeld?

15                   MR. BLUMENFELD:  Good afternoon, Your Honor.

16   Jack Blumenfeld from Morris Nichols for Intel, and with me

17   is Amanda Major from Wilmer Hale, Mashood Rassam, who is

18   in-house at Intel.  Behind them, Jordan Hirsch, who is at

19   Wilmer Hale and Alexandra Amrhein, who is also at Wilmer

20   Hale.

21                   THE COURT:  All right.

22                   MR. BLUMENFELD:  Thank you.

23                   THE COURT:  Great.  Who filed first?

24                   MR. ABERNETHY:  I believe we did, plaintiff.

25                   THE COURT:  All right.  Go ahead then.
```

1          MR. ABERNETHY:  Thank you, Your Honor.  Chris

2    Abernethy of Irell Manella for plaintiff VLSI.

3          Your Honor, we were here last before the Court

4    about two months ago in April and the issue before the Court

5    was whether to order narrowing of asserted claims and of

6    prior art combinations.  At Intel's urging, the Court issued

7    an order on April 22nd.

8          THE COURT:  I'm familiar with all of that.

9          MR. ABERNETHY:  Okay.

10          THE COURT:  Actually, why don't I hear from the

11    defense on this.  I think it would move faster for me to

12    hear from the defense.

13          MR. ABERNETHY:  Thank you, Your Honor.

14          THE COURT:  I don't mean to be short.  I need to

15    be efficient.

16          MS. MAJOR:  So, Your Honor, consistent with Your

17    Honor's order on May 10th, defendant identified 80 prior art

18    combinations, identifying within those certain categories of

19    items that plaintiff is now contending represent multiple

20    references that should not properly become just one.

21          THE COURT:  And it makes sense to me.  I don't

22    know how you count them.  I don't know how you count

23    multiple references within admitted prior art as one

24    reference.

25          MS. MAJOR:  Well --

1      THE COURT:  I mean, I don't know how you

2  understood when you left here that you could do that.

3      MS. MAJOR:  Yes, let me explain, Your Honor.

4  We're not identifying multiple prior art references within a

5  single reference.

6      If I may, Your Honor, I have a copy of the '331

7  patent, which is one of the patents at issue.  And may I

8  approach, Your Honor?

9      THE COURT:  Sure.

10      (Ms. Major handed documents to the Court.)

11      MS. MAJOR:  So in the category of what we

12  identified in the disclosure as admitted prior art is merely

13  the highlighted passages in this asserted patent that the

14  applicant, the patentee, patentees themselves admitted

15  constitute prior art to the --

16      THE COURT:  So why don't you just identify the

17  patent as the prior art?

18      MS. MAJOR:  Because there's -- it's technically

19  referred to as admitted prior art where it's the patentee

20  that is admitting that in the patent specification.

21      THE COURT:  All right.  So then let me go back

22  then.

23      So, all right.  So then if I look at Exhibit 2

24  of plaintiff's motion to strike, which is DI 173.

25      MS. MAJOR:  Yes.  Correct:  So where --

1          THE COURT:  Now, are you saying that '331 is

2    prior art?

3          MS. MAJOR:  So, Your Honor, the '331 has certain

4    disclosures in the specification that constitute prior art

5    that was admitted by the patentee, so it's these specific

6    passages which we cited in our invalidity contentions that

7    account for the, what we've identified there as the '331

8    admitted prior art.

9          This is -- we cited a couple cases where the

10   PTAB has recognized that the patentee's admissions in the

11   specification constitute prior art.  As we've demonstrated

12   in this document, we're not trying to merge multiple

13   references into a single item.  We're merely relying on a

14   subset of the patentee's own language in the disclosure of

15   the '331 patent.

16         THE COURT:  And this is prior art that you

17   were trying to prove the invalidity of the '331 patent.

18   Correct?

19         MS. MAJOR:  Correct.  It's permissible to do

20   that.

21         THE COURT:  All right.

22         MS. MAJOR:  Yes.

23         THE COURT:  I just find it hard to believe when

24   you left this last hearing that somebody was going to come

25   back here and say that a prior ART reference was anything

1    other than a publication and not -- you know, and I agree

2    you can point to some case which makes a reference to it.

3    That's certainly not what I thought when you left here.

4              MS. MAJOR:  Well, Your Honor, this is a single

5    document that we're relying on.

6              THE COURT:  It's the patent.  It's the patent at

7    issue.  When I have lawyers before me with a patent, they

8    always talk about the prior art that is cited in the patent,

9    and then they refer to specific articles or specific patents

10   or publications that are cited in the patent.

11             I've never had anybody, and I agree that, you

12   know, the problem here is you practiced patent law longer

13   than I have.  Right.  So that's the one hesitancy I have in

14   challenging you, although I'm obviously challenging you.

15   But I find it suspect that when we left here, you were going

16   to come back and say, a prior art reference could include

17   just highlighted passages in this patent.

18             MS. MAJOR:  Well, Your Honor, we have --

19             THE COURT:  Can you show me any case where

20   somebody has discussed it in this context of limiting prior

21   art, that somebody had to count what you are calling

22   admitted prior art, which is basically just highlights from

23   the patent that's at issue?

24             MS. MAJOR:  Right, Your Honor.  We have not

25   found a case in this specific context where there's

1   discussion of narrowing of prior art references or

2   combinations, but --

3                    THE COURT:  When did you first know you were

4   going to cite admitted prior art?

5                    MS. MAJOR:  This was in our invalidity

6   contentions, Your Honor, so March 6th is when we disclosed

7   those.

8                    Your Honor, if we had appreciated that this

9   would be something that was not within your expectation, we

10  would have flagged at the April conference.

11                   In our practice, this is not uncommon, that you

12  can rely on what the applicant himself says existed in the

13  prior art in --

14                   THE COURT:  Well, of course, you can.  I mean,

15  of course, you can, and what the applicant is talking about,

16  existing prior art, they're discussing specific references

17  that are in here.

18                   MS. MAJOR:  But these are all of the applicant's

19  admissions within this single reference, so, you know, to

20  Your Honor's point, one of the cases we cited talks about

21  how two different figures in a patent were qualified as a

22  reference on which the challenger relied.

23                   So, you know, we've cited some examples of

24  where --

25                   THE COURT:  Two different figures --

1          MS. MAJOR:  In the same patent.

2          THE COURT:  Constitute one prior art?

3          MS. MAJOR:  Were considered as part of the

4    invalidating combinations.  They were treated together as a

5    single reference, yes.

6          THE COURT:  And was the reference the patent?

7          MS. MAJOR:  I believe it was, Your Honor.  Yes.

8    That was admitted prior art, the patentee's own figures in

9    the challenged patent.

10         THE COURT:  All right.  Let's talk about what

11   about the product's prior art?

12         MS. MAJOR:  So as we've explained in our

13   submission, Your Honor, what we have pointed to is a product

14   family.  There are two categories here.  I will address the

15   Intel product prior art first.

16         So we've identified by product family product

17   prior art that forms the basis for invalidating the claims

18   of the asserted patents.  We've treated these as plaintiff

19   has, as a family, because that is how they are commonly

20   regarded.  They are based on the same architecture, the same

21   RTL descriptions.  It's all a product family, and that is

22   why in our disclosure we identified it as such.  We had

23   identified it as such in our invalidity contentions, and

24   there was never some issue, some question raised by VLSI

25   that this was somehow multiplying the references that we

1    were relying on.

2                    What we have done is identified a product family

3    that serves as a basis for invalidating the asserted

4    patents.   And we've cited two cases, Your Honor, where

5    courts have in the context of -- one of the cases in the

6    context where the challenger was counting for purposes of

7    how many references they could rely on where the Court

8    came out and agreed that like references are treated as

9    a group.   So if you have a product that's on sale and

10   serves as invalidating prior art and you have articles

11   about that product, that is all one piece of product, or

12   one piece of prior art.   That's what the Court said in the

13   case cited.

14                   Similarly, we've cited another case where

15   likewise versions of the same product were treated as one

16   piece of prior art for purposes of challenging the claims of

17   the asserted patents.

18                   THE COURT:  So is it okay for VLSI to identify

19   products then in the same manner in which you are

20   identifying them?

21                   MS. MAJOR:  They have identified them.

22                   THE COURT:  I know they have.  You don't object

23   to that?

24                   MS. MAJOR:  We have not objected.  We've been

25   providing discovery relating to the entire family, not

1    because we say there's some deficiency in their naming of a

2    product-by-product family basis.

3                    THE COURT:  Okay.  And then the Cadence art?

4                    MS. MAJOR:  The Cadence art, as we explained in

5    our submission, Your Honor, we did not have Cadence's

6    complete document production.  They're a third party.

7                    After we received VLSI's infringement

8    contentions and understood their theories relating to that

9    patent, we subpoenaed Cadence at the time of our claim, or

10   prior art narrowing submission.  We have not yet received

11   their complete document production.  We've since done that

12   and we've identified for VLSI the specific Cadence art that

13   we will rely on.

14                   Our intention was never to rely on anything

15   under the sun as VLSI has suggested.  It was merely a

16   situation where the third party had the information and we

17   were merely waiting to obtain that information from the

18   third party.  We've now disclosed that Friday.  We provided

19   a claim chart that corresponds to that prior art, the

20   Cadence encounter, and certain claims of the patent.

21                   THE COURT:  Okay.  I'm striking the admitted

22   prior art for sure.

23                   MS. MAJOR:  Your Honor, may we request some

24   supplemental briefing on that?

25                   THE COURT:  No, you can't.  We have to move

1    these cases.

2              Maybe you really left here thinking you were

3    going to cite admitted prior art.  I think it was very clear

4    to me, it was very clear to plaintiff.  I would have thought

5    it was very clear to everybody in the room that that meant

6    individual references.  To the extent a patent relies on

7    references, you can't just cite a paragraph in the patent

8    and say that that somehow counts, so I'm striking those.

9              I will hear from plaintiffs on the Cadence art

10   and the accused products for prior art.

11             MR. ABERNETHY:  Thank you, Your Honor.

12             THE COURT:  So why isn't what's good for the

13   goose good for the gander?  You cite the products.  They

14   rely on them.  It makes sense to me.

15             MR. ABERNETHY:  So, Your Honor, the Court's

16   order was for the plaintiff to narrow its asserted claims,

17   for the defendant to narrow its combination of prior art.

18   They were limited to 80 combinations of prior art.  What

19   they are trying to analogize that to is the plaintiff's

20   identification of accused products of which there is no

21   limit in this case.

22             When we identify a product category like

23   skylights, for example, we are, in fact, identifying many,

24   many different processors, but that has nothing to do with

25   what we're talking about here.  The ordered case narrowing

 1   was for plaintiff to narrow its asserted claims by a date

 2   certain to 25 claims.  We did that by April 25th.  We did

 3   not use placeholders.  We identified the 25 exact claims we

 4   were narrowing it to.

 5             THE COURT:  And that just seems to me

 6   irrelevant.  The point is you feel comfortable enough

 7   identifying products in the same manner that they are

 8   identifying product prior art.  So I mean, it seems to me

 9   comparable.

10             Do you know any cases they cite in support of

11   their position?

12             MR. ABERNETHY:  The cases they cite in support

13   of their position are simply saying it's not prior art.  It

14   is not concerned with the issues that we are presently

15   concerned with, which is counting the number of

16   combinations.

17             THE COURT:  But they refer to it as prior art.

18   Right?

19             MR. ABERNETHY:  Well, I can refer to the whole

20   family as prior art because it is a family of many, many

21   prior art processors.  So, for example, could I please pull

22   up slide 7.

23             So here is one example.  In their disclosure

24   of 80 purported prior art combinations, one purchase

25   reported reference is the Nehalem processor or processor

1    family.

2            Now, in Intel's invalidity contentions, as you

3    see at the bottom, they identify this once, Intel's

4    processor.  That's the only prior identification of this

5    category of prior art VLSI had prior to Intel's Court

6    ordered May 10th of 80 components.

7            Now, what is the Nehalem?  The Nehalem is a

8    family of 186 processors across 11 Intel sub-families.  They

9    are listed here.

10            If I may approach, Your Honor, we went to

11    Intel's website and printed out all of the processors that

12    are implicated by their five categories of prior art.  They

13    span, as you see here, XP all the way to the Intel Nehalem.

14    And by citing this four times, they preserved their ability,

15    or attempted to preserve their ability to later select from

16    this set of 186 different processors to fill that

17    placeholder, which should have been a specific combination

18    of the 80 ordered combinations Your Honor ordered.  And

19    this goes to the same for the rest of the families they

20    cite.  They're paring 150 processors across four

21    sub-families.

22            The Pentium M, Intel itself admits that it

23    includes multiple sub-families.  Within their disclosure of

24    80 prior art combinations, they identified the Dothan and

25    Banias sub-families separately for the '552 patent.  Those

1    are both sub-families of the Pentium M.

2              THE COURT:  So where do things stand now in

3    terms of you've identified an accused product?

4              MR. ABERNETHY:  Yes.

5              THE COURT:  All right.  And then isn't the whole

6    system set up, if you identify an accused product, then you

7    identify your contention.  Then they look at both the

8    product and your infringement contentions and they decide

9    what claims to press forward with.

10             MR. ABERNETHY:  So we are the plaintiff, so we

11   are bringing the claims.

12             THE COURT:  Right.

13             MR. ABERNETHY:  And we are asserting 25 asserted

14   claims as Your Honor ordered.

15             THE COURT:  Right.

16             MR. ABERNETHY:  Before the order, we asserted

17   82.

18             THE COURT:  I've got it.

19             MR. ABERNETHY:  We narrowed down to 25 as you

20   ordered.  We still have many accused products that go across

21   Intel's product line, but that's not what the Court ordered,

22   and I'm aware of no case in which a Court has made them

23   narrow their case to --

24             THE COURT:  That's not my point.  On their side,

25   they have to decide invalidity based on really two things.

```
 1    Right?  One is your infringement contentions, or, sorry,

 2    your claim, the identified claim that you are going to go

 3    forward with in your infringement claim.  They look at

 4    those, right.  And then don't they also consider what the

 5    products are that you're accusing?

 6              MR. ABERNETHY:  For invalidity, the claims are

 7    compared against the prior art.  For infringement, the

 8    claims are compared against the accused products.  Two

 9    separate analyses.

10              THE COURT:  Two separate.  There's not going to

11    be any overlap whatsoever?

12              MR. ABERNETHY:  No.

13              THE COURT:  Okay.  All right.  What about the

14    Cadence prior art?

15              MR. ABERNETHY:  The Cadence prior art, Your

16    Honor, was a pure placeholder.  We had no identification of

17    anything from Cadence prior to just a few days, June 13,

18    2019, when Intel for the very first time identified --

19              THE COURT:  Right.  Is it moot now?

20              MR. ABERNETHY:  No.  Definitely not, Your

21    Honor.

22              THE COURT:  Okay.  Explain why.

23              MR. ABERNETHY:  Intel argued very candidly that

24    the Court ordered narrowing of the case was needed before

25    claim construction began.  The Court ordered narrowing.  The
```

 1    plaintiff has narrowed the asserted claims by April 26.

 2    Defendant then had to narrow its asserted prior art

 3    combinations to 80 by May 10th.

 4              Our, VLSI's, opening claim construction brief

 5    was due May 31st, so we have not received a reciprocal

 6    benefit that Intel did.  We complied with the Court's order.

 7    We narrowed the 25 asserted claims.  They didn't receive

 8    that benefit in taking a claim construction position and

 9    working on the claim construction brief it is about to file

10    or to serve.

11              Intel then turned around and violated the

12    Court's order.  Denied VLSI the reciprocal benefit.  We had

13    to proceed to serve sour first opening claim construction

14    brief without the benefit of 80 specific prior art

15    combinations, as the Court ordered.  In fact, thousands were

16    maintained.  Just the cited prior art from their own

17    processors amount to over 2400 combinations.

18              And the Cadence prior art was explicitly left

19    open to be something that Cadence could produce in the

20    future that could be in theory anything.  Any document

21    Cadence could have produced to Intel, they could have cited

22    on June 13th and say, well, there's the Cadence prior art

23    that we identified, or in fact, did not identify back on

24    May 10th.

25              So what is happening here is Intel has violated

1    the Court's order and obtained an improper strategic

2    advantage in claim construction proceedings, and so it can't

3    be delayed.  They were ordered to identify the 80

4    combinations by May 10th.

5              THE COURT:  What if I gave you a chance to

6    supplement your claim?

7              MR. ABERNETHY:  I'm sorry?

8              THE COURT:  What if I gave you a chance to add

9    claims.

10             MR. ABERNETHY:  Well, we do have a chance to add

11   claims as the Court ordered to show cause and for due

12   process in.  Are you suggesting something else?

13             THE COURT:  I'm just wondering, you know, if

14   that's the way to overcome any prejudice you have by the

15   late identification of --

16             MR. ABERNETHY:  I don't believe so, Your Honor,

17   because if you recall, when the parties served their joint

18   claim construction chart, we identified the same claim terms

19   for construction that we have now gone forth and briefed

20   after our narrowing.  So we narrowed from 82 asserted

21   claims and did not change the claim construction issues as

22   all.

23             So we would ask, Your Honor, for the relief

24   here, to strike the combinations from their May 10th

25   disclosure that condition comply.  That's all the

```
 1    combinations that have the identification of an entire prior
 2    processing family that identify the placeholder of admitted
 3    art and all combinations that identify Cadence's prior art
 4    as the placeholder.  And then we ask that you limit Intel to
 5    relying on only the combined disclosures from the May 10th
 6    identification of prior art going forward.
 7                THE COURT:  All right.  Anything else?
 8                MR. ABERNETHY:  No, Your Honor.
 9                THE COURT:  All right.
10                MS. MAJOR:  May I respond?
11                THE COURT:  Yes.
12                MS. MAJOR:  So with regard to one point,
13    Mr. Abernethy keeps referring to some advantage that Intel
14    is currently seeking.
15                THE COURT:  You can come to the podium.
16                MS. MAJOR:  So Mr. Abernethy keeps referring to
17    some supposed advantage that Intel received because of the
18    way that we disclosed the prior art.  I have not heard him
19    articulate what that advantage supposedly is.  The fact of
20    the matter is the claim narrowing helped focus the parties
21    for claim construction in terms of what claim terms existed
22    in the claims that VLSI selected to continue moving forward
23    with.  I'm not sure how and what VLSI is now pointing to
24    somehow paused.  They have not articulated a specific kind
25    of prejudice.
```

1          One other point, Your Honor, is just that if

2    there is some increased level of specificity that's

3    required, we're amenable to doing that, but we were merely

4    disclosing what we understood everybody understood product

5    families to be, one thing.

6          And in the case of, for instance, Mr. Abernethy

7    mentioned Dothan and Banias with respect to the '552 patent.

8    It is the case that the Dothan prior art product invalidates

9    the '552 patent.  That's our position.  So to treat it as

10   some greater class of references is just simply not the

11   way any Court that we're aware of has listed those.

12   Certainly not the way the parties have been talking about

13   the things.

14          And what we see VLSI doing here is trying to

15   gain some strategic advantage by pointing to a technicality

16   regarding the facts fact that Intel utilizes different model

17   numbers for what are essentially the same product with

18   differences at the margin.

19          So just to reiterate, prior to this first

20   challenge that VLSI raised, we're not aware of there being

21   any basis for someone to interpret Banias or Dothan as

22   multiple families.  And with respect to Mr. Abernethy's

23   mention that in our disclosure we referred to the Pentium

24   family without specifying one of the two sub-families that

25   are included in that family, we have clarified that in our

1    submission.  Banias was the only family identified in our

2    contentions with respect to the '027 patent.  That remains

3    in the case, and hopefully we'll clarify any ambiguity on

4    that point.

5            So with respect to the Cadence prior art, again,

6    the only reason for our inability to specify the particular

7    Cadence art at the time was that we were still waiting to

8    obtain access to the documents produced by Cadence.  As

9    consistent with other third-party productions we've received

10    in this case, we've provided those documents to VLSI and we

11    think we mooted the particular issue by disclosing to VLSI

12    the particular Cadence product that will serve the basis for

13    any invalidity positioning going forward for those

14    combinations.

15            So, Your Honor, simply we think that we complied

16    with the2Court's order.  It was every intention to comply

17    with the Court's order, but if in Your Honor's view more

18    specificity is required, we're certainly amenable to doing

19    that if necessary, but we think everyone, VLSI and Intel,

20    have typically treated these product families as one class.

21            And -- go ahead.

22            THE COURT:  Let me hear from Mr. Abernethy.

23            So you're claiming prejudice because of the

24    Markman briefing.  Is that right?

25            MR. ABERNETHY:  If I may address one predicate

1    issue.  There are a few things she said, Your Honor.

2              She said that Intel had never identified them

3    separately.  That is false.  They identified him separately

4    both in their May 10th disclosure as you see here.  They

5    identified Dothan and Banias as separate purported

6    references.  That is our May 10th disclosure.  It goes back

7    further.  This is their invalidity contention.  March 6,

8    2019, where they live.  Pentium M and Dothan.

9              THE COURT:  I thought she said that.

10             MR. ABERNETHY:  Sorry?

11             THE COURT:  I thought she said that.

12             MR. ABERNETHY:  No.  She said Intel has never

13   listed them separately or separated them separately.  They

14   did in their own contentions.

15             Now, in a letter brief they tried to run it

16   back.  They say, Intel elected to include Banias.  Those are

17   the only products on rely.  That is a modification of their

18   May 10th identification that they tried to do in a footnote

19   in their letter briefing.

20             They did the same thing again for the Pentium 4,

21   where in same footnote they say, they elected to include

22   Prescott in its reference opinion 4.  So those are the only

23   product on which Intel relied.  But the Pentium 4 family

24   includes sub-families Northwood, Gallatin, Prescott, Cedar

25   Mill.  155 processors.

1           And Intel found, different enough, to give them

2  different sub-family names and categorize differently and

3  give them brand names like Xeon or Celeron or Core.  So this

4  is as far from the identification of a single processor as

5  you can get.

6           And, Your Honor, if I may approach, I would

7  like you to see the printout from their website of the full

8  list.

9           THE COURT:  Yes.  I mean, my problem here is

10 I've heard folks back in a patent case this morning refer to

11 product prior art, so that is something I'm familiar with,

12 although not intimately.  So I'm willing to give them the

13 benefit of the doubt.  The question is, how do we solve it

14 so you're not prejudiced, which goes to my point.  What's

15 your prejudice?

16          MR. ABERNETHY:  Prejudice, Your Honor, is in the

17 timing that Intel argued for.  Intel argued.  And, in fact,

18 can I get slide number 4, please.

19          So in two different hearings before Your Honor,

20 Intel argued that case narrowing was needed prior to the

21 Markman briefing, before we start the claim construction

22 process.  Intel said that both parties and potentially the

23 Court would benefit from making decisions about Markman

24 issues.

25          See, the issue is that when you are viewing

1    prior art in a patent case, you need to consider it when

2    you're taking your claim construction positions and making

3    your claim construction arguments.  That is obviously a much

4    more difficult thing to do if you have thousands and

5    thousands and thousands of possible combinations and

6    references in play than if you had eight.

7            And Intel argued that this narrowing was needed

8    for both parties.  So they would get the benefit of

9    narrowing the 25 asserted claims.  We would get the benefit

10   of narrowing 80 prior art combinations.  We did so. They did

11   not.  May 10th, they kept thousand and thousands, an

12   unbounded set of combinations alive because they could

13   choose from any of the hundreds of different processors and

14   any of the five families they identified.  They could choose

15   from any of the prior art cited in the intrinsic record.

16   They can choose from anything that Cadence later produced,

17   and as a result, we did not get the benefit of having

18   specific 80 prior art combinations identified for us, but

19   we're working on our May 31st claim construction brief.

20           Can I get slide 20, please?

21           Now, Intel, they did get the benefit.  Their

22   opening Markman brief is due on June 22nd.  They had the

23   benefit of considering our 25 asserted claims.  We did not

24   identify 12 asserted claims and then a bunch of plaintiffs'

25   lawyers saying, you know what?  We'll tell you when you can

1    file your claim construction brief.  That's what they did.

2            So, Your Honor, we ask that you strike their

3    combinations that did not comply from their May 10th hearing

4    or their May 10th disclosure and limit them to the complying

5    combinations going forward.

6            THE COURT:  All right.  I'm going to strike the

7    admitted prior art.  I'm going to deny the application with

8    respect to striking the other prior art references.

9            And --

10           MR. ABERNETHY:  If I may ask, Your Honor, for

11   the Intel products that they've identified, so the Nehalem,

12   Penryn.  In fact, can I get slide 6, please.  This is all

13   within their knowledge.

14           THE COURT:  I didn't finish telling you what I

15   was going to do.

16           MR. ABERNETHY:  Okay.

17           THE COURT:  But go ahead.

18           MR. ABERNETHY:  I can wait.

19           THE COURT:  What I was going to say, I think

20   they have to identify with more specificity something within

21   the product's prior art, and I was going to ask both parties

22   to -- I think actually Intel has already volunteered, to

23   some extent, to do something along those lines.  So how do

24   we accomplish that?

25           MR. ABERNETHY:  So, Your Honor, what I was

```
 1   actually going to propose, which could go some of the way

 2   but not all of the way towards addressing the prejudice, is

 3   if you allow VLSI to pick which specific processor in these

 4   categories Intel needs to rely on.  Presumably, they

 5   shouldn't care because everything in those categories is the

 6   same from their perspective.  Right?  So VLSI should get to

 7   pick.

 8                THE COURT:  All right.  Let me hear from Intel.

 9                MS. MAJOR:  Your Honor, we disagree with that

10   proposal.

11                THE COURT:  What's your proposal?

12                MS. MAJOR:  We're amenable to talk about a date

13   by which we can provide more specificity.  I will reiterate

14   that still VLSI does not identify what the prejudice is as

15   between us relying on one model number or another.

16                THE COURT:  Well, you know, I think in fairness

17   to them, the problem is, you know, what do you want them to

18   do?  Concede that, oh, I wish I had picked another claim as

19   opposed to this claim or another term as opposed to this

20   term?  You know, but I mean, the reason why you all want

21   narrowing is to inform your selections of terms for

22   construction.

23                So I mean it's a little bit unfair to require

24   them now to come forward and basically say, oh, this is our

25   weak term.  Right?  I mean, what do I do?  Right?  That's
```

1    why we set these rules in place up front and that's why, you

2    know, I'm not saying on the record that you all on the Intel

3    side possess the subjective intent, if you will, to

4    disregard the order, but I have to do to the best of my

5    ability, with the best of my ability to assess what is

6    fair.  And I left this courtroom with an understanding

7    that's consistent with the plaintiffs, that you were not

8    going to cite admitted prior art that would basically be

9    passages from a patent from which everybody is supposed to

10   deduce or determine what are all the various prior art

11   combinations.

12            And I actually, in fairness again to the

13   plaintiff, I think my order and the reduction could be

14   construed pretty fairly as favoring Intel.  Certainly, the

15   plaintiff didn't want any narrowing of the case.  So we are

16   where we are.  I've already ruled.  I'm going to strike the

17   admitted prior art references.

18            What's the alternative that you want to put

19   forward as opposed to me just striking forever the product

20   prior art references?

21            MS. MAJOR:  And, Your Honor, I will come to that

22   in just a minute, but just to clarify, because I don't want

23   there to be any perception that there was ill intent on

24   Intel's part.  It certainly was not.

25            THE COURT:  I just said, I'm not making that

1    determination.  I am just saying I step back and I look.  I

2    think it's pretty clear.  You know, we don't need to go

3    there.

4              MS. MAJOR:  Okay.

5              THE COURT:  It is what it is now.

6              MS. MAJOR:  Yes.  But --

7              THE COURT:  I did not expect I would be back

8    revisiting this issue about all these permutations that

9    exist out there because of the manner in which you are now

10   characterizing a prior art reference, singular.

11             MS. MAJOR:  Just to be clear though, with

12   respect to the admitted prior art, and I understand your

13   ruling, I just want to be clear.  We are not and never were

14   trying to bring in what is identified, the other references

15   that are mentioned in this patent.  We were merely relying

16   on the portions of the patent itself, not so that we could

17   harken back to the '628 patent that's mentioned in here.

18             So just to be clear, this was not a way to bring

19   in permutations of references that happened to be mentioned

20   here.  Here, we were merely trying to adduce the applicant's

21   own words stated in the patent.  So I just wanted that to be

22   clear.  So not any of the references that happen to be

23   mentioned there.  Those are not part of our admitted prior

24   art.  This is merely the applicant's own characterization.

25             THE COURT:  So won't that factor into the

1    analysis anyway?

2              MS. MAJOR:  Well, Your Honor, it could, and I'm

3    sure it may well still play in if the inventor takes the

4    stand, for instance.  But in the framework of narrowing the

5    asserted claims and the combinations, we thought it was fair

6    to disclose that we intend to rely on the patentee's own

7    words as part of why we think the claims are invalid.

8              So, you know, maybe how it's played out, our own

9    disclosure of the patentee's own words as kind of admissions

10   of what existed in the prior art, maybe it ended up putting

11   us in a worse off position given Your Honor's ruling, but

12   that was our -- our intention was really to point to the

13   words in the patent, not to any of the references so that we

14   might go during the trial to the '628 patent that happens to

15   be mentioned here and cite some other passage from that

16   patent.

17             THE COURT:  Okay.  Well, I will say that's a

18   little bit different than I had understood.  I thought you

19   were effectively bootstrapping --

20             MS. MAJOR:  No.

21             THE COURT:  -- in all the art that's implicit in

22   the statement in the paragraphs that you've highlighted.

23             MS. MAJOR:  No, not at all.  Just specific

24   quotes from the specification, not the references that might

25   be mentioned.

```
 1                    THE COURT:  Well, that becomes the same.  Well,

 2   anyway --

 3                    MS. MAJOR:  I just want to be clear.

 4                    THE COURT:  That's not what I understood would

 5   be a prior art reference.

 6                    MS. MAJOR:  With respect to the product prior

 7   art, if Your Honor, with additional guidance, wants us to

 8   provide more specificity, then we're amenable to doing that.

 9   I think perhaps we could just work out a date certain to do

10   that among ourselves.

11                    THE COURT:  I guess they have to figure out how

12   you're going to do it though.

13                    MS. MAJOR:  Well, that would be --

14                    THE COURT:  I don't want this to come back.  I

15   mean, I thought we were done with combinations and now I'm

16   revisiting the issue.  I don't want to revisit it.

17                    MS. MAJOR:  In our view, there's no need to

18   revisit it because our disclosure is clear, but we are happy

19   to --

20                    THE COURT:  Well, wait a minute.  That's why

21   we're here.  You're saying the disclosure is clear.  They

22   are saying it's not.

23                    MS. MAJOR:  Well, in our view it was, and that's

24   why --

25                    THE COURT:  So they are supposed to figure out
```

1    the 774 references within the Pentium product family?  I

2    mean, how do you do that?

3                MS. MAJOR:  Yes.  Well, I think that's a

4    mischaracterization of what we have identified.  We've

5    identified one product family that will serve as a basis for

6    the invalidating combination.  As I've said, they all go

7    hand in hand.  They are all based on the same architecture

8    and RTL, design layouts.

9                In our view, it's one family, one product, but

10   if you want us to be more specific, we can be more specific,

11   I suppose, and if a model number is what you have in mind.

12   I don't know what is going to satisfy VLSI, but we certainly

13   don't want there to be any clarity.  We don't want to take

14   up Your Honor's time with these issues.

15               THE COURT:  So, help me out with this.  So

16   you've got an invalidity witness on the stand, and that

17   person, he is going to say I think this patent is invalid

18   because it's obvious.  It would have been obvious to

19   anybody, a POSITA, because of three references.  Right?

20   They cite three references.

21               Now, they can go beyond those three references.

22   Don't they have to in the sense that -- I mean, at some

23   level there has to be knowledge within the art that may not

24   be literally or explicitly addressed in those three prior

25   art references, but that would be known to any POSITA and

1    that would inform an obviousness analysis.  Correct?

2              MS. MAJOR:  Correct.

3              THE COURT:  Which is why I'm getting at this.

4    There's stuff within the admitted prior art that would come

5    in I think even though it's not cited as a reference.

6              MS. MAJOR:  Yes.

7              THE COURT:  So to put it in the Joe six-pack

8    terms, which is probably as good as I get.  I'm a molecular

9    biologist on the stand talking about three prior art

10   references, but she needs to talk about what a cell is or

11   what an atom is, that's not discussed in the three prior art

12   references, but it's known to every POSITA.  She gets to

13   talk about that and gets to inform the decision about

14   obviousness.  Correct?

15             MS. MAJOR:  Generally, yes.  Something at the

16   level of a cell that -- yes.

17             THE COURT:  Well, at some level.  Right.

18             MS. MAJOR:  Yes.

19             THE COURT:  All right.  So then let's talk about

20   in terms of product.

21             MS. MAJOR:  Yes.

22             THE COURT:  I mean --

23             MS. MAJOR:  So here is maybe the way to

24   illustrate this.  What VLSI will point to for its

25   infringement case, for instance, for the '502 patent, which

1    has to do with whether there are dummy metal lines inserted

2    into a chip to provide support under the area where the chip

3    is connected to some external device, like a memory.

4             What they will point to for their infringement

5    evidence is design lay out files, design rules.  Those

6    layout files and design rules apply not to a single model

7    number of an Intel product, but to the products in that

8    family, and VLSI is not going to put on evidence for every

9    model number in the family of why these infringe.  They'll

10   point to their expert's analysis of those design rules and

11   lay out files, and that is how, you know, that's how these

12   cases go.

13            There's one body of code or layout files or

14   design rules that accompany a given family.  And so what we

15   would do on the product prior art side of that is point to

16   similar technical documents that show that the infringement

17   read VLSI is making would have potentially covered the prior

18   art Intel products that Intel was already doing.  And,

19   again, what we would point to as the evidence is the layout

20   files and design rules that coincide with, yes, multiple

21   model numbers, but they are all part of the same family.

22            THE COURT:  Okay.  So you can identify -- but

23   the family is something smaller than --

24            MS. MAJOR:  Which we clarified in our brief,

25   Pentium and Banias.

1            THE COURT:  You will leave here and identify the

2       family.

3            MS. MAJOR:  And we've done that, Your Honor.

4       Hopefully, there's no confusion about Pentium and Banias is

5       what we're relying on for the '027 patent.  Pentium Prescott

6       is what we're relying on for the '026 patent.  For the

7       others, I think we were already abundantly clear that in the

8       disclosure, Banias is one family, and that's among the

9       disclosed combinations.  Dothan is another family.

10           THE COURT:  Okay.  All right.  So what I'm going

11      to do as far as this first application --

12           MR. ABERNETHY:  Your Honor, if I may be heard

13      one more time to correct the record.

14           THE COURT:  You can be heard briefly.

15           MR. ABERNETHY:  Slide 17, please.

16           So, Your Honor, Intel's counsel just stood

17      before you and said that Intel has not previously relied

18      upon the cited art of record for the '331 patent as prior

19      art.  That is demonstrably false.

20           THE COURT:  Please, slow down.  What did she

21      say?

22           MR. ABERNETHY:  She said that for the admitted

23      prior art, Intel has always only relied upon statements in

24      the patents, not prior art cited of record, and that is

25      false.

1          In their invalidity contentions, March 6th,

2   2019, Intel expressly relied upon all documents cited on the

3   face of the patent and in the file histories and

4   applications.

5          THE COURT:  Okay.

6          MR. ABERNETHY:  Intel then cited a specific

7   example of admitted prior art citing one such reference.

8          THE COURT:  All right.

9          MR. ABERNETHY:  And it wasn't until June 13th in

10  an e-mail, the day we filed this motion, that Intel changed

11  its position and said, we are no longer going to rely upon

12  the art cited of record, but Intel definitely did not do so

13  by May 10th as the Court ordered.

14         THE COURT:  I would be interested in what Intel

15  said about that.

16         MS. MAJOR:  Yes, Your Honor.  I think in our

17  May, I'm sorry, our March 6th contentions, we've included

18  reservation-of-rights-type language.  That has nothing to do

19  with the disclosures, the prior art combinations that we

20  narrowed to on May 10th.  We certainly didn't include

21  language to that effect in our May 10th selection of prior

22  art combinations.

23         With regard to the second item highlighted on

24  the slide, part of the passage that we cite in the '331

25  patent doesn't refer to the '628 patent, but as we told VLSI

1    on a meet and confer a week before the filing of these

2    briefs, we did not intend to rely on that patent, and we

3    clarified that in writing after we received a letter stating

4    that we had said otherwise.

5                So we're not relying -- we've been very clear

6    that we are not relying on the '628 patent.

7                THE COURT:  All right.  Well, I'm striking the

8    admitted prior art.

9                MR. ABERNETHY:  And -- sorry.

10               THE COURT:  Yes?

11               MR. ABERNETHY:  For the Intel product, I guess

12   slide 7, please.

13               THE COURT:  Okay.  So now Intel has confirmed

14   beyond any doubt that they've limited the product prior art

15   to the families that they've identified.  Right?

16               MR. ABERNETHY:  So I'm not sure what family

17   those are that's in here today, but I do know that on

18   May 10th, Intel identified Nehalem.  Nehalem is 186

19   processors across 11 sub-families.  They expand from

20   their commercial names, from Intel Xenon, Intel Celeron, the

21   Core.

22               THE COURT:  Right.  See, this is where we get

23   into -- I mean, what do you want to have?  Do you want a

24   product number?  What do you want?

25               MR. ABERNETHY:  I would like the combination

 1    stricken because as of May 10th, they preserved --

 2              THE COURT:  I'm not going to strike the

 3    combination, so you lost that battle.  Let's talk about

 4    moving forward in a productive way.  What do you want?

 5    Right?  I mean, I get the point, families.  I mean, how are

 6    you prejudiced by you know the family?

 7              MR. ABERNETHY:  Well, we did not know the family

 8    when we filed --

 9              THE COURT:  You do now.  Right?  You do now.

10              MR. ABERNETHY:  Now, I don't believe so.  I

11    would have to go look at the invalidity contentions I think

12    they just served a day ago.  If it references to a

13    particular family, I don't know as I stand here today.  The

14    point is, Your Honor, it's not just a family.  You need to

15    identify a specific processor and they needed to have done

16    so on May 10th.  The alternative would be to allow VLSI pick

17    a processor from the family that they identified on

18    May 10th.  There's no dispute that on May 10th they

19    identified all of them.

20              THE COURT:  I'm not in the position to know the

21    difference between a processor and a family unit.

22              MR. ABERNETHY:  Would you like to see the list?

23    I have them all listed right here, saying VLSI should pick

24    from this list.

25              THE COURT:  You can show me and it would educate

1    me as to what the differences are and how the difference

2    matters.

3                    MR. ABERNETHY:  Well, presumably, if Intel is

4    being truthful and if it does matter, then they won't care

5    to have VLSI pick one.

6                    THE COURT:  Pick one of what?

7                    MR. ABERNETHY:  So, for instance, they

8    identified Nehalem in their May 10th combinations.  In these

9    combinations for the '027 patent, they identified four

10   combinations.  What I'm suggesting, Your Honor, is to allow

11   VLSI to pick the single processor from the 186 processors

12   that fall in the Nehalem family.

13                   THE COURT:  So you used Nehalem to modify both

14   family and processor.  This is what I'm kind of saying.  I'm

15   not sure what the difference is.

16                   MR. ABERNETHY:  So the Nehalem family consists

17   of 11 sub-families.  We have them listed here.  May I

18   approach?

19                   THE COURT:  Sure.

20                   MR. ABERNETHY:  This is more clear in this

21   document.

22                   So this was gathered from Intel's website.  This

23   is the full list of processors, their families, and their

24   sub-families as you see listed on the screen.

25                   So Nehalem, this is of 186 processors across 11

```
 1      sub-families you see here, Jasper Forest, Bloomfeld,

 2      Linfield, Clark's Field, Westmere, Gulltown, Parkdale.

 3      Within those sub-families you have different specific

 4      processors.  And what Intel has done is they've pointed to a

 5      very large top end microarchitecture, which is a generation

 6      of processors, many of which differ, differ enough such that

 7      Intel gave them different category, subcategory names and

 8      then also gave them different brand names and market them

 9      under Xeon, under Celeron, under Core i7, and Core i5, et

10      cetera.

11                  So it's our view these are different processors,

12      but if Intel believes they're all the same processor, then

13      they shouldn't care that VLSI gets to pick the one

14      processor, that placeholder in their 80 combinations from

15      May 10th.

16                  THE COURT:  When you say picks a processor, so

17      what are you picking?  The e5506 or are you picking the

18      Nehalem EP?

19                  MR. ABERNETHY:  So it would be one of the 186

20      processors you see listed on this document.

21                  THE COURT:  Which is basically a single product.

22                  MR. ABERNETHY:  Correct.  That is the point.  A

23      single product is a single prior art product.  They identify

24      186 prior art products and gave themselves the option to

25      select later after the Court's May 10th order, after VLSI
```

1    served its claim construction brief.

2              We've been prejudiced as a result, and this is

3    the minimal thing the Court could do to start.  It takes the

4    selection.  They should have never preserved the right to

5    select what reference would fill a placeholder in one of the

6    80 ordered combinations.  An equivalent would be VLSI had

7    identified rather than these specific 25 claims we see

8    listed, if we had put an X and a Y and a Z and said, you

9    know what, we'll tell you after you file your first claim

10   construction brief.  Then you will have clarity, but by

11   then, the cat is out of the bag.  The timing here mattered.

12             THE COURT:  You have identified Nehalem.

13   Correct?

14             MS. MAJOR:  Correct.

15             THE COURT:  Which consists of 186 different

16   processor.

17             MS. MAJOR:  Well, Your Honor, just to be clear,

18   I'm not sure that VLSI has the numbers cut the right way.

19             THE COURT:  All right.

20             MS. MAJOR:  It's admittedly confusing how Intel

21   uses different terms for marketing names as well as

22   architectural names versus other branding names.  It's not a

23   clear, clear thing.  So I don't agree that we've identified

24   the exact number of products that VLSI has suggested.

25             In any event, putting go that to the side, VLSI

```
 1    should not be entitled to essentially write our invalidity

 2    contentions for us, so we'll, if Your Honor orders --

 3                THE COURT:  All I'm looking for is a way to

 4    solve this.

 5                MS. MAJOR:  Yes.

 6                THE COURT:  I mean, the way I look at it is, if

 7    it were a car and you picked the Honda Accord, whether it's

 8    an EX or the DZ, it probably doesn't matter.  They probably

 9    have different product names, but we all know that they're

10    referring to the Honda Accord.  And I'm just trying,

11    completely ignorant of what this product really is, trying

12    to figure out is there a way to pick something like a Honda

13    Accord versus a Honda Accord DX.

14                MS. MAJOR:  Right.

15                THE COURT:  Versus Honda sedan.  Right?  Let's

16    get something that's workable.  Right?  And I don't know.  I

17    mean, nobody is giving me information to make an informed

18    decision what that should be.

19                MS. MAJOR:  Well, Your Honor, this is why we

20    identified it as the product family, because that's how this

21    is understood.

22                THE COURT:  Right.  So let's try to narrow it so

23    it's workable.  I'm not going to let Mr. Abernethy pick the

24    quote "Intel Xeon processor" and be done with it.  I know

25    that would make his day, but that's not going to happen, so
```

1  pick something.

2          MS. MAJOR:  Your Honor, we can identify by

3  product family name.  I mean, that is the level at which, as

4  I said, Intel talks about these things.

5          THE COURT:  When your experts comes up, how is

6  your expert going to testify about this?

7          MS. MAJOR:  Well, he or she is going to talk

8  about, here is the code that coincides with the Nehalem, and

9  here is the evidence that the Nehalem was on sale prior to

10  the relevant priority date.

11          So our expert would talk about it in terms of

12  the product family name.  But if we needed some way to move

13  forward, I would suggest --

14          THE COURT:  Well, let me ask you this:  If I

15  looked at the design, the internal documents, have they been

16  produced yet?

17          MS. MAJOR:  I believe some have and some are

18  still in the process.

19          THE COURT:  Okay.  So what would I expect to

20  find?  If I went and looked, is it going to be Nehalem

21  that's going to have it?  What are the internal documents

22  going to say?

23          MS. MAJOR:  Largely, the internal documents

24  refer to the product family name that we have, Nehalem.  And

25  there are other ways that products are mentioned in

1    documents that do talk about more specific, like the model

2    number.  And it's all kind of arbitrary in some senses

3    with a model number because it may simply mean that there

4    are, you know, for cores rather than two.  So those are

5    the types of features that are indicated by a different

6    model number.

7                THE COURT:  Okay.  And let me just ask a real

8    stupid question.  This is all internal stuff.  It is not out

9    in the public realm anyway, or is it?

10               MS. MAJOR:  No.  All the products to which we're

11   pointing were in the public.  They were on sale by Intel

12   prior to --

13               THE COURT:  It's just that they were on sale,

14   not that the design --

15               MS. MAJOR:  The design plans were not available.

16               THE COURT:  That's right.

17               MS. MAJOR:  Exactly.  But the product --

18               THE COURT:  If somebody reverse engineered it,

19   they should be able to figure this out?

20               MS. MAJOR:  Yes.

21               THE COURT:  I'm good with the family.  I'm just

22   going to require that you identify, to the extent you've not

23   already, you need to identify the family, and I will leave

24   it at that.

25               MS. MAJOR:  Thank you, Your Honor.

1          THE COURT:  I'm not going to grant relief with

2     respect to the Cadence.

3          All right.  Now, do I need to do anything more

4     or are you good with the oral ruling I have made, which I am

5     granting and denying in part your first application.  I am

6     striking the admitted prior art references, and otherwise

7     I'm denying the relief except insofar as I am requiring

8     Intel, to the extent they have not already to identify the

9     particular families for the product prior art.

10          Is my ruling clear from Intel's perspective?

11          MS. MAJOR:  It is, Your Honor.

12          THE COURT:  Is it clear from your perspective?

13          MR. ABERNETHY:  No, Your Honor.  Can I -- sorry,

14     slide number --

15          THE COURT:  Why do you need a slide number?

16     What's not clear about it?

17          MR. ABERNETHY:  So the question, Your Honor, is

18     you said you're striking the prior art references.  The

19     motion is to strike the combinations that were disclosed.

20     Intel disclosed --

21          THE COURT:  Okay.  So I'm striking the

22     combinations that have the admitted prior art.  I'm

23     otherwise denying the application except insofar as there

24     is a reference and a combination to a product prior art

25     that needs to be specified what family it is.  Are you okay

1    now?

2                    MR. ABERNETHY:  And by family, I assume you're

3    referring to the lowest family application.  So, for

4    example, Nehalem --

5                    THE COURT:  I'm referring to that --

6                    MR. ABERNETHY:  The sub-families.

7                    THE COURT:  The family as an example is Nehalem.

8                    MR. ABERNETHY:  So Nehalem is a family because

9    Nehalem consists of 186 processors and 11 sub-families.  We

10   won't know if they're pointing to Arendale or Black Tail or

11   Gull Town.

12                   THE COURT:  Correct.

13                   MR. ABERNETHY:  At a minimum, I think they would

14   need to get down --

15                   THE COURT:  Correct.  We're done with the

16   argument.  My only question is:  Are you clear?  Do you

17   understand the order?  Do I need to clarify it further?

18                   MR. ABERNETHY:  So Intel's reference to Nehalem

19   is sufficient under your order.

20                   THE COURT:  Correct.

21                   MR. ABERNEHTY:  Understood.

22                   THE COURT:  All right.  We're all clear.  Next

23   application.  We're going to have to pick up the pace.

24                   MR. ABERNETHY:  So before the Court, Your Honor,

25   is VLSI's motion to compel production of documents.

1          We have severe concerns with Intel's scope and

2    speed of its document production in this case.  Its

3    production thus far has been severely deficient and we have

4    severe concerns with Intel meeting its discovery obligations

5    within the document disclosure period.

6          This case has been pending a year now.  VLSI

7    served its first request for production almost seven months

8    ago and a series of additional requests for production

9    shortly thereafter.  They've been pending from three to

10   six-plus months overall.  And in all of that time, Intel has

11   produced only 18,645 documents in this case.

12         May I please get slide 23.

13         Now, this is off by a significant order of

14   magnitude for a case of this size with the level of

15   resources that are at stake, with the number of processors

16   and products at issue.

17         In one comparison in a recent patent case, Intel

18   v. Future Link Systems, Intel produced 606,138 documents, a

19   full 32 times, or 3,250 percent more than in this case, and

20   now the close of document production is just two months

21   away.

22         And in Intel's brief they suggest that, well,

23   the Future Link case is not worthwhile to look at as a

24   benchmark of what is a fairly equal benchmark in this case,

25   but we figured out it is a fairly equal benchmark,

1    particularly given the drastic disparity in the level of

2    document production as it occurs so far.

3            As we see on the screen and in Intel's own

4    admission, billions of dollars are at stake in the case.

5    Intel's motion they're about to argue regarding our damages

6    contentions, they talk about expecting a five billion

7    dollar-plus damages ask in this case.

8            In the Future Link case there was a significant

9    product overlap.  You see a number listed on the board, and

10   yet there's no explanation whatsoever that we have received

11   or that they've given the Court for why they produced

12   97 percent of the documents in the case.

13           Now, Intel has created just a significant

14   unmanageable number of discovery disputes, and so we can

15   only bring so many to the Court at one time.  We focused on

16   a couple global issues and a few select requests for

17   production in this hearing.

18           One of the first issues is Intel's refusal

19   to adhere to Federal Rule of Civil Procedure 34(b)(2)(B).

20   As Your Honor is likely aware, the Federal Rules were

21   amended December 1st, 2015 to add this requirement that for

22   a given request for production, the response must include

23   producing the documents by the time specified in the

24   request or another reasonable time specified in the

25   response.

1              The Advisory Committee notes says you must

2    supply both a beginning and an end date if you are going to

3    do a rolling production.  And Intel ignores this in their

4    brief.  They do not cited Rule 34 at all, nor have they

5    suggested any authority to us that they can violate it.

6              Now, Intel has said that it will do document

7    productions on a rolling basis ending August 23rd, 2019.

8    That is the Court's deadline for document production in this

9    case.

10              The problem is, is that this would deny VLSI the

11    opportunity for a production and serve meaningful followup

12    production during the fact discovery period.  Either they're

13    going to dump hundreds of thousands of documents on our

14    doorstep at the end of the discovery period in two months,

15    or they're not going to produce them at all.  Either way we

16    have a problem.

17              Now, Intel says that the close of fact discovery

18    is a reasonable time, but there's no authority that they

19    cited for that, nor does logic support that.  This timeline

20    shows when we filed our request for production, almost seven

21    months ago.  In all of this time, they've produced only

22    18,000 documents, and they are saying they cannot possibly

23    complete their production by our request, which is July 9th.

24    We've asked for July 9th, Your Honor, so that will give us

25    time to serve followup requests for production by July 24th

 1    so that they can be responded to and produced by the

 2    August 23rd document production deadline.

 3              THE COURT:  Do you dispute -- you say they

 4    produced 2.5 terabytes of technical data, which you don't

 5    mention.

 6              MR. ABERNETHY:  I assume what they're pointing

 7    to, it's the source code that is sitting on their source

 8    code review computer at Wilmer Hale's office.  Source code

 9    can be very voluminous in terms of data.

10              What we're talking about here is documents,

11    documents that were produced in the normal course with Bates

12    numbers.  That's the disparity we're seeing here.  There are

13    only 18,000 or so documents that they produced in this case.

14    If you factor in the documents they produced in the Northern

15    District of California case, which is about 44,000 and

16    they're available for cross-use here, that's still only

17    about 60,000.  That's still 90 percent less than we would

18    expect to see at this point in the litigation.

19              THE COURT:  Okay.  All right.  Anything else on

20    that issue?

21              MR. ABERNETHY:  No, Your Honor.

22              THE COURT:  All right.  Let's hear from Intel.

23              MS. MAJOR:  Your Honor, as we note, we have

24    produced quite a substantial volume of documents.  2.5

25    terabytes are a tremendous volume.  It's equated to -- one

1    terabyte is something on the order of three million

2    documents, regular documents that aren't --

3                   THE COURT:  The source code?

4                   MS. MAJOR:  It's the source code.

5                   THE COURT:  What are we going to do?  We can't

6    have a document dump at the end of August.

7                   MS. MAJOR:  Nor do we ever expect to provide

8    that, Your Honor.  As we made clear in a meet and confer

9    after a meet and confer, we are producing on a rolling

10   basis.  We have another production Friday.  And really what

11   remains to be produced is the ESI that will be reviewed and

12   produced pursuant to the default standard.

13                  We have been engaged in discussion of search

14   terms with VLSI over the last several months.  We disclosed

15   our terms in early April, April 1st to be exact.  We didn't

16   get proposed terms from VLSI until May 21st.  So there has

17   been a bit of a delay contrary to, you know, our effort to

18   get out in front of this issue, but I think the parties are

19   nearing agreement on terms, and as soon as we do, we will

20   have a better understanding of the full scope of what

21   remains to be done.

22                  And we said to VLSI, at that point in time if we

23   can't commit to some earlier document production date, we're

24   amenable to discussing.  In the meantime, even while we've

25   been discussing that terms should be used for the ESI

1    collection, we have gone ahead and started reviewing and

2    producing in accordance with the terms we were proposing.

3    So our first ESI production will be rolling out either later

4    this week or early next week.

5                We are reviewing and producing as diligently as

6    we can, and we have absolutely no intention to dump massive

7    amounts of documents at the end of discovery.  We've been

8    clear about that.

9                The respective to Mr. Abernethy's emphasis on

10   the Future Link case, it just doesn't pertain to what is

11   reasonable and necessary for the needs of this case.  That

12   was a patent that case that went on for three years,

13   involved 17 patents.

14               So we don't think that there's any particular

15   relevance to the number of documents produced there and

16   here, but if you take into account the almost 20,000

17   documents that we've produced here, the 45,000 documents

18   that we've produced in California, we're already upwards of

19   2.2 million pages of documents, which is quite a substantial

20   production in the way of documents, and we're continuing to

21   work quickly to complete our production.

22               THE COURT:  So I mean I'm a little concerned

23   with some of the timing of some of the concessions that

24   Intel has made.  As I read it, the last minute extension

25   hanging over it.  So on the other hand, you don't have

```
 1   search terms until May 21st.  That's not that long ago.  But
 2   I do think, unfortunately, I think I kind of have to have a
 3   hammer over your head.
 4              MR. GUTMAN:  Your Honor --
 5              THE COURT:  I mean, I don't know.  It should be
 6   something like, if you are going to wait until August, then
 7   you get sanctioned if there are any documents that weren't
 8   produced that are discovered in September or October,
 9   because you could have used as an excuse, well, you know,
10   we were in a rush to get stuff out.  I mean, what does it
11   take to make sure a party produces in timely fashion
12   documents?
13              MS. MAJOR:  Well, Your Honor, the document
14   production deadline in the scheduling order is, as we
15   understand it, in there for a reason, so that the parties
16   complete their document productions by that date.
17              THE COURT:  Well, wait.  I mean, it has to be
18   read in conjunction with the Federal Rules.
19              MS. MAJOR:  Of course.
20              THE COURT:  Which provides for when you serve a
21   document request, you don't say, you don't say 30 days
22   for sport.  You expect that you are going to get it
23   reasonably -- well, sometime thereafter.  You don't expect
24   it means I get it at the end of fact discovery or document
25   production.
```

1          MS. MAJOR:  Sure.

2          THE COURT:  What do you need to address that?

3          MS. MAJOR:  Your Honor, as I said, I think we

4   are nearing agreement on search terms.  We have been able to

5   provide some additional head count that I think will help

6   the parties reach agreement on terms to be applied across

7   the Intel custodians, and as I said, once we kind of

8   understand the volume of documents associated with the head

9   count, I think we can step back and assess, okay, what's a

10  realistic deadline for getting all of this out.

11          As I said, we're on pace to definitely produce

12  things in advance of the 23rd, but simply at this time,

13  without that kind of complete understanding of the scope of

14  our review, by how much, it's hard to say.

15          So I would propose that the parties continue

16  meeting and conferring on this, and we can talk about as

17  soon as we come to agreement on these terms a realistic

18  production schedule.

19          We have made dozens of productions so far in

20  this case, so this is not a situation where there's any

21  intention to hold back documents.  It's just a truism of

22  discovery today, is that the vast bulk of documents that are

23  produced in this fashion as opposed to on source code

24  computers comes in a log at VLSI, and that is the process

25  we're engaged in right now.

```
 1                THE COURT:  All right.  Where I am on this is I
 2    just think the record is cloudy.  I don't think the record
 3    supports the notion that VLSI was out there promptly
 4    responding to efforts to narrow search terms and whatnot.
 5    So I'm going to deny the application, but I don't know how
 6    to make it any clearer that if I think games are being
 7    played, I'm going to rule in the same manner I ruled on the
 8    admitted prior art.  All right?
 9                MR. ABERNETHY:  If I may be heard briefly, Your
10    Honor?
11                THE COURT:  No, next.  Next application.  And
12    for the record, no, because you've had extensive oral
13    argument.
14                MR. ABERNETHY:  Understood.
15                THE COURT:  We need to move quickly and you've
16    had extensive briefing.
17                All right.  Next issue.
18                MR. ABERNETHY:  So the next issue, Your Honor,
19    is Intel's unilateral narrowing of VLSI's definition of
20    accused products.  It appears that this is one way that
21    Intel has managed to constrain its search for responsive
22    documents.
23                Now, this is a chicken-and-the-egg problem.  In
24    our complaint we accused certain technologies of
25    infringement.  We then received a core technical document
```

1    production and served infringement contentions identifying

2    the products that we were able to tell from the disclosure

3    Intel had provided that we could chart for infringement

4    contentions.

5            Now, Intel has taken the position that accused

6    products will only mean something that VLSI has specifically

7    identified by product name and/or model number.  And in

8    subsequent correspondence, they changed this to be

9    specifically identified by family name.

10           The issue, Your Honor, is that we cannot

11   identify something as an infringing product until we receive

12   discovery on it, and they are saying they will not give us

13   discovery on the things that we have accused of

14   infringement, the features, until we are able to name the

15   products that include this.

16           Intel is a party with the best position to know

17   what products of theirs include the features that we have

18   accused of infringement.  So in our request for production,

19   we defined accused products with reference to specific

20   functionality that we defined, distributed firewall, IOSF,

21   integrated circuit packaging, et cetera.  Those definitions

22   are straightforward.  They stem from our complaint, from the

23   language of the asserted patents, and from the infringement

24   contentions.  And if Your Honor wishes, I'm happy to walk

25   through all of them in copious detail, but I don't think we

1    need to.  This is a more fundamental issue here.

2         The law simply does not allow them to withhold

3    discovery on the basis that we have not yet been able to

4    identify the name of what we are accusing of infringement.

5    That is, contrary to the broad liberal policy of discovery.

6         Something that will be missed by this.  They may

7    have products that simply have no product name because

8    they're infringing internally and we can't identify the name

9    probably until they give us the documents without it.  They

10   may have products with identical features as those we have

11   accused of infringement like IOSF or the management engine,

12   specific things they know their product has but we don't

13   because they've withheld discovery until we can identify the

14   family name of the product that includes the feature that

15   we've accused of infringement.

16        It would also mesh with various products with

17   different names.  And I think the biggest issue here, this

18   is going to go to damages discovery.  We're not going to

19   know if we have a complete picture of what products of

20   theirs have the features that we've disclosed we are

21   accusing of infringement.

22        This Court has ordered production in similar

23   situations.  So here in the Tesseara versus Sony case,

24   this Court ordered production of your product.  It's defined

25   on functionality.  Your product means your product

 1    components that contain two or more microelectronic

 2    components so far.

 3                So what we would ask, Your Honor, is that the

 4    Court order Intel to respond to our request for production

 5    using the definition of accused products we provided in our

 6    RFP.

 7                THE COURT:  Mr. Blumenfeld.

 8                MR. BLUMENFELD:  Thank you, Your Honor.  So

 9    under the scheduling order and under the default standard,

10    VLSI defined the scope of this case and they set out the

11    accused products before they ever had a single document

12    from us, and they did it, I presume, by going to our

13    website where there are data sheets for our products, and

14    that is the way you start.  You don't sue and say, I'm

15    suing you.  Now give me your documents so I can find out

16    where you are.

17                So they are the ones who picked eight

18    microprocessor families and 12 chip sets.  That's what

19    they accused, and they did that without any information from

20    us.

21                Now they want discovery, I'm not going to

22    exaggerate this, on virtually everything that Intel does.

23    And if you look, I will make this point very quickly.

24    Mr. Abernethy put up a chart saying, it's just a few

25    things.

 1                THE COURT:  I'm looking at it.  I have the same

 2   kind of reaction.  IOSF.  Is there a product made by Intel

 3   that doesn't have IOSF?

 4                MR. BLUMENFELD:  I don't know if there is or

 5   not, but if you look at Exhibit 8, pages 2 and 3.

 6                THE COURT:  Yes.  That's what I'm looking at.

 7                MR. BLUMENFELD:  They define accused products.

 8   They say, first, it's the stuff we actually accuse, that

 9   we're dealing with and we can deal were.  But then when they

10   say, all products or components that comprise, implement,

11   utilize or in any way relate to a distributed firewall, to

12   IOSF, to integrated circuit packaging, to integrated circuit

13   power management, and then they cited products that are

14   defined or identified hereinafter.  All products or

15   components based on the same architecture as any of the

16   foregoing products or components, and then it gets a little

17   worse on the next page because they start defining.

18                And I won't go through all the definitions they

19   have, but one that struck me when I was looking go at this

20   in paragraph 8, integrated circuit packaging means any

21   mechanism for providing structural support for bond path

22   reasons in an integrated circuit, including, but not limited

23   to, the use of enforcing metal lines.

24                These chips are put into computers or other

25   electronics devices and they're bonded, and that has nothing

1    to do with the accused products.  That's like everything

2    Intel does, there are chips that are floating out there as

3    part of the technology.  And then it gets a little worse in

4    paragraph 10 where they say relating to, and they go through

5    a bunch of definitions.  And if you look, Your Honor, at the

6    last three lines, about two-and-a-half lines, or having any

7    logical or factual connection whatsoever with the subject

8    address regardless whether the factual connection is

9    favorable or adverse to Intel.

10              I don't even know what they are asking for when

11   I read this except that it looks to me like they're asking

12   for everything we do.  It's not tied to the patents.  It's

13   not tied to their infringement allegations.

14              And in their letter and again during the

15   argument today, what do they say about why they get all this

16   stuff?  They say, because we asked for it.  And in their

17   letter they say, and I will quote it, "VLSI is entitled to

18   discovery on all such products," and I know Judge Robinson

19   always used to say you're not entitled to anything in my

20   courtroom.  But putting go that aside, there's not a word in

21   their letter, and I didn't hear much today about relevance

22   or ability to get public information before you accuse

23   things, or burden to us, or infringement contentions, or

24   patents.

25              And the law, they put up a couple quotes from

1    cases, but there's not a single case that they cited,

2    there's not a single case that I know of that says you get

3    discovery because you asked for it, and the defendant

4    doesn't get to object, and the defendant doesn't get to say,

5    no, you only get things that are actually relevant to the

6    infringement contentions you put out there.

7            And if you look at the key cases, the Federal

8    Circuit's Micromotion case from 1990, they said the first

9    thing you look at is relevance, and the second thing is

10   whether things are publicly available.  You don't get things

11   based on suspicion or speculation, and that was the fishing

12   expedition case, where they said the plaintiff is unmoored

13   and trolling.  And that's a little bit what we have here, or

14   maybe more than a little.  And Judge Jordan's Honeywell

15   case, which we cited, where he said, you don't accuse three

16   products and then get discovery on 15 products.

17           And that is where we are.  And even if you look

18   at the Invensys case that they like to cite, it was the same

19   thing.  I think it was Magistrate Judge Burke.  But he said,

20   you would look at the relevance.  You look at whether things

21   are publicly available so the plaintiff has access to them,

22   which are things that are publicly available.  And then you

23   look at the burden, but you have to provide relevance with

24   specificity.  You don't just come in and say, give me all

25   your documents on other products.

1           And in that case, Judge Burke denied the

2     plaintiff's request.  He denied it even after it was

3     narrowed down.  What they did was they narrowed their

4     definition to key it to the patent claims.  You won't see

5     that in what we looked at on page 2 and 3 of Exhibit 8.

6           And he said I'm not giving you that.  I mean, he

7     gave them some relief, but he said I'm denying your request

8     for those documents.  And there's nothing in their letter

9     and nothing today about any of the factors courts may have

10    applied about relevance, about lack of public availability,

11    about burden, and it's all suspicion and speculation.  Well,

12    maybe there's something we missed, so they should give us

13    that, too, because it's generally in the same ballpark of

14    what we accuse.  We're way past that in this case, Your

15    Honor.

16               THE COURT:  All right.  Thank you.

17               MR. BLUMENFELD:  Thank you.

18               THE COURT:  All right.  I think the definition

19    that's utilized is far too broad.  I think Intel actually

20    was quite reasonable in narrowing to a proportional degree

21    what should be expected in discovery, so I'm going to deny

22    the application.

23               All right.  Next.

24               MR. ABERNETHY:  As I said, Intel has created

25    just an unmanageable number of discovery disputes.  We can

1    only address so many in one letter brief or even at this

2    hearing.  So what we did is, we selected a set of technical

3    requests for production and damages request for production.

4            Could I get slide 59, please.  That we're asking

5    you to resolve at this hearing.

6            Now, I'm happy to walk through each of these one

7    by one.  I have the slides to do it.  We can talk about this

8    detailed language.  If that is what you would like, I'm

9    happy to do so now.  But what I think, Your Honor, is that

10   we have a serious problem with document production in this

11   case.  We're two months away.

12            THE COURT:  So, look.  We're just repeating what

13   we've already dealt with.  Do you have a specific request

14   that you want some relief for?

15            MR. ABERNETHY:  Yes, Your Honor.  The request

16   is that you order Intel to produce all documents responsive

17   to these requests for production by July 9th and to respond

18   as they are written, not as Intel has rewritten them.  If

19   you would like, I will walk through each and every one of

20   them.

21            THE COURT:  Where is it in your letter?

22            MR. ABERNETHY:  In the letter?  This is on the

23   third page of our letter.  Part 2, C.  Intel's refusal to

24   respond as written, second paragraph.  We ask for this

25   relief for all the art PFC listed on the screen.

```
 1                THE COURT:  Right.

 2                MR. ABERNETHY:  Shall I begin?

 3                THE COURT:  Well, yes, I guess.  I mean, limit

 4      it to what's in your letter.  So we start with RFP Number

 5      10.

 6                MR. ABERNETHY:  Sure.  So all of these technical

 7      RFPs identified in the letter first share one common issue.

 8      All of them ask for specifications, and we provided a

 9      definition for a specification.  It seeks all documents and

10      things relating to how something is or should be inspected

11      or tested, and it gives some examples.

12                Intel did not object to this definition in any

13      of their responses, yet in each of their responses, they

14      removed the term.  These things are from the upper case

15      Specification to a lower case specification.  And we no idea

16      how they're interpreting that.  For all we know, they are

17      only searching for documents that actually state

18      specification on their face, and that's plainly not what the

19      requests ask form and Intel did not object on this ground.

20      That's simply improper.

21                And like I said, there are so many discovery

22      disputes, we don't know exactly what the reason is for

23      Intel's deficient production to date, but it's a series of

24      things like this.

25                THE COURT:  Tell me about the meet and confer.
```

1    Did you agree to meet and confer on Request No. 10?

2                    MR. ABERNETHY:  Yes.

3                    THE COURT:  Who was on it?

4                    MR. ABERNETHY:  I don't recall.  We've had many

5    meet and confers going back to February.

6                    THE COURT:  Well, Mr. Farnan, were you on the

7    meet and confer on No. 10?

8                    MR. FARNAN:  Yes.

9                    THE COURT:  Do you remember anything about it?

10   I know there's a lot going on in the case, but...

11                   MR. FARNAN:  I remember what was discussed, Your

12   Honor.  We had three or four meet and confers over ten

13   hours, total.

14                   THE COURT:  You've got to pick your shots is

15   what it really boils down to.  So let me hear from Intel on

16   No. 10.

17                   MR. ABERNETHY:  So I wasn't done yet, Your

18   Honor.  That is a global issue to all of the technical RFPs

19   we're talking about here, that they have narrowed from our

20   definition of the specification to the specification.  I'm

21   happy to talk about RFP 10 specifically now, or would you

22   like to hear from them on a global issue first?

23                   THE COURT:  I would like to hear from them if

24   you don't mind.

25                   MS. MAJOR:  So, Your Honor, with respect to all

1    of these, what we feel to be lacking is we do not know from

2    VLSI what specifically it thinks it's not going to get by

3    virtue of us having objected and specified what we plan to

4    produce in response to their RFP.  We are more than happy to

5    meet and confer on these issues.

6              THE COURT:  Did you have a meet and confer on

7    No. 10?

8              MS. MAJOR:  I was not on it.  I don't know that

9    there was a detailed discussion of specification.  But,

10   Your Honor, if I may just jump ahead, I'd like to get to a

11   couple of the RFPs that I think may short-circuit this

12   discussion.

13             THE COURT:  Okay.

14             MS. MAJOR:  Just as an example.

15             So, for instance, VLSI points to RFPs 42 and 43

16   as being among those that they want relief on.

17             If you look at the exhibits attached to VLSI's

18   letter brief, in Exhibit 17, which is our responsive letter

19   to what they have raised with respect to our narrowing of

20   requests relating to integrated circuit management, I'm on

21   page 11 of that exhibit in Section H, where we say

22   specifically, we've narrowed things in accordance with

23   what's accused in this case.  We're not withholding any

24   documents based on our narrowing of your definition.  If

25   there is something you don't think you have, let us know.

1           The very next correspondence is Exhibit 18, and

2    here is a response that tells us that they have 20 exemplary

3    RFPs that they will be raising to this Court.  The last --

4    at the last page 8 and 9 of the exhibit.

5           The last time any of these RFPs had been

6    discussed on a meet and confer was March 14th, I'm sorry,

7    May 14th, and the bottom line is, if we can talk about

8    something specific, we're happy to go back and figure out if

9    we think there's a basis for them requesting that specific

10   thing, but we need to know with specificity what it is

11   they're seeking, not just talk about the vague and broad

12   definitions.  And we're happy to do that on whatever

13   timetable Your Honor would set if you think it's worthwhile

14   for the parties to continue discussing these issues.

15           THE COURT:  Yes.  This is just not sufficiently

16   teed up.  I don't believe this comports with the overall, if

17   not the literal requirement, certainly the spirit of the

18   requirements of the rules, which are supposed to be,

19   supposed to have very specific reasons with a very specific

20   discussion on the meet and confer and only then tee up what

21   should be a very, very discrete, concrete issue for me to

22   resolve, understanding with respect to positions of the two

23   parties.  That doesn't exist here.  So I'm going to deny the

24   application, and I am going to require the parties to meet

25   and confer about any outstanding document discovery

1    production issues and to do so by close of business next

2    Friday.

3              MR. ABERNETHY:  Your Honor, if I may just for

4    the record, we did have a very detailed discussion on all of

5    these requests.  The first letter that we sent on these was

6    February 22nd and it's Exhibit 16 to the brief.

7              THE COURT:  So I asked you during your argument

8    if you could identify the participants in the meet and

9    confer.

10             MR. ABERNETHY:  That was a letter, not a meet

11   and confer.  I don't know as I stand here who met and

12   conferred after the letter.

13             THE COURT:  Okay.

14             MR. ABERNETHY:  I though it's a letter from me

15   to Alexandra Amrhein.

16             THE COURT:  So I was asking questions about the

17   meet and confer because that's what's required by the rules.

18             So your application is denied.  You didn't set

19   forth in your letter in any kind of sufficient detail a

20   means by which I could intelligently resolve the dispute or

21   even figure out what the nature of dispute is.

22             You have to meet and confer.  You have until

23   next Friday to do that and follow the procedures that are

24   required by the scheduling order.  All right.

25             So I will deny then the remaining portions of

1    the application brought by plaintiff and I will hear

2    defendant's application.

3              MR. ABERNETHY:  Your Honor, there was one more

4    portion, the Dr. Mangione Smith reports.

5              THE COURT:  Right.

6              MR. ABERNETHY:  Since then, Intel has agreed to

7    produce the reports with redacted third-party confidential

8    information by June 28th, but has not agreed to give us a

9    date certain by when they'll produce the unredacted copy of

10   the reports.  They now agree that production should happen

11   in this case.  We're simply asking that you order them to do

12   so by July 9th as we requested in our motion.

13             THE COURT:  All right.  So, wait.  I thought

14   that issue had been resolved.  There's a dispute over the

15   unredacted version?

16             MR. ABERNETHY:  Correct, as to timing.  We don't

17   want to receive it at the close of the document production

18   period.  Our motion was received by July 9th.

19             MS. MAJOR:  May I respond, Your Honor?

20             THE COURT:  Yes, please.

21             MS. MAJOR:  So what we committed to do was to

22   provide a redacted version by next Friday, and we also

23   committed to provide an update with respect to the status of

24   any third-party confidentiality issues at that time.  We're

25   by no means trying to delay.  If we can produce by July 9th,

```
 1    we will, but these reports are only retained by Intel's

 2    outside counsel in that case, the Future Link case, so we

 3    simply don't know the contours of the third-party

 4    confidentiality requirements.

 5              I can commit that we will produce whatever we

 6    can in an unredacted form after we've addressed any issues.

 7    And in the meantime, we will provide any redacted report.

 8              THE COURT:  All right.  You're producing the

 9    unredacted version by when?

10              MS. MAJOR:  As soon as possible.  We're --

11              THE COURT:  I'm sorry.  I meant the redacted.

12              MS. MAJOR:  By next Friday, June 28th.

13              THE COURT:  How long is your report?

14              MS. MAJOR:  I believe it's on the order of 1400

15    pages, but it's multiple reports and exhibits.

16              THE COURT:  Okay.  And then --

17              MS. MAJOR:  And we're hopeful that if there are

18    third-party confidentiality issues, that they can be

19    addressed quickly.  We'll do that as quickly as we can.  We

20    don't physically have the reports.  We're not under that

21    protective order, so I don't know how complicated it will be

22    to obtain third-party consents.

23              THE COURT:  Okay.  And we'll just have to

24    address that issue.

25              I'm going to deny the application with the
```

1    understanding that Intel will produce the redacted report by

2    next Friday and that it will move expeditiously to cooperate

3    with third parties to ensure that at some point, to the

4    extent possible, unredacted versions can be provided to the

5    plaintiff.  All right.

6              Is there any clarification that needs to be made

7    by any of the oral rulings I've made so far from Intel?

8              MS. MAJOR:  No, Your Honor.

9              THE COURT:  And VLSI?

10             MR. ABERNETHY:  No, Your Honor.

11             THE COURT:  Okay.  Let's go, Intel.

12             MR. HIRSCH:  Your Honor, Jordan Hirsch for

13   Intel.

14             If I may, Your Honor, there is one preliminary

15   issue with respect to our motion to compel further damages

16   information from VLSI.

17             They've taken the position that their response

18   to Interrogatory No. 12, which is the damages interrogatory

19   at issue, contains VLSI confidential information because it

20   includes their attorney analysis and assertions, and we

21   disagree with that, but I do want to make sure that we

22   resolve that now so that I can refer to those.

23             THE COURT:  The only persons in the room work

24   for the Court besides the parties.

25             MR. HIRSCH:  Thank you, Your Honor.

1              Your Honor, if I may approach, I've got a set of

2    slides to guide the discussion.

3              What I think this dispute boils down to, Your

4    Honor, is that this case has been pending for a year.  We've

5    produced more than a million pages of damages related

6    documents, but we still don't --

7              THE COURT:  Wait.  I thought you produced 18,000

8    documents.

9              MR. HIRSCH:  That was -- they are referring to

10   18,000 is the documents that were not previously produced in

11   the Northern District of California case.  There are many of

12   the same products at issue.

13             THE COURT:  Okay.  It has been produced in the

14   California case, but they have it?

15             MR. HIRSCH:  They have it.  We produced

16   additional documents in this specific case.  In total, our

17   damages-related production for the products that are at

18   issue is more than 1.5 million pages.

19             THE COURT:  Okay.

20             MR. HIRSCH:  But, Your Honor, at this point in

21   the case, we don't know what methodology VLSI is going to

22   use to get to a damages number.  We don't know the factual

23   bases they're going to rely on for their assertions that

24   these patents are valuable, and we don't know what their

25   damages number is going to be.

1          THE COURT:  So isn't that what you get with an

2  expert report?

3          MR. HIRSCH:  Your Honor, we'll get some of that

4  in the expert report, but I would submit to Your Honor, the

5  purpose of fact discovery is to narrow and focus the case

6  now so that we know what their damages arguments are going

7  to be.

8          We have some idea as to how to take discovery as

9  to what those damages arguments are going to be, what

10  methodology they're going to use, what facts they're going

11  to present, and so that we have an opportunity to develop

12  our own rebuttal evidence to their damages arguments.

13          I think, Your Honor, if I may, this becomes

14  particularly important given the damages demand that they

15  made in California, where they sought up to $7.1 billion,

16  nearly three times the highest patent damages verdict ever

17  in the United States.

18          THE COURT:  I get all of that.  I'm aware of the

19  letter.  I'm just trying to go through here and get

20  something done.

21          So why don't we just wait for the expert

22  reports, and if you show that, hey, you know, I propounded

23  these interrogatories, here's the answers, they're clearly

24  inadequate, then guess what?  The plaintiff is going to pay

25  the price because we're going to delay the case.  We're

 1    going to reopen discovery.  You're going to have the

 2    opportunity to take all the fact discovery you need to rebut

 3    those theories at that time.  Why don't we just address it

 4    then?

 5              MR. HIRSCH:  I think there's two separate

 6    things.  That's an appropriate remedy.  We get the expert

 7    reports and they disclose new information they have not

 8    disclosed yet.  But I think there's a separate piece, which

 9    is our ability during the fact discovery period to develop

10    the rebuttal evidence.

11              THE COURT:  I'm saying you get that, too.  If

12    they have not -- if you've propounded requests for their

13    theory of damages and the facts that support their theory of

14    damages and their response is, I'm not telling you now, it's

15    premature, it's not ripe, we learned about it during the

16    expert reports, don't you get to reopen fact discovery?

17    We're going to get -- you can take whatever you need to

18    rebut some theory that they have not disclosed to date.

19    That's the risk they take as the plaintiffs.

20              MR. HIRSCH:  I agree with that, Your Honor.  I

21    think part of the problem here, if I can focus first on the

22    methodology issue, what they've done in their interrogatory

23    response is give us a laundry list of methodologies, more

24    than 20 that they may pursue.  So in a sense, yes, they've

25    disclosed them, but as a practical matter, they have not

1    disclosed anything because we don't know which one they're

2    going to pick and we can't take discovery as to what their

3    methodology is going to be.

4              For example, they mentioned regression analyses.

5    If that's going to be their method, well, then, we ought to

6    know so that we can develop the evidence now to rebut that

7    methodology and take discovery from them as to what basis

8    they have to argue that regression is an appropriate model

9    to value patents in a case like this, and to develop our own

10   rebuttal evidence to say, look, this has never been done in

11   reality.

12             No one ever measures the value of a patent using

13   a regression analysis, and that's with respect to the

14   methodology point.  The amount of damages as well.  The

15   damages number has a direct impact on the discovery that we

16   need to take to defend ourselves.

17             If they are going to seek something even close

18   to $7 billion in this case, we need to know so that we can

19   develop the evidence now, so we can take the right

20   depositions, so that we can --

21             THE COURT:  But you should know that.  I mean,

22   it's obvious.  They're going to.  I mean, I think you have

23   to assume they're going to seek at least five billion.

24   They just don't want to pin themselves down to a specific

25   number.

1           MR. HIRSCH:  I agree.

2           THE COURT:  How does that impact you, whether

3   it's five billion or seven billion or ten billion?  You

4   know it's a ridiculous amount of money.

5           MR. HIRSCH:  We know it's going to be a

6   ridiculous amount of money.

7           THE COURT:  By ridiculous, I mean extraordinary.

8           MR. HIRSCH:  Understood.

9           THE COURT:  I'm not impugning the plaintiff's

10  case.

11          MR. HIRSCH:  Understood.

12          THE COURT:  I am saying a massive amount.

13          MR. HIRSCH:  Understood.  Your Honor, the point

14  of having an early disclosure of damages, even if it's going

15  to be something over a billion, but we don't know the order

16  of magnitude, still narrows and focuses the case.

17          Rule 26 says, look.  At initial disclosure time,

18  give a number to help focus the case, narrow the case, and

19  allow the defendant to develop the defenses.  And I would

20  submit, Your Honor, it does matter if their damages number

21  is going to be one billion or ten billion.  That's an order

22  of magnitude.  That's a $9 billion difference.

23          THE COURT:  What would you do differently?

24          MR. HIRSCH:  It may have an impact on some

25  discovery dispute.  It may have an impact on what their

1    methodology is.

2              THE COURT:  Give me a concrete example.  If they

3    tell you it's one billion versus seven billion, what do you

4    do differently?

5              MR. HIRSCH:  It depends on what their

6    methodology it.

7              THE COURT:  That's a different question.  Let's

8    just focus on the amount.  Why do you need to know the

9    number right now?

10             MR. HIRSCH:  Because that informs the scope of

11   the case.

12             THE COURT:  So then what would you do

13   differently if it was one versus seven?

14             MR. HIRSCH:  It's hard for me to say, other

15   than --

16             THE COURT:  Say anything other than it's hard to

17   say.  Give me a specific answer.

18             MR. HIRSCH:  If they take the position that each

19   patent is worth a billion dollars, we could show through

20   fact discovery that never in the history of patent

21   litigation has a patent been worth more than a billion

22   dollars, for example.  If they make a claim of $10 billion,

23   there may be other factual evidence that we can show that

24   claim is just outlandish and totally disconnected from the

25   facts.

1          THE COURT:  Move on from the amount because I'm

2     not getting a good answer.  I understand methodology.  Go

3     ahead.  Anything else?

4          MR. HIRSCH:  With respect to the methodology,

5     Your Honor, I point Your Honor to the cases that we cited in

6     our brief, the cyclobenzaprine case, the Acceleration Bay

7     case from this district, where the Court says, the Court

8     holds that you do have to provide a damages methodology

9     early in the case during fact discovery, again, so that the

10    parties have some idea as to what's at issue in the case,

11    what methodology you're going to use.

12          I would also direct Your Honor's attention to

13    the Corning case from the Northern District of California,

14    which likewise requires a disclosure of methodology, so we

15    can frame the case.

16          With respect to the factual bases, Your Honor,

17    what they've provided are a series of assertions that the

18    patents at issue provide a number of purported benefits, but

19    we don't have any bases for that, for those assertions.

20    What they do instead is provide essentially a wall of Bates

21    numbers, 120,000 pages of Bates numbers which doesn't tell

22    you what are you relying on to allege that these patents

23    have these purported benefits?

24          And here's an example for Your Honor.  They

25    state in their opposition to our letter brief that they

1     provided narrative responses, narrative information as to

2     specific benefits of each patent.  They provided their

3     factual bases.  What they actually provide, for example, for

4     the '552 patent, is an assertion that says, Intel allegedly

5     uses the technology to get purported manufacturing and

6     reliability benefits.  But we don't know, is there a

7     statement they're relying on for that?  Is there a piece of

8     data that they're relying on for that?  Again, we need to

9     know that to develop the rebuttal evidence to defend

10    ourselves against those allegations.  And, again, the Courts

11    have, looking at similar issues, found that you've got to

12    disclose as a plaintiff the factual underlying for your

13    assertions.  Again, the cyclobenzaprine case, the

14    Acceleration Bay case, and the Glaxo SmithKline case that we

15    cite in our papers.

16              And if I may, Your Honor, turn to the damages,

17    the damages number, I hope this provides some more clarity

18    with respect to our position.  There is law directly on

19    point that says you do have to provide a damages number in

20    fact discovery.  During the case, the hearing that we had

21    before Your Honor with respect to the number of asserted

22    claims, Your Honor mentioned that the rules in California

23    and Texas can in some situations be instructive as to how to

24    narrow and focus the case.  And I point Your Honor to those

25    jurisdictions for this very issue.

1          The California courts with the Corning case that

2     we cited in our papers, for example, said, look, we don't

3     know at this stage in the case as fact discovery is coming

4     to a close a couple of months away what the number is.   Are

5     we talking about a billion dollars or something less?   And

6     required the plaintiff to disclose during fact discovery

7     their damages number.   And the Court also said, look, that's

8     also relevant to proportionality.   That I need to understand

9     what the different proportions are when you're seeking

10    documents, when you are seeking information, are you are

11    demanding $10 billion, that might impact the discovery

12    analysis.

13          The THX case also from the Northern District of

14    California is another example on point.   The Court said,

15    look, you've got to provide to the best of your ability

16    during fact discovery a damages number to shape the case.

17    Yes, you say it's expert discovery.   That's fine.   You'll

18    get more detail.   But the Federal Rules require damages

19    number with initial disclosures.   We need that to narrow and

20    focus the case.

21          In addition, the Eastern District of Texas

22    General order 14-3 provides that in Track B cases, the

23    plaintiff must provide a good faith damages expert along

24    with its methodology within 14 days of initial disclosures.

25          We submit that that relief, Your Honor, is

```
 1    particularly appropriate here given the demand that they've

 2    made in the Northern District of California, given what Your

 3    Honor suggested we suspect might be coming here, that we

 4    should know what we're talking about, what order of

 5    magnitude of damages are we talking about so we know how to

 6    defend ourselves.

 7              It should not be the case, I submit to Your

 8    Honor, that a plaintiff can demand billions of dollars and

 9    not tell the defendant what the number is or how they got

10    there until the second we get their expert report.

11              THE COURT:  All right.  Anything else?

12              MR. HIRSCH:  No, Your Honor.  Thank you.

13              THE COURT:  All right.  Thank you.  Let me hear

14    from plaintiff.

15              MR. PROCTOR:  Thank you, Your Honor.

16              So as just stated, everyone knows that we're in

17    the billions of dollars here.  That's the expected ballpark,

18    so there's no mystery surrounding that.

19              THE COURT:  Right.  So why does Rule 26-A say

20    the financial disclosure --

21              MR. PROCTOR:  So Rule 26-A actually explicitly

22    excludes the scenario where the plaintiff is going to rely

23    on the defendant's document for calculating its damages, and

24    that's exactly the scenario here.  And as you just heard in

25    connection with the multiple applications we made, we are
```

1    still very early in document production.  We have no ESI

2    discovery from them at all yet.  We have a total of around

3    60,000 documents.  That's it.  We've taken one deposition.

4    We actually noticed six depositions in April and May, and so

5    far they've offered only three dates, dates for three of the

6    witnesses.  Those dates are all in August and September.  So

7    they're asking us for detailed disclosures of our damages

8    theories without providing the underlying facts that will

9    inform those theories.

10              And so at the end of the day, like Your Honor

11   said earlier in response to Mr. Hirsch, this is all

12   premature.  We're not saying --

13              THE COURT:  I don't think it's premature.

14              MR. PROCTOR:  Let me walk through a little bit

15   more.

16              THE COURT:  You might be able to hold off on the

17   dollar number for right now, but I think you've got to

18   disclose your methodologies.  You can't bring a case like

19   this without knowing what your methodologies are.

20              MR. PROCTOR:  I absolutely agree, and we have

21   done that.

22              THE COURT:  You can't do it.  Talk about

23   document dump.  Your discovery response is simply a document

24   dump.  It's the analog to it.

25              MR. PROCTOR:  So I completely disagree.  We've

1    tried to explain in our Exhibit A, which is a letter we sent

2    to them last week, and we explained on multiple

3    meet-and-confers what the theories really are we're relying

4    on.   To the extent we're reserving other theories, we are

5    doing so because we don't get half the discovery to know if

6    those theories will be relevant.   So this really is again a

7    problem with their document production and the state of

8    discovery.

9            They have essentially three arguments here.

10   They are saying we've refused to identify damages theories.

11   It is not true.   We've identified two primary damages

12   theories.   And as you know, there are 15 Georgia-Pacific

13   factors.

14           THE COURT:   Can you point me in the discovery

15   response where this is?

16           MR. PROCTOR:   Sure.   I want to actually briefly

17   look at -- here's one example.

18           THE COURT:   No, no.   Go back.   You wanted to

19   have the two theories, so point me in the discovery

20   response.

21           MR. PROCTOR:   This is one of our theories.   It's

22   on page 192 to 206.   This identifies eight likely comparable

23   licenses.   We've explained a preliminary analysis of those.

24           THE COURT:   Where does it say what your two

25   primary theories are?

| 1 | MR. PROCTOR:  We don't use the language two |

1    MR. PROCTOR:  We don't use the language two

2    primary theories.  I'm using that language today.  In our

3    letter, if you look at Exhibit A.

4         THE COURT:  I'm not interested in your letter.

5         MR. PROCTOR:  Okay.  So I'm not using the phrase

6    two primary theories, but I do think it is very clear from

7    our response and certainly from our meet and confers since

8    we served this response what our theories are, and one of

9    them is comparable licensing.  So we have disclosed that

10   theory.  We've identified the licenses.  We've provided the

11   facts.

12        You heard Mr. Hirsch say the law in the cases,

13   they distinguish between the underlying facts versus expert

14   analysis of those facts.  So to the extent we have the

15   underlying facts, we've identified them.

16        Another, the other high level theory I'm

17   referring to today is the revenue apportionment theory, and

18   this is a detailed methodology that we've walked through

19   with Intel on calls.

20        THE COURT:  Where is it in your discovery

21   response?

22        MR. PROCTOR:  So if you look at -- the way

23   it's structured, at the very beginning we talk about the

24   royalty base and we identify 20 or so of Intel's financial

25   documents that we expect our experts to use to calculate the

1    royalty bases for the patents.  Then we go onto the royalty

2    rate.

3                And when we talk about the royalty rate, one of

4    the very first things we talk about is incremental benefits

5    on page 105.  The performance due to or associated with

6    infringing features of the instrumentalities.  And we

7    explain that these patents provide incremental benefits to

8    Intel.  We go on to incorporate our response.

9                If you go to the next page, we go through each

10   patent.  This is on pages 106 through 107.  We go through

11   each patent and describe the incremental benefits.

12               Then if you look at page 108.  So that's kind of

13   step one, analyze infringement and benefits associated with

14   each patent.  We've already done that.  106, 107.

15               Then the next step is quantify the incremental

16   benefits.  So we've explained how we intend to quantify

17   those benefits through expert analysis of Intel documents,

18   deposition testimony, other products and testing.

19               Then we talk about how we'll value the

20   incremental benefits.  They said we mentioned regression

21   analyses and they pretended like there was something

22   mysterious about it, that they needed to take discovery on

23   regression analyses.

24               The answer is to the extent that they think that

25   fact discovery was relevant, they should take that

1    discovery, because we have said we intended to have our

2    experts do a regression analysis.  And not only that, we

3    actually provided a public regression analysis that looks

4    directly at Intel products and correlates Intel's product

5    performance with the residue until it gets on the products.

6    We've actually provided a number here.  We had a one percent

7    decrease in performance.  We explain we expect our experts

8    to perform this regression analysis.

9                In our view, of course, this analysis itself

10   will be expert discovery and the discovery will be expert

11   discovery.  They can depose our expert, ask him about his

12   methodologies, ask him about what data he considered.  I

13   have no doubt they will do all of that.

14               We are in fact discovery with months left before

15   even the document production deadline, so we disclosed that

16   we expect our expert to do it, and we disclosed the public

17   regression analysis that we're aware of.

18               Now, so those are Intel's first two demands.

19   They say we refused to identify our theories.  Not true.

20   We have.  They say we fail to identify any factual support.

21   If you look at the proposed order, it asks for all facts

22   known on multiple topics, and that's what we've tried to

23   provide already.  We've tried to provide all known facts

24   based on the limited productions available to us today, but

25   of course we are still developing that factual record and,

1    of course, we still expect our experts to analyze that

2    factual record.

3            The third thing they demand is a calculation of

4    damages.  Like Your Honor said, we're just not at a point

5    where that's a realistic request.  That will be the subject

6    of expert testimony and, in fact, in every decision that was

7    decided in this district, no calculation of damages was

8    ordered during fact discovery.  Even in the Northern

9    District of California and other districts where courts have

10    tried out as a new rule.

11            In California, the rule was just enacted I think

12    in early 2017 requiring damage calculations.  So the amount

13    of authority on that is very limited, but even in that rule

14    itself, the Northern District of California acknowledges

15    that you need fulsome discovery in order to be able to

16    provide a calculation of damages.

17            But the case law is consistent across the board.

18    Rule 26 itself says a party would not be expected to provide

19    a calculation of damages which, as in many patent

20    infringement actions, depends on information in the

21    possession of another party.

22            Now, one point Intel has made repeatedly is they

23    need this information to shape their own discovery, but the

24    information we're telling them we will rely on is their own

25    information.  We're telling them we will rely on their

1    documents, on their witnesses' deposition testimony, on

2    their sales numbers, on their product design and development

3    and features.  This is information Intel has unlimited

4    access to already, and so it is just not reasonable for them

5    to say that they're somehow prejudiced by their failure to

6    provide that information to us in a timely manner so we can

7    actually calculate our damages and do that analysis at this

8    stage.  So ultimately, Courts are consistent that damages

9    and expert discovery, and it's not appropriate at this stage

10   in the case.

11            And they cite a couple times the Northern

12   District of California case.  The contentions there were

13   actually no judge reviewed detailed contentions similar to

14   those provided here.  The reason why you have a wall of base

15   numbers really was just to address the order entered there

16   about disclosing all known facts.  It's really just an

17   attempt to be thorough, but in all cases we've introduced

18   the Bates numbers, descriptions of what the documents

19   include and their role in the analysis.

20            And just to go briefly back to the point

21   Mr. Hirsch made about the 20 damages theories that they

22   think we've disclosed.  If you look at their list in

23   footnote 2, it's on page 2 of their letter brief, which is

24   DI 175.

25            THE COURT:  DI what?

1          MR. PROCTOR:  175, Your Honor.

2          Their list says things like, we'll start at the

3    beginning.  Econometric analysis.  That's just a category

4    that includes regression.  We disclosed that we intend to

5    rely on regression.  They separately list regress later in

6    this list.  It's not a separate thing as meant here.  They

7    are completely overlapping analyses.

8          There are other types of regression, I'm sorry,

9    econometric analysis, but at this point we've identified

10   regression as the type we intend to rely on.  They say

11   analysis of product sales, related product sales.  Convoyed

12   sales.  These are allegedly separate categories.  I'm sorry.

13   Separate damages theories.  That's obviously not true.

14   Those are different components of a potential royalty base.

15          So, again, their claim that we've asserted 20

16   damages theories and --

17          THE COURT:  How many damages theories have you

18   asserted?

19          MR. PROCTOR:  I think we asserted the two

20   primary damages theories and we've reserved right to assert

21   other damages theories as appropriate.

22          THE COURT:  Okay.  Here's what I'm thinking of

23   doing.  I think you should be limited to your two damages

24   theories that you articulated today unless good cause exists

25   at a later date for you to expand the number of theories

1    unless you can articulate right now more than those two.

2              What do you think about that?

3              MR. PROCTOR:  I can articulate other ones.

4              THE COURT:  See, when I say articulate, I don't

5    mean hypothetically articulate damages theories.  I mean I'm

6    going to require you to list with specificity your damages

7    theories, and you keep saying you've got two primary ones.

8    I get that.

9              All right.  What are your other ones with

10   specificity?

11             MR. PROCTOR:  Your Honor, I will give you two

12   other examples that are in our contentions.  So one is a

13   price premium theory, and this is one where we do not have

14   enough discovery from Intel to know exactly how this theory

15   will work or whether it will apply to every patent.  That's

16   why we have not given them more information.  But that's a

17   theory where you say, let's look at Intel's pricing

18   information on its products to see exactly how much it was

19   charging for product X, exactly how much it was charging for

20   product Y, look at the differences and see if we can

21   attribute all or some of that price premium to --

22             THE COURT:  That's legitimate.  Here's the

23   thing.  So you articulate that you've got two theories

24   right now, and then if you get documents or testimony

25   during the course of discovery that makes you think you

1    could justify a price premium theory, you then get to amend

2    your responses.

3                  MR. PROCTOR:  Your Honor, here's what I think --

4    I can see where you are going.  I think there's a simpler

5    way to do this.  It's too soon for that kind of order.

6                  As you have heard, two months up to fact

7    discovery, six months until expert discovery.  We will agree

8    to supplement our damages contentions just as a matters of

9    course as people do during fact discovery after they

10   complete their document production hopefully on August 23rd

11   as set by the Court.

12                 THE COURT:  See, they need to take their

13   discovery now, so they need to know one of your theories.

14                 MR. PROCTOR:  I'm sorry.

15                 THE COURT:  Go ahead.

16                 MR. PROCTOR:  I have not heard a single thing

17   that they've said that the discovery they need to take is

18   based on our theories.  They have their own separate

19   theories that relate to NXP licensing, free scale licensing,

20   other allegedly comparable licenses.

21                 They're taking that discovery.  I've not heard a

22   bit of fact discovery.  The fact discovery we want to rely

23   on for the theories they've describe is under their control.

24   So it's not reasonable for them to say our disclosures are

25   impacting their fact discovery.  So I don't think there's

1    any prejudice to them.

2              THE COURT:  All right.  You've articulated you

3    have two primary theories.  You put those on the record.

4    You've got a third, price premium.  What's the fourth?

5              MR. PROCTOR:  The other one I've referred to is

6    forecast theory.  They have limited the scope of forecast

7    they produced for many months.  They only produced one

8    forecast.  It was from that day going forward.  We said

9    we need historical forecasts.  We need more detailed

10   forecasts.

11             Let's say they are thinking about including this

12   design, this feature and the products, the forecast map.

13   Then they decide not to include it.  They do a new forecast.

14   Those are the types of forecasts the Federal Circuit has

15   said are directly relevant, can be used to calculate

16   damages.  You can imagine --

17             THE COURT:  Any other theories besides those

18   four?

19             MR. PROCTOR:  I would have to double-check, but

20   those are the ones I have off the top of my mind and those

21   are the ones we've articulated in the contentions.

22             There are a lot of other facts we pointed to.  I

23   would rely on the Georgia-Pacific factors.

24             THE COURT:  We don't need to go there.

25             MR. PROCTOR:  We would rely on consumer surveys

1    to show demand.  We intend to rely on costs and pricing and

2    that sort of information.

3              So these are things that are relevant to the

4    Georgia-Pacific factors.  I don't consider them separate

5    damages theories.  We do, of course, expert our expert to go

6    through the 15 Georgia-Pacific factors and to rely on

7    relevant evidence in discussing those factors.

8              THE COURT:  All right.  Anything else?

9              MR. PROCTOR:  I would suggest we be allowed to

10   do what the Federal Rules require of us, which is to

11   supplement our interrogatory responses as a matter of course

12   as information becomes available.

13              And in this case --

14              THE COURT:  Well, why don't you separate them

15   out?

16              MR. PROCTOR:  Well, so we have very limited

17   information to date.

18              THE COURT:  You can at least identify them.

19   You've got two primary theories.

20              MR. PROCTOR:  Well, I think we've identified

21   that.

22              THE COURT:  Why don't you supplement your

23   discovery responses to incorporate what you've discussed

24   here today.

25              MR. PROCTOR:  If it's a matter of restructuring

1    what we've provided, I'm happy to do that and put in here

2    the, you know, two primary theories and explain what we

3    explained on the slide.  I do think it's a little bit maybe

4    unnecessary given that explanation we provided today on

5    multiple meet and confers and what's already in the

6    contentions, but if that's what Your Honor thinks we need to

7    do, I'm happy to try and clarify.

8              THE COURT:  Let me hear from Intel and I will

9    decide.

10             MR. PROCTOR:  Thank you, Your Honor.

11             MR. HIRSCH:  Thank you, Your Honor.

12             With respect to the assertion that we have not

13   given them enough information, that is listed out on slide 3

14   of our presentation.  We've given them the damages-related

15   documents that we have other than ESI.  We've given them

16   hundreds of license agreements.  We've given them more than

17   10,000 marketing documents.  We've given them more than

18   20,000 pricing related documents.  We've given them all of

19   the revenues, the financials for the accused products.

20             THE COURT:  Let me ask you this:  I think in

21   this district, the general rule, certainly my experience is,

22   that stuff normally waits for expert reports.  I'm sensitive

23   to the frustrations and the potential for abuse that having

24   a discovery response to, that VLSI has propounded in this

25   case is of concern.  On the other hand, I don't know what

1      you would do differently.  They've articulated two primary

2      theories, two backup theories.  There's only so much that is

3      out there, and you've not given me any -- not one example of

4      something you would do differently if you had further

5      specificity.

6                  MR. HIRSCH:  Here's an example if I may, Your

7      Honor.  They said that one of their primary theories, which

8      is not, Your Honor, referenced in the discovery response,

9      what their primary theories are or are not.  But today

10     counsel stated apportionment.  That could encompass dozens

11     of different things.

12                  The question is:  How are you going to

13     apportion?  Are you going to look at -- they listed each of

14     these in their responses.  Performance, R&D, price.  Are you

15     going to use a regression to apportion?  Is there some other

16     apportionment method that you have?  That's what we don't

17     know.

18                  THE COURT:  Right.  What you are going to do

19     differently --

20                  MR. HIRSCH:  Sure.

21                  THE COURT:  -- in propounding seeking discovery

22     to address that?

23                  MR. HIRSCH:  Sure.  If we're dealing with 20

24     different potential methods or 20 different apportionment

25     methods, it becomes very difficult for us to figure out,

```
 1    okay, where do we need to take discovery.

 2                THE COURT:  Can you give me an example?

 3                MR. HIRSCH:  Your Honor, the regression example.

 4                THE COURT:  You were on apportionment, so stick

 5    with apportionment.  What would you do differently?

 6                MR. HIRSCH:  That the method they use to

 7    apportion is not reliable.

 8                THE COURT:  What discovery would you take that

 9    you wouldn't otherwise take?

10                MR. HIRSCH:  We would do two things.  First,

11    take discovery as to what basis, what historical evidence is

12    there that that --

13                THE COURT:  That's methodology.  That's expert

14    stuff.  What fact discovery would you ask for if you knew

15    they were committed to an apportionment theory?

16                MR. HIRSCH:  A license agreement where the

17    royalty or the payment was arrived at using whatever theory

18    they have and a single instance where --

19                THE COURT:  Wait.  Who would you take that from?

20    Where would you get that license from?

21                MR. HIRSCH:  Whether VLSI has any basis to

22    assert that.

23                THE COURT:  Haven't you asked for any licenses?

24                MR. HIRSCH:  We have asked for any licensing

25    evidence.
```

1          THE COURT:  Okay.  What would you ask for that

2    you have not already asked for or that you wouldn't already

3    ask for?

4          MR. HIRSCH:  Your Honor, we could make that

5    request as to the specific methodology from third parties.

6    For example, the prior owners of the patents, whether they

7    have ever used that specific methodology that VLSI says

8    here's how we're going to apportion, whether that has ever

9    been used.

10          The flip side is to develop our own factual

11    evidence, the evidence that we have that shows, look, this

12    specific method --

13          THE COURT:  That's their whole point.  You have

14    in your hands all the discovery you need.

15          MR. HIRSCH:  It can't be the case we've got to

16    litigate 20 different methodologies.

17          THE COURT:  But you can wait until experts

18    opine, and then you've got the evidence that's in your --

19          MR. HIRSCH:  But fact discovery is over and

20    we'll have taken the depositions of the prior owners of the

21    patents.  We'll have completed our production, our

22    interrogatory responses.

23          Again, I would point Your Honor to the

24    requirements of the rules and the holdings in the cases that

25    say, you've got to disclose some theory so that we have

1      something to shoot at.  Just saying here's 20 different

2      potential theories is, I suggest to Your Honor, it's akin to

3      saying, here's 80 claims that we may assert and we've got to

4      defends ourselves on each of those claims.  That's the point

5      of discovery, to focus.

6                      THE COURT:  All right.  Thank you.

7                      All right.  I'm going to deny the application.

8      I do not think Intel has articulated how they are

9      prejudiced.  I am going to require VLSI to supplement, and

10     it should be supplemented consistent with the

11     representations that were made today.

12                     And anything else?

13                     MR. ABERNETHY:  One final point, Your Honor.

14     With respect to VLSI's motion, I'm checking my notes, but I

15     believe you did deny our request to order Intel to produce

16     documents by July 9th.  Correct?

17                     THE COURT:  I'm sorry.  What?

18                     MR. ABERNETHY:  You did deny VLSI's motion to

19     order Intel to produce documents by July 9th pending RFPs?

20                     THE COURT:  Yes.

21                     MR. ABERNETHY:  Our primary concern is we will

22     not have enough time to serve all our RFPs.  Our request is

23     whenever they do complete production, we'd like to have

24     30 days from that date to serve a follow-up request for

25     production.

1                    THE COURT:  I'm not going to give an advisory

2       opinion.  You have to play by the rules, and if you've got

3       good cause to extend the deadlines that are set forth in the

4       discovery order, then we can amend the discovery order at

5       that time.  So we'll wait and have something concrete.

6                    And before I leave, I want to articulate on the

7       last thing on damages.  I think VLSI has articulated

8       theories in their response to the interrogatories.  They

9       have provided more specificity today.  They need to

10      supplement their response to reflect that kind of

11      specificity.  And the reason why I'm not going to confine

12      them anymore is because, as I mentioned, I'm not satisfied

13      that Intel in any way is prejudiced by what has been

14      provided today and in the actual discovery response.  It

15      just hasn't shown to me what discovery it would take had it

16      been provided any additional clarification.  And I think all

17      of this will come out in expert reports.  All right.

18                    Anything else?  All right.  Thank you.

19                    (Counsel respond, "Thank you, Your Honor.")

20                    (Hearing concluded at 6:09 p.m.)

21                              -  -  -

22

23

24

25