```
 1                   IN THE UNITED STATES DISTRICT COURT

 2                  IN AND FOR THE DISTRICT OF DELAWARE

 3                               - - -

 4
        VLSI TECHNOLOGY LLC,            :    CIVIL ACTION
 5                                      :
                       Plaintiff,       :
 6                                      :
            vs.                         :
 7                                      :
        INTEL CORPORATION,              :
 8                                      :
                       Defendant.       :    NO. 18-966 (CFC)
 9

10                               - - -

11                              Wilmington, Delaware
                                Monday, October 21, 2019
12                              1:00 o'clock, p.m.

13                               - - -

14      BEFORE:  HONORABLE CHRISTOPHER J. BURKE, U.S. MAGISTRATE
        JUDGE
15                               - - -

16      APPEARANCES:

17

18              FARNAN LLP
                BY:  MICHAEL J. FARNAN, ESQ.
19

20                      -and-

21

22

23

24                              Valerie J. Gunning
25                              Official Court Reporter
```

```
 1    APPEARANCES (Continued):

 2

 3              IRELL & MANELLA LLP
                BY:  CHRISTOPHER ABERNETHY, ESQ. and
 4                   AMY E. PROCTOR, ESQ.
                     (Los Angeles, California)
 5

 6                   Counsel for Plaintiff

 7

 8              MORRIS, NICHOLS, ARSHT & TUNNELL LLP
                BY:  JACK B. BLUMENFELD, ESQ.
 9

10                      -and-

11

12              WILMER CUTLER PICKERING HALE AND DORR LLP
                BY:  WILLIAM F. LEE, ESQ. and
13                   AMANDA L. MAJOR, ESQ.
                     (Boston, Massachusetts)
14
                        -and-
15

16              WILMER CUTLER PICKERING HALE AND DORR LLP
                BY:  JOSHUA L. STERN, ESQ.
17                   (Washington, D.C.)

18
                        -and-
19

20              INTEL CORPORATION
                BY:  MASHOOD RASSAM, ESQ.
21

22                   Counsel for Defendant

23
                        -   -   -
24

25
```

1                    P R O C E E D I N G S

2

3              (REPORTER'S NOTE:  The following telephone

4      conference was held in chambers, beginning at 1:00 p.m.)

5

6              THE COURT:  Good afternoon, everyone.  It's

7      Judge Burke here.

8              Before we begin, let me just say a few things

9      for the record, and the first is that we're here this

10     afternoon for a discovery dispute teleconference in this

11     matter, which is captioned VLSI Technology LLC versus Intel

12     Corporation.  It's Civil Action No. 18-966-CFC-CJB in our

13     Court.

14             And because we're here on the record today for a

15     teleconference, I have with me a court reporter from our

16     Court, Ms. Gunning, who will be taking down our call this

17     afternoon.  I would just ask counsel if they would try to

18     remember to identify themselves before they speak to help

19     make sure we get a good and accurate record of our call

20     today for our court reporter.

21             With that said, let's have counsel identify

22     themselves for the record, and we'll start first with

23     counsel for the plaintiff's side and begin there with

24     Delaware counsel.

25             MR. FARNAN:  Good afternoon, Your Honor.  Brian

1    Farnan on behalf of the plaintiff.

2              I have Chris Abernathy and Amy Proctor from

3    Irell Manella in Los Angeles, California.

4              THE COURT:  All right.  To you all, good

5    afternoon.  And we'll do the same with counsel for

6    defendant's side, again, beginning with Delaware counsel.

7              MR. BLUMENFELD:  Good afternoon, Your Honor.

8    It's Jack Blumenfeld from Morris Nichols for Intel.

9              Also on are Bill Lee, Amanda Major and Joshua

10   Stern from Wilmer Hale, and Mashood Rassam, who is in-house

11   at Intel.

12             THE COURT:  All right.  Thank you and good

13   afternoon to you all as well.

14             Okay.  Counsel, I know that there were letters

15   filed both by the plaintiff and by the defendant.  As the

16   parties know, I have earlier today resolved, based on

17   conversations with Judge Connolly, issues relating to the

18   admitted prior art issue, which appeared in both letters,

19   but that still leaves each side with another issue that it

20   raised, and we'll certainly go through those on our call

21   today.

22             And I will start first with the plaintiff's

23   letter, and then we'll then move after we discuss that to

24   the defendant's letter and its issue.

25             In the plaintiff's letter, the additional issue

1    that's unresolved relates to its motion to compel the

2    production of documents responsive to its fifth set of

3    RFPs.  And I certainly want to hear from the parties on

4    this issue, but I will just tell you off the top, my

5    overarching thought is that I'm most interested in trying

6    to talk through with the parties a process for me to

7    actually resolve all of these disputes as opposed to

8    thinking that with regard to sixty-some or more disputed

9    RFPs, I'm somehow going to have the ability on this call to

10   be able to definitively resolve the disputes as to every

11   single one of them.  I'm looking, I think, more for guidance

12   from counsel as to a process by which I could make a call if

13   I need to as to these RFPs as opposed to trying to do this

14   all today on the phone.

15           With that said, I'm happy to hear first from

16   counsel for plaintiff's side.  And who is going to speak on

17   behalf of plaintiff's counsel?

18           MS. PROCTOR:  Good afternoon, Your Honor.  This

19   is Amy Proctor from Irell on behalf of VLSI Technologies,

20   the plaintiffs.

21           THE COURT:  Okay.  Ms. Proctor, it seems to me,

22   and, again, I'm just trying to get my hands around kind of

23   the overarching dispute here.  Tell me if this sounds right

24   to you.

25           In your fifth set of RFPs, you propounded 97 new

1    RFPs, which takes -- I mean, I don't know if I've ever seen

2    as many RFPs as there are in total here.  It takes you to

3    close to 300.  But as to these 97, the other side says that

4    in their letter that 63 of the 97 are in dispute and then it

5    seems like the parties break those 63 up into three

6    different buckets, like what I would call kind of bucket

7    number one is covered in your letter at the bottom of page 2

8    over to the top of page 3, and then bucket number two is,

9    you know, covered in the next paragraph of your letter on

10   page 3, what you call the 11 other requests.  I think

11   there's a dispute about whether it's 11 or nine.  And then

12   bucket three is the next paragraph, the one that begins,

13   "Finally."

14            Am I right that just in terms of trying to

15   figure out where we are here, that this is the number of

16   RFPs that are in dispute and they break down in your view

17   into three different sets of buckets?

18            MS. PROCTOR:  That's right, Your Honor.  The

19   buckets were created when Intel responded one day before we

20   filed our letter brief, treating prior art differently.  So,

21   yes, I agree with those divisions.

22            THE COURT:  Okay.  And, again, I'm looking for

23   ways to kind of figure out how do I attack these with the

24   parties?  One thing that the defendant suggests in its

25   responsive letter is that with regard to, you know, what I

1    think we're talking about is bucket three, that is the

2    bucket that begins with RFPs No. 196 and 197, I think what

3    they basically say is, look, we promise.  We had a

4    productive call.  We got clarification that we asked for.

5    They heard us, we heard them.  And we said we're going to

6    look, and that we're going to produce documents in response

7    to these RFPs, and we're confirming in our letter, we will,

8    we are going to produce documents.

9              So I think what they are saying there is, so

10   this isn't ripe yet.  Let us produce the docs and let

11   plaintiff see what they think about we've produced and then

12   maybe there won't be a problem.

13             Is that a way that I could push off this bucket

14   in an acceptable way or no, in your view?

15             MS. PROCTOR:  Well, to some extent I think

16   that's right, Your Honor.  They did for the first time in

17   their responsive letter agree to actually produce some

18   responsive material, but here's the issue that we are

19   facing.

20             So the deadline for document production is

21   August 23rd, 2019, and so we are now two months after that

22   deadline and only one month from the close of fact

23   discovery, and we just simply don't have the time to

24   continue to wait for Intel to do any investigation.

25             The documents were requested in July.  We really

1    think the investigation should have happened much sooner,

2    and Intel's ongoing delays in actually producing these

3    things tend to seriously prejudice the other side.

4           So we need time to respond to the production

5    that they claim that they make to actually review it and

6    follow up on any missing materials and we need to do before

7    fact discovery closes.

8           And so the delays here have made this more

9    urgent than it might otherwise be, and so I think maybe that

10   a compromised proposal is possible here, that Your Honor

11   order them to make whatever productions they are going to

12   make by the end of the month so we'll at least have three

13   weeks to review those productions and deal with them.  But

14   really, these productions should have been made back in

15   August, so that's the problem.

16          THE COURT:  So one aspect of what you say I

17   should do there is order the production, whatever it is

18   going to be, occur by a date certain, which you say should

19   be by the end of the month.

20          Can I ask, and I'm asking in part because I know

21   an undercurrent of defendant's letter is, wow, we've already

22   produced so much stuff and now they are asking for all this

23   additional stuff kind of late in the game, was there any

24   agreement on the number of RFPs each side could propound,

25   and if you've propounded almost 300, how many have they

1    propounded?

2              MS. PROCTOR:  Well, I will have to check the

3    number that they propounded, but there was none of them

4    that -- they haven't argued that we've propounded an

5    unreasonably large number.  They have not argued that our

6    requests were untimely, because they weren't.  They were

7    four months before the close of fact discovery.

8              So this is a large case.  There are a lot of

9    things at issue.  But for this bucket of requests, they are

10   not even arguing that they are duplicative of other

11   requests.  They've acknowledged that these are relevant

12   responsive materials they've agreed to produce.  It's just

13   that it comes so late that it tends to substantially

14   prejudice the other side.

15             THE COURT:  Now, you say you've propounded them

16   about four months before the close of fact discovery.  Is it

17   also true you propounded them about one month before the

18   close of substantial completion?

19             MS. PROCTOR:  It was approximately one month

20   before the deadline for document production, yes.

21             THE COURT:  So I mean, you know, it's going

22   to be tight regardless in terms of where these 97 RFPs

23   kind of fit into the mix.  You would acknowledge that.

24   Right?

25             MS. PROCTOR:  Yes, and so we actually did give

1    Intel an extension on its response to these RFPs that went

2    past the deadline for document production deadline, so we

3    tried to accommodate Intel's investigation throughout this

4    process.  The issue is that for the first almost two months

5    it had these RFPs, but it conducted no investigation, and

6    that is what has led to this delay and potentially great

7    prejudice.

8              THE COURT:  Okay.

9              MS. PROCTOR:  And --

10             THE COURT:  Okay.  Let's go back then.  So on

11   bucket three, maybe, depending on what happens, there's a

12   shared understanding that these are relevant, they should be

13   responded to, that the defendant is going to produce docs,

14   and maybe there might not be a dispute in the end, but the

15   relief there you would ask is, let's get a date certain for

16   production so that we can have a timetable for knowing

17   whether or not we've got problems with that bucket or not.

18             Circling back to the first bucket, which I

19   gather amounts to a substantial number of the RFPs, it

20   sounds like, but tell me if this is right, that this relates

21   to their response in Exhibit 9, I think, and that does it

22   seem like to you what they have done is say, look, we have

23   done some kind of investigation.  We've determined that we

24   previously produced docs with regard to these RFPs and that

25   to the extent you want us to search for or produce any more,

1    we think your request is unduly burdensome, overbroad, et

2    cetera, and we're not going to do it.  Is that where you

3    think things stand as to those RFPs?

4              MS. PROCTOR:  I think that's generally right.  I

5    think what Intel has actually said is that it has conducted

6    some investigation and determined that it need not produce

7    even a single document in response to, you're right, this is

8    a large bucket.  It's 41 distinct requests.  And what

9    Intel's new boilerplate response for most of these requests

10   says is that because it has already produced voluminous

11   discovery and that discovery Intel believes includes some

12   documents, so maybe even just a handful of documents that

13   happened to overlap with these new requests, it is under no

14   obligation to do any additional searching or to produce any

15   additional documents.

16             THE COURT:  And is your answer to that that, I

17   mean, is what are you saying, in essence, look, Intel, if

18   you're asserting that the main reason or maybe the only

19   reason as to these 41 RFPs you don't have to produce any

20   further documents is burden or cost or overbreadth or

21   whatever, you've got to actually articulate, you know, why

22   would it be unduly burdensome?  How much money would it

23   cost?  How much time would it take and why vis-a-vis what

24   you've already produced are you not responding?

25             Is that the kind of detail that you are saying

1    isn't there and that you think should be there?

2              MS. PROCTOR:  That's right, Your Honor.  And

3    also we disagree that these are unduly burdensome.  I think

4    there are some good examples of requests and could go

5    through if you would like.  That clearly they are not overly

6    broad and where Intel said we could do any new searching

7    suggests we think that on these type of technical

8    objections, they have to have provide more information.

9              They also claim to have spent I guess almost

10   three months now investigating the overlap between these

11   requests and the earlier production, but they have not given

12   us any information about that, so they have not told us

13   whether, like I said, it's a handful of documents that

14   overlap or whether they actually think they've already

15   produced broad categories of documents that are actually

16   responsive to these new requests.

17             We think for at least some of these new

18   requests, the earlier productions are not sufficient and

19   don't overlap with enough of these requests to be

20   meaningful.

21             THE COURT:  Okay.  And then, lastly, and this

22   is, again, at a high level just trying to articulate what we

23   think are the basic areas of fight with regard to the basic

24   kind of categories or buckets of disputes, what I will call

25   bucket number two, which begins with RFP No. 201 on your

1    page 3 of your letter.

2             It sounds like as to this bucket, the gist is

3    the other side just doesn't think these RFPs are relevant

4    and they push back on that and you disagree, and so for this

5    one, it's less an issue of burden and more a question of

6    relevance.

7             Is that how you take it or am I missing

8    something there?

9             MS. PROCTOR:  Well, that's generally right.  So

10    for these, you're right, that Intel has refused to even

11    search for documents, so Intel has a standing objection.

12    And it's treating these requests differently than the first

13    bucket, and by doing so, it's admitting that these

14    productions do not cover these requests.

15             And so the only reason they are refusing to

16    produce these documents is that it believes that they're

17    irrelevant or overly broad.  And so we've explained in a

18    couple of examples in the letter brief why that's not the

19    case and we don't think it's proper for Intel to refuse to

20    produce, to conduct any searches here.  That's not correct

21    under the Federal Rules.  And they have an obligation to

22    actually, even if they think the requests are overly broad,

23    to then search for and produce documents in response to the

24    scope that they think is relevant.

25             THE COURT:  And just in terms of what kind of

1    has been done so far, I mean, assume that for now that I

2    just don't think it would be fair one way or the other for

3    me to say as a blanket matter, well, with regard to the 41

4    RFPs in bucket one or the 9 or 11 in bucket two, plaintiff

5    must do, or defendant must do, you know, if I felt like as a

6    practical matter there has to be a more nuanced analysis,

7    the next question would be, well, what has already gone

8    forward?

9              And so there, I would ask in the meet and

10   confers that have preceded this call today, have the

11   parties kind of gone through on an RFP-by-RFP basis, you

12   know, for example, as to bucket number two, look, here's

13   what we're asking for, and the defendant says, here's why I

14   think these aren't relevant, and plaintiff says, here's

15   our response.

16             Have you had kind of that granular level back

17   and forth or has it been more at a higher level?

18             MS. PROCTOR:  To some extent, we have, Your

19   Honor.  We had a meet and confer in September and VLSI

20   offered to go through each of the requests that we are

21   moving on today during that meet and confer.

22             We ended up going through about 20 requests one

23   by one and discussing them in detail, and Intel did not want

24   to go through the remaining requests and said it would

25   instead get back to us in writing on our overarching

1   concerns, and on the requests we discussed, among others,

2   including the full set that we're moving on today, and it

3   took Intel almost a month to actually provide that written

4   response.  They provided it one day before they filed this

5   letter brief.

6           So since Intel created these buckets on

7   October 10th, we have not had an opportunity to further meet

8   and confer, but, again, we offered to meet and confer on

9   every single one of these requests on September 13th and it

10  was Intel who did not want to actually take the time to do

11  that and said it would get back to us in writing.

12          THE COURT:  Okay.  And then maybe my last

13  question here before I ask if there's anything else you

14  wanted to add before I turn to your colleague on the other

15  side is:  How would you suggest if you were me that I attack

16  this from here?  You know, obviously, as to bucket three,

17  one answer could be, you know, that I get some mutually

18  acceptable date by which the defendants produce what they

19  are going to produce as to those RFPs and that the parties

20  further meet and confer and determine whether there are

21  any lingering disputes at all, but as to the other two

22  buckets, I mean, the substance of them, there's a lot of

23  substance and the correct answer to whether stuff gets

24  produced or doesn't might depend on relevance or it might

25  depend on burden, and that might involve some specific

1    questions.

2            How should I try to adjudicate these issues or

3    get the parties to help me adjudicate these issues in terms

4    of the scope of what's before me here?  Do you have a view

5    on that?

6            MS. PROCTOR:  Yes, Your Honor.  So I think for

7    bucket three, I think that's right.  Like we said, having a

8    date certain for them to complete their production in

9    response to that set of requests such as end of the month,

10   which we think is kind of the latest reasonable date given

11   how close we are to the upcoming deadlines here, and even

12   that date we think is prejudicial to VLSI, but at this

13   point, that's the best we can do.

14           So the other requests, I think there's other

15   information that Intel should provide and that that also

16   needs to be provided on the tightest possible timeline.

17           So our request for groups, the first and second

18   buckets is that the Court order Intel to actually conduct

19   reasonable searches and produce the response to documents

20   that they locate through their searches.  And I think that

21   that is a request that could also be done by a date certain

22   in the very near future to give us time to follow up and

23   have those materials reasonably in advance of expert report

24   deadlines, which is the opening report deadline is

25   December 23rd.

1          THE COURT:  Okay.

2          MS. PROCTOR:  If Your Honor is not willing to do

3     that today, I think the next alternative is to set another

4     hearing in the near future and to order Intel today to

5     provide much more detailed information about the basis for

6     its objections for the first and second groups.

7          So like Your Honor explained for the first

8     bucket, Intel has not provided any discussion of burden, has

9     not provided any detail on what categories of documents it

10    thinks it already produced that are relevant to these

11    responses and what categories it's refusing to actually

12    search for.

13         So there's no clarity in terms of what Intel's

14    decision really is on the details.  It's just standing on

15    these really broad objections and refusing to do any new

16    searches, and that's true for both of these buckets.

17         And so I think we're happy to meet and confer

18    further, but, again, the time pressure is very serious at

19    this point in the case and so we can't wait for Intel to do

20    all of this on the (inaudible) schedule, and we need another

21    hearing on the calendar at minimum and an order requiring

22    Intel to provide all of that level of detail and to meet and

23    confer with the other side and to then actually start

24    searching as soon as possible.

25         THE COURT:  Okay.  Ms. Proctor, thank you.

1    Anything further before I turn to your colleague on the

2    other side?

3              MS. PROCTOR:  No.  That's fine, Your Honor.  I

4    will wait to hear what they say and I appreciate the

5    opportunity to respond.

6              THE COURT:  Okay.  Turning to defendant's side,

7    who is going to speak on behalf of the defendant's side as

8    to this issue?

9              MS. MAJOR:  Hi, Your Honor.  This is Amanda

10   Major.

11             THE COURT:  Okay.  Ms. Major, good afternoon to

12   you.

13             I guess maybe a place to start for you as well

14   is, you've heard me kind of break up the RFPs at issue into

15   three buckets and to suggest that maybe at least as to the

16   third bucket, there may not be ultimately a dispute and that

17   it may depend on what you all produce, and perhaps the best

18   thing to do is to just set a date by which you will produce

19   what you have to produce and then see where we are.

20             I guess the first question to you would be:  Am

21   I right in looking at this in kind of, as kind of three

22   buckets of issues with three kind of distinctive responses

23   from Intel, and if so, at least as to bucket three, does

24   that seem like a reasonable path forward?

25             MS. MAJOR:  So, Your Honor, as to your first

1    question as to whether it's reasonable to look at these in

2    three buckets, we agree that that is the easiest way to kind

3    of cut to the nub of the issues.

4            With respect to what you've been referring to as

5    bucket number three where we are in the process of

6    completing a search in view of some of the clarification we

7    received from VLSI during our meet and confer, we do plan to

8    make those productions as quickly as possible, and my only

9    hesitation in offering up a date certain at this point is

10   that the unique nature of what VLSI has requested and what

11   we are trying to make available, which are simulators and

12   modeling tools, they are quite difficult to produce.

13           We are trying to compile both software tools and

14   licensing and input data that goes into these simulators so

15   that they can be functional in the source code review

16   environment.

17           At this point, I just cannot commit to a date

18   certain.  I can commit that we will make available what we

19   have found that is potentially responsive to VLSI's request

20   as quickly as we possibly can, and hopefully, that will be

21   later this month.  But that is the only hesitation I have in

22   agreeing that there is some date by which we will

23   definitively have those simulation tools available and set

24   up in the source code review environment.

25           THE COURT:  If I was concerned with having no

1 outer limits on the bounds of when there would be responsive

2 production with regard to this bucket, is there anything

3 that you're willing to concede that you could live with?

4 That is, well, at a minimum, the defendants would agree that

5 it would be fair if we were to start producing material as

6 of X and conclude our process by Y, or something similar?

7 Are there any boundaries you think it's fair that I could

8 put on you?

9     MS. MAJOR:  Certainly, Your Honor.  I think we

10 are in a position to make a partial production if not

11 tomorrow, then certainly by Wednesday of this week.  This

12 relates not to the simulation-related tools that I mentioned

13 that are the problematic aspects of the production, but to

14 some of the other requests that we've met and conferred with

15 VLSI about, and we can start rolling things out either

16 tomorrow or Wednesday of this week.

17     With respect to an outer bound, one potential

18 solution here might be to have the parties continue to meet

19 and confer and we could submit a joint update to the Court

20 as to timing as more information becomes available to us

21 about when the tools might be ready and available to VLSI

22 for use.

23     THE COURT:  And as to the RFPs in this third

24 bucket, Ms. Major, are there particular ones to which

25 the simulator tools are relevant to and particular ones

1    where they're not?  If I was trying to say, okay, of these

2    RFPs that are at issue, the ones that are likely to be

3    the most difficult to complete production are on blank,

4    do you have that at your disposal now?  If you don't, that's

5    fine.

6              MS. MAJOR:  I don't have them at my fingertips,

7    but I could compile this during the rest of this call and

8    get back to you.

9              THE COURT:  Okay.  Or maybe that I ask the

10   parties, as you said, to follow up on in a subsequent

11   letter.

12             Okay.  Let's assume one way or the other as to

13   bucket three I will be determining that it's not clear to me

14   that there are disputes as to that bucket yet and I will be

15   setting out some schedule or process by way for the

16   defendant to produce in a timely fashion what it has to

17   produce.  And, again, I may call for some additional

18   information on that.

19             Let's then focus on the other two buckets.

20   Again, a lot of my questions to Ms. Proctor is to try to

21   figure out what is the basic dispute as to these buckets.

22   In other words, why isn't defendant answering the RFPs in

23   bucket one and why aren't they answering them in bucket two?

24   To what extent are these reasons different?  And then what's

25   a process that I could kind of put in place to try to

1    resolve these disputes in a fair way knowing that we're

2    talking about a lot of RFPs here?

3              I'm happy to hear your thoughts about those

4    questions, both how we've categorized the disputes and about

5    how to resolve them.

6              MS. MAJOR:  Certainly.  So I will start with

7    what was referred to as bucket number one, and this I

8    believe was mentioned as 41 distinct requests.

9              Our understanding at the meet and confer we had

10   with VLSI was that the plaintiff's dispute was whether our

11   responses made clear we had, in fact, conducted a search in

12   order to provide our response.

13             We have now amended our RFP responses.  We took

14   issue with that, but we have now amended those RFP

15   responses, and we think that we have made clear that we have

16   conducted the search to verify that the documents that we've

17   already produced among the almost 3.8 million pages of

18   materials and the 3.4 terabytes of data that we've produced

19   in this case overlap with what has been requested fairly in

20   those RFPs.

21             Now, we have made objections to producing more

22   or conducting further searches where, for instance, those

23   RFPs call for documents relating to features that are not

24   accused or are so broad that they could arguably be read to

25   touch on products that are not at issue in this case.  And

1    so in our view in this bucket, we have, in fact, produced

2    the documents that are responsive subject to our objections

3    that kind of fall within a reasonable reading of these

4    requests that relate to this litigation and we don't know

5    what additional search we would conduct if Your Honor were

6    to order a search in this instance.

7              Now, I did hear Ms. Proctor say that in VLSI's

8    view, there are certain categories where they don't believe

9    what we've produced is sufficient to provide everything that

10   they're looking for in response to some subset of these

11   RFPs.  If that's the case, we're of course happy to hear

12   about the specifics and can look into those particular

13   requests further, but in my mind at least, I think that

14   would be a very efficient way to move this forward if there

15   are specific RFPs where VLSI is of the view that there

16   wasn't perfect overlap with what we've already provided and

17   what indeed they were looking for.

18             THE COURT:  So is what you are saying, to put it

19   differently, that as to these 41 RFPs, look, there may be

20   some aspects of them that you think are calling for

21   irrelevant information if they are read literally, i.e.,

22   calling for information that just doesn't sufficiently

23   relate to the claims or defenses at issue in this case, but

24   that of the, you know, of the remainder of them or as to the

25   rest of them, what you are asserting is when it comes to the

1    places that we would search and the people whose documents

2    we would search, we've searched them, and any docs that are

3    relevant or related to those relevant portions of the RFPs,

4    we've produced.

5             So it's not like we're sitting here saying, oh,

6    as to RFP 250, is there another document that exists with

7    regard to one of our custodians or in one of the places that

8    we have searched that we have not provided yet that would

9    meet the limits of this RFP and is relevant?  Yes, there is,

10   but we don't think we should have to look for it, because in

11   light of all that we have produced already, that would be

12   too burdensome.  That's not what you are saying?

13             MS. PROCTOR:  That's correct, Your Honor.

14             THE COURT:  Okay.  And then I guess to answer a

15   question of Ms. Proctor's, it sounds like in getting to the

16   point where you could issue the letter that is in Exhibit 9,

17   you must have tried in your own mind match up as to each

18   RFP, okay, do I think we've actually produced docs relevant

19   to this RFP before, and if so, like where did we do that?

20   Like, where in our production did we do that?

21             Do you have that information?  In other words,

22   if the plaintiff were to say, and, again, I'm just picking

23   an RFP, but as to RFP 250, okay, defendant, you say you've

24   produced documents responsive to this RFP already and you

25   think that's all you have, let's make sure we feel like that

1    is probably all you have or we understand what you are

2    talking about.

3            What docs are you referring to that you've

4    produced?  Do you have that information?

5            MS. MAJOR:  So, Your Honor, we don't have a

6    laundry list of all of that information at our disposal.  I

7    can say that part of the process involved circling back to

8    what we have produced.  Of course, we did receive these

9    requests prior to the document production deadline and there

10   was ongoing review, and so we also were taking a view of

11   whether the ongoing review of the search terms that had been

12   used for the ESI custodians and all of that ongoing

13   searching were broad enough to sweep in these topics and

14   were not, you know, leaving things out that were somehow

15   responsive here that might technically not have been

16   previously.

17           So I can guess what I think they are looking

18   for, is there something we can provide to plaintiffs to kind

19   of verify the overlap that we believe exists.  And I would

20   say to you that I think requesting that we go back through

21   the production of millions and millions of pages to identify

22   the full set of materials that are responsive to a given RFP

23   here would be quite burdensome, and so we don't have it at

24   our disposal, and I do think that it would be quite

25   difficult to now compile a, you know, fulsome set of all of

1    what is responsible to a given RFP here.  It's quite a

2    volume.

3              THE COURT:  No, and I'm not suggesting

4    unnecessarily I would order you to do that.  I'm just

5    wondering, you know, what have you done?  For example, let's

6    just try to make it specific as to at least one RFP.

7              If you could just turn to, and this is Exhibit 9

8    of the plaintiff's letter.  And Exhibit 9 is your letter of

9    October 10th.  And on page 3 of it, I just picked an RFP at

10   random, RFP 250.

11             This is an RFP that deals with documents

12   sufficient to show the release date, date of first sale

13   and first shipment of each of the accused products in the

14   U.S.

15             So for that one, your amended response is that

16   you've now conducted a reasonably diligent investigation

17   responsive to the request, and you're confirming you've

18   produced extensive financial data showing the first quarter

19   in which the accused products as defined in general

20   objections were sold and extensive data regarding them to

21   have a nexus with the United States.  That data is

22   responsive to this request and it pertains to the claims and

23   defense of the request.  Then you say you are not going to

24   separately search for and produce anything else.

25             So, you know, like for that one, I'm gathering,

1    you must know, and there must be some shared understanding

2    of what "extensive financial data" you're talking about, and

3    like if we were only dealing with that one RFP, the parties

4    could probably have a pretty focused conversation about,

5    okay, what data are you talking about?

6              To the extent plaintiff thinks they're asking

7    for more or something different, why do they think that?  Do

8    you have that kind of information?  Is that kind of

9    conversation possible?

10             MS. MAJOR:  Yes, Your Honor, that is accurate,

11   and certainly, the RFP you have selected is more focused

12   than some of them.

13             And so for this particular RFP, I believe we

14   have a certain document, a set, a small number of documents

15   that we know are responsive and provide the documents

16   sufficient to show that are being requested in this RFP.  So

17   that is very much a conversation that we could and would be

18   very willing to have with plaintiffs.

19             I would just note that this is a more focused

20   RFP, and for others of these, it is, you know, a broader set

21   of data that will be the overlap.

22             THE COURT:  It sounds like it may not always be

23   that easy.

24             MS. MAJOR:  Yes, exactly.

25             THE COURT:  Okay.  And then, lastly, as to

1    what I've been calling bucket two, these are the requests

2    in the plaintiff's letter that start with RFP Nos. 201,

3    et al.

4            It sounds like the nature of your objection

5    there is different than the nature of the 41 in bucket one,

6    and it sounded like the nature of the objection was

7    particularly relevance based.  Is that right or, if not,

8    tell me how the objections to this bucket differ from those

9    in the first.

10            MS. MAJOR:  Yes.  So we have objected to these

11    requests, and I know we referenced a particular example in

12    our letter.  We could march through some other examples if

13    it would be helpful to Your Honor.  But here, it's not just

14    that there's a difference in the types of objections that we

15    raised as compared to bucket three, which we were talking

16    about in the first instance.

17            Here, the issue is that discussion of these RFPs

18    is not as advanced as what was discussed in bucket number

19    three.  What we were speaking about as being part of bucket

20    RFP 3, or bucket number three, and what we're currently

21    conducting a search to try to provide VLSI what it's looking

22    for and which we feel is fairly requested, we have not had

23    that detailed meet and confer on this bucket of RFPs.  We

24    have indicated a willingness to do so and we remain willing

25    to do so.

1              But simply here, we're looking for an

2      explanation from VLSI as to how it is this request arguably

3      in their minds relates to what it actually is at issue in

4      this litigation.

5              If we can have that discussion and potentially

6      narrow the focus or gain some understanding about what these

7      RFPs are targeting, we may well be willing to provide

8      additional materials or conduct an additional search and

9      provide materials that are identified through that, but this

10     bucket really is just at a different stage in discussions

11     among the parties.

12             THE COURT:  And, for example, you made

13     reference, among others, to RFP No. 235, so, again, just

14     taking that one at random, which calls for documents created

15     or dated after January 1st, 2001, sufficient to identify

16     security breaches involving exploitation of Intel processors

17     or chip sets.

18             It sounds like you question the relevance of

19     that request as it relates to the claims of the defenses in

20     this case.  And aren't certain maps and further articulation

21     from the plaintiff, why is it any documents should be

22     produced in response to that RFP?  I mean, again, using that

23     as example, am I right about that and, if so, by way of

24     example, do you want to explain why this is one that falls

25     into bucket two, in your view?

```
 1              MS. MAJOR:  Yes.  So, Your Honor, as a good
 2    example to pick out, this request in our view calls for a
 3    very overbroad set of materials dealing with instances
 4    dating back more than 19 or 18 years, which is outside the
 5    time period of relevance in this case, broadly calls for
 6    anything relating to security breaches without reference to
 7    the particular patents or features that are asserted or at
 8    issue in this litigation.  So this is just a wide-ranging
 9    request that would call for a vast amount of material that
10    has absolutely no bearing on issues in this case.
11              If we can talk with VLSI and have a meet and
12    confer where maybe they're able to put some bounds on that
13    that that make it possible to conduct a search and provide
14    potentially responsive nonprivileged materials, we're happy
15    to do that, but we've not had that detailed meet and confer
16    discussion despite indicating a willingness to do so.
17              THE COURT:  Okay.  And, Ms. Major, as to these
18    issues, is there anything else that you'd want to say?
19    Again, we've been talking about them at a high level because
20    I think that's probably all I can talk about them at this
21    stage on, but is there anything else you'd like to say about
22    how you think I should go about from here setting out a
23    process by which to get closure on these?
24              MS. MAJOR:  Obviously, Your Honor, whatever your
25    preference is fine by Intel.  I have mentioned a few times
```

1    that we're happy to meet and confer, and if you wanted to

2    put a date certain by which we complete that meet and confer

3    on the calendar, we're amenable to that.  We don't want to

4    take any more of your time than necessary.

5             THE COURT:  Okay.  Thank you.

6             Let me turn back to Ms. Proctor and just ask if

7    there's anything more she wishes to add.

8             There is one question I have for you Ms.

9    Proctor, and that is, I think I have in my head how we can

10   address bucket three, but as to buckets one and two, which,

11   you know, amount to a pretty large number of RFPs, if I were

12   to have some further process that I set out by way of an

13   order which might include the parties more specifically

14   meeting and conferring, are there particular RFPs in buckets

15   one and two that you would say, Judge, I want you to have us

16   deal with those first because they're most important to us,

17   and, you know, if we're going to get stuff in response to

18   them, I want to make sure we get that sooner rather than

19   later?

20            Do you know what I'm asking?

21            MS. PROCTOR:  Yes, Your Honor.  Amy Proctor

22   again.

23            We'd be happy to provide a list of the high

24   priority RFPs in buckets one and two to Your Honor after

25   this call.  And to answer your first question, I do also

1    have a couple of comments I'd like to add on the three

2    buckets in general.

3                    THE COURT:  Okay.  Please do.

4                    MS. PROCTOR:  Thank you, Your Honor.

5                    So I will go in the same order.  Starting with

6    the third bucket, Ms. Major made statements that Intel has

7    already determined what simulators and things it intends to

8    produce.  I would assume in order for them to know what

9    licenses they need and to know the difficulties that she

10   expressed associated with producing them, that they have

11   identified the simulators and other materials they intend to

12   produce, or at least some of those materials.

13                   So I would say a good first step there would be

14   for them to identify immediately what those materials they

15   are fighting to produce are, because even if they can't

16   produce them tomorrow, if we know tomorrow what they are

17   planning to produce, then we can begin to evaluate whether

18   we think that production is likely to be sufficient when we

19   do get it, and I think that would speed up the process

20   significantly.

21                   THE COURT:  Okay.

22                   MS. PROCTOR:  Going to the first bit, so Ms.

23   Major mentioned that Intel's production on our original RFPs

24   continued through August 23rd, the schedule for document

25   production.  That's correct.

1           So we actually tried to serve our RFPs sooner

2      and Intel would not agree to finish its production in

3      response to our original RFP, and it is due on August 23rd.

4      And so that really limited the time at which we had to file

5      our RFPs.  And so we had to serve our RFPs before they

6      produced their production and we did so in July.  But we had

7      a good number of documents by that point and we had access

8      to the documents.

9           We knew in general strokes what they were

10     planning to produce.  Ms. Major said today for the very

11     first time Intel produced documents responsive to the

12     full scope in the first bucket.  We just don't think

13     that's true.  We served many of these requests based on

14     what had been produced as of that date, and in our view,

15     none of these requests completely overlap with the existing

16     production.

17          I would be happy to go through a couple of

18     examples.  For one, RFP 191 to 195, and these were new

19     requests in response to Intel's noninfringement position.

20     So there might have been some discovery that potentially

21     overlapped in some small part, but we don't think anything

22     produced to date, especially as to the full scope of those

23     issues.

24          And then for other requests where Intel has

25     actually provided a little bit of detail on what it thinks

1    it has produced that's responsive, and you gave one example,

2    RFP 50 to another, which is No. 225.

3                  For this one, we asked for all documents

4    relating to the reverse engineering, and it goes on.  And

5    what Intel's response says, it can produce marketing

6    materials and documents related to the competitive

7    advantages of Intel's products.  That is a quote.  And so

8    they have not even addressed reverse engineering.

9                  So we find it hard again to believe they really

10   think they've produced materials material to the full scope

11   of this request, which is reverse engineering, when they

12   even said in their response that they are only producing

13   marketing materials and documents related to competitive

14   advantages.

15                 And so, again, I think this even reinforces some

16   of the themes Your Honor addressed with Ms. Major about how

17   we need to know what they think they've produced that's

18   overlapping, and in many cases I don't think that we'll

19   agree that it's fully overlapping or that it fully

20   encompasses the scope of what we're entitled to.  And that

21   is one example where we certainly don't agree that marketing

22   materials overlap with reverse engineering or other

23   competitive analysis.

24                 THE COURT:  Understood.  And, you know, again,

25   just using that as an example, I mean, if that ultimately

1    came down to a dispute I had to adjudicate, I mean, of

2    course, among other things, one thing I would have to know

3    is to what extent does the defendant believe they have

4    produced documents that are overlapping, and generally, what

5    are those docs.

6              And then another issue I'd have to delve into

7    with the parties is to the extent the defendants are arguing

8    that some or all of the RFP calls for irrelevant

9    information, what's the assertion of relevance?  Does it

10   relate to damages, lost profits, or whatever?  And, of

11   course, if I was going to do that, the parties would have to

12   have that kind of granular discussion before I did that just

13   to make sure they teed up the issues properly and they were

14   speaking about apples to apples.

15             And so, again, you know, we're going to have to

16   have a process is that adjudicates this or results in no

17   dispute ultimately, and I am just trying to figure out how

18   to do that in an appropriate way.

19             I mean, on the one hand, I understand that the

20   plaintiff has propounded RFPs and there's no limit as to the

21   amount they can propound, and so the defendant ultimately

22   has to produce or have a valid basis for not producing, but

23   on the other hand, produce a ton of RFPs, you know, fairly

24   late in the game, it might take some time to get through all

25   of the disputes about them.  So I am just trying to figure

1    out how to find a happy medium.

2                Okay.  I think I've heard enough on this that I

3    can try to articulate a path forward to the parties.  What I

4    will do as to this issue as to the plaintiff's request with

5    regard to its fifth set of RFP is, either by the end of the

6    day today or first thing tomorrow, I will set out an order

7    that will require the parties to provide me with some

8    further information.  Likely what that will include is

9    asking the parties to meet and confer and to provide me

10   with some information about bucket three to include dates

11   by which the plaintiff, I'm sorry, the defendant will

12   expect to produce certain materials, and then additionally,

13   perhaps some other information about what materials they may

14   intend to produce in the future that they have not yet

15   produced.

16                And then as to buckets one and two, what I may

17   do is to ask the plaintiff to help me prioritize which ones

18   of those should the parties address first and then set out

19   some kind of further meet-and-confer process that will lead

20   to more focused resolution of those issues by me.  So the

21   parties should look for an order with regard to that very

22   shortly.

23                All right.  That all being said, I know that

24   there were also issues raised by the defendant's side that

25   have not yet been resolved, and this really relates to the

 1    issue of the assertion by defendant that the plaintiff has

 2    untimely added what it called dozens of accused product

 3    families to the case and the plaintiff's response that it

 4    hasn't.

 5            So on this issue, who is going to speak on

 6    behalf of defendants side?

 7            MR. LEE:  Your Honor, this is Bill Lee, and I

 8    will.

 9            THE COURT:  Okay.  Mr. Lee, on this front, I

10    mean, this is one of those where I kind of wished I had a

11    reply brief as part of our typical discovery dispute

12    process.  I mean, at a very high level, it sounded like to

13    some degree, defendant's position was you're adding product

14    families and you're doing it late in the game and you should

15    have done it much earlier, and the plaintiff's response is,

16    basically, no, we're not.  We're merely identifying

17    sub-families within already identified families, and that

18    the parties' briefs looked like they might be talking past

19    each other a bit as to that issue.

20            Is there anything, you know, as to that kind

21    of, like, big picture issue, anything you want to say to

22    help provide further clarity about what you think is really

23    in dispute here and what the parties are really arguing

24    about?

25            MR. LEE:  Yes, Your Honor.  Let me answer it in

1    two parts.  One is chronological, and that's discussing some

2    of the events that resulted or some of the events that

3    occurred before the supplemental contentions.  And then I

4    think I can take you to their contentions themselves and the

5    redline contentions, Exhibit 1 to our letter.  And all you

6    have to do is look at the way that they have characterized

7    things and you will see that this argument that these

8    product families are not new is just wrong in a literal

9    manner, and the best demonstration of that in my view is

10   just comparing what they said before to what they are saying

11   today.

12            So if I could just address those two issues

13   quickly, Your Honor, and if it's not answering your

14   question, just let me know.

15            THE COURT:  Sure.  Go ahead.

16            MR. LEE:  I think the backdrop is important

17   because VLSI began seeking discovery on accused products

18   almost immediately.  I think, as your Honor knows, there was

19   a requirement to disclose accused products in November of

20   2018.  There was a requirement under the default standard to

21   submit additional infringement contentions in January of

22   2019.

23            Very early on, VLSI began seeking discovery in

24   our view of unaccused products.  VLSI brought that issue to

25   Judge Connolly in June, and it was concisely the issue of

         1    whether the scope of the case, the scope of the accused

         2    products, discovery on accused and unaccused products need

         3    to have some proportional and clear limits.

         4            And I think, as your Honor knows, on June 18th,

         5    Judge Connolly said, no, I'm not going to allow you to have

         6    discovery into the unaccused products.  There are

         7    specifically accused products.  That's what we ought to be

         8    dealing with.  And that's where things sat until July 24th,

         9    which is just one month before the close of document

        10    discovery.

        11            And, you know, to some extent I agree with

        12    Ms.  Proctor, from what she said to you in arguing the

        13    first issue, which is, you know, time pressure is very

        14    serious and having newly accused products a month before the

        15    end of document discovery is a very serious problem for

        16    everyone.

        17            There has been no discovery on these new

        18    products, Your Honor.  VLSI, at least as far as we know, has

        19    no additional information at least from us on any of these

        20    new products in large part because of Judge Connolly's

        21    order, and all of the document discovery and the discovery

        22    that accompanied the document discovery through July 23rd

        23    focused on what had been the accused products as of

        24    November 2018 and January 2019.  And I don't think anybody

        25    can reasonably dispute that chronology.

1          The real focus, I think, and what Your Honor is

2     asking about is, are these new product families or not?  And

3     the answer is they are.

4          Your Honor, if I took you to -- I'm just going

5     to give you a couple of examples since they might help the

6     Court.  But if I took you to Exhibit 1 attached to our

7     letter.

8               THE COURT:  Okay.

9               MR. LEE:  And the pages aren't numbered, so I'm

10    going to count pages in.  But if I take you in about six

11    pages in, you will see the disclosure for the '027 patent.

12              THE COURT:  Okay.

13              MR. LEE:  And this is a, you know, a redline.

14    These are our track changes.  And so the things that I've

15    been stricken that are in red were the original infringement

16    contentions, and what is underlined on the chart is what is

17    underlined, what was new.

18          And let me turn you to the second page, and this

19    document is replete with examples like this.

20          You will see on the second page a chart that

21    has 2014, 2015, 2016, 2017, 2018.  In the original

22    disclosure of accused products, Coffee Lake and Kaby Lake

23    were accused product families that infringe.  You'll see

24    that in 2016 and 2017.  They are product families.  They had

25    separate names.  They're separate product families.  They

1    were at the time.  They are today.

2            What you will see, what VLSI has done in order

3    to make, and here's what I think is a confusing argument, is

4    in 2015, they have taken Coffee Lake and Kaby Lake, which in

5    their first disclosure was a separate product family and

6    they now call it a sub-family of Skylake.  So it somehow has

7    morphed from a separate family to a sub-family of another

8    product that has been identified in the earlier disclosure.

9            And then, Your Honor, they use that as a vehicle

10   to Amber Lake -- Amber Lake and Whiskey Lake --

11           THE COURT:  Yes.

12           MR. LEE:  -- in the same entry for 2015, which

13   you will not find anywhere.

14           So what they've done, they've redefined for

15   their own purposes what a product family is.  They have

16   taken what previously worked, product families, and now

17   called them sub-families, and in the process they have

18   dropped other families of products into that category as

19   well.

20           And actually, when you get into the, if Your

21   Honor gets into the substance of what they've done,

22   bypassing a Google test, you'll find that what they've

23   accused to define the families differs from patent to

24   patent.

25           So if I just turn Your Honor fours pages -- I'm

1    sorry, one page later, four pages later to the disclosure

2    for the '552 patent.

3                  THE COURT:  Okay.

4                  MR. LEE:  You'll see, Your Honor, it says,

5    disclosures, July 24th, 2019, '552 patent.

6                  THE COURT:  Yes.

7                  MR. LEE:  If you then look down at the chart,

8    Your Honor, this goes for three pages, four pages, in the

9    original disclosure, there was a column that had a parent

10   release year and then it had a column that said processor.

11   All right.  Those were the products that were accused.

12                 What has been added now is a new column called

13   product family, and here a different definition of product

14   family.

15                 And then, Your Honor, if you look at the column

16   on the right-hand side, it used to be called Processor.  Its

17   name has changed to Exemplary Sub-Family.

18                 And if you go on that page beginning with Ivy

19   Bridge to the next page, which goes to A Trail, to the next

20   page that goes to Forest Canyon, on that third page, you

21   will see a definition of another product family called the

22   14-nanometer product.  Again, this is a definition that was

23   not in the earlier disclosure.  It was first offered in

24   July.  It's basically a makeweight to allow them to list all

25   of these, what they call sub-families, fact families.  And

1    you'll see, Your Honor, even on that third page, Skylake,

2    now sub-families, which include products that were back in

3    January families, and it includes things like Coffee Lake

4    and Amber and Whiskey Lake.  I'm sorry.  Amber lake and

5    Whiskey Lake have never been listed before, and then it

6    continues onto the fourth page.

7              Your Honor, I would think these three things, I

8    hope I've answered your question.  Each of these products

9    has a different name because they are different products.

10   Each of these products were listed by not us, but by VLSI as

11   separate product families and separate products in their

12   initial disclosure for a reason, and that's because that is

13   what they are.

14             If VLSI has now redefined for its own purposes

15   what are called the family, what it calls a sub-family and

16   introduce a whole bunch of product names, however you

17   characterize it, that they had not accused before, there is

18   no way we can get that done with one month left in

19   discovery.  And it's not just a question of whether we can

20   get the information to them.  As your Honor knows, if we had

21   these additional products, product families, product

22   sub-families, whatever you want to call them, if we have to

23   address them, then we're going to have to go ourselves in

24   each one of these different categories, each one of these

25   different products, and we're going to have to identify how

1    they are the same and how they're different.  We're going to

2    have to come up with infringement contentions and

3    noninfringement contentions for each of them.  There's just

4    no way to get it done and have fact discovery close and

5    expert discovery occur on any principal basis.

6            So I hope I've answered Your Honor's question.

7    The answer at the end of the day is, it should have been

8    clear that after Judge Connolly ruled, that if you had

9    something to supplement, you should supplement it promptly.

10   That didn't occur, and what has happened now is,

11   notwithstanding they say is just clarifying things.  It's

12   not.  It's really the addition of new products.

13           THE COURT:  And, Mr. Lee, just to break in on

14   that front, I mean, I understand the plaintiff's argument I

15   think in part or maybe in whole to be, look, when it comes

16   to what we're calling a product family, we think there's

17   kind of a joint understanding that anything that's within

18   the product family basically functions in a structured, in

19   the same way, and so if we had been arguing about product

20   Family X in this case and we clearly identified product

21   Family X from the start as one that is at issue, if we were

22   to simply pick, you know, some sub-family members of Family

23   X and just be more specific about them or list them, it

24   wouldn't be a big deal, because whether or not any

25   sub-family member of Family X infringes or doesn't is the

1    same issue.  The thing is structured the same.  It functions

2    the same.

3              And so we think that's all we're doing here.  We

4    think we are identifying "sub-families" of already

5    identified product families that basically are structured

6    and function in exactly the same way, so no harm, no foul.

7    It sounds like what you are saying is, no.  Just as a

8    factual matter, what they are calling sub-families are

9    actually different families that are or at least may be

10   structured or function in a totally different way than

11   previously identified families.

12             Is that what you're saying?  And if so, how do I

13   know who is right?

14             MR. LEE:  Your Honor, that is exactly what we're

15   saying, and I think if I can give you a very clear example,

16   if I could bring you back to the '027 patent disclosure for

17   just like four pages earlier.

18             THE COURT:  Okay.

19             MR. LEE:  The last page of '0271 that we talked

20   about a little bit briefly.  You will see for Kaby Lake,

21   which had been listed in 2016 before, there's a Kaby Lake,

22   Kaby Lake R, Kaby Lake G.

23             We're not claiming that those sub-families of

24   Kaby lake are separate products or separate families that

25   have to be treated that they needed -- had to be treated

1    separately.  What we're saying is that Coffee Lake, Amber

2    Lake and Whiskey Lake are not the same as Kaby Lake R, Kaby

3    Lake G, that they are, in fact, different products.

4         And so, Your Honor, I think it's right.  I think

5    that we may be two ships passing in the night.  I don't

6    think everything in discovery needs to become an accusation.

7         They've taken the position that they're all just

8    part of sub-families, sub-families of larger families.

9    We've said no, and we've said there are things such as

10   sub-families.  We're not excluding them, but there are

11   products with different names.

12        And I think at the end of the day, Your Honor,

13   if you are searching for a tie-breaker, the tie-breaker I

14   would suggest are two questions, which is:  Why do the

15   products have different names, number one.  And the second

16   one was:  Why do you need to supplement if they're all the

17   same?

18        THE COURT:  And just looking at the '027, just

19   to understand fully your position, it looks like previously

20   they were calling Coffee Lake its own product family and

21   accusing it of a 2017 release year.  Now they are subsuming

22   Coffee Lake within the Skylake family vis-a-vis the 2015

23   release year.

24        If I were to say to you, well, they already

25   accused Coffee Lake, albeit a different release year, and

1    now they're just simply subsuming that within Skylake, so

2    you all must have been producing docs about Coffee Lake and

3    Coffee Lake must be at issue.  Is the answer that, no, it's

4    not, because they're talking now about a Coffee Lake from a

5    different release year and so it's a different structured

6    product?

7                    MR. LEE:  No, Your Honor.  And I may have been

8    unclear.  The fact that Coffee Lake has become a sub-family

9    when it was a family before is just an indication of what

10   has occurred with this supplemental disclosure.

11                   THE COURT:  Okay.

12                   MR. LEE:  We have produced on Coffee Lake.  The

13   reason that's important is because, as you look at that

14   chart, you will look forever and you won't find Amber Lake

15   or Whiskey Lake.

16                   THE COURT:  I see.

17                   MR. LEE:  So what has happened is, Skylake,

18   which was a product family before, it has now evolved into

19   having sub-families that include Coffee Lake and Kaby Lake,

20   which we have produced on before, and we're not claiming

21   that we have not produced on them before.  I don't think

22   that they are claiming we haven't subject to the issues that

23   Ms. Proctor and Ms. Major discussed.  But if you look at

24   Amber Lake and Whiskey Lake, you won't find them anywhere in

25   the January 2019 infringement disclosures.

1           So I basically have covered too quickly two

2     points, but they're related.

3           THE COURT:  No, I understand.  Now I understand

4     what you are saying.

5           MR. LEE:  Okay.

6           THE COURT:  At base, it's basically if you can't

7     find this name in their prior contentions, i.e., Amber Lake

8     and Whiskey Lake as to the '027, that should be out.  If you

9     can find it in the prior contentions, it's in, but you won't

10    find it with regard to Amber Lake and Whiskey Lake, which we

11    believe are separate product families and should have been

12    identified earlier.  Is that right?

13          MR. LEE:  Yes, and I think there are about 30 or

14    40 names in the category of Amber Lake or Whiskey Lake.

15          THE COURT:  And then I guess two last questions

16    for you.  One is -- I mean, one way to do this, I guess, if

17    it were me and I was making the call is, well, is the name

18    different, and if the name is different, it must be a

19    different family.  Is that the best I can do?  Isn't

20    there -- I mean, metaphysically, if I were to say, I just

21    want to be assured that it's really correct that what the

22    plaintiff is calling a sub-family isn't that at all and

23    really is a separate "family."  I mean, is there, other than

24    seeing that it has a different name, is there anything else

25    I can do?  Any other piece of info that the defendant might

1    be able to show me that would "confirm" that that is

2    metaphysically correct?

3                MR. LEE:   Yes.   There was one other thing,

4    Your Honor, which is, we have produced no documents on

5    Amber Lake or Whiskey Lake during the document discovery

6    period that Ms. Major and Ms. Proctor discussed with you

7    because they weren't accused products.

8                So the only information that could form the

9    basis of any of these additional names are this publicly

10   available information that has been available for months

11   now.   And if that's the basis, then the supplementation

12   should have occurred earlier.   So there's also just a timing

13   and prejudice issue.

14               And let me just add one other thing, and that

15   is, Your Honor, it's an answer that's related.   In the

16   briefing to Your Honor, there's a suggestion that one of the

17   reasons that they're supplementing now is because of a

18   deposition that took place where a witness talked about some

19   of these being from the same families.

20               And what I would just say, Your Honor, this is

21   Exhibit 14 to their exhibits, and it includes -- it

22   specifically addresses a question whether Skylake, Kaby Lake

23   and Coffee Lake are different products.   And you'll see, if

24   you go to page 52 of their exhibit, that it says they're

25   different products.

```
1              THE COURT:  Yes.

2              MR. LEE:  So I think that there is -- I think

3   the answer to your question is, I understand exactly what

4   you are saying.  I'm not sure if the question just was up or

5   down substantively, that there's enough information for Your

6   Honor to resolve it, but given that all -- it's based on

7   publicly available information, we think virtually we can

8   believe at least for the most part why was supplementation

9   among the proposed discovery?

10             THE COURT:  Well, I guess as to that, and this

11  is Exhibit 14 is the Krishnamoorthy deposition.  If it's not

12  correct that -- well, I guess that admission there, when

13  he's asked, when he's asked, what about Whiskey Lake, is

14  that also a part of Skylake, it sounds like what he ends up

15  saying is, well, they're all in the same family.

16             Is that what he's saying, and if he's saying

17  they're in the same family, how come you're saying they are

18  not in the same family?

19             MR. LEE:  Well, Your Honor, the first thing is,

20  if you look at their disclosure, they've identified families

21  by five different definitions.  No one asked him about the

22  definitions they used in the contentions, but I think the

23  answer is actually at page 52, because the question of

24  whether given that the question of families and sub-families

25  has been, it has been argued it's a moving target, the
```

1    question is are they different products, because if they are

2    different products, it will implicate different products,

3    different features, different infringement contentions going

4    both ways.

5            And what he says on page 52, which is after the

6    portion they've quoted for you, immediately after, or close

7    to immediately after is, they are different products.

8    Skylake is a different product.  Kaby Lake is a different

9    product.  Coffee Lake is a different product.

10           So the real question, especially given that VLSI

11   has used different definitions of what a family is, what a

12   sub-family is, the real question is, are they different

13   products, because that will implicate different discovery,

14   different contentions.  And the answer is they are.  They

15   have different names.  They have different -- they have

16   similar overlapping features.  They have some features that

17   are different.

18           And if they can supplement it on this basis, we

19   need to have all the discovery that is required to litigate

20   those additional products.

21           THE COURT:  Okay.  So it sounds like what you

22   are saying is, look, even to some degree, if some or all of

23   these additional product-related or accused product-related

24   names are actually in the same family, but are different

25   products, even to the extent that the parties have

1    previously been talking about, you know, identified families

2    as being in and unidentified families as being out of the

3    case, if now even within a family you're identifying

4    different products at this late date because that's going to

5    implicate a significant amount of new discovery, it's just

6    too late as to that.

7            Is that part of what you are saying?

8            MR. LEE:  Yes.  I think, Your Honor, if I were

9    to phrase it at all differently, we think it would be this.

10   We think these are different products and therefore

11   different families, and the way that VLSI has characterized

12   them in the original contentions is correct.  But if you set

13   that aside and you accept the characterization that they

14   have made of sub-families that I tried to take you through,

15   they're still different products and it has all of the

16   prejudice and the problems that we've tried to identify.

17           THE COURT:  Okay.  Thank you, Mr. Mr. Lee.  Let

18   me turn to your colleague on the other side.

19           Who is going to speak on behalf of the plaintiff

20   for this issue?

21           MR. ABERNATHY:  Good afternoon, Your Honor.

22   This is Chris Abernathy of Irell Manella for the plaintiff,

23   VLSI.

24           THE COURT:  Okay.  Mr. Abernathy, and good

25   afternoon to you.  You've heard the back and forth that I've

 1    been having with your colleague on the other side and, you

 2    know, I mean, I guess the bucket, the buckets of discussion

 3    I would summarize as, you know, is it fair, and how do I

 4    know it's fair to assert that the newly identified products

 5    are within already identified families or whether

 6    alternatively they are really just new and shouldn't be

 7    added to the case at this late stage?

 8            I'm happy to hear from you as to how you would

 9    like to frame plaintiff's view on why they are really not

10    new and it's not a big deal to add them where we are now.

11            MR. ABERNATHY:  Thank you, your Honor.  So this

12    goes back to the discovery hearing that was held in June of

13    2019 -- June 18th, 2019.

14            At that hearing, Intel contended that it was

15    entitled to limit discovery to products that VLSI had

16    identified by "family names" in infringement contentions.

17    Intel also contended that Intel could identify Intel product

18    prior art by family names as well because, "We identified

19    products by family because that's the level at which Intel

20    talks about these things."

21            Intel went on to explain how its expert

22    witnesses would talk about things at the family level and

23    how documents refer to things at the family level, and one

24    example that was focused on at the hearing was Nehalem.

25            Nehalem is in the Intel product family that

1      includes 11 sub-families and 186 processors.  Some of the

2      sub-families had completely different names like Jasper

3      Forest or Blue Bell or Arendale, for example, yet Intel took

4      the position that according to Nehalem, the family was

5      perfectly fine for Intel in its invalidity contentions and

6      that it was fine for VLSI to use it.

7              Intel did the same for other product prior art,

8      like Henron, 152 processors.  The Pentium 10, which as two

9      sub-families, and so on.

10             The Court found that this was sufficient for

11     both parties, and the Court specifically found that Intel

12     Family 2 Nehalem was sufficient for its invalidity

13     contentions.

14             Now, turning to VLSI's infringement contentions.

15     Intel has conceded that it is very confusing how Intel

16     defines its own product family hierarchy.  Intel has done

17     everything possible to hide the ball on this throughout this

18     litigation.  They even refused to answer an interrogatory,

19     Interrogatory No. 16 that was seeking for them to decide

20     which families had different features.

21             And so after the Court ruled on June 18th that

22     identification by family name was the way this case is going

23     to be run, we in an abundance of caution amended our

24     infringement contentions shortly thereafter, just a month

25     thereafter on July 24th to add further specificity of the

1    sub-families within families already in use.

2              Now, one of the things Mr. Lee talked about was

3    how there's some discrepancy between our initial

4    infringement contentions and what was identified as a

5    sub-family of what and our later infringement contentions.

6    That is merely reflective of the fact of how confusing it is

7    about how Intel identifies its family structure, but that

8    should not govern the scope of this case.

9              Infringement contentions are intended to provide

10   fair notice of the plaintiff's infringement theories.  We

11   have done so.  Noticeably absent from anywhere in their

12   brief or from Mr. Lee's discussion just now is any

13   allegation that we failed to provide fair notice or that the

14   infringement allegations that we provided aren't

15   representative of the infringement allegations for

16   everything we listed in our amended infringement

17   contentions.

18             Now, there's some confusion here, I think this

19   is by design, that Intel was trying to hide the ball.  We

20   need to focus on these patents individually.

21             So first let's talk about the '026 and '027

22   patents.  Now, Intel put up a redline that shows a lot of

23   red because we restructured the way the table is.  But in

24   reality, there are only two disputed product sub-families at

25   issue for the '026 and '027.  That's Amber Lake Y and

1    Whiskey Lake.  Intel confirmed this in written

2    correspondence prior to the meet-and-confer process.  Now,

3    there also appeared to be no dispute that Amber Lake Y and

4    Whiskey Lake are both sub-families of Skylake, a family that

5    VLSI identified for both '026 and '027 in our original

6    infringement contentions.

7            Their 30(b)(6) witness confirmed that Amber Lake

8    is in the same family as Skylake and that Whiskey Lake is

9    part of the Skylake family, and so this fact is in dispute

10   and Mr. Lee did not just dispute that.  What he's trying to

11   say is, well, they're different products.  Sure, they are

12   different products within the same family, but the rules of

13   this case, as the Court ruled, is that identification at the

14   family level is sufficient, like Intel has been permitted to

15   do for its invalidity contentions.

16           THE COURT:  Well, Mr. Abernathy, just to step

17   in there, am I right that a part of your argument as to why

18   it is that there isn't any prejudice or any problem about

19   kind of further identifying by what you call sub-family here

20   is that by just simply articulating that Amber Lake and

21   Whiskey Lake are a part of the accusations for the '026

22   and '027, or maybe it's just the '027, you're asserting,

23   I think, it's not like we're going to have to start from

24   scratch with regard to infringement as to those products,

25   because I think what you are saying is, the way we

1    understand it, if other members of that family, which we're

2    calling Kaby Lake and Coffee Lake, if they infringe, so,

3    too, will Amber Lake and Whiskey Lake.  They are all

4    structured the same.  They work the same.  It's not like

5    we're going to have to gin up whole new infringement

6    contentions, noninfringement contentions, discovery, et

7    cetera, about these "new products."

8            Is that part of your assertion?  I mean, is that

9    what you are saying?

10           MR. ABERNATHY:  Yes.  That is exactly correct,

11   Your Honor.

12           So in our infringement contentions, both the

13   original and the supplemental infringement contentions,

14   we expressly state that "the theory of infringement

15   described below in connection with the asserted claims is

16   analogous to the theories of infringement for all accused

17   products."

18           We are asserting that the infringement theory

19   disclosed, which that is what Paragraph 4C requires, the

20   disclosure of an infringement theory, we are asserting that

21   it applies to all of the families and sub-families within

22   those families.  And notably, Intel is not disputing that.

23   There is nothing in their motion or nothing that Mr. Lee

24   just said suggesting that they are challenging that they

25   have fair notice of our infringement brief or that we've

1    shown sufficient representatives.  And if they were to show

2    challenge that, we have already offered to amend our

3    infringement contentions again in the coming weeks to add

4    further detail as to representative, if that's the issue.

5    But clearly, that's not what's at issue here.  Intel is

6    trying to with words and with their own product named

7    inventions in order to try to shrink the scope of their

8    damages exposure.

9             There's not a dispute here over whether or not

10   these products have been accused of infringement.  We've

11   simply provided more specificity to the set of products that

12   have the features we have already expressly accused and have

13   accused the whole time.

14            THE COURT:  And if you are right then that in

15   light of Judge Connolly's prior order and the way the case

16   has been run on the invalidity side, that the real question

17   here is whether these assertedly newly identified products

18   or families are really part of already identified families,

19   obviously, for the '027, you have the Exhibit 14 that you

20   point to, where you that have Mr.  Krishnamoorthy providing

21   some evidence that, yes, Whiskey Lake and Amber Lake are, in

22   fact, a part of an already identified Skylake family.

23            What about as to the other patents though?  Do

24   you have that same kind of evidence?  And if I wasn't sure

25   who is right, why wouldn't I default to the defendant's

1     side?

2                    MR. ABERNATHY:   Yes.   Let's again keep walking

3     through these patent by patent because they are really

4     different issues.

5                    Next is the '331 patent.   In the '331 patents,

6     we have accused Intel's product families based on a feature

7     called the management engine.   It is an embedded subsystem

8     with an Intel product, and many different Intel products

9     include that embedded subsystem.

10                   And from the very get-go in our initial

11    infringement contentions, we accused Versions ME6 through

12    ME14, and those are families.   And Intel can argue however

13    it wants about trying to define its own internal family

14    name, but there is no dispute that we have accused all of

15    the ME6 products, for example, all the M7 products, ME8.

16                   Now, there also is no dispute that these are

17    representative.   In fact, while it's not shown in the

18    motion, Intel's 30(b)(6) witness was deposed just on Friday.

19    This is William Stevens.   And he testified that the ME10 is

20    representative for the purposes of this case for all of ME6

21    through ME10 products.

22                   And he further testified that ME11 is

23    representative for the purposes of this case for all ME11

24    and ME14 products.   And so in adding specificity in our

25    amended contentions, all he did was have some additional

1    sub-families listed within the ME6, ME7, ME10 and ME12

2    products.  It's shown in blue in our brief.

3              And, once again, I don't hear any dispute from

4    Intel that they are on fair notice of our infringement

5    allegations of each of these ME versions or that they are

6    representative.  Indeed, they can't do that, because their

7    30(b)(6) witness just testified to it on Friday.

8              THE COURT:  So, for example, you're saying as to

9    the ME6, you had previously identified IVEX chipset as

10   infringing.  You've now added or identified the Tylersburg

11   chipset as well.  Your assertion is if one infringes, the

12   other does.  Everyone knows that has been our allegation.

13   We'd be perfectly happy living with a world in which we

14   don't prove infringement as to the AVEX chipset.  We

15   couldn't prove it as to the Tylersburg chipset, and that is

16   the way this case will go.  And that's why, among other

17   things, it's not a problem that we've just been more

18   specific in identifying another chipset that falls within

19   the ME6 version.

20             Is that what you are saying?

21             MR. ABERNATHY:  Yes, but it goes even beyond

22   that, your Honor.  Their 30(b)(6) witness testified that the

23   ME10 would be representative of ME6 products and everything

24   in between, so it's even further than that.  They are really

25   saying that ME6 through ME10 is one design for the purposes

1    of this case and ME11 through ME14 is another different set,

2    substantially similar.

3            THE COURT:  Do I have that deposition transcript

4    before me or no?

5            MR. ABERNATHY:  No, Your Honor.  The deposition

6    occurred on Friday.

7            THE COURT:  I see.  Okay.

8            MR. ABERNATHY:  This is very well established

9    through discovery.

10           THE COURT:  I know you wanted to address the

11   'tt2 as well.

12           MR. ABERNATHY:  Yes, Your Honor.  So the '552 is

13   where most of the sub-families at issue here on this motion

14   exist.  So thus far for the '027 and '026, it was just two,

15   Amber Lake and Whiskey Lake, and for the '331, I don't know

16   that there's any issue there given that it's undisputed that

17   it is representative.

18           Now, for the '552, the families at issue are

19   fabrication process families.  Now, the '552 patent, it

20   concerns a technique for reinforcing an area of integrated

21   circuit to alleviate a problem with defects caused by stress

22   applied to a bond patent.

23           And what VLSI has accused of infringement from

24   the get-go is a set of products that are made in accordance

25   with a particular fabrication process design methodology.

1      The infringement theory will apply to all integrated

2      circuits that are made with that accused fabrication process

3      design.

4                  Now, at the start of this case we identified an

5      infringing methodology in the 22-nanometer family, usually

6      reverse engineering with the chip as well as an example of a

7      sub-family.

8                  That reverse engineering is extremely costly.

9      You're talking about hundreds of thousands, if not, more,

10     dollars.  Based on that reverse engineering, we filed our

11     complaint, did our initial infringement contentions and got

12     discovery.  Through the course of discovery we obtained

13     design rules of Intel about the 22-nanometer fabrication

14     process.

15                 Design rules are rules that set forth the rules

16     defining the infringing fabrication process, design,

17     methodology in question.

18                 Now, based on the design rules that were

19     produced for the 22-nanometer family, we strongly suspected

20     Intel was applying the same infringing fabrication process

21     design methodology to its 14-nanometer and 10-nanometer

22     product families as well.

23                 The issue was, we did not yet have evidence to

24     confirm that suspicion, so we didn't have necessarily a

25     Rule 11 basis to update our infringement contentions at that

1    time.   So we sought further discovery.   We conferred with

2    Intel for months, and Intel agreed after many back-and-forth

3    sessions through May and July, or through July.   Around

4    June, Intel agreed to produce documents for Broadwell,

5    Skylake, Kaby Lake, Coffee Lake and Whiskey Lake, which are

6    all in the 14 nanometer family.   They also agreed to produce

7    documents for Cannon Lake, which is in the ten-millimeter

8    family, adding those products to the case.

9              Now, in producing those documents, Intel

10   produced the design rules for the 14 nanometer and the

11   ten-nanometer families, and they produced those on

12   July 16th, 2019, after months of back and forth between May

13   and July.   And those design rules confirmed exactly VLSI's

14   suspicion, that Intel was indeed applying the same

15   methodology process to its 14-nanometer and 10-nanometer

16   product families.   VLSI promptly amended its contentions to

17   eight issues later, on July 24th, 2019.

18             So we still do contend that everything listed in

19   the '552 is a sub-family of either the 22 nanometer process

20   family, the 14-nanometer process family, or the

21   ten-nanometer process family, and I think that ends the

22   question there, but even if it did not, clearly, it was

23   not timely.   It's based on discovery that was long sought

24   and that we amended just days after receiving that

25   discovery.

1          And, once again, I do not hear any contentions

2    from Intel, not in their brief, not in Bill Lee's argument

3    that they have either lack of fair notice as to what our

4    infringement theory is for these products or that there's

5    insufficient representatives.  In fact, their brief says the

6    opposite.  It seems to agree that Intel uses certain of the

7    same manufacturing process technology for all of these

8    production.

9          THE COURT:  And, Mr. Abernathy, one last

10   question on my end before I give your colleague the last

11   word on the other side is, if you were to lose this motion,

12   if you were not to prevail and if the accused products were

13   frozen prior to your most recent submission, what would the

14   impact on you be?

15         And if you were saying, if the other side was

16   saying, look, it's not the end of the world.  If they still

17   think, you know, maybe after going through this case or

18   maybe in some other time frame that there are other products

19   to accuse, they can so accuse them in a separate case or

20   process.

21         Why would that be prejudicial or why is that a

22   bad outcome?

23         MR. ABERNATHY:  Well, so, Your Honor, first and

24   foremost, the impact primarily is one of damages.  That's

25   really what I think is going on here.  There's no real

1    dispute as to the theory of infringement or

2    representativeness or that they have fair notice.  There's

3    also no real dispute as to discovery.  All of the parade of

4    horribles that Intel raised in its motion about the need for

5    copious additional document production, the need for ESI

6    discovery, that's all not real.

7            We have not asked for additional discovery based

8    on our supplemental contentions.  We have not asked for

9    additional ESI.  In fact, the parties finished negotiating

10   ESI search terms after we made our contentions and

11   supplemented in August, and we have not asked to reopen

12   that.

13           Intel has not identified any new depositions

14   that need to be scheduled, so we have not identified any

15   case schedule that we would need to shift.  Simply put, we

16   provided this supplementation four months before the close

17   of fact discovery, five months for expert reports and

18   16 months before trial.

19           There is no reason that these products should

20   not be in this case because, simply put, we've already

21   accused the features of infringement and this is simply a

22   more specific list of the products that include those

23   already accused features that are already within families we

24   dispute.

25           Now, if Intel would be permitted to cut all of

1    these sub-families from the '552 patent, the primary impact

2    would be one of damages.  It's not going to change how this

3    case is litigated.  It's simply going to decrease Intel's

4    damages exposure because they are going to be saying, look,

5    even though the same infringement applies to them, they're

6    out of the case.  Therefore, you can't calculate them in the

7    damages calculus.

8               THE COURT:  In other words, you'd --

9               MR. ABERNATHY:  And there will be some question

10   as to whether collateral estoppel or the Tesla doctrine will

11   apply after the case is settled.  It is really, there is no

12   benefit to --

13              THE COURT:  In other words, you arguably lose up

14   to six years in damages as to those products, depending on

15   what some future fact-finder decided?  Is that what you are

16   saying?

17              MR. ABERNATHY:  Potentially.

18              THE COURT:  All right.  Anything further, Mr.

19   Abernathy, before I turn to your colleague on the other

20   side?

21              MR. ABERNATHY:  No, but I anticipate that I will

22   have some response if it's available.

23              THE COURT:  Well, we have to get to the end here

24   shortly.

25              So, Mr. Lee, it's your motion.  I will give you

1    the chance to reply.  And at least to start, the one

2    question I have is, you know, I know you have asserted that

3    whether you call them separate products or separate

4    families, these new additions are going to involve separate

5    discovery and separate documents, but what Mr. Abernathy is

6    saying is, but as a practical matter, when it comes to what

7    the case is about, which is do they infringe, there's

8    nothing different there.  The argument about infringement is

9    going to be the same as it is as to the previously

10   identified family/products, and so there really isn't all

11   that big a deal about bringing these in now.  It's really

12   just about the defendant trying to cut us off from a certain

13   amount of damages.

14           What's your response as to that?

15           MR. LEE:  Your Honor, I have two responses, and

16   as I listened to the argument by Mr. Abernathy, we were

17   accused three times of trying to hide the ball essentially,

18   and the answer is we are not and we have not and we

19   wouldn't.

20           The answer is, these are different products with

21   different features.  I actually think, Your Honor, when you

22   look at the RFPs that you were discussing with Ms. Proctor

23   and Ms. Major, you will find that bringing these products

24   in, these new product families in, will implicate a number

25   of the significant RFPs you had before that Rule Book 97

1      that was filed a little late today.

2                  The mere fact that they say there's no more

3      discovery to take isn't correct.  We have documents that --

4      we gathered documents of all the product families they've

5      identified.  In fact, Your Honor, for the '552, just to be

6      clear, in May of this year, VLSI sent us a letter, Exhibit 9

7      to their letter, and they added, they asked to add six

8      product families to the accused products to supplement the

9      disclosure that had been made in January.

10                 We agreed and we then produced documents for

11     those product families back in May.  We agreed simply

12     because we thought 46 product families being added back in

13     May, there was no reason to bring it to the Court, and it

14     should be resolved later.

15                 So I think the idea that you could add all of

16     this a month before the close of fact discovery, that we

17     would have to produce all of the documents relevant to this

18     30 to 40 products that have different names just isn't

19     correct.  And to put us in a situation where they submitted

20     what they've made through now with this simple argument

21     that, oh, you can treat them all the same, and we wouldn't

22     be in a position to be able to prove our documents

23     demonstrate that that wasn't, in fact, true.  We couldn't

24     produce our witnesses to prove that that was, in fact, not

25     true.  It would be very prejudicial if you are giving them

1    the benefit of the late disclosure.

2              Let me make one last point, Your Honor, if I

3    could.

4              THE COURT:  Okay.

5              MR. LEE:  As I listened to Mr. Abernathy for

6    each of the patents he went through, he would make an

7    argument that there was something that occurred after

8    January that provided them additional information that

9    allowed them to make the supplemental disclosure.  So the

10   '026 and '027, it was the deposition.  For the '331, it was

11   the deposition of I guess a week ago.  For the '552, it was

12   design files, which Your Honor, are not layout files.

13   They're different.  I don't think we give the information

14   that we're talking about here.  But setting that aside, that

15   was in July.

16             If we take VLSI at their word, that there were

17   these events that occurred later in the day, that's part of

18   the genesis for the supplementation, then to allow the

19   supplementation without any opportunity to reasonably

20   respond would be pretty prejudicial, and that's what we're

21   concerned about.

22             I understand completely what you are saying

23   about the six years of damages.  Instead, there's a

24   suggestion that that was our motivation here.  I can assure

25   you that it's not.

1      But when the question is who is going to be most

2   prejudiced by adding the 30 to 40 products not identified by

3   name before July to the case a month before fact discovery,

4   it's going to be a challenge for both of us, but Intel will

5   surely be prejudiced.

6              THE COURT:  Okay.  Thank you, Mr. Lee.

7              Mr. Abernathy, I will give you just one minute

8   to say anything else you want to say here.

9              MR. ABERNATHY:  Thank you, Your Honor.

10             So first and foremost in Mr. Lee's rebuttal, he

11  again tried to shift the goalpost from product family to

12  product.  It has been settled in this case that product

13  family is the appropriate level of which to identify things

14  that are accused of infringement and things that are

15  identified as a product's prior art, like Nehalem Intel's

16  family.

17             Mr. Lee said that they have not produced

18  discovery yet on all sub-families.  Well, that's okay.

19  They also have not produced discovery on all sub-families of

20  their product prior art, so as I said, Nehalem has 11

21  sub-families and 186 processors.

22             They certainly have not produced source code on

23  all 186 of the processors or different documents for each of

24  them because, simply put, producing source code for one is

25  representative, and that's the way this case is to be run.

1           And so it's simple fiction that they would need

2    to go through and produce source code for every single

3    sub-family, everything identified.  And those sub-families

4    would have been included even if we are not amended because

5    we were simply adding further speculation that the Court did

6    not require.

7           THE COURT:  Okay.

8           MR. ABERNATHY:  Finally, Your Honor, Mr. Lee

9    said that we were relying on recent depositions as the basis

10   for our supplementation for the '026, '027 and '331, and

11   that is simply not true.  I was referring to those

12   depositions of evidence of the fact that they are, indeed,

13   correct, these are sub-families.  Noticeably, in Mr. Lee's

14   rebuttal, he did not dispute at all that anything we have

15   listed is, in fact, a sub-family.

16          THE COURT:  Could you have known earlier they

17   were sub-families, earlier than July?

18          MR. ABERNATHY:  Frankly, Your Honor, I don't

19   think that is the standard.  The default standard says the

20   parties shall be permitted to supplement, and, frankly, we

21   didn't have any impetus to supplement until after the

22   June 18th hearing, when the Court said the family name is

23   going to be how it's done in this case.

24          So with an abundance of caution, we scoured the

25   earth to find -- you know, to try to reverse engineer

1    Intel's inventions, the Datamize arc on their website and

2    things like that to add further specificity above and beyond

3    what the Court was even requiring just in an abundance of

4    caution.    Now, Intel having been provided that specificity

5    is complaining about it.

6            THE COURT:  But, Mr. Abernathy, you would agree

7    that under the default standard, if it made a difference in

8    addressing a new product or a new family, it's not as if you

9    could know that you should do it six months ago, but then

10   say, well, you know, the default standard, it allows me to

11   supplement anytime I want, so what I'm going to do is, I'm

12   just going to wait six months, and on the very last day,

13   then I am going to do it, because that will really hurt

14   them.

15           It wouldn't allow you to do that.  Right?

16   There's a timeliness component that underlies even what is

17   provided by the default standard, is there not?

18           MR. ABERNATHY:  That is correct, Your Honor, but

19   we did identify the family originally.  We were just adding

20   the sub-family specificity.

21           Like I said, the Court did not require this.

22   Intel is trying to use our going above and beyond as a tool

23   to try to extract some sub-families that already fell within

24   the families identified in the damages portion.

25           THE COURT:  And, again, just to put a finer

1    point on it, if you think about the '027, I know there's a

2    dispute here about what it means to add Amber Lake and

3    Whiskey Lake.  Now, there's a dispute about whether are

4    those different families, are those different products

5    within a family?  And whatever they're called, do they

6    possibly engage a different infringement analysis?

7             I know those are disputes, but if it's just

8    about the question of why did it, why did plaintiff add

9    those to its contentions when it did and not say a month

10   before or six months before, is it that, well, in this

11   deposition that is attached as Exhibit 14, we were told that

12   these are in the same family, so that's why we did it, or is

13   there some other explanation about why you added them when

14   you added them?

15            MR. ABERNATHY:  No, Your Honor.  The deposition

16   came after the supplementation.  The deposition was cited

17   here simply as proof of the fact that, in fact, it is not in

18   dispute that these are sub-families.  This is their 30(b)(6)

19   witness who testified to this.  So this is admitted, and

20   Bill Lee has not denied it on this call.

21            Now, we did not need to ever add these

22   sub-families into our infringement contentions for them to

23   deal with in the case because we've already identified

24   Skylake in our initial infringement contentions, and this

25   Court ruled on June 18, 2019, that the identification of a

1    family like Skylake or Nehalem almost moots everything

2    within that family.  That's what the Court ruled.  And we

3    did not add this at all.  We just did it out of an abundance

4    of caution and because Intel's main inventions are difficult

5    to decipher, so why not add further specificity?  We should

6    not be penalized for adding further specificity we did not

7    need to add.

8                THE COURT:  Okay.  Just humor me then and answer

9    my question, which is:  When did you know that you could add

10   them if you were so inclined to provide further specificity

11   that you're not required to provide?  In other words, did

12   you know that you could have provided that further

13   specificity six months ago, or did you know that you could

14   have provided that further specificity one day before you

15   amended?  That's what I'm asking.

16               I understand your overarching argument that you

17   are not required to identify sub-families, but I'm asking a

18   different question.  I'm asking when it is that you had the

19   basis of information to know that Amber Lake and Whiskey

20   Lake are, in fact, sub-families of Skylake for purposes of

21   your infringement analysis as to the '027 patent.  What is

22   the answer?

23               MR. LEE:  The answer is, Your Honor, after the

24   June 18th hearing, we did a further investigation to try to

25   identify all of the sub-families we could, and that's when

1    we came to acknowledge Amber Lake and Whiskey Lake were, in

2    fact, sub-families of Skylake, which we had already

3    identified.  So we promptly added them to our disclosures

4    even though we were not required to do so.

5                    THE COURT:  Okay.  We will have to leave it

6    there.

7                    MR. LEE:  It was after the June 18th hearing and

8    before the Krishnamoorthy deposition.

9                    THE COURT:  Okay.  We'll have to leave it there.

10   And I appreciate counsel's argument on this issue and the

11   other.

12                    On this issue, with regard to the addition of

13   accused products, it's an important one, and I understand

14   that it has significant ramifications and a minimum for

15   damages as well as potentially for the case schedule, so I

16   want to think about the parties' arguments for at least some

17   short period of time and reflect back on the transcript of

18   our call today.  So I will take the matter under advisement.

19                    My hope will be to issue an order resolving this

20   in the relatively short-term.  It's possible I may ask the

21   parties for some additional information, though I may not.

22   In any event, I understand the parties want to get a prompt

23   answer so that they know what the scope of the case will be

24   moving forward and I will be focused on that.

25                    So with regard to these issues, in a sense I'm

1   taking them all understand advisement, but as I said, with

2   regard to the discovery disputes that have been raised by

3   the plaintiff's side, you can expect orders from me very

4   shortly that will set out a process for resolving those.

5   And with regard to the dispute that the defendant has

6   raised, I will take it under advisement and hope to get

7   something to you as soon as I can.

8              With all of that said, is there anything from a

9   procedural perspective that we need to take up otherwise at

10  this time?  On the plaintiff's side, Mr. Abernathy?

11             MR. ABERNATHY:  I don't believe so, Your Honor.

12             THE COURT:  Okay.  On defendant's side, Mr. Lee

13  or Ms. Major?

14             MR. LEE:  It is Bill Lee.  Nothing, Your Honor.

15  Thank you.

16             THE COURT:  Okay.  All right, counsel.  I

17  appreciate your arguments again.  I wish everybody a good

18  day and a good week and I look forward to working with you

19  on the case in the future.  We'll end our call today.  Thank

20  you.

21             (Counsel respond, "Thank you, Your Honor.")

22             (Telephone conference concluded at 2:42 p.m.)

23                        -   -   -

24

25