IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| VLSI TECHNOLOGY LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 18-966-(CFC) |
| | ) | |
| INTEL CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

**INTEL CORPORATION'S NOTICE OF SUBPOENAS TO
<u>FINJAN HOLDINGS, LLC</u>**

PLEASE TAKE NOTICE THAT, pursuant to Federal Rules of Civil Procedure 26, 30(b)(6), and 45, Defendant Intel Corporation will serve Finjan Holdings, LLC with the attached subpoenas for the production of documents and things and deposition testimony.  The production and deposition shall be made at such date, time, and location as is specified in the accompanying subpoenas, or at such date, time, and location as ordered by the Court.

PLEASE TAKE FURTHER NOTICE that, pursuant to Rule 30(b)(3) of the Federal Rules of Civil Procedure, the deposition will be videotaped and recorded stenographically. You are invited to attend and cross-examine.

The subpoenas and their schedules describing the relevant subject matter are attached.

OF COUNSEL:

William F. Lee
Dominic E. Massa
Joseph J. Mueller
Jordan L. Hirsch
Louis Tompros
Felicia H. Ellsworth
Kate Saxton
Benjamin N. Ernst
Thomas F. Lampert
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000

Gregory H. Lantier
Amanda L. Major
Joshua L. Stern
R. Gregory Israelsen
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006
(202) 663-6000

S. Calvin Walden
Jeffrey A. Dennhardt
WILMER CUTLER PICKERING
  HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 295-6359

Arthur W. Coviello
Christine E. Duh
WILMER CUTLER PICKERING
  HALE AND DORR LLP
950 Page Mill Road
Palo Alto, CA 94304
(650) 858-6069

August 5, 2021

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jeremy A. Tigan*

_____

Jack B. Blumenfeld (#1014)
Jeremy A. Tigan (#5239)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@morrisnichols.com
jtigan@morrisnichols.com

*Attorneys for Defendant*

AO 88A  (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of Delaware

| | |
|---|---|
| VLSI Technology LLC | ) |
| *Plaintiff* | ) |
| v. | )    Civil Action No.   1:18-cv-00966-CFC |
| Intel Corporation | ) |
| | ) |
| *Defendant* | ) |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:            Finjan Holdings, LLC
c/o Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801

*(Name of person to whom this subpoena is directed)*

☑ *Testimony:* **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action.  If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:
See attached Schedule A.

| Place: To be mutually agreed upon by the parties. | Date and Time:<br>09/07/2021 or as mutually agreed by the parties. |
|---|---|

The deposition will be recorded by this method:   Stenographically, video, audio, and/or LiveNote

❐ *Production:*  You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:    08/05/2021

         *CLERK OF COURT*

                       OR          /s/ Gregory H. Lantier

       *Signature of Clerk or Deputy Clerk*                  *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*   Intel Corporation
, who issues or requests this subpoena, are:

Gregory Lantier, 1875 Pennsylvania Ave, NW, Washington, DC 20006, gregory.lantier@wilmerhale.com, (202) 663-6327

## Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88A  (Rev.  02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No.   1:18-cv-00966-CFC

## PROOF OF SERVICE

### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❐ I served the subpoena by delivering a copy to the named individual as follows: _____

_____ on *(date)* _____ ; or

❐ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88A  (Rev.  02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

 **(1) *For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
   **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
   **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
      **(i)** is a party or a party's officer; or
      **(ii)** is commanded to attend a trial and would not incur substantial expense.

 **(2) *For Other Discovery.*** A subpoena may command:
   **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
   **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

 **(1) *Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

 **(2) *Command to Produce Materials or Permit Inspection.***
   **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
   **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
      **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
      **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

 **(3) *Quashing or Modifying a Subpoena.***
   **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
      **(i)** fails to allow a reasonable time to comply;
      **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
      **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
      **(iv)** subjects a person to undue burden.
   **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

      **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
      **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
   **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
      **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
      **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

 **(1) *Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:
   **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
   **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
   **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
   **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

 **(2) *Claiming Privilege or Protection.***
   **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
      **(i)** expressly make the claim; and
      **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
   **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

---

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

# SCHEDULE A

# DEFINITIONS

The words and phrases used in these Topics shall have the meanings ascribed to them under the Federal Rules of Civil Procedure.  In addition, the following terms shall have the meanings set forth below whenever used in any Topic:

1.      "Finjan," "You," "Your," and/or "Finjan Entities" mean CFIP Goldfish Holdings LLC, Finjan LLC, Finjan Software, Inc., Finjan Holdings, LLC, and/or their parent entities, subsidiary entities, affiliated entities, and any companies that have a controlling Interest in CFIP Goldfish Holdings LLC, Finjan LLC, Finjan Software, Inc., and Finjan Holdings, Inc., together with each of their respective divisions, predecessors, successors, and any current or former employee, officer, director, principal, agent, consultant, representative, or attorney thereof, or anyone acting on their behalf, collectively or individually.

2.      "Intel" means Intel Corporation, including when communicating through its present and former officers, employees, representatives, agents, and anyone acting on its behalf.

3.      "Fortress" means Fortress Investment Group, LLC, and/or its parent entities, subsidiary entities, and affiliated entities, together with each of their respective divisions, predecessors, successors, present and former officers, directors,

employees, representatives, agents, and anyone acting on its behalf, collectively or individually.

4.  "VLSI" means Defendants VLSI Technology LLC, CF VLSI Holdings LLC, and/or their parent entities, subsidiary entities, and affiliated entities, together with each of their respective divisions, predecessors, successors, present and former officers, directors, employees, representatives, agents, and anyone acting on their behalf, collectively or individually.

5.  "Acquisition" means the acquisition by Fortress of Finjan Holdings, LLC and its wholly owned subsidiary Finjan LLC.

6.  "Patent License Agreement" means the Confidential Settlement, Release, and Patent License Agreement dated November 20, 2012, entered into by Intel, Finjan, Inc., and Finjan Software, Inc.

7.  "Person(s)" means natural persons as well as business entities and associations of all sorts, including partnerships, companies, firms, proprietorships, joint ventures, corporations, government agencies, and unincorporated associations.

8.  "Investor(s)" means any Person who holds or has held (a)any security issued by any of the Finjan Defendants, or (b) any derivative security (as defined in 17 CFR § 240.16a-1) the value of which is in any way related to any of the Finjan Entities.

- 2 -

9.      "Litigation" means the above-referenced action, 1:18-cv-00966-CFC, in the United States District Court for the District of Delaware.

10.     "Chancery Court Litigation" means the action filed by Intel Corporation in the Delaware Court of Chancery, *Intel Corporation v. Fortress Investment Group, et al.*, C.A. No. 2021-0021-MTZ (Del. Ch. Ct.).

11.     "Interest" means a financial interest of any kind in the subject matter of this Litigation or any other interest that could be substantially affected by the outcome of this Litigation.

12.     "Document(s)" has the broadest possible meaning permitted by Rules 26 and 34 of the Rules of the Federal Rules of Civil Procedure and the relevant case law, and specifically and without limitation include tangible Things and electronically stored information, including e-mail, texts, messages and information stored on computer disk or other electronic, magnetic, or optical data storage medium. "Document(s)" also includes all drafts or non-final versions, alterations, modifications, and amendments to any of the foregoing.

13.     "Communication(s)" means the transmittal of information in the form of facts, ideas, inquiries, and any exchange or transfer of information whether written, oral, electronic, or in any form.

- 3 -

14. "Date(s)" shall mean the exact date(s), if known, or the closest approximation to the exact date(s) as can be specified, including without limitation the year, month, week in a month, or part of a month.

15. "Relating" means regarding, referring to, concerning, mentioning, reflecting, pertaining to, analyzing, evidencing, stating, involving, identifying, describing, discussing, documenting, commenting on, dealing with, embodying, responding to, supporting, contradicting, comprising, containing, or constituting (in whole or in part), as the context makes appropriate.

16. The singular form of a word shall be interpreted as plural, and vice versa; the use of the masculine form of a pronoun also includes within its meaning the feminine form of the pronoun so used, and vice versa; and the use of any tense of any verb includes also within its meaning all other tenses of the verb so used.

17. The connectives "and" and "or" shall be construed either disjunctively or conjunctively so as to acquire the broadest meaning possible, so as to bring within the scope of the Request all information that might otherwise be construed to be outside its scope.

18. The term "all" is to be construed to mean "any" and "each" and vice versa.

- 4 -

19.    "Including" shall be construed to mean "including, without limitation" or "including, but not limited to."

20.    "Identify" means (1) when referring to a Person, the Person's full name, present or last known address and telephone number, and the last known title and place of employment; (2) when referring to Documents, the production number or type of Document, its general nature and subject matter, Date of creation, and all author(s), addresses(s), and recipient(s); (3) when referring to a source or Thing, sufficient information to identify the location, ownership, and nature of such source or Thing.

## **DEPOSITION TOPICS**

1.    Any Communications with one or more of Fortress Investment Group, LLC, VLSI Technology LLC, and CF VLSI Holdings LLC Relating to the Patent License Agreement, the Acquisition, this Litigation, or the Chancery Court Litigation.

2.    Any Communications with one or more of Irell & Manella LLP and/or Moore & Van Allen Relating to the Patent License Agreement, the Acquisition, this Litigation, or the Chancery Court Litigation.

3.    The Acquisition and/or the Patent License Agreement.

4.    Any patent licenses entered on behalf of one or more of the Finjan Entities at any time between 2007 and 2017.

- 5 -

5.     Licensing policies of any of the Finjan Entities in place between 2007 and 2017.

6.     The receipt and distribution of any funds paid by Intel under the Patent License Agreement.

7.     Each of the Finjan Entities' revenues from 2007 to the present and the source of those revenues.

8.     Any of the Finjan Entities' revenue projections for 2020 through 2030.

9.     The identity of the directors, managers, and senior employees of each of the Finjan Entities in 2012, 2020, and today.

10.    The corporate formation (without regard for date) and ownership (presently and for the past three years) of each of the Finjan Entities.

11.    Fortress's direct or indirect control, or lack thereof, over each of the Finjan Entities.

12.    Evidence Relating to anything of value, including funds, transferred to or from any of the Finjan Entities, or any of their employees, officers, or directors, directly or indirectly, to or from Fortress or VLSI, or any of their employees, officers, or directors.

13.    The Chancery Court Litigation.

14.     The identity of the three Finjan employees, officers, outside counsel, and/or other personnel most knowledgeable regarding the Patent License Agreement and its negotiation and drafting.

15.     The identity of the Finjan employees, officers, outside counsel, and/or other personnel most knowledgeable regarding the Acquisition, including knowledge of the decision to enter into a sale or acquisition of Finjan, the bidding process, the due diligence process, the entities that participated, and the negotiations between Finjan and said entities.

16.     Due diligence prior to the Acquisition by any and all entities that presented bids to purchase Finjan and participated in due diligence.

17.     The identity of all entities that participated in the bidding process to acquire Finjan, including those referred to as "Party A," "Party B," "Party C," and "Party D" in Finjan Holdings, Inc.'s Schedule 14D-9 filed with the United States Securities and Exchange Commission on June 24, 2020.

18.     Any Communications with Fortress Relating to Fortress's due diligence review of the Finjan Entities' assets and liabilities, including but not limited to the Finjan Entities' patents and patent licenses, from January 1, 2018 through the present.

19.     Fortress's control over, oversight of, or access to the Finjan Entities' cash, assets, other funding sources, bank accounts, or finances generally.

20.     Any Communications between the Finjan Entities and Fortress Relating to patent purchases, patent licenses, or litigation.

21.     Documents sufficient to show all patents owned, assigned, or licensed to any of the Finjan Entities.

22.     Any actual or threatened preemptive challenges to the validity of any patents owned, assigned or licensed to any of the Finjan Entities, including Documents sufficient to show all threatened or filed petitions for *Inter Partes* review.

23.     The following documents served or produced in *Goebert v. Finjan Holdings Inc.*, No. 2020-0610 (Del. Ch. Ct.):  all written discovery responses Finjan served, all deposition transcripts from depositions taken of Finjan witnesses, any pleadings filed under seal, and any documents produced under Section 220 of the Delaware General Corporation Law.

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of Delaware

| | |
|---|---|
| VLSI Technology LLC | ) |
| *Plaintiff* | ) |
| v. | )    Civil Action No.   1:18-cv-00966-CFC |
| Intel Corporation | ) |
| | ) |
| *Defendant* | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:        Finjan Holdings, LLC
c/o Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See attached Schedule A.

| Place: To be mutually agreed upon by the parties. | Date and Time: 09/07/2021 or as mutually agreed by the parties. |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:    08/05/2021

*CLERK OF COURT*

                                     OR

                              /s/ Gregory H. Lantier

     *Signature of Clerk or Deputy Clerk*                           *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*   Intel Corporation
                                               , who issues or requests this subpoena, are:

Gregory Lantier, 1875 Pennsylvania Ave, NW, Washington, DC 20006, gregory.lantier@wilmerhale.com, (202) 663-632

## Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.   1:18-cv-00966-CFC

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❐ I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

❐ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00    .

I declare under penalty of perjury that this information is true.

Date: _____       _____

*Server's signature*

_____

*Printed name and title*

_____

*Server's address*

Additional information regarding attempted service, etc.:

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

 **(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

 **(2)** *For Other Discovery.* A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

 **(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

 **(2)** *Command to Produce Materials or Permit Inspection.*
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

 **(3)** *Quashing or Modifying a Subpoena.*
  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

 **(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

 **(2)** *Claiming Privilege or Protection.*
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## SCHEDULE A

## DEFINITIONS

The words and phrases used in these Requests shall have the meanings ascribed to them under the Federal Rules of Civil Procedure. In addition, the following terms shall have the meanings set forth below whenever used in any Request:

1.      "Finjan," "You," "Your," and/or "Finjan Entities" mean CFIP Goldfish Holdings LLC, Finjan LLC, Finjan Software, Inc., Finjan Holdings, LLC, and/or their parent entities, subsidiary entities, affiliated entities, and any companies that have a controlling Interest in CFIP Goldfish Holdings LLC, Finjan LLC, Finjan Software, Inc., and Finjan Holdings, Inc., together with each of their respective divisions, predecessors, successors, and any current or former employee, officer, director, principal, agent, consultant, representative, or attorney thereof, or anyone acting on their behalf, collectively or individually.

2.      "Intel" means Intel Corporation, including when communicating through its present and former officers, employees, representatives, agents, and anyone acting on its behalf.

3.      "Fortress" means Fortress Investment Group, LLC, and/or its parent entities, subsidiary entities, and affiliated entities, together with each of their respective divisions, predecessors, successors, present and former officers, directors,

employees, representatives, agents, and anyone acting on its behalf, collectively or individually.

4.      "VLSI" means Defendants VLSI Technology LLC, CF VLSI Holdings LLC, and/or their parent entities, subsidiary entities, and affiliated entities, together with each of their respective divisions, predecessors, successors, present and former officers, directors, employees, representatives, agents, and anyone acting on their behalf, collectively or individually.

5.      "Acquisition" means the acquisition by Fortress of Finjan Holdings, LLC and its wholly owned subsidiary Finjan LLC.

6.      "Patent License Agreement" means the Confidential Settlement, Release, and Patent License Agreement dated November 20, 2012, entered into by Intel, Finjan, Inc., and Finjan Software, Inc.

7.      "Person(s)" means natural persons as well as business entities and associations of all sorts, including partnerships, companies, firms, proprietorships, joint ventures, corporations, government agencies, and unincorporated associations.

8.      "Investor(s)" means any Person who holds or has held (a)any security issued by any of the Finjan Defendants, or (b) any derivative security (as defined in 17 CFR § 240.16a-1) the value of which is in any way related to any of the Finjan Entities.

9.      "Litigation" means the above-referenced action, 1:18-cv-00966-CFC, in the United States District Court for the District of Delaware.

10.     "Chancery Court Litigation" means the action filed by Intel Corporation in the Delaware Court of Chancery, *Intel Corporation v. Fortress Investment Group, et al.*, C.A. No. 2021-0021-MTZ (Del. Ch. Ct.).

11.     "Interest" means a financial interest of any kind in the subject matter of this Litigation or any other interest that could be substantially affected by the outcome of this Litigation.

12.     "Document(s)" has the broadest possible meaning permitted by Rules 26 and 34 of the Rules of the Federal Rules of Civil Procedure and the relevant case law, and specifically and without limitation include tangible Things and electronically stored information, including e-mail, texts, messages and information stored on computer disk or other electronic, magnetic, or optical data storage medium. "Document(s)" also includes all drafts or non-final versions, alterations, modifications, and amendments to any of the foregoing.

13.     "Communication(s)" means the transmittal of information in the form of facts, ideas, inquiries, and any exchange or transfer of information whether written, oral, electronic, or in any form.

- 3 -

14.     "Date(s)" shall mean the exact date(s), if known, or the closest approximation to the exact date(s) as can be specified, including without limitation the year, month, week in a month, or part of a month.

15.     "Relating" means regarding, referring to, concerning, mentioning, reflecting, pertaining to, analyzing, evidencing, stating, involving, identifying, describing, discussing, documenting, commenting on, dealing with, embodying, responding to, supporting, contradicting, comprising, containing, or constituting (in whole or in part), as the context makes appropriate.

16.     The singular form of a word shall be interpreted as plural, and vice versa; the use of the masculine form of a pronoun also includes within its meaning the feminine form of the pronoun so used, and vice versa; and the use of any tense of any verb includes also within its meaning all other tenses of the verb so used.

17.     The connectives "and" and "or" shall be construed either disjunctively or conjunctively so as to acquire the broadest meaning possible, so as to bring within the scope of the Request all information that might otherwise be construed to be outside its scope.

18.     The term "all" is to be construed to mean "any" and "each" and vice versa.

19.     "Including" shall be construed to mean "including, without limitation" or "including, but not limited to."

- 4 -

20.     "Identify" means (1) when referring to a Person, the Person's full name, present or last known address and telephone number, and the last known title and place of employment; (2) when referring to Documents, the production number or type of Document, its general nature and subject matter, Date of creation, and all author(s), addresses(s), and recipient(s); (3) when referring to a source or Thing, sufficient information to identify the location, ownership, and nature of such source or Thing.

## **INSTRUCTIONS**

The following instructions shall apply to all the below Requests and should be considered part of each Request.

21.     You shall produce all responsive Documents (including any stored by electronic means).  If You are withholding or intend to withhold any Documents responsive to these Requests, You are requested to state the basis for withholding the Document in a manner sufficient to enable Intel and the Court to adjudicate the validity of its withholding.  In the case of any Documents being withheld on the grounds of attorney-client privilege, work-product doctrine, or other privilege doctrine or immunity, please also provide a privilege log identifying the following information for each Document:

- 5 -

a.      the Date appearing on the Document, and if no Date appears thereon, so state and give the Date, or approximate Date, on which the Document was prepared;

b.      the type or general nature of the Document (i.e., whether it is a letter, memorandum, email, minutes of a meeting, etc.);

c.      the name, title, and company affiliation of the Person who prepared the Document;

d.      the name, title, and company affiliation of each Person to whom the Document was disclosed, including the Person or Persons to whom it was addressed and the Person or Persons who received the Document, or copies of the Document including blind copy recipients, and any individual to whom the Document was distributed, shown, or explained;

e.      the name, title, and company affiliation of the Person or Persons who maintain custody of the Document; and

f.      the general subject matter of the Document and the basis for withholding the Document, in a manner sufficient for Intel and the Court to determine the validity of Your withholding.

22.    Produce all responsive Documents in Your actual or constructive possession, custody, or control, or the actual or constructive possession, custody, or

control of Your attorneys, accountants, representatives, consultants, agents, employees, or anyone else acting on Your behalf. You are to produce entire Documents, including attachments, enclosures, cover letters, memoranda and appendices.

23.    Each Document is to be produced along with all nonidentical drafts thereof in their entirety, without abbreviation or redaction, and as maintained in the ordinary course of business.  In the event that multiple copies of a Document exist, produce every copy on which appear any notations or markings of any sort not appearing on any other copy.

24.    If You contend that any Request is objectionable in whole or in part, You shall state with particularity each objection, the basis for it, and the categories of information to which the objection applies and shall respond to the Request insofar as it is not deemed objectionable.

25.    If You find the meaning of any term in these Requests unclear or ambiguous, You shall assume a reasonable meaning, state what the assumed meaning is, and respond to the Request according to the assumed meaning.

26.    The Documents produced in response to these Requests shall be (a) organized and designated to correspond to the categories in these Requests or, if not, (b) produced as they are maintained in the normal course of business, and in either case: (i) all associated file labels, file headings, and file folders shall be produced

together with the responsive Documents from each file and each file shall be identified as to its owner or custodian; (ii) all Documents that cannot be legibly copied shall be produced in their original form; otherwise, You may produce photocopies; (iii) all photocopies shall be stapled or clipped as the originals; and (iv) each page shall be given a discrete production number.

27.     None of the Definitions or Requests set forth above and below shall be construed as an admission Relating to the existence of evidence, to the relevance or admissibility of any evidence, or to the truth or accuracy of any statement or characterization in the Definition or Request.

28.     These Requests are continuing in nature and require supplemental or additional responses in accordance with Rule 26(e) of the Federal Rules of Civil Procedure.

## **DOCUMENT REQUESTS**

1.     All Communications with one or more of Fortress Investment Group, LLC, VLSI Technology LLC, and CF VLSI Holdings LLC Relating to the Patent License Agreement, the Acquisition, this Litigation, or the Chancery Court Litigation.

2.     All Communications with one or more of Irell & Manella LLP and/or Moore & Van Allen Relating to the Patent License Agreement, the Acquisition, this Litigation, or the Chancery Court Litigation.

- 8 -

3.      All Documents and Communications Relating to the Acquisition and/or the Patent License Agreement.

4.      All patent licenses entered on behalf of one or more of the Finjan Entities at any time between 2007 and 2017.

5.      All Documents and Communications relating to any licensing policies of any of the Finjan Entities in place between 2007 and 2017.

6.      Documents sufficient to show the receipt and distribution of any funds paid by Intel under the Patent License Agreement.

7.      Documents sufficient to show each of the Finjan Entities' revenues from 2007 to the present and to identify the source of those revenues.

8.      All Documents reflecting one or more of the Finjan Entities' revenue projections for 2020 through 2030.

9.      Documents sufficient to identify the directors, managers, and senior employees of each of the Finjan Entities in 2012, 2020, and today.

10.     Documents sufficient to show the corporate formation (without regard for date) and ownership (presently and for the past three years) of each of the Finjan Entities.

11.     All Documents and Communications that Relate to Fortress's direct or indirect control, or lack thereof, over each of the Finjan Entities.

12.     All Documents and Communications evidencing anything of value, including funds, transferred to or from any of the Finjan Entities, or any of their employees, officers, or directors, directly or indirectly, to or from Fortress or VLSI, or any of their employees, officers, or directors.

13.     All Communications Relating to the Chancery Court Litigation.

14.     Documents sufficient to identify the three Finjan employees, officers, outside counsel, and/or other personnel most knowledgeable regarding the Patent License Agreement and its negotiation and drafting.

15.     Documents sufficient to identify the Finjan employees, officers, outside counsel, and/or other personnel most knowledgeable regarding the Acquisition, including knowledge of the decision to enter into a sale or acquisition of Finjan, the bidding process, the due diligence process, the entities that participated, and the negotiations between Finjan and said entities.

16.     All Documents and Communications relating to due diligence prior to the Acquisition by any and all entities that presented bids to purchase Finjan and participated in due diligence.

17.     Documents sufficient to identify all entities that participated in the bidding process to acquire Finjan, including those referred to as "Party A," "Party B," "Party C," and "Party D" in Finjan Holdings, Inc.'s Schedule 14D-9 filed with the United States Securities and Exchange Commission on June 24, 2020.

- 10 -

18.     All Communications with Fortress Relating to Fortress's due diligence review of the Finjan Entities' assets and liabilities, including but not limited to the Finjan Entities' patents and patent licenses, from January 1, 2018 through the present.

19.     All Documents and Communications Relating to Fortress's control over, oversight of, or access to the Finjan Entities' cash, assets, other funding sources, bank accounts, or finances generally.

20.     All Communications between the Finjan Entities and Fortress Relating to patent purchases, patent licenses, or litigation.

21.     Documents sufficient to show all patents owned, assigned, or licensed to any of the Finjan Entities.

22.     Documents sufficient to show all actual or threatened preemptive challenges to the validity of any patents owned, assigned or licensed to any of the Finjan Entities, including Documents sufficient to show all threatened or filed petitions for *Inter Partes* review.

23.     The following documents served or produced in *Goebert v. Finjan Holdings Inc.*, No. 2020-0610 (Del. Ch. Ct.):  all written discovery responses Finjan served, all deposition transcripts from depositions taken of Finjan witnesses, any pleadings filed under seal, and any documents produced under Section 220 of the Delaware General Corporation Law.

- 11 -

# Exhibit A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| VLSI TECHNOLOGY LLC, | |
| Plaintiff, | |
|  | C.A. No. _____ |
| v. | **JURY TRIAL DEMANDED** |
| INTEL CORPORATION, | |
| Defendant. | |

## VLSI TECHNOLOGY LLC'S COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff VLSI Technology LLC ("VLSI"), by and through its undersigned counsel, pleads the following against Intel Corporation ("Intel") and alleges as follows:

## THE PARTIES

1.     Plaintiff VLSI is a Delaware limited liability company duly organized and existing under the laws of the State of Delaware. The address of the registered office of VLSI is Corporation Trust Center, 1209 Orange St., Wilmington, DE 19801. The name of VLSI's registered agent at that address is The Corporation Trust Company.

2.     VLSI is the assignee and owns all right, title, and interest to U.S. Patent Nos. 6,212,633 ("the '633 Patent"), 7,246,027 ("the '027 Patent"), 7,247,552 ("the '552 Patent"),

7,523,331 ("the '331 Patent"), and 8,081,026 ("the '026 Patent") (collectively, the "Asserted Patents").

3.      On information and belief, Defendant Intel is a corporation duly organized and existing under the laws of the State of Delaware, having its principal place of business at 2200 Mission College Blvd., Santa Clara, CA 95054.

## JURISDICTION AND VENUE

4.      This is an action arising under the patent laws of the United States, 35 U.S.C. § 1 *et seq*. Accordingly, this Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

5.      This Court has personal jurisdiction over Intel because Intel is incorporated in Delaware. Intel also manufactures products that are and have been used, offered for sale, sold, and purchased in the District of Delaware.

6.      Under 28 U.S.C. §§ 1391(b)-(d) and 1400(b), venue is proper in this judicial district because Intel is incorporated in this district, has committed acts of infringement within this judicial district giving rise to this action, and does business in this district.

## FIRST CLAIM

### (Infringement of U.S. Patent No. 6,212,633)

7.      VLSI re-alleges and incorporates herein by reference Paragraphs 1-6 of its Complaint.

8.      The '633 Patent, entitled "Secure data communication over a memory-mapped serial communications interface utilizing a distributed firewall," was duly and lawfully issued April 3, 2001. A true and correct copy of the '633 Patent is attached hereto as Exhibit 1.

9.      The '633 Patent names Paul S. Levy and Steve Cornelius as co-inventors.

10.     The '633 Patent has been in full force and effect since its issuance. VLSI owns by assignment the entire right, title, and interest in and to the '633 Patent, including the right to seek damages for past, current, and future infringement thereof.

11.     The '633 Patent states that it relates to a "distributed firewall . . . utilized in conjunction with a memory-mapped serial communications interface." Ex. 1 at Abstract.

12.     The '633 Patent explains that "Peer-to-peer communications are particularly useful in bandwidth-intensive operations such as video communications. Thus, for example, if a computer CPU is coupled to a video display and a DVD drive through an IEEE 1394 interface, the DVD drive could transmit video information directly to the video display over the interface, thereby eliminating the need for the CPU to process and oversee the transmission." Ex. 1 at 2:51-60.

13.     The patent further explains that "one problem associated with . . . memory-mapped communications interfaces, is that there is no provision for secured communications between devices coupled to such interfaces. Each data transmission is broadcast to every node on the interface. Only a node that is indicated as the destination for a data transmission handles the transmission—all other nodes ignore the data transmission. Moreover, data is transmitted without any encryption—a process often used in other environments to scramble transmitted information and thereby prevent unauthorized entities from comprehending any intercepted information." Ex. 1 at 2:60-67.

14.     The '633 Patent states that the "distributed firewall incorporates security managers in the selected nodes that are respectively configured to control access to their associated nodes, thereby restricting access to such nodes to only authorized entities." Ex. 1 at 3:52-56.

15.     VLSI is informed and believes, and thereon alleges, that Intel has infringed and unless enjoined will continue to infringe one or more claims of the '633 Patent, in violation of 35 U.S.C. § 271, by, among other things, making, using, offering to sell, and selling within the United States, supplying or causing to be supplied in or from the United States, and importing into the United States, without authority or license, Intel products with the infringing features, including Intel products containing Intel On-Chip System Fabric (commonly abbreviated "IOSF") technology.

16.     The '633 accused products, for example, embody every limitation of at least claim 36 of the '633 Patent, literally or under the doctrine of equivalents, as set forth below. The further descriptions below, which are based on publicly available information, are preliminary examples and are non-limiting.

**["A method of controlling access to first and second nodes from a plurality of nodes coupled to one another over a memory-mapped serial communications interface of the type supporting peer-to-peer communications between the plurality of nodes, the method comprising:"]**

17.     The '633 accused products implement a method of controlling access to multiple IOSF sideband agents (such as the circuit hosting the TMCSRCCLK, TMCSRCCKL2, ENCCKRQ, and ICCSEC registers as described on page 181 of the Intel C620 Series Chipset Platform Controller Hub Datasheet, as well as the "Intel ME" and "PMC" circuits).

Case 1:18-cv-00066-CFC-CJB  Document 743  Filed 03/05/21  Page 34 of 120 PageID #:
23686
Case 1:18-cv-00966-VAC-CJB  Document 143  Filed 06/28/18  Page 5 of 47 PageID #: 5

| 5 | 0h RW/L | **Lock Bit for Group 1 of Dynamically Configured ICC Registers (Lock_ICCG1Dyn):** This lock bit covers registers TMCSRCCLK, TMCSRCCLK2, ENCCKRQ 0: Target endpoint will accept all incoming requests as normal. 1: Target endpoint will deny incoming requests addressed to above listed ICC Registers, unless those requests are attributed with Intel ME SAI or PMC SAI. When denying a request, target endpoint will generate a completion packet as follows: Read will complete without data as Unsuccessful on IOSFSB (normally read completes with data as Successful on IOSFSB), Non-posted Write will complete without data as Unsuccessful on IOSFSB (normally non-posted write completes without data as Successful on IOSFSB) and the Write does not take effect at the register (i.e., register content is not affected.) |
|---|---|---|
| 4:1 | 0h RO | Reserved. |
| 0 | 0h RW/L | **Lock Bit for ICC Security Register (Lock_ICCSEC):** This lock bit covers register ICCSEC, i.e., this same register where this lock bit resides. 0: Target endpoint will accept all incoming requests as normal. 1: Target endpoint will deny incoming requests addressed to ICCSEC register, unless those requests are attributed with Intel ME SAI. When denying a request, target endpoint will generate a completion packet as follows: Read will complete without data as Unsuccessful on IOSFSB (normally read completes with data as Successful on IOSFSB), Non-posted Write will complete without data as Unsuccessful on IOSFSB (normally non-posted write completes without data as Successful on IOSFSB) and the Write does not take effect at the register (i.e., register content is not affected.) |

18.     This method controls access over a memory-mapped serial communications

interface.  For example, ICCSEC is memory-mapped at offset 0x1020.

# ICC Security (ICCSEC)—Offset 1020h

19.     Furthermore, agents on the IOSFSB, which stands for "IOSF Sideband," use serial

communications.

20.     For example, Intel's U.S. Patent No. 9,213,666 discussing IOSF sideband explains

that "[a] sideband interface . . . can be implemented as a serial message interface (instead of

many parallel sideband wires) to simplify structural layout requirements." 6:53-56.

21.     Moreover, the patent further notes that "on-chip power management control" is an

"example[] of communication types that may be sent via a sideband message interface," 6:57-59;

"PMC," referenced above in the ICCSEC description, appears to be a type of Power

Management Control based on its use of an acronym commonly appropriated for that purpose,

further correlating the "IOSFB" reference with IOSF sideband as described in the '666 patent.

Similarly, the patent notes that "a manageability engine" (such as Intel's ME) can communicate

through an IOSF sideband hub, further correlating the "IOSFSB" reference with IOSF sideband as described in the '666 patent. 15:19-22.

22. As described in the '666 patent, IOSF sideband can provide communications "between the agents" on the fabric (as stated in the Abstract), *i.e.*, peer-to-peer communication between nodes on the fabric, such as the circuitry implementing ICCSEC, Intel ME, and PMC.

**["a) controlling access to the first node using a first security manager disposed in the first node,"]**

23. The '633 accused products control access to the first node using a first security manager disposed in the first node, such as the Policy Enforcer 371 in each IOSF sideband agent, such as the circuit implementing the PMC, that controls access to the sideband agent, such as the node implementing registers TMCSRCCLK, TMCSRCCKL2, ENCCKRQ, and ICCSEC.

24. As explained in Intel's U.S. Patent No. 9,805,221 discussing SAI attributes, referenced above in Intel's discussion of ICCSEC in the Intel C620 product, "incoming security information, which can include, in one embodiment, the SAI, command information and address information, can be provided through input multiplexer 376 to policy enforcer 371 to determine whether access is to be permitted," 7:34-39, with reference to Figure 5 reproduced here:

Case 1:18-cv-00966-CFC-CJB Document 743 Filed 02/05/21 Page 36 of 120 PageID #: 7:
Case 1:18-cv-00966-VAC-CJB Document 143 Filed 06/28/18 Page 7 of 47 PageID #:
23688



FIG. 5

25.     The Security Attributes Generator 365 and the Policy Enforcer 371 present in the

IOSF agents (such as the Intel ME, the PMC, and the circuit implementing ICCSEC), are a

distributed firewall as claimed.

26.     Furthermore, as explained in the '221 patent, functional units "may also be

configured to perform sophisticated access control mechanisms such as dynamic policy

configuration to enable on-the-fly revision of policy values linked to an asset," thus locally

generating an authorization list of authorized nodes as claimed. 8:36-39.

**["wherein the first node is assigned a segment of memory addresses for the**

**communications interface, the segment of memory addresses including secure and**

**unsecure portions thereof,"]**

27.     The first node in the '633 accused products is assigned a segment of memory

addresses for the communications interface, the segment of memory addresses including secure

and unsecure portions thereof.  For example, as shown in the excerpt from page 181 of the Intel C620 Series Chipset Platform Controller Hub Datasheet above, the Lock_ICCG1Dyn and Lock_ICCSEC bits of the ICC Security register control access to certain memory-mapped ICC registers.  For example, Lock_ICCG1Dyn controls access to TMCSRCCLK, TMCSRCCLK2, and ENCCKRQ, and when the bit is 1, accesses are denied.  In this configuration, the memory-mapped addresses of these registers (at offsets 0x1000, 0x1004, and 01x1008, respectively) are a secure portion of the segment of memory addresses.  Analogously, Lock_ICCSEC controls access to the ICC Security Register mapped at offset 0x1000.  When this bit is 0, the memory-mapped address of ICCSEC is an unsecure portion of the segment.

### ["and wherein the first security manager is configured to control access only to the secure portion of the segment of memory addresses for the first node; and"]

28.     The first security manager of the '633 accused products is configured to control access only to the secure portion of the segment of memory addresses for the first node.  For example, as explained on the above-referenced page 181, setting the Lock_ICCG1Dyn and/or Lock_ICCSEC bits trigger SAI-based access controls by the Policy Enforcer only in the IOSF sideband agent corresponding to the circuit implementing the relevant registers.

### ["(b) controlling access to the second node using a second security manager disposed in the second node"]

29.     Access to the second node in the '633 accused products is controlled using a second security manager disposed in the second node.  For example, other sideband nodes also control access with their own Policy Enforcer circuits using SAIs, as discussed above, such as Intel ME and PMC.

**["wherein the first and second security managers define a distributed firewall for the communications interface."]**

30.     The first and second security managers define a distributed firewall for the communication interface in the '633 accused products.  For example, by controlling access to individual nodes as described herein, the Policy Enforcers define a distributed firewall for the IOSF sideband agents.

31.     Intel has long had knowledge of the '633 Patent. For example, the '633 Patent has been cited in multiple Intel patent prosecutions, including during the prosecution of its U.S. Patent Nos. 7,215,781; 9,507,962; 9,507,963; 9,547,779; and 9,619,672. To the extent Intel claims it did not have broader actual knowledge of the '633 Patent, Intel has been willfully blind to that patent's existence based on, for example, its publicly-known corporate policy forbidding its employees from reading patents held by outside companies or individuals.

32.     VLSI is informed and believes, and thereon alleges, that Intel actively, knowingly, and intentionally has induced infringement of the '633 Patent by, for example, controlling the design and manufacture of, offering for sale, selling, supplying, and otherwise providing instruction and guidance regarding the above-described products with the knowledge and specific intent to encourage and facilitate infringing uses of such products by its customers both inside and outside the United States (as used in this pleading, "customers" refers to both direct and indirect customers, including entities that distribute and resell the accused products, alone or as part of a system, and end users of such products and systems). For example, Intel publicly provides documentation, including datasheets available through Intel's publicly accessible ARK service and software developer's manuals, instructing customers on uses of Intel's products that infringe the methods of the '633 Patent. *See, e.g.*, http://ark.intel.com. On

information and belief, Intel's customers directly infringe the '633 Patent by, for example, making, using, offering to sell, and selling within the United States, and importing into the United States, without authority or license, products containing the above-described Intel products.

33.    VLSI is informed and believes, and thereon alleges, that Intel has contributed to the infringement by its customers of the '633 Patent by, without authority, importing, selling and offering to sell within the United States materials and apparatuses for practicing the claimed invention of the '633 Patent both inside and outside the United States. For example, the above-described products constitute a material part of the inventions of the '633 Patent and are not staple articles or commodities of commerce suitable for substantial noninfringing use. On information and belief, Intel knows that the above-described products constitute a material part of the inventions of the '633 Patent and are not staple articles or commodities of commerce suitable for substantial noninfringing use. On information and belief, Intel's customers directly infringe the '633 Patent by, for example, making, using, offering to sell, and selling within the United States, and importing into the United States, without authority or license, products containing the above-described Intel products.

34.    As a result of Intel's infringement of the '633 Patent, VLSI has been damaged. VLSI is entitled to recover for damages sustained as a result of Intel's wrongful acts in an amount subject to proof at trial.

35.    To the extent 35 U.S.C. § 287 is determined to be applicable, on information and belief its requirements have been satisfied with respect to the '633 Patent.

36.    In addition, Intel's infringing acts and practices have caused and are causing immediate and irreparable harm to VLSI.

37.     VLSI is informed and believes, and thereon alleges, that the infringement of the '633 Patent by Intel has been and continues to be willful. As noted above, Intel has long had knowledge of the '633 Patent. Intel has deliberately continued to infringe in a wanton, malicious, and egregious manner, with reckless disregard for VLSI's patent rights. Thus, Intel's infringing actions have been and continue to be consciously wrongful.

38.     VLSI is informed and believes, and thereon alleges, that this is an exceptional case, which warrants an award of attorney's fees to VLSI pursuant to 35 U.S.C. § 285.

## SECOND CLAIM

### (Infringement of U.S. Patent No. 7,246,027)

39.     VLSI re-alleges and incorporates herein by reference Paragraphs 1-38 of its Complaint.

40.     The '027 Patent, entitled "Power optimization of a mixed-signal system on an integrated circuit," was duly and lawfully issued July 17, 2007. A true and correct copy of the '027 Patent is attached hereto as Exhibit 2.

41.     The '027 Patent names Marcus W. May and Matthew D. Felder as co-inventors.

42.     The '027 Patent has been in full force and effect since its issuance. VLSI owns by assignment the entire right, title, and interest in and to the '027 Patent, including the right to seek damages for past, current, and future infringement thereof.

43.     The '027 Patent states that it "relates generally to portable electronic equipment and more particularly to a sensing digital and analog parameters of an integrated circuit to provide power supply optimization." Ex. 2 at 1:7-10.

44.     The '027 Patent explains "a need exists for an integrated circuit that provides multiple functions through mixed-signal operation and architectures for handheld devices with

appropriate optimized power-consumption and with a minimal requirement of external components." Ex. 2 at 2:32-36.

45.     The '027 Patent provides "a method and apparatus for conserving power of a system-on-a-chip having analog circuitry. An aspect is a method and apparatus for increasing the power supply efficiency of an integrated circuit, by determining an analog variation parameter that is representative of an integrated circuit fabrication process variance of the integrated circuit. An operational temperature is determined, where the operational temperature is associated with the analog variation parameter. With the analog variation parameter and the operational temperature, an adjustment signal is determined for a power supply level of the integrated circuit, such that power consumption of the integrated circuit is optimized." Ex. 2 at 2:40-51.

46.     VLSI is informed and believes, and thereon alleges, that Intel has infringed and unless enjoined will continue to infringe one or more claims of the '027 Patent, in violation of 35 U.S.C. § 271, by, among other things, making, using, offering to sell, and selling within the United States, supplying or causing to be supplied in or from the United States, and importing into the United States, without authority or license, Intel products with a Power Control Unit (PCU) to compensate for Inverse Temperature Dependence (ITD) in an infringing manner.

47.     The '027 accused products embody every limitation of at least claim 18 of the '027 Patent, literally or under the doctrine of equivalents, as set forth below. The further descriptions below, which are based on publicly available information, are preliminary examples and are non-limiting.

**["A method for increasing power supply efficiency of an integrated circuit, comprising:"]**

48.     The '027 accused products use a method for increasing power supply efficiency of an integrated circuit. For example, the PCU of the '027 accused products is designed to maximize the power supply efficiency of a microprocessor by using the "optimal voltage at all operating points" in a manner such as that shown below.



["determining an analog variation parameter representative of an integrated circuit fabrication process variance of the integrated circuit; and"]

49.     The '027 accused products use a method that includes determining an analog variation parameter representative of an integrated circuit fabrication process variance of the integrated circuit. For example, Intel marketing materials demonstrate that the PCU of the '027 accused products uses thermal sensors to estimate the temperature of the coldest point on the die

Case 1:18-cv-00966-CFC-CJB   Document 743   Filed 02/05/21   Page 43 of 120 PageID #:
23695
Case 1:18-cv-00966-VAC-CJB   Document 143   Filed 06/28/18   Page 14 of 47   PageID #: 14

to compensate for Inverse Temperature Dependence using a process and architecture such as that described below.



**["determining an adjustment signal for a power supply voltage level of the integrated circuit based on the analog variation parameter, and"]**

50.    The '027 accused products use a method that includes determining an adjustment signal for a power supply voltage level of the integrated circuit based on the analog variation parameter. For example, Intel marketing materials demonstrate that the PCU interpolates linearly against test voltages to determine a power supply voltage level through a process that practices this element.



51.     As a further example, public statements by Intel engineers also demonstrate that the PCU uses thermal information to adjust the power supply voltage level: "As temperature is lowered, the frequency of the chip can degrade because of the ITD effect (Inverse Temperature Dependence). In this case, information from the thermal sensor is used to raise the supply voltage to maintain performance." Dr. Peter Shor, http://www.ee.columbia.edu/compact-thermal-sensors-intel-processors-90nm-22nm.

**["adjusting a regulation signal of a DC-to-DC converter based on the adjustment signal to optimize power consumption of the integrated circuit."]**

52.     The '027 accused products use a method that includes adjusting a regulation signal of a DC-to-DC converter based on the adjustment signal to optimize power consumption of the integrated circuit. For example, Intel marketing materials show that the PCU adjusts a

regulation signal of a voltage regulator, a DC-to-DC converter in a manner such as that described below.



53.    As a further example, Intel technical documentation such as the specification included below demonstrates that '027 accused products adjust a regulation signal to a DC-to-DC converter via interfaces such as the "processor Serial Voltage IDentification (SVID) interface."

**Electrical Specifications**



# 7 Electrical Specifications

## 7.1 Power and Ground Lands

The processor has VCC, VDDQ, VCCPLL, VCCSA, VCCAXG, VCCIO and VSS (ground) inputs for on-chip power distribution. All power lands must be connected to their respective processor power planes, while all VSS lands must be connected to the system ground plane. Use of multiple power and ground planes is recommended to reduce I*R drop. The VCC and VCCAXG lands must be supplied with the voltage determined by the processor **S**erial **V**oltage **ID**entification (**SVID**) interface. A new serial VID interface is implemented on the processor. Table 7-1 specifies the voltage level for the various VIDs.

https://www.intel.com/content/www/us/en/processors/core/3rd-gen-core-desktop-vol-1-datasheet.html at 75.

54.     Intel has long had knowledge of the '027 Patent. For example, VLSI's predecessor Freescale provided notice of this patent to Intel on May 30, 2014. To the extent Intel claims it did not have broader actual knowledge of the '027 Patent, Intel has been willfully blind to that patent's existence based on, for example, its publicly-known corporate policy forbidding its employees from reading patents held by outside companies or individuals.

55.     VLSI is informed and believes, and thereon alleges, that Intel actively, knowingly, and intentionally has induced infringement of the '027 Patent by, for example, controlling the design and manufacture of, offering for sale, selling, supplying, and otherwise providing instruction and guidance regarding the above-described products with the knowledge and specific intent to encourage and facilitate infringing uses of such products by its customers both inside and outside the United States. For example, Intel publicly provides documentation, including datasheets available through Intel's publicly accessible ARK service and software developer's manuals, instructing customers on uses of Intel's products that infringe the methods of the '027 Patent. *See, e.g.*, http://ark.intel.com. On information and belief, Intel's customers

directly infringe the '027 Patent by, for example, making, using, offering to sell, and selling within the United States, and importing into the United States, without authority or license, products containing the above-described Intel products.

56.     VLSI is informed and believes, and thereon alleges, that Intel has contributed to the infringement by its customers of the '027 Patent by, without authority, importing, selling and offering to sell within the United States materials and apparatuses for practicing the claimed invention of the '027 Patent both inside and outside the United States. For example, the above-described products constitute a material part of the inventions of the '027 Patent and are not staple articles or commodities of commerce suitable for substantial noninfringing use. On information and belief, Intel knows that the above-described products constitute a material part of the inventions of the '027 Patent and are not staple articles or commodities of commerce suitable for substantial noninfringing use. On information and belief, Intel's customers directly infringe the '027 Patent by, for example, making, using, offering to sell, and selling within the United States, and importing into the United States, without authority or license, products containing the above-described Intel products.

57.     As a result of Intel's infringement of the '027 Patent, VLSI has been damaged. VLSI is entitled to recover for damages sustained as a result of Intel's wrongful acts in an amount subject to proof at trial.

58.     To the extent 35 U.S.C. § 287 is determined to be applicable, on information and belief its requirements have been satisfied with respect to the '027 Patent.

59.     In addition, Intel's infringing acts and practices have caused and are causing immediate and irreparable harm to VLSI.

60.     VLSI is informed and believes, and thereon alleges, that the infringement of the '027 Patent by Intel has been and continues to be willful. As noted above, Intel has long had knowledge of the '027 Patent. Intel has deliberately continued to infringe in a wanton, malicious, and egregious manner, with reckless disregard for VLSI's patent rights. Thus, Intel's infringing actions have been and continue to be consciously wrongful.

61.     VLSI is informed and believes, and thereon alleges, that this is an exceptional case, which warrants an award of attorney's fees to VLSI pursuant to 35 U.S.C. § 285.

## THIRD CLAIM

## (Infringement of U.S. Patent No. 7,247,552)

62.     VLSI re-alleges and incorporates herein by reference Paragraphs 1-61 of its Complaint.

63.     The '552 Patent, entitled "Integrated circuit having structural support for a flip-chip interconnect pad and method therefor," was duly and lawfully issued July 24, 2007. A true and correct copy of the '552 Patent is attached hereto as Exhibit 3.

64.     The '552 Patent names Scott K. Pozder, Kevin J. Hess, Pak K. Leung, Edward O. Travis, Brett P. Wilkerson, David G. Wontor, and Jie-Hua Zhao as co-inventors.

65.     The '552 Patent has been in full force and effect since its issuance. VLSI owns by assignment the entire right, title, and interest in and to the '552 Patent, including the right to seek damages for past, current, and future infringement thereof.

66.     The '552 Patent states that it "relates to packaged semiconductors and more particularly to interconnect pads of integrated circuits for making electrical connection to underlying conductive layers." Ex. 3 at 1:18-21.

67.     The '552 Patent provides "a method and apparatus for providing structural support for interconnect pad locations in an integrated circuit (IC) by using novel layout techniques in the metallization and dielectric stack underlying the pad. As used herein, an interconnect pad, formed of metal, is placed at the surface of an integrated circuit where an electrical connection is made from the pad to one or more underlying interconnect layers. In a typical IC design, multiple interconnect layers separated by interlevel dielectrics are formed in a stack to provide the required interconnections between devices in the semiconductor substrate." Ex. 3 at 2:31-42.

68.     VLSI is informed and believes, and thereon alleges, that Intel has infringed and unless enjoined will continue to infringe one or more claims of the '552 Patent, in violation of 35 U.S.C. § 271, by, among other things, making, using, offering to sell, and selling within the United States, supplying or causing to be supplied in or from the United States, and importing into the United States, without authority or license, Intel products with metal dummy lines to reinforce regions under bond pads in an infringing manner.

69.     The '552 accused products embody every limitation of at least claim 11 of the '552 Patent, literally or under the doctrine of equivalents, as set forth below. The further descriptions below, which are based on publicly available information, are preliminary examples and are non-limiting.

### ["A method of making an integrated circuit having a plurality of bond pads, comprising:"]

70.     The '552 accused products are manufactured using a method of making an integrated circuit having a plurality of bond pads.

71.     For example, electron micrographs of Intel products, including the i7-4770 processor, show a plurality of bond pads:

Case 1:18-cv-00966-VAC-CJB   Document 143   Filed 06/26/18   Page 21 of 47   PageID #: 21



**["developing a circuit design of the integrated circuit;"]**

72.     The '552 accused products are manufactured using a method that includes developing a circuit design of the integrated circuit.

73.     For example, electron micrographs of Intel products, including the i7-4770 processor, show a circuit design made up of gates and interconnecting wires:



**["developing a layout of the integrated circuit according to the circuit design, wherein the layout comprises a plurality of interconnect layers underlying a first bond pad of the plurality of bond pads, at least one of the plurality of interconnect layers not being electrically connected to the first bond pad and used for wiring or interconnect other than directly to the first bond pad;"]**

74.     The '552 accused products are manufactured using a method that includes developing a layout of the integrated circuit according to the circuit design, wherein the layout comprises a plurality of interconnect layers underlying a first bond pad of the plurality of bond pads, at least one of the plurality of interconnect layers not being electrically connected to the first bond pad and used for wiring or interconnect other than directly to the first bond pad.

75.     For example, electron micrographs of Intel products, including the i7-4770 processor, show several interconnect layers underlying the bond pads.



76.     Some, but not all, of the interconnects on various interconnect layers are

electrically connected using vias to the bond pads, in such a way that practices this element.

Case 1:18-cv-00966-VAC-CJB   Document 143   Filed 06/26/18   Page 24 of 47   PageID #: 24





**["defining a force region at least under the first bond pad of the plurality of bond pads, wherein the force region comprises a first portion of each of the plurality of interconnect layers;"]**

77. The '552 accused products are manufactured using a method that includes defining a force region at least under the first bond pad of the plurality of bond pads, wherein the force region comprises a first portion of each of the plurality of interconnect layers.

78. For example, electron micrographs of Intel products, including the i7-4770 processor, show a region under each bond pad that represents a "force region," in a manner such as that shown below.



**["identifying a first interconnect layer of the plurality of interconnect layers in which the first portion of the first interconnect layer has a metal density below a predetermined percentage;"]**

79. The '552 accused products are manufactured using a method that includes identifying a first interconnect layer of the plurality of interconnect layers in which the first portion of the first interconnect layer has a metal density below a predetermined percentage.

80. For example, electron micrographs of Intel products, including the i7-4770 processor, show that particular interconnect layers have regions where the density of actively used metal is low.



**["modifying the layout by adding dummy metal lines to the first portion of the first interconnect layer to increase the metal density of the first portion of the first interconnect layer; and"]**

81.     The '552 accused products are manufactured using a method that includes modifying the layout by adding dummy metal lines to the first portion of the first interconnect layer to increase the metal density of the first portion of the first interconnect layer.

82.     For example, electron micrographs of Intel products, including the i7-4770 processor, show that dummy metal lines have been added to the particular interconnect layers in regions where the density of actively used metal is low through a process that practices this element.

**["making the integrated circuit comprising the dummy metal lines."]**

83.     The '552 accused products are manufactured using a method that includes making the integrated circuit comprising the dummy metal lines.  For example, the above discussion provides an example of how the integrated circuit comprising the dummy metal lines is made.

84.     Intel has had knowledge of the '552 Patent at least since the filing of this complaint, and if it did not have actual knowledge prior to that time, it was willfully blind to the existence of the '552 Patent based on, for example, its publicly-known corporate policy forbidding its employees from reading patents held by outside companies or individuals.

85.     As a result of Intel's infringement of the '552 Patent, VLSI has been damaged. VLSI is entitled to recover for damages sustained as a result of Intel's wrongful acts in an amount subject to proof at trial.

86.     To the extent 35 U.S.C. § 287 is determined to be applicable, on information and belief its requirements have been satisfied with respect to the '552 Patent.

87.     In addition, Intel's infringing acts and practices have caused and are causing immediate and irreparable harm to VLSI.

88.     VLSI is informed and believes, and thereon alleges, that Intel's infringement of the '552 Patent has been and continues to be willful.

89.     VLSI is informed and believes, and thereon alleges, that this is an exceptional case, which warrants an award of attorney's fees to VLSI pursuant to 35 U.S.C. § 285.

## FOURTH CLAIM

### (Infringement of U.S. Patent No. 7,523,331)

90.     VLSI re-alleges and incorporates herein by reference Paragraphs 1-89 of its Complaint.

91.     The '331 Patent, entitled "Power saving operation of an apparatus with a cache memory," was duly and lawfully issued April 21, 2009. A true and correct copy of the '331 Patent is attached hereto as Exhibit 4.

92.     The '331 Patent names Gerardus Wilhelmus Theodorus Van Der Heijden as the inventor.

93.     The '331 Patent has been in full force and effect since its issuance. VLSI owns by assignment the entire right, title, and interest in and to the '331 Patent, including the right to seek damages for past, current, and future infringement thereof.

94.     The '331 Patent "relates to an apparatus that supports a low power operating mode." Ex. 4 at 1:4-5.

95.     The '331 Patent explains that "[a]mong others it is an object of the invention to provide a reduction of power consumption by an apparatus with a low power operating mode." Ex. 4 at 1:50-52.

96.     The '331 Patent further explains that "at least part of a cache memory is selectively kept active in the low power mode while the main memory is deactivated (deactivation typically comprising cutting power supply to the main memory, or at least significantly reducing power supply consumption, so that the main memory is not or not fully operational). Prior to switching to the low power mode a program of instructions that are needed to perform a function while the apparatus is in the low power mode is loaded into the cache memory for later use. When an instruction processing circuit performs the function in the low power mode, it loads the instructions from the cache memory, without activating (supplying full power) the main memory." Ex. 4 at 1:54-66.

97.     VLSI is informed and believes, and thereon alleges, that Intel has infringed and unless enjoined will continue to infringe one or more claims of the '331 Patent, in violation of 35 U.S.C. § 271, by, among other things, making, using, offering to sell, and selling within the United States, supplying or causing to be supplied in or from the United States, and importing into the United States, without authority or license, Intel products that include an infringing Management Engine and a CPU that includes a memory controller.

98.     The '331 accused products embody every limitation of at least claim 7 of the '331 Patent, literally or under the doctrine of equivalents, as set forth below. The further descriptions below, which are based on publicly available information, are preliminary examples and are non-limiting.

**["A method of operating an apparatus that contains an instruction processing circuit, a main memory addressable by the instruction processing circuit and a cache memory, the method comprising:"]**

99.     The '331 accused products operate using a method of operating an apparatus that contains an instruction processing circuit, a main memory addressable by the instruction processing circuit and a cache memory.

100.    For example, documentation written by Intel engineers explains that the Management Engine ("ME") "hardware is comprised of a processor, code and data caches, DMA (direct memory access) engines, cryptography engines, read-only memory (ROM), internal memory (static random-access memory, or SRAM), a timer, and other supporting devices." https://link.springer.com/book/10.1007%2F978-1-4302-6572-6 at 30.

**["using the cache memory and the main memory in a normal operating mode, to cache in cache memory a part of data and/or instructions that the instruction**

**processing circuit addresses in the main memory during execution, and to substitute cached data and/or instructions when the instruction processing circuit addresses the data and/or instructions in the main memory;"]**

101.    The '331 accused products operate using the cache memory and the main memory in a normal operating mode, to cache in cache memory a part of data and/or instructions that the instruction processing circuit addresses in the main memory during execution, and to substitute cached data and/or instructions when the instruction processing circuit addresses the data and/or instructions in the main memory.

102.    For example, documentation written by Intel engineers explains that "[t]here is a small code and data cache to help the processor reduce the number of accesses to the internal SRAM. The internal SRAM is the memory that stores firmware code and data at runtime. The capacity of SRAM varies depending on the product, but generally ranges between 256KB and 1MB. In addition to the internal SRAM, the management engine also uses a certain amount of DRAM (dynamic random-access memory) from the main system memory. Code and data pages that are not recently accessed may be evicted from the SRAM and swapped out to the reserved memory. When a page is needed again, it will be swapped in to the SRAM."

https://link.springer.com/book/10.1007%2F978-1-4302-6572-6 at 30-31.

**["storing, in the main memory, a program of instructions for executing an interrupt function during operating in a low power operating mode, wherein the interrupt program is stored at addresses in main memory that have been selected so that all instructions of the interrupt program can be stored together in the cache memory;"]**

103.    The '331 accused products operate by storing, in the main memory, a program of instructions for executing an interrupt function during operating in a low power operating mode,

wherein the interrupt program is stored at addresses in main memory that have been selected so that all instructions of the interrupt program can be stored together in the cache memory.

104.    For example, documentation written by Intel engineers shows that the Intel Management Engine uses an interrupt controller.



*Figure 2-1.  Hardware architecture of the management engine*

https://link.springer.com/book/10.1007%2F978-1-4302-6572-6 at 30.

105.    As explained above, the ME stores code in both internal cache as well as system main memory through a process that practices this element.  For example, upon information and belief, the ME stores, in the main memory, a program of instructions for executing an interrupt function during operating in a low power operating mode, wherein the interrupt program is stored at addresses in main memory that have been selected so that all instructions of the interrupt program can be stored together in the cache memory.

- 31 -

**["detecting that it is no longer necessary to operate in the normal operating mode; switching to the low power operating mode once it is detected that it is no longer necessary to operate in the normal operating mode, by"]**

106.    The '331 accused products operate by detecting that it is no longer necessary to operate in the normal operating mode and switching to the low power operating mode once it is detected that it is no longer necessary to operate in the normal operating mode.

107.    For example, Intel technical documentation explains that systems including the Intel Management Engine switch to ACPI system states based on detection of signals from the operating system, including the S5 state, in a manner such as that described below.



**Power Management**

## 4.1    Advanced Configuration and Power Interface (ACPI) States Supported

The ACPI states supported by the processor are described in this section.

### 4.1.1    System States

Table 4-1.    System States

| State | Description |
|---|---|
| G0/S0 | Full On |
| G1/S3-Cold | Suspend-to-RAM (STR). Context saved to memory (S3-Hot is not supported by the processor). |
| G1/S4 | Suspend-to-Disk (STD). All power lost (except wakeup on PCH). |
| G2/S5 | Soft off. All power lost (except wakeup on PCH). Total reboot. |
| G3 | Mechanical off. All power removed from system. |

https://www.intel.com/content/www/us/en/processors/core/3rd-gen-core-desktop-vol-1-datasheet.html at 48.

**["loading the interrupt program into the cache memory from the main memory, wherein all instructions of the interrupt program are stored together in the cache memory;"]**

108.    The '331 accused products operate by loading the interrupt program into the cache memory from the main memory, wherein all instructions of the interrupt program are stored together in the cache memory.

109.    For example, documentation written by Intel engineers, including the example provided below, explains that the Management Engine remains on during the S5 system state, even though the CPU and main memory are turned off.



Intel® ME Manageability Features

3.4.3.1    **Intel® ME ON in Host Sleep States**
            Under Intel ME Power Control,

1.  Select 'Intel ME ON in Host Sleep States'.

2.  Press Enter to select.

The following options can be selected:

-   **Desktop: On in S0** – Power Package 1
-   **Desktop: On in S0, ME Wake in S3, S4-5** –Power Package 2*

**Table 1: Supported Power Packages**

| Power Package | 1 | 2* |
|---|---|---|
| S0 | ON | ON |
| S3 | OFF | ON /ME WoL |
| S4/S5 | OFF | ON/ ME WoL |

*Default setting

https://www.intel.com/content/dam/support/us/en/documents/motherboards/desktop/db75en/sb/intel_mebx_user_guide_for_db75en.pdf at 18.



[https://communities.intel.com/thread/110798](https://communities.intel.com/thread/110798).

110. Upon information and belief, the ability to run code at the ME regardless of the power state of main memory means that these systems function by loading the interrupt program into the cache memory from the main memory, wherein all instructions of the interrupt program are stored together in the cache memory.

**["deactivating the main memory to reduce power consumption, but keeping active at least a part of the cache memory, that is needed for retrieving the interrupt program and for executing the interrupt function; executing the interrupt program from said at least part of the cache memory."]**

111. The '331 accused products operate by deactivating the main memory to reduce power consumption, but keeping active at least a part of the cache memory, that is needed for retrieving the interrupt program and for executing the interrupt function and executing the interrupt program from said at least part of the cache memory.

112. For example, documentation written by Intel engineers explains that the S5 power state is a deeper power state than S4, the "Suspend to Disk" power state wherein the contents of main memory is flushed, and all power (including main memory) is "lost." However, upon

information and belief, at least a part of the cache memory must be kept active for retrieving and executing the interrupt function through a process that practices this element.

Figure 4-1.   Processor Power States



https://www.intel.com/content/www/us/en/processors/core/3rd-gen-core-desktop-vol-1-datasheet.html at 47.



*Power Management*

## 4.1 Advanced Configuration and Power Interface (ACPI) States Supported

The ACPI states supported by the processor are described in this section.

### 4.1.1 System States

**Table 4-1.  System States**

| State | Description |
|-------|-------------|
| G0/S0 | Full On |
| G1/S3-Cold | Suspend-to-RAM (STR). Context saved to memory (S3-Hot is not supported by the processor). |
| G1/S4 | Suspend-to-Disk (STD). All power lost (except wakeup on PCH). |
| G2/S5 | Soft off. All power lost (except wakeup on PCH). Total reboot. |
| G3 | Mechanical off. All power removed from system. |

*Id.* at 48.

113.    Intel has long had knowledge of the '331 Patent. For example, the '331 Patent has been cited in Intel patent prosecutions, including during the prosecution of its U.S. Patent No. 7,523,327. To the extent Intel claims it did not have broader actual knowledge of the '331 Patent, Intel has been willfully blind to that patent's existence based on, for example, its publicly-known corporate policy forbidding its employees from reading patents held by outside companies or individuals.

114.    VLSI is informed and believes, and thereon alleges, that Intel actively, knowingly, and intentionally has induced infringement of the '331 Patent by, for example, controlling the design and manufacture of, offering for sale, selling, supplying, and otherwise providing instruction and guidance regarding the above-described products with the knowledge and specific intent to encourage and facilitate infringing uses of such products by its customers both inside and outside the United States. For example, Intel publicly provides documentation, including datasheets available through Intel's publicly accessible ARK service and software

developer's manuals, instructing customers on uses of Intel's products that infringe the methods of the '331 Patent. *See, e.g.*, http://ark.intel.com. On information and belief, Intel's customers directly infringe the '331 Patent by, for example, making, using, offering to sell, and selling within the United States, and importing into the United States, without authority or license, products containing the above-described Intel products.

115.    VLSI is informed and believes, and thereon alleges, that Intel has contributed to the infringement by its customers of the '331 Patent by, without authority, importing, selling and offering to sell within the United States materials and apparatuses for practicing the claimed invention of the '331 Patent both inside and outside the United States. For example, the above-described products constitute a material part of the inventions of the '331 Patent and are not staple articles or commodities of commerce suitable for substantial noninfringing use. On information and belief, Intel knows that the above-described products constitute a material part of the inventions of the '331 Patent and are not staple articles or commodities of commerce suitable for substantial noninfringing use. On information and belief, Intel's customers directly infringe the '331 Patent by, for example, making, using, offering to sell, and selling within the United States, and importing into the United States, without authority or license, products containing the above-described Intel products.

116.    As a result of Intel's infringement of the '331 Patent, VLSI has been damaged. VLSI is entitled to recover for damages sustained as a result of Intel's wrongful acts in an amount subject to proof at trial.

117.    To the extent 35 U.S.C. § 287 is determined to be applicable, on information and belief its requirements have been satisfied with respect to the '331 Patent.

118.    In addition, Intel's infringing acts and practices have caused and are causing immediate and irreparable harm to VLSI.

119.    VLSI is informed and believes, and thereon alleges, that the infringement of the '331 Patent by Intel has been and continues to be willful. As noted above, Intel has long had knowledge of the '331 Patent. Intel has deliberately continued to infringe in a wanton, malicious, and egregious manner, with reckless disregard for VLSI's patent rights. Thus, Intel's infringing actions have been and continue to be consciously wrongful.

120.    VLSI is informed and believes, and thereon alleges, that this is an exceptional case, which warrants an award of attorney's fees to VLSI pursuant to 35 U.S.C. § 285.

## FIFTH CLAIM

### (Infringement of U.S. Patent No. 8,081,026)

121.    VLSI re-alleges and incorporates herein by reference Paragraphs 1-120 of its Complaint.

122.    The '026 Patent, entitled "Method for supplying an output supply voltage to a power gated circuit and an integrated circuit," was duly and lawfully issued December 20, 2011. A true and correct copy of the '026 Patent is attached hereto as Exhibit 5.

123.    The '026 Patent names Sergey Sofer, Eyal Melamed-Kohen, and Valery Neiman as co-inventors.

124.    The '026 Patent has been in full force and effect since its issuance. VLSI owns by assignment the entire right, title, and interest in and to the '026 Patent, including the right to seek damages for past, current, and future infringement thereof.

125.   The '026 Patent states that it "relates to a method for supplying an output supply voltage to a power gated circuit and to an integrated circuit that has a power gated circuit." Ex. 5 at 1:7-9.

126.   The '026 Patent explains that "[i]ntegrated circuits can be required to operate at a certain speed and to consume up to an allowable level of current. These contradicting demands can reduce the yield of the manufacturing process—as some integrated circuits can be too slow but comply to the current consumption requirements whilst some integrated circuits will exhibit a too high current consumption but comply with the speed requirements." Ex. 5 at 1:34-40.

127.   The '026 Patent further explains that "[i]n case the power gated circuit 30 has to be in a low power mode, also referred to as gated mode, the conductivity of the power gating switch can be set to a level that facilitates a power retention mode that is power efficient and enables memory and latch devices that belong to the power gated circuit to retain data. Retention mode is the low power mode when the integrated circuit does not perform any operation, and only retains data stored in memory or latch devices." Ex. 5 at 3:12-19.

128.   VLSI is informed and believes, and thereon alleges, that Intel has infringed and unless enjoined will continue to infringe one or more claims of the '026 Patent, in violation of 35 U.S.C. § 271, by, among other things, making, using, offering to sell, and selling within the United States, supplying or causing to be supplied in or from the United States, and importing into the United States, without authority or license, Intel products that supply an output supply voltage to a power gated circuit in an infringing manner.

129.   The '026 accused products embody every limitation of at least claim 13 of the '026 Patent, literally or under the doctrine of equivalents, as set forth below. The further

- 39 -

Case 1:18-cv-00966-VAC-CJB    Document 143    Filed 06/28/18    Page 40 of 47    PageID #: 40

descriptions below, which are based on publicly available information, are preliminary examples and are non-limiting.

**["A method for supplying an output supply voltage to a power gated circuit, the method comprising"]**

130.    The '026 accused products use a method for supplying an output supply voltage to a power gated circuit.

131.    For example, Intel marketing materials show various power gated circuits with independent power gates supplying output supply voltages. One example is provided below.



**["providing to an input port of a power gating switch an input supply voltage;"]**

132.    The '026 accused products use a method that includes providing to an input port of a power gating switch an input supply voltage.

133.    For example, reverse engineering of the Intel i3-6300 shows that the power gating switch receives an input supply voltage:



**["receiving, by a control circuit, a mode indicator that indicates of a desired mode of the power gated circuit;"]**

134.    The '026 accused products use a method that includes receiving, by a control circuit, a mode indicator that indicates of a desired mode of the power gated circuit.

135.    For example, technical documentation shows that the products receive at control circuitry, including the PCU, a mode indicator that indicates a desired mode, such as the Processor IA core C6 state, in a way such as that described below.

**Processor IA core C6 State**

Individual threads of a processor IA core can enter the C6 state by initiating a P_LVL3 I/O read or an MWAIT(C6) instruction. Before entering processor IA core C6 state, the processor IA core will save its architectural state to a dedicated SRAM. Once complete, a processor IA core will have its voltage reduced to zero volts. During exit, the processor IA core is powered on and its architectural state is restored.

https://www.intel.com/content/www/us/en/processors/core/desktop-6th-gen-core-family-datasheet-vol-1.html at 66.

**["receiving, by the control circuit, a leakage indicator that indicates of a leakage level of the power gated circuit;"]**

136.    The '026 accused products use a method that includes receiving, by the control circuit, a leakage indicator that indicates of a leakage level of the power gated circuit.

137.    For example, Intel engineers have confirmed that control circuitry, including the PCU, receive indication of the leakage level of the power gated circuit by a process that practices this element. *See, e.g.*, http://myeventagenda.com/sessions/0B9F4191-1C29-408A-8B61-65D7520025A8/7/5#sessionID=155 ("Sure temperature is always there, leakage is a function of temperature, we calculate the leakage at run time and we do all of the optimizations based on the temperature and the leakage.").

**["selecting, by the control circuit, a value of a control signal based on the mode indicator and on the leakage indicator; supplying the control signal to a control port of the power gating switch"]**

138.    The '026 accused products use a method that includes selecting, by the control of a control signal based on the mode indicator and on the leakage indicator, and supplying the control signal to a control port of the power gating switch.

139.    For example, as discussed above, control circuitry including the PCU, receive both a mode indicator and a leakage indicator in a manner such as that shown below.  In one such embodiment, this circuitry is then connected to a control port of the power gating switch shown here as CTR[28:0]:



**["providing, from an output port of the power gating switch, the output supply voltage to the power gated circuit; wherein a relationship between a value of the input supply voltage and a value of the output supply voltage is responsive to the value of the control signal."]**

140.    The '026 accused products use a method that includes providing, from an output port of the power gating switch, the output supply voltage to the power gated circuit; wherein a relationship between a value of the input supply voltage and a value of the output supply voltage is responsive to the value of the control signal.

141.    For example, the value of the control signal determines the number of power gating transistors that are active, passing current from the input to the output port of the power gating switch.  This number determines the resistance across the gate, and therefore the relationship between the voltage at the input and the voltage of the output, using architecture such as that shown below.



142.    Intel has long had knowledge of the '026 Patent. For example, the '026 Patent has been cited in Intel patent prosecutions, including during the prosecution of its U.S. Patent No. 8,810,304. To the extent Intel claims it did not have broader actual knowledge of the '026 Patent, Intel has been willfully blind to that patent's existence based on, for example, its publicly-known corporate policy forbidding its employees from reading patents held by outside companies or individuals.

143.    VLSI is informed and believes, and thereon alleges, that Intel actively, knowingly, and intentionally has induced infringement of the '026 Patent by, for example, controlling the design and manufacture of, offering for sale, selling, supplying, and otherwise providing instruction and guidance regarding the above-described products with the knowledge and specific intent to encourage and facilitate infringing uses of such products by its customers both inside and outside the United States. For example, Intel publicly provides documentation, including datasheets available through Intel's publicly accessible ARK service and software developer's manuals, instructing customers on uses of Intel's products that infringe the methods of the '026 Patent. *See, e.g.*, http://ark.intel.com. On information and belief, Intel's customers

directly infringe the '026 Patent by, for example, making, using, offering to sell, and selling within the United States, and importing into the United States, without authority or license, products containing the above-described Intel products.

144. VLSI is informed and believes, and thereon alleges, that Intel has contributed to the infringement by its customers of the '026 Patent by, without authority, importing, selling and offering to sell within the United States materials and apparatuses for practicing the claimed invention of the '026 Patent both inside and outside the United States. For example, the above-described products constitute a material part of the inventions of the '026 Patent and are not staple articles or commodities of commerce suitable for substantial noninfringing use. On information and belief, Intel knows that the above-described products constitute a material part of the inventions of the '026 Patent and are not staple articles or commodities of commerce suitable for substantial noninfringing use. On information and belief, Intel's customers directly infringe the '026 Patent by, for example, making, using, offering to sell, and selling within the United States, and importing into the United States, without authority or license, products containing the above-described Intel products.

145. As a result of Intel's infringement of the '026 Patent, VLSI has been damaged. VLSI is entitled to recover for damages sustained as a result of Intel's wrongful acts in an amount subject to proof at trial.

146. To the extent 35 U.S.C. § 287 is determined to be applicable, on information and belief its requirements have been satisfied with respect to the '026 Patent.

147. In addition, Intel's infringing acts and practices have caused and are causing immediate and irreparable harm to VLSI.

148.     VLSI is informed and believes, and thereon alleges, that the infringement of the '026 Patent by Intel has been and continues to be willful. As noted above, Intel has long had knowledge of the '026 Patent. Intel has deliberately continued to infringe in a wanton, malicious, and egregious manner, with reckless disregard for VLSI's patent rights. Thus, Intel's infringing actions have been and continue to be consciously wrongful.

149.     VLSI is informed and believes, and thereon alleges, that this is an exceptional case, which warrants an award of attorney's fees to VLSI pursuant to 35 U.S.C. § 285.

## PRAYER FOR RELIEF

WHEREFORE, VLSI prays for judgment against Intel as follows:

A.     That Intel has infringed, and unless enjoined will continue to infringe, each of the Asserted Patents;

B.     That Intel has willfully infringed each of the Asserted Patents;

C.     That Intel pay VLSI damages adequate to compensate VLSI for Intel's infringement of the Asserted Patents, together with interest and costs under 35 U.S.C. § 284;

D.     That Intel be ordered to pay prejudgment and postjudgment interest on the damages assessed;

E.     That Intel pay VLSI enhanced damages pursuant to 35 U.S.C. § 284;

F.     That Intel be ordered to pay supplemental damages to VLSI, including interest, with an accounting, as needed;

G.     That Intel be enjoined from infringing the Asserted Patents, or if its infringement is not enjoined, that Intel be ordered to pay ongoing royalties to VLSI for any postjudgment infringement of the Asserted Patents;

H.     That this is an exceptional case under 35 U.S.C. § 285, and that Intel pay VLSI's attorneys' fees and costs in this action; and

I.      That VLSI be awarded such other and further relief, including equitable relief, as this Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38(b), VLSI hereby demands a trial by jury on all issues triable to a jury.

Dated:  June 28, 2018                              Respectfully submitted,

                                                                  FARNAN LLP

                                                                  /s/ Brian E. Farnan
                                                                  Brian E. Farnan (Bar No. 4089)
                                                                  Michael J. Farnan (Bar No. 5165)
                                                                  919 N. Market Street, 12th Street
                                                                  Wilmington, Delaware 19801
                                                                  Telephone:  (302) 777-0300
                                                                  Facsimile:   (302) 777-0301
                                                                  bfarnan@farnanlaw.com
                                                                  mfarnan@farnanlaw.com

                                                                  *Attorneys for Plaintiff VLSI Technology LLC*

# Exhibit B

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| VLSI TECHNOLOGY LLC, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:18-cv-00966-CFC |
| | ) | |
| v. | ) | |
| | ) | |
| INTEL CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

## AGREED PROTECTIVE ORDER

To expedite the flow of discovery material, to facilitate the prompt resolution of disputes over confidentiality of discovery materials, to adequately protect information the parties are entitled to keep confidential, to ensure that only materials the parties are entitled to keep confidential are subject to such treatment, and to ensure that the parties are permitted reasonably necessary uses of such materials in preparation for and in the conduct of trial, pursuant to Fed. R. Civ. P. 26(c), it is hereby **ORDERED THAT**:

A.  **Definitions**

1.  "Party": any party to this action, including all of its officers, directors, employees, consultants, retained experts, and outside counsel (and their support staff).

2.  "Material": all information, testimony, documents, and things produced, served, or otherwise provided in this action by the Parties or by non-parties.

3.  "CONFIDENTIAL Material": information, documents, and things the Designating Party believes in good faith is not generally known to others, and which the Designating Party (i) would not normally reveal to third parties except in confidence or has undertaken with others to maintain in confidence, or (ii) believes in good faith is protected by a right to privacy under federal or state law or any other applicable privilege or right related to confidentiality or privacy.

This designation includes all Material referring or relating to the foregoing, including but not limited to copies, summaries, and abstracts of the foregoing.

    4.    "OUTSIDE COUNSEL EYES ONLY Material": information, documents, and things the Designating Party believes in good faith is not generally known to others and has significant competitive value such that unrestricted disclosure to others would create a substantial risk of serious injury, and which the Designating Party (i) would not normally reveal to third parties except in confidence or has undertaken with others to maintain in confidence, or (ii) believes in good faith is significantly sensitive and protected by a right to privacy under federal or state law or any other applicable privilege or right related to confidentiality or privacy. The designation is reserved for information that constitutes proprietary financial or technical or commercially sensitive competitive information that the Designating Party maintains as highly confidential in its business, including information obtained from a non-party pursuant to a Nondisclosure Agreement ("NDA"), information relating to future products, strategic plans, non-public financial data, documents that would reveal trade secrets, licensing documents or licensing communications, and settlement agreements or settlement communications, the disclosure of which is likely to cause harm to the competitive position of the Designating Party. This designation includes all Material referring or relating to the foregoing, including but not limited to copies, summaries, and abstracts of the foregoing.

    5.    "OUTSIDE COUNSEL EYES ONLY – SOURCE CODE": C, C++, assembler, digital signal processing (DSP) programming language, firmware source code, register transfer language (RTL), hardware description language (HDL), circuit simulation files, non-programing files that are part of the source code development suite (such as README, Release Note, log and input files), design files (schematics, netlists, and layout files), microcode, and/or similarly sensitive code or schematics (i.e., representations of any silicon mask or circuit design, diagram, or blueprint containing specific gate-level circuit design representations) (collectively, "Source Code") that the Designating Party believes in good faith is not generally known to others and has significant competitive value such that unrestricted disclosure to others would create a substantial risk of serious injury, and which the Designating Party (i) would not normally reveal to third

               - 2 -

parties except in confidence or has undertaken with others to maintain in confidence, or (ii) believes in good faith is significantly sensitive and protected by a right to privacy under federal or state law or any other applicable privilege or right related to confidentiality or privacy. This designation includes all Material referring or relating to the foregoing, including but not limited to copies, summaries, and abstracts of the foregoing. Any document designated as "OUTSIDE COUNSEL EYES ONLY – SOURCE CODE" information is automatically designated as SUBJECT TO PROSECUTION BAR in Section H.

     6.     "OUTSIDE COUNSEL EYES ONLY – PROCESS RECIPES": especially sensitive semiconductor fabrication processes documentation (process flow specifications, operating specifications, process sequence documents, die layout files, and process recipes) (collectively "Process Recipes") which the Designating Party believes in good faith is not generally known to others, which has significant competitive value such that unrestricted disclosure to others would create a substantial risk of serious injury, and which the Designating Party, in the ordinary course of business, takes precautions to protect, and, further, which the Designating Party (i) would not normally reveal to third parties except in confidence or has undertaken with others to maintain in confidence, or (ii) believes in good faith is significantly sensitive and protected by a right to privacy under federal or state law or any other applicable privilege or right related to confidentiality or privacy. This designation includes all Material referring or relating to the foregoing, including but not limited to copies, summaries, and abstracts of the foregoing. Intel states that it treats Process Recipe Material in a manner that is at least as protective as Source Code. Any document designated as "OUTSIDE COUNSEL EYES ONLY – PROCESS RECIPES" information is automatically designated as SUBJECT TO PROSECUTION BAR in Section H.

     7.     "Producing Party": a Party or non-party that produces Material in this action.

     8.     "Receiving Party": a Party that receives Material from a Producing Party.

     9.     "Designated Material": Material that is designated "CONFIDENTIAL", "OUTSIDE COUNSEL EYES ONLY", "OUTSIDE COUNSEL EYES ONLY – SOURCE CODE" or "OUTSIDE COUNSEL EYES ONLY – PROCESS RECIPE" under this Order.

10.     "Designating Party": a Party or non-party that designates Material as "CONFIDENTIAL", "OUTSIDE COUNSEL EYES ONLY", "OUTSIDE COUNSEL EYES ONLY – SOURCE CODE" or "OUTSIDE COUNSEL EYES ONLY – PROCESS RECIPE".

11.     "Counsel of Record": (i) outside counsel who appears on the pleadings as counsel for a Party; (ii) partners, associates, and employees of such outside counsel to whom it is reasonably necessary to disclose the information for this litigation, including supporting personnel employed by the attorneys, such as paralegals, legal translators, legal secretaries, legal clerks, and shorthand reporters; (iii) independent legal translators retained to translate in connection with this action, or independent shorthand reporters retained to record and transcribe testimony in connection with this action. "Counsel of Record" does not include any person who is an employee, director, or officer of a Party or a Party's affiliates even if that person appears on the pleadings as counsel for a Party.

12.     "Litigation Managers": an employee in a Party's legal department or intellectual property division whose primary responsibilities include overseeing this litigation, who is not a competitive decisionmaker and who is not a Board member or Board-appointed officer of that Party. For the avoidance of doubt, an individual is not a competitive decisionmaker solely by virtue of participating in the negotiation of settlement agreements. Each Party may have a maximum of two Litigation Managers. Either party may substitute one or more of its Litigation Managers with reasonable notice to the other party.

13.     "Outside Consultant": a person with specialized knowledge or experience in a matter pertinent to the action who has been retained by a Party or its Counsel of Record to serve as an expert witness or as a consultant in this action and who is not a current employee, officer, or director of a Party or of a competitor of a Party and who, at the time of retention, is not anticipated to become an employee, officer, or director of a Party or of a competitor of a Party.

14.     "Professional Vendors": persons or entities that provide litigation support services (e.g., photocopying, organizing, storing, or retrieval of data in any form or medium, videotaping, translating, designing and preparing exhibits, graphics, or demonstrations, etc.) and their employees and subcontractors. This definition includes a professional jury or trial consultant

retained in connection with this litigation and mock jurors retained by such a consultant to assist them in their work. Professional Vendors do not include consultants who fall within the definition of Outside Consultant.

**B.   Scope**

15.   The protections conferred by this Order cover not only Designated Material (as defined above), but also any information copied or extracted therefrom, as well as all copies, excerpts, summaries, or compilations thereof. Nothing herein changes in any way the discovery provisions of the Federal Rules of Civil Procedure or the Court's deadlines. Identification of any individual pursuant to this Protective Order does not make that individual available for deposition or any other form of discovery outside of the restrictions and procedures of the Federal Rules of Civil Procedure, the rules of the United States District Court for the District of Delaware, and the Court's orders applicable to this case.

**C.   Access to Designated Material**

16.   **CONFIDENTIAL Material:** Unless otherwise ordered by the Court or permitted in writing by the Designating Party, a Receiving Party may disclose any information, document, or thing designated "CONFIDENTIAL" only to:

(a)   persons who appear on the face of Designated Material as an author, addressee, or recipient thereof, provided, however, that no one may show Designated Material to an ex-employee of a Producing Party without first notifying the Producing Party and providing the Producing Party with an opportunity to object prior to such disclosure;

(b)   Counsel of Record;

(c)   Litigation Managers to whom disclosure is reasonably necessary for this litigation and who have signed the "Litigation Manager Acknowledgment and Agreement to Be Bound by Protective Order" attached as Exhibit C;

(d)   Outside Consultants of the Receiving Party to whom disclosure is reasonably necessary for this litigation and who have signed the "Acknowledgment and Agreement To Be Bound By Protective Order" attached hereto as Exhibit A and the "Certification Of Outside Consultant" attached hereto as Exhibit B. Disclosure may be made to such Outside

Consultants of the Receiving Party only pursuant to and after completion of the procedures set out in Section D below;

(e)      witnesses of the Producing Party at deposition and/or trial, provided that such witnesses may not retain copies of Designated Material unless permitted by other provisions of this Order;

(f)      this Court in the above-captioned civil action, the U.S. District Court for the Northern District of California in *VLSI Technology LLC v. Intel Corp.*, No. 17-cv-05671-BLF (N.D. Cal.), and the court in any appeal from either of the foregoing actions, in each case including such court's personnel;

(g)      any designated arbitrator or mediator who is assigned to hear this matter, and his or her staff, who have signed the "Acknowledgment and Agreement To Be Bound By Protective Order" attached hereto as Exhibit A and the "Certification Of Outside Consultant" attached hereto as Exhibit B;

(h)      court reporters; and

(i)      Professional Vendors to which disclosure is reasonably necessary for this litigation and a representative of which has signed the "Acknowledgment and Agreement To Be Bound By Protective Order" attached hereto as Exhibit A.

17.      **OUTSIDE COUNSEL EYES ONLY Material**: Unless otherwise ordered by the Court or permitted in writing by the Designating Party, a Receiving Party may disclose any information, documents, or things designated OUTSIDE COUNSEL EYES ONLY Material only to the following in addition to those identified in Paragraphs 45-46 below regarding use of Designated Material at depositions:

(a)      persons who appear on the face of Designated Material as an author, addressee, or recipient thereof, provided, however, that no one may show Designated Material to an ex-employee of a Producing Party without first notifying the Producing Party and providing the Producing Party with an opportunity to object prior to such disclosure;

(b)      Counsel of Record;

      (c)     Outside Consultants of the Receiving Party to whom disclosure is reasonably necessary for this litigation and who have signed the "Acknowledgment and Agreement To Be Bound By Protective Order" attached hereto as Exhibit A and the "Certification Of Outside Consultant" attached hereto as Exhibit B. Disclosure may be made to such Outside Consultants of the Receiving Party only pursuant to and after completion of the procedures set out in Section D below;

      (d)     this Court in the above-captioned civil action, the U.S. District Court for the Northern District of California in *VLSI Technology LLC v. Intel Corp.*, No. 17-cv-05671-BLF (N.D. Cal.), and the court in any appeal from either of the foregoing actions, in each case including such court's personnel;

      (e)     any designated arbitrator or mediator who is assigned to hear this matter, and his or her staff, who have signed the "Acknowledgment and Agreement To Be Bound By Protective Order" attached hereto as Exhibit A and the "Certification Of Outside Consultant" attached hereto as Exhibit B;

      (f)     court reporters; and

      (g)     Professional Vendors to which disclosure is reasonably necessary for this litigation and a representative of which has signed the "Acknowledgment and Agreement To Be Bound By Protective Order" attached hereto as Exhibit A.

    18.    **OUTSIDE COUNSEL EYES ONLY – SOURCE CODE Material**:  Unless otherwise ordered by the Court or permitted in writing by the Designating Party, a Receiving Party may disclose any information, documents, or things designated OUTSIDE COUNSEL EYES ONLY – SOURCE CODE Material only to the following in addition to those identified in Paragraphs 45-46 below regarding use of Designated Material at depositions:

      (a)     persons who appear on the face of Designated Material as an author, addressee, or recipient thereof, provided, however, that no one may show Designated Material to an ex-employee of a Producing Party without first notifying the Producing Party and providing the Producing Party with an opportunity to object prior to such disclosure;

      (b)     Counsel of Record;

(c)       Outside Consultants of the Receiving Party to whom disclosure is reasonably necessary for this litigation and who have signed the "Acknowledgment and Agreement To Be Bound By Protective Order" attached hereto as Exhibit A and the "Certification Of Outside Consultant" attached hereto as Exhibit B. Disclosure may be made to such Outside Consultants of the Receiving Party only pursuant to and after completion of the procedures set out in Section D below;

(d)       this Court in the above-captioned civil action, the U.S. District Court for the Northern District of California in *VLSI Technology LLC v. Intel Corp.*, No. 17-cv-05671-BLF (N.D. Cal.), and the court in any appeal from either of the foregoing actions, in each case including such court's personnel;

(e)       any designated arbitrator or mediator who is assigned to hear this matter, and his or her staff, who have signed the "Acknowledgment and Agreement To Be Bound By Protective Order" attached hereto as Exhibit A and the "Certification Of Outside Consultant" attached hereto as Exhibit B; and

(f)       court reporters.

19.    **OUTSIDE COUNSEL EYES ONLY – PROCESS RECIPE Material:** Unless otherwise ordered by the Court or permitted in writing by the Designating Party, a Receiving Party may disclose any information, documents, or things designated OUTSIDE COUNSEL EYES ONLY – PROCESS RECIPE Material only to the following in addition to those identified in Paragraph 45 below regarding use of Designated Material at depositions:

(a)       persons who appear on the face of Designated Material as an author, addressee, or recipient thereof, provided, however, that no one may show Designated Material to an ex-employee of a Producing Party without first notifying the Producing Party and providing the Producing Party with an opportunity to object prior to such disclosure;

(b)       Counsel of Record;

(c)       Outside Consultants of the Receiving Party to whom disclosure is reasonably necessary for this litigation and who have signed the "Acknowledgment and Agreement To Be Bound By Protective Order" attached hereto as Exhibit A and the "Certification

Of Outside Process Recipe Consultant" attached hereto as Exhibit D. Disclosure may be made to such Outside Consultants of the Receiving Party only pursuant to and after completion of the procedures set out in Section D below;

> (d)    this Court in the above-captioned civil action, the U.S. District Court for the Northern District of California in *VLSI Technology LLC v. Intel Corp.*, No. 17-cv-05671-BLF (N.D. Cal.), and the court in any appeal from either of the foregoing actions, in each case including such court's personnel;

> (e)    any designated arbitrator or mediator who is assigned to hear this matter, and his or her staff, who have signed the "Acknowledgment and Agreement To Be Bound By Protective Order" attached hereto as Exhibit A and the "Certification Of Outside Process Recipe Consultant" attached hereto as Exhibit D; and

> (f)    court reporters.

20.    Each person to whom Designated Material may be disclosed, and who is required to sign the "Acknowledgment and Agreement To Be Bound By Protective Order" attached hereto as Exhibit A, or the "Certification Of Outside Consultant" attached hereto as Exhibit B (if applicable) or the "Litigation Manager Acknowledgment and Agreement to Be Bound by Protective Order" attached hereto as Exhibit C (if applicable) or the "Certification Of Outside Process Recipe Consultant" attached hereto as Exhibit D (if applicable), must do so prior to the time such Designated Material is disclosed to him or her. Counsel for a Party who makes any disclosure of Designated Material must retain each original executed certificate and, upon written request, must provide copies to counsel for all other Parties at the termination of this action.

21.    At the request of the Designating Party, persons not permitted access to Designated Material under the terms of this Protective Order must not be present at depositions while the Designating Party's Designated Material is discussed or otherwise disclosed. Pre-trial and trial proceedings must be conducted in a manner, subject to the supervision of the Court, to protect Designated Material from disclosure to persons not authorized to have access to such Material.

- 9 -

**D.      Access By Outside Consultants**

22.      **Notice.** If a Receiving Party wishes to disclose another Party's Designated Material to any Outside Consultant, such Receiving Party must provide advance written notice by email to counsel for the Designating Party, which notice must include: (a) the individual's name and business title; (b) business address; (c) business or profession; (d) the individual's CV; (e) any previous, current or anticipated relationship (personal or professional) with any of the Parties (and/or their predecessors or successors in interest) or a Party's competitor (and/or their predecessors or successors in interest); (f) a list of other cases in which the individual has testified (at trial or deposition) within the last four years; (g) an identification of all companies with which the individual has consulted or by which the individual has been employed within the last four years;[1] and (h) a signed copy of (1) the "Acknowledgment and Agreement To Be Bound By Protective Order" attached hereto as Exhibit A and (2) one or both of the "Certification Of Outside Consultant" attached hereto as Exhibit B and the "Certificate of Outside Process Recipe Consultant" attached hereto as Exhibit D.

23.      **Objections.** The Designating Party will have seven (7) business days from receipt of the notice specified in Paragraph 22 to object in writing to such disclosure. Any such objection must set forth in detail the grounds on which it is based. After the expiration of the 7-day period, if no objection has been asserted, then Designated Material may be disclosed to the Outside Consultant pursuant to the terms of this Order. However, if the Designating Party objects within the 7-day period, the Receiving Party may not disclose Designated Material to the challenged individual absent written resolution of the dispute or Court Order. In the event the Designating Party makes a timely objection, the Parties must meet and confer within three business days by telephone or in person to try to resolve the matter by agreement. If the Parties cannot reach an

---

[1] If the Outside Consultant believes any of this information is subject to a confidentiality obligation to a third-party, then the Outside Consultant should provide sufficient information for the Designating Party to determine whether it needs to object to the Outside Consultant. In all instances, the Outside Consultant may not omit entirely the existence of work that was performed pursuant to a confidentiality agreement. In addition, the Party seeking to disclose to the Outside Consultant shall be available to meet and confer with the Designating Party regarding any such engagement.

agreement, the objecting Party may within five (5) business days following the meet and confer move for a protective order preventing disclosure of Designated Material to the Outside Consultant or for other appropriate relief. If the objecting Party fails to move for protective order within the prescribed period, any objection to the Outside Consultant is waived, and Designated Material may thereafter be disclosed to such individual (upon signing the "Agreement To Be Bound By Protective Order" attached hereto as Exhibit A). If the objecting Party timely moves for a protective order, Designated Material must not be disclosed to the challenged individual until and unless a final ruling allowing such disclosure is made by this Court or by the consent of the objecting Party, whichever occurs first.

E.  **Production of OUTSIDE COUNSEL EYES ONLY – SOURCE CODE Material**

24.  Unless otherwise agreed to in writing between the Producing Party and the Receiving Party, Source Code designated as "OUTSIDE COUNSEL EYES ONLY – SOURCE CODE" may only be provided on at least two stand-alone computers (that is, computers not connected to a network, the Internet, or any peripheral device, except that the stand-alone computers may be connected to a printer or printers and a monitor and will have a mouse connected, all other ports must be disabled) at a secure location, to be made available during regular business hours (9:00 a.m. to 6:00 p.m. local time) on weekdays on five (5) business days' notice, at Producing Party's counsel's offices in the United States ("Source Code Computers"). For Intel, the secure location will be the offices of WilmerHale in Los Angeles, California. The Receiving Party must identify in writing to the Producing Party the persons who will be conducting the inspection or will be present during the inspection no less than 48 hours in advance of any such inspection. Before being admitted into the secure location, an individual must provide a photo identification card issued by the United States federal government or the government of a state of the United States.

25.  The Producing Party will produce Source Code designated as "OUTSIDE COUNSEL EYES ONLY – SOURCE CODE" in computer searchable format and in a file structure and format that mirrors the file structure and format of the Source Code as maintained by the Producing Party in the ordinary course of business, pursuant to the provisions of Paragraph 24

above, but need not produce in executable format absent further written agreement of the parties or order of the Court. The Producing Party may monitor any review of Source Code designated as "OUTSIDE COUNSEL EYES ONLY – SOURCE CODE", but only as is reasonable to ensure compliance with this Protective Order and in a manner that will not interfere with the Receiving Party's confidential communications or otherwise invade the Receiving Party's attorney work product, and that will afford the Receiving Party adequate privacy to permit the development of appropriate work product. The Producing Party shall provide the Receiving Party with information explaining how to start, log on to, and operate the Source Code Computers in order to access the produced Source Code. In order to verify that its Source Code has not later been altered, the Producing Party may benchmark the materials to confirm that the materials have not been altered before and after they are provided but shall not install any keystroke or other monitoring software on the Source Code Computers. Each time a Producing Party makes Material available for review on the Source Code Computer, it shall promptly notify the Receiving Party of the same and provide a summary of the volume and nature of such newly available Material.

26.     Except as otherwise provided herein, no copies of any portion of the Source Code may leave the secure location in which the Source Code is inspected. Further, except as provided herein, no written or electronic record of the Source Code is permitted. Notwithstanding the foregoing, the Receiving Party may request printed copies of specific portions of Source Code designated as "OUTSIDE COUNSEL EYES ONLY – SOURCE CODE." Within three (3) business days of the printing request, the Producing Party must either (i) provide five (5) paper copies of Source Code designated as "OUTSIDE COUNSEL EYES ONLY – SOURCE CODE" including Bates numbers and appropriate confidentiality labels when printed, along with a native Microsoft Excel file that lists the filepath and filename, as they appear on any stand-alone computers, of each requested file, correlated to the beginning Bates number of the corresponding print-out, or, alternatively, the Producing Party may brand printouts with the filepath and filename of each file, as it appears on any stand-alone computer; or (ii) object that a printing request is excessive and/or not done for a permitted purpose. The Producing Party must retain copies of any portions of Source Code printed and the Receiving Party is prohibited from removing the copies

from the secure location. The entire code or an unreasonably large portion of the code must not be requested. The Receiving Party is not entitled to request copies in order to review blocks of Source Code designated as "OUTSIDE COUNSEL EYES ONLY – SOURCE CODE" elsewhere in the first instance, i.e., as an alternative to reviewing the materials electronically on the stand-alone computers provided by the Producing Party, as the parties acknowledge and agree that the purpose of the protections herein would be frustrated by printing portions of code for review and analysis elsewhere. Printouts of the Source Code that exceed 60 contiguous pages or 20% or more of a specific software release will be presumed excessive unless the Receiving Party provides a compelling justification that such printed portions are necessary. For example, if the requested portion of the source code comprises a complete code module that is directly relevant to the operation of the accused instrumentality, yet that requested portion exceeds the aforementioned page limits, such request may be deemed a compelling justification. If the Producing Party objects within three (3) business days of a printing request that the printing request is excessive and/or not done for a permitted purpose, the Producing Party and Receiving Party will meet and confer within three (3) business days of the Producing Party's objection. If the Producing Party and the Receiving Party cannot resolve the objection, the Receiving Party may, within three (3) business days after the meet and confer, seek the Court's resolution of whether the request is narrowly tailored for a permitted purpose. The burden will be on the Receiving Party to demonstrate that such portions are no more than is reasonably necessary for a permitted purpose, and not merely for the purpose of review and analysis in another location.

27.     A Receiving Party of any paper copies of any Source Code designated as "OUTSIDE COUNSEL EYES ONLY – SOURCE CODE" must always keep the paper copies of the Source Code at the office of the Receiving Party's Outside Counsel of Record, and in a locked storage container at the office of the Receiving Party's Outside Counsel of Record when the paper copies of the Source Code are not in use. Outside Consultants and experts are prohibited from keeping copy sets. The Receiving Party may not reproduce the paper copies of the Source Code, absent written agreement of the Producing Party. The Receiving Party must maintain a Source Code Access Log identifying, for each and every time any Source Code is viewed, accessed, or

analyzed: (i) the name of each person who accessed the Source Code; (ii) the date of access; and (iii) the location of access. The Receiving Party must produce such log to the Producing Party within one month of final disposition of this action or, during this action, upon seven (7) business days' advance notice to Receiving Party only when the Producing Party has a good faith reasonable basis for believing that a violation of Paragraph 27 of this Protective Order has occurred and explains the basis for such belief in writing at the time of the request for the log. If a Party has in its possession any Source Code that is owned by a third party and subject to a claim of confidentiality or subject to any license restriction on its distribution or release, the Party possessing the third party Source Code will not be required to produce such code until such time as the third party has been notified by the Party of the anticipated production of such code and the third party has had an opportunity to object to such production and to seek a protective order from the Court concerning the same within fifteen (15) days of being notified of the anticipated production of such code.

28.     Except as otherwise provided herein, no electronic devices, including but not limited to cellular phones, PDAs, cameras, and voice recorders will be permitted in the secure location. Laptops may be used during inspection of Source Code, provided any such use is consistent with this Protective Order (e.g., any camera or other non-permitted functionality will not be used). The Producing Party shall make reasonable efforts to provide the Receiving Party's reviewers with a "breakout room" that is separate from the room containing the Source Code Computers, where said Receiving Party reviewers may keep their cellular phones, etc., and have access to the internet. Whenever the Producing Party is unable to provide such a "breakout room," the reviewers will be permitted to keep their cellular phones and other personal electronics with them in the secure location so long as these devices are powered down and kept in a closed container. The Receiving Party's source code reviewers will be entitled to take notes relating to the Source Code, but may not copy the Source Code into the notes. Such notes will be treated the same as original printouts.

29.     A Receiving Party that wants to use any printouts of Source Code designated as "OUTSIDE COUNSEL EYES ONLY – SOURCE CODE" at a deposition must notify the

Producing Party in writing at least five (5) calendar days before the date of the deposition about the specific pages the Receiving Party intends to actually use at the deposition by Bates production number, and the Producing Party will bring printed copies of those portions of the code to the deposition for use by the Receiving Party. Copies of Source Code designated as "OUTSIDE COUNSEL EYES ONLY – SOURCE CODE" that are marked as deposition exhibits must not be provided to the court reporter or attached to deposition transcripts; rather the deposition record will identify such an exhibit by its production numbers. All printouts of Source Code designated as "OUTSIDE COUNSEL EYES ONLY – SOURCE CODE" brought to a deposition must be collected by the Producing Party at the conclusion of the deposition. In addition (or as an alternative to the use of printouts at a deposition), the Producing Party shall, on request, make a copy of the Source Code available on a single stand-alone computer (but otherwise in the same format in which the source code is available under Paragraph 25 above) during depositions of witnesses who would otherwise be permitted access to such Source Code. The Receiving Party shall make such requests at least ten (10) calendar days before the deposition. The Producing Party shall make reasonable efforts to comply with such a request made less than ten (10) calendar days before a deposition, provided the request is made in good faith and could not reasonably under the circumstances have been made sooner. Any deposition at which a copy of the Source Code is made available on a single stand alone computer shall occur at a city or metropolitan area mutually agreed upon by the parties. Location within the city or metropolitan area can be selected by the Producing Party for the purpose of efficiently setting up the stand alone computer.

30.     Except as provided herein, absent express written permission from the Producing Party, the Receiving Party may not create electronic images, or any other images, or make electronic copies, of the Source Code designated as "OUTSIDE COUNSEL EYES ONLY – SOURCE CODE" from any paper copy of the Source Code for use in any manner (including, by way of example only, the Receiving Party may not scan Source Code designated as "OUTSIDE COUNSEL EYES ONLY – SOURCE CODE" to a PDF or photograph the code). Paper copies of the Source Code designated as "OUTSIDE COUNSEL EYES ONLY – SOURCE CODE" also may not be converted by the Receiving Party into an electronic document, and may not be scanned

using optical character recognition ("OCR") technology.  The exception to this restriction is for the Receiving Party's expert reports, including any rebuttal reports, and for filings with the Court (subject to the limitations below).  To the extent it is necessary to reference Source Code in an expert report or other discovery document, the excerpts must be limited to the minimum amount necessary to support the specific argument made, but in no event may an excerpt exceed 25 contiguous lines of code.  Longer excerpts shall not be copied for use in an expert report or other discovery document but shall be referred to by citations to Bates Numbers and/or file names numbers and line numbers on the Source Code Computer.  Furthermore, in order to safeguard the Producing Party's Source Code that may be replicated in an expert report, the parties agree that any copies of such reports that include any portion of the Producing Party's Source Code may not be transmitted electronically, but must be served by hand delivery.  For avoidance of doubt, copies of such reports where any Source Code has been redacted or removed may be transmitted electronically subject, however, to the other provisions herein.  Images or copies of Source Code designated as "OUTSIDE COUNSEL EYES ONLY – SOURCE CODE" must not be included in correspondence between the parties (references to production numbers must be used instead), and must be omitted from pleadings and other papers whenever possible.  If the Receiving Party reasonably believes that it needs to submit a portion of Source Code designated as "OUTSIDE COUNSEL EYES ONLY – SOURCE CODE" as part of a filing with the Court, the parties must meet and confer as to how to make such a filing while protecting the confidentiality of the Source Code.  If the parties are unable to reach agreement at the meet and confer about how such filing shall be made, the Receiving Party agrees that it must observe the following minimum protections in making the filing: (i) the Receiving Party will rely on expert declarations or other means to describe the relevant feature or functionality of the Source Code (including by identifying the corresponding production number(s) and line number(s) of the referenced Source Code), rather than copying portions of the Source Code into a filing, to the extent possible; (ii) if any portion of Source Code is included in a filing, the Receiving Party will copy the minimal amount of Source Code that is necessary for purposes of that filing; (iii) the filing will be made only under seal, and all confidential information concerning the Source Code must be redacted or removed in any

public versions of the filed documents; and (iv) the Receiving Party's communication and/or disclosure of electronic files or other materials containing any portion of Source Code in connection with a filing must at all times be limited solely to individuals who are expressly authorized to view Source Code under the provisions of this Order, and all such individuals must be identified on the log as reviewers and/or recipients of paper copies in accordance with Paragraph 27.

31.     The Receiving Party may request that commercially available software tools for viewing and searching Source Code designated as "OUTSIDE COUNSEL EYES ONLY – SOURCE CODE" be installed on the Source Code Computers, provided that such tools are reasonably necessary for the Receiving Party to perform its review of the Source Code consistent with the protections herein.  Specific tools may include, but are not limited to, Understand, Notepad++, Beyond Compare, XCode tools, Slick Edit, Source-Navigator, PowerGrep, ExamDiffPro, Sigasi, UltraEdit, Graphviz, Eclipse, Cygwin, or other similar programs, schematic editors used for reviewing circuit schematics, such as LTSpice, and software programs that may be necessary to review RTL, HDL, and similar-type files.  Other mutually agreed upon tools may be used.  The Producing Party must attempt to install licensed copies of mutually agreed upon tools on the Source Code Computers, and any license or subscription fees will be paid for by the Receiving Party.  If the Producing Party's good faith attempt to install additional software is successful on one of the Source Code Computers, the second stand-alone computer will be similarly updated within three (3) business days.  The Receiving Party must provide the Producing Party with such licensed software tools at least five (5) business days before the date on which the Receiving Party wishes to have the additional software tools available for use on the Source Code Computer.  If a mutually agreed upon software tool is available at no cost from an easily accessible and publicly available source, the Receiving Party must identify where the Producing Party may obtain the tool at least five (5) business days before the date on which it wishes to have the additional tool and the mutually agreed upon tool will be installed on the Source Code Computer by the Providing Party.  Unless otherwise agreed in writing by the parties, the Receiving Party must not at any time use any compilers, interpreters or simulators in connection

with the Producing Party's Source Code designated as "OUTSIDE COUNSEL EYES ONLY – SOURCE CODE." The parties agree to meet and confer on any further specific format for reviewing the Source Code designated as "OUTSIDE COUNSEL EYES ONLY – SOURCE CODE," including any additional tools that may be requested. Except as otherwise provided herein or agreed in writing by the parties, in no event may tools be installed on the Source Code Computer that have the effect of altering, modifying, deleting, copying, or otherwise permitting the reproduction or removal of any Source Code.

**F.    Production of OUTSIDE COUNSEL EYES ONLY – PROCESS RECIPE Material**

32.    Intel states that it treats Process Recipe Material in a manner that is at least as protective as Source Code. Unless otherwise agreed to in writing between the Producing Party and the Receiving Party, Process Recipes designated as "OUTSIDE COUNSEL EYES ONLY – PROCESS RECIPE" may only be provided on at least one stand-alone computer (that is, a computer not connected to a network, the Internet, or any peripheral device, except that the stand-alone computer may be connected to a printer or printers and a monitor and will have a mouse connected, all other ports disabled) at a secure location, to be made available during regular business hours (9:00 a.m. to 6:00 p.m. local time) on weekdays on five (5) business days' notice, at Producing Party's counsel's offices in the United States ("Process Recipe Computer"). The Process Recipe Computer must be distinct from any Source Code Computers. For Intel, the secure location will be the offices of WilmerHale in Los Angeles, California. At the option of the Producing Party, the secure location provided for review of "OUTSIDE COUNSEL EYES ONLY – PROCESS RECIPE" Material may be physically separate from the secure location provided for review of "OUTSIDE COUNSEL EYES ONLY – SOURCE CODE" Material. If the Producing Party makes the Process Recipe Computer available in the same secure location as the Source Code Computers, any laptop used pursuant to Paragraph 28 to take notes during the review of the Source Code Computers must not be used when reviewing the Process Recipe Computer. If the Producing Party makes the Process Recipe Computer available in the same secure location as the Source Code Computers, individuals who access only the Source Code Computers will not be deemed to have received "OUTSIDE COUNSEL EYES ONLY – PROCESS RECIPE" Material.

The Receiving Party must identify in writing to the Producing Party the persons who will be conducting the inspection or will be present during the inspection no less than 48 hours in advance of any such inspection. Before being admitted into the secure location, an individual must provide a photo identification card issued by the United States federal government or the government of a state of the United States.

33.     The Producing Party will produce Process Recipes designated as "OUTSIDE COUNSEL EYES ONLY – PROCESS RECIPE" in computer searchable format. The Producing Party may monitor any review of Process Recipes designated as "OUTSIDE COUNSEL EYES ONLY – PROCESS RECIPE", but only as is reasonable to ensure compliance with this Protective Order and in a manner that will not interfere with the Receiving Party's confidential communications or otherwise invade the Receiving Party's attorney work product, and that will afford the Receiving Party adequate privacy to permit the development of appropriate work product. The Producing Party shall provide the Receiving Party with information explaining how to start, log on to, and operate the Process Recipe Computer in order to access the produced Process Recipes. In order to verify that its Process Recipes have not later been altered, the Producing Party may benchmark the materials to confirm that the materials have not been altered before and after they are provided but shall not install any keystroke or other monitoring software on any stand-alone computers. Each time a Producing Party makes Material available for review on the Process Recipe Computer, it shall promptly notify the Receiving Party of the same and provide a summary of the volume and nature of such newly available Material.

34.     Except as otherwise provided herein, no copies of any portion of the Process Recipes may leave the secure location in which the Process Recipes are inspected. Further, except as provided herein, no written or electronic record of the Process Recipes is permitted. Notwithstanding the foregoing, the Receiving Party may request printed copies of specific portions of Process Recipes designated as "OUTSIDE COUNSEL EYES ONLY – PROCESS RECIPES." Within three (3) business days of the printing request, the Producing Party must either (i) provide two (2) paper color copies of Process Recipes designated as "OUTSIDE COUNSEL EYES ONLY – PROCESS RECIPES" including Bates numbers and appropriate confidentiality

labels when printed, as they appear on any Process Recipe Computers, of each requested file, correlated to the beginning Bates number of the corresponding print-out, or, alternatively, the Producing Party may brand printouts with the filepath and filename of each file, as it appears on any stand-alone computer; or (ii) object that a printing request is excessive and/or not done for a permitted purpose. Paper copies are restricted to what is necessary for use in preparing a filing, an expert report, a deposition, or a hearing. A Receiving Party must not print passages to facilitate review of the paper copies of Process Recipes designated as "OUTSIDE COUNSEL EYES ONLY – PROCESS RECIPES" away from the secure location; Process Recipes are to be reviewed and analyzed using the Process Recipe Computer. The Receiving Party is prohibited from removing the paper copies of Process Recipes designated "OUTSIDE COUNSEL EYES ONLY – PROCESS RECIPES" from their secure location. If the Producing Party objects within three (3) business days of a printing request that the printing request is excessive and/or not done for a permitted purpose, the Producing Party and Receiving Party will meet and confer within three (3) business days of the Producing Party's objection. If the Producing Party and the Receiving Party cannot resolve the objection, the Receiving Party may, within three (3) business days after the meet and confer, seek the Court's resolution of whether the request is narrowly tailored for a permitted purpose. The burden will be on the Receiving Party to demonstrate that such portions are no more than is reasonably necessary for a permitted purpose, and not merely for the purpose of review and analysis in another location.

35.     A Receiving Party of any paper copies of any Process Recipes designated as "OUTSIDE COUNSEL EYES ONLY – PROCESS RECIPES" must always keep the paper copies of the Process Recipes at the office of the Receiving Party's Outside Counsel of Record, and in a locked storage container at the office of the Receiving Party's Outside Counsel of Record when the paper copies of the Process Recipes are not in use. Outside Consultants and experts are prohibited from keeping copy sets. The Receiving Party may not reproduce the paper copies of the Process Recipes, absent written agreement of the Producing Party. The Receiving Party must maintain a Process Recipes Access Log identifying, for each and every time any Process Recipe is viewed, accessed, or analyzed: (i) the name of each person who accessed the Process Recipes; (ii) the date

of access; and (iii) the location of access. The Receiving Party must produce such log to the Producing Party within one month of final disposition of this action or, during this action, upon seven (7) business days' advance notice to Receiving Party only when the Producing Party has a good faith reasonable basis for believing that a violation of Paragraph 35 of this Protective Order has occurred and explains the basis for such belief in writing at the time of the request for the log. If a Party has in its possession any Process Recipes owned by a third party and subject to a claim of confidentiality or subject to any license restriction on its distribution or release, the Party possessing the third party Process Recipes will not be required to produce such Process Recipes until such time as the third party has been notified by the Party of the anticipated production of such code and the third party has had an opportunity to object to such production and to seek a protective order from the Court concerning the same within fifteen (15) days of being notified of the anticipated production of such code.

36.     No electronic devices, including but not limited to laptops, hard drives, thumb drives, mass-storage devices, floppy drives, zip drives, cellular phones, PDAs, cameras, and voice recorders will be permitted in the secure location with the Process Recipe Computer, except as provided in Paragraphs 32 and 37. Non-electronic devices capable of similar functionality are also prohibited, as is loose paper that could be used in a printer. Written notes relating to the Process Recipes may be taken only in spiral- or permanently-bound notebooks or on the provided Process Recipe Notetaking Computer described in Paragraph 37.

37.     In addition to the secure computers used for "OUTSIDE COUNSEL EYES ONLY – PROCESS RECIPE" Material, the Producing Party shall make available in the secure location with such Process Recipe Computer a reasonably modern laptop computer with no network connection or camera functionality (the "Process Recipe Notetaking Computer") for purposes of enabling the Receiving Party's Counsel of Record and/or Outside Consultants to take notes relating to the Process Recipes. The Process Recipe Notetaking Computer shall have pre-installed a commercially reasonable text editing program, Microsoft Excel or OpenOffice Calc spreadsheet software, and an encryption program which uses AES-256 encryption. The Receiving Party's Counsel of Record and/or Outside Consultants may use the computer for the purposes of taking

notes relating to the Process Recipes. The Reviewing Party shall, upon completion of its review, store its notes within an encrypted volume using AES-256 encryption, protected by at least a 20-character password. Upon completion of each review session, the Producing Party shall, upon request by the Receiving Party, provide the Receiving Party with an electronic storage medium, such as a USB storage device, containing the encrypted volume file with the notes taken by the Receiving Party. At the start of each review session, the Producing Party also shall, upon request by the Receiving Party, copy an updated encrypted volume file containing any revised notes taken by the Receiving Party, from such electronic storage medium onto the Process Recipe Notetaking Computer, for further editing. The Receiving Party shall maintain any notes removed from the secure location in the encrypted form described above at all times when storing or transmitting them. The Receiving Party will move the USB storage device only by hand and shall not copy the materials from the USB storage device onto a computer network or onto a computer that is connected to a computer network. These materials will be deleted from any computer prior to connecting that computer to a computer network. The USB storage device may be connected to a computer that is connected to a computer network only if that computer network is a non-public network with reasonable security measures (for example, a non-encrypted WiFi network would not be permitted, while an encrypted WiFi network with firewall and/or antivirus monitoring would be permitted) and if no materials from the USB storage device are copied off of the storage device. The Producing Party shall not monitor or review any notes taken on the Process Recipe Notetaking Computer, shall not receive the encryption password, and shall not interact with any note files on the computer in any way except to transfer the encrypted volume files, without reviewing their contents, to and from a USB storage medium as described above. The use of such computer shall not be asserted to be a waiver of any privilege or protection. The Producing Party will make reasonable efforts to provide the Receiving Party's Process Recipe reviewers with a "breakout room" that is separate from the room containing the stand-alone computer, where said Receiving Party Process Recipe reviewers may keep their cellular phones, etc., and have access to the internet. Whenever the Producing Party is unable to provide such a "breakout room," the reviewers will be permitted to keep their cellular phones and other personal electronics with them

in the secure location so long as these devices are powered down and kept in a closed container. The Receiving Party's Process Recipes reviewers will be entitled to take notes relating to the Process Recipes, but may not copy the Process Recipes into the notes. Such notes will be treated the same as original printouts.

38.     A Receiving Party that wants to use any printouts of Process Recipes designated as "OUTSIDE COUNSEL EYES ONLY – PROCESS RECIPE" at a deposition must notify the Producing Party in writing at least five (5) calendar days before the date of the deposition about the specific pages the Receiving Party intends to actually use at the deposition by Bates production number, and the Producing Party will bring printed color copies of those portions of the Process Recipes to the deposition for use by the Receiving Party. Copies of Process Recipes designated as "OUTSIDE COUNSEL EYES ONLY – PROCESS RECIPES" that are marked as deposition exhibits must not be provided to the court reporter or attached to deposition transcripts; rather the deposition record will identify such an exhibit by its production numbers. All printouts of Process Recipes designated as "OUTSIDE COUNSEL EYES ONLY – PROCESS RECIPES" brought to a deposition must be collected by the Producing Party at the conclusion of the deposition. In addition (or as an alternative to the use of printouts at a deposition), the Producing Party shall, on request, make a copy of the Process Recipes available on a single stand-alone computer (but otherwise in the same format in which the Process Recipes are available under Paragraph 33 above) during depositions of witnesses who would otherwise be permitted access to such Process Recipes. The Receiving Party shall make such requests at least ten (10) calendar days before the deposition. The Producing Party shall make reasonable efforts to comply with such a request made less than ten (10) calendar days before a deposition, provided the request is made in good faith and could not reasonably under the circumstances have been made sooner. Any deposition at which a copy of the Process Recipes is made available on a single stand alone computer shall occur at a city or metropolitan area mutually agreed upon by the parties. Location within the city or metropolitan area can be selected by the Producing Party for the purpose of efficiently setting up the stand alone computer.

39.   Except as provided herein, absent express written permission from the Producing Party, the Receiving Party may not create electronic images, or any other images, or make electronic copies, Process Recipes designated as "OUTSIDE COUNSEL EYES ONLY – PROCESS RECIPES" from any paper copy Process Recipes for use in any manner (including, by way of example only, the Receiving Party may not scan Process Recipes designated as "OUTSIDE COUNSEL EYES ONLY – PROCESS RECIPES" to a PDF or photograph the Process Recipes). Paper copies of the Process Recipes designated as "OUTSIDE COUNSEL EYES ONLY – PROCESS RECIPES" also may not be converted by the Receiving Party into an electronic document, and may not be scanned using optical character recognition ("OCR") technology. The exception to this restriction is for the Receiving Party's expert reports, including any rebuttal reports, and for filings with the Court (subject to the limitations below). To the extent it is necessary to reference Process Recipes in an expert report or other discovery document, the excerpts must be limited to the minimum amount necessary to support the specific argument made, but in no event may an excerpt exceed 25 contiguous lines of a process recipe document. Longer excerpts shall not be copied for use in an expert report or other discovery document but shall be referred to by citations to Bates Numbers and/or file names and page numbers or row and column numbers on the Process Recipe Computer. Furthermore, in order to safeguard the Producing Party's Process Recipes that may be replicated in an expert report, the parties agree that any copies reports that include any portion of the Producing Party's Process Recipes may not be transmitted electronically, but must be served by hand delivery. For avoidance of doubt, copies of such reports where any Process Recipes has been redacted or removed may be transmitted electronically subject, however, to the other provisions herein. Images or copies of Process Recipes designated as "OUTSIDE COUNSEL EYES ONLY – PROCESS RECIPE" must not be included in correspondence between the parties (references to production numbers must be used instead), and must be omitted from pleadings and other papers whenever possible. If the Receiving Party reasonably believes that it needs to submit a portion of Process Recipes designated as "OUTSIDE COUNSEL EYES ONLY – PROCESS RECIPES" as part of a filing with the Court, the parties must meet and confer as to how to make such a filing while protecting

the confidentiality of the Process Recipes. If the parties are unable to reach agreement at the meet and confer about how such filing shall be made, the Receiving Party agrees that it must observe the following minimum protections in making the filing: (i) the Receiving Party will rely on expert declarations or other means to describe the relevant feature or functionality of the Process Recipes (including by identifying the corresponding production number(s) and/or file names and page numbers or row and column numbers of the referenced Process Recipes), rather than copying portions of the Process Recipes into a filing, to the extent possible; (ii) if any portion of Process Recipes is included in a filing, the Receiving Party will copy the minimal amount of Process Recipes that is necessary for purposes of that filing; (iii) the filing will be made only under seal, and all confidential information concerning the Process Recipes must be redacted or removed in any public versions of the filed documents; and (iv) the Receiving Party's communication and/or disclosure of electronic files or other materials containing any portion of Process Recipes in connection with a filing must at all times be limited solely to individuals who are expressly authorized to view Process Recipes under the provisions of this Order, and all such individuals must be identified on the log as reviewers and/or recipients of paper copies in accordance with Paragraph 35.

### G.  Financial Summaries

40.    In satisfaction of its discovery obligations or otherwise, Intel may generate certain financial summaries for the purpose of this litigation. Intel may produce such financial summaries in native form (i.e., Excel, CSV, or similar database or delimited form). The original and any copies of such financial summaries must at all times be stored in an encrypted container using 256-bit Advanced Encryption Standard (AES-256) encryption and having a passphrase of at least 20 characters in length. Absent Intel's written permission, such financial summaries shall not be transmitted over the Internet.

### H.  Prosecution Bar

41.    A Producing Party may designate and label Material as "SUBJECT TO PROSECUTION BAR" if (i) it is also appropriately labeled "OUTSIDE COUNSEL EYES ONLY" or "OUTSIDE COUNSEL EYES ONLY – SOURCE CODE" or "OUTSIDE COUNSEL

- 25 -

EYES ONLY – PROCESS RECIPES" and (ii) it discloses confidential technical information. Unless otherwise agreed to in writing by the Producing Party, any individual (including, but not limited to, experts, consultants, or attorneys) who personally receives any Material designated "SUBJECT TO PROSECUTION BAR" and labeled as such at the time of receipt must not be involved in the prosecution of patents or patent applications before any foreign or domestic agency, including the United States Patent and Trademark Office, specifically directed to (a) on-chip communications fabrics and distributed access controls using such fabrics; (b) dynamically adjusting voltage based on one or more measurements related to at least one variation parameter; (c) increasing the metal density of die interconnect layers using dummy materials; (d) using on-chip cache memory to store and execute instructions while a main memory is deactivated; and (e) modulating a power gate based on a measurement of leakage, from the time of receipt of such Material through one (1) year after final and non-appealable termination of this litigation. Notwithstanding the foregoing, if an individual has not had access to Material designated "SUBJECT TO PROSECUTION BAR" for one (1) year and the individual is no longer performing work for the Producing Party or the Receiving Party, the individual is no longer subject to the prosecution bar.  For purposes of this paragraph, "prosecution" means directly or indirectly drafting, amending, or advising on the drafting or amending of claims in connection with original prosecution, reissue, reexamination, *inter partes* review proceedings, or other domestic or foreign post-grant review proceedings.  Notwithstanding the foregoing, the Receiving Party's Outside Counsel of Record that is permitted to receive and does receive Material designated "SUBJECT TO PROSECUTION BAR" may be involved in domestic or foreign post-grant patent prosecution (e.g., *inter partes* review, reexamination, nullity proceedings, etc.) provided, however, such counsel is prohibited from directly or indirectly drafting, amending, or advising on the drafting or amending of claims in connection with such post-grant patent prosecution.  To avoid any doubt, "prosecution" as used in this paragraph does not include representing a party challenging a patent before a domestic or foreign agency (including, but not limited to, a reissue protest, ex parte reexamination or *inter partes* review).

## I.      Development Bar

42.      Outside Consultants who personally receive any Material designated "OUTSIDE COUNSEL EYES ONLY –PROCESS RECIPE" Material from Intel must execute the "Certification of Outside Process Recipe Consultant" attached as Exhibit D in which they agree not to perform product development work for commercial purposes that is directed to structures and methods for the manufacturing and packaging of silicon layers, interconnect layers, and bond pads in computer chips, including, and not limited to, increasing the metal density of die interconnect layers using dummy materials, until one year following the final termination of this action (including any appeals).

## J.      Use of Designated Material

43.      **Use Of Designated Material By Receiving Party.** Unless otherwise ordered by the Court or agreed to in writing by the Designating Party, Designated Material and all information derived therefrom may be used by the Receiving Party only for purposes of (1) the above-captioned civil action and any appeals therefrom, and (2) *VLSI Technology LLC v. Intel Corp.*, No. 17-cv-05671-BLF (N.D. Cal.) and any appeals therefrom (except with respect to Designated Material in deposition transcripts, for which any potential cross-use under this subpart (2) will be addressed on an as-requested basis), and must not be used in any other way whatsoever. The Parties will negotiate in good faith regarding any requested cross-use of specific Designated Material in deposition transcripts under subpart (2) above, and the Receiving Party may move this Court to seek permission for such requested cross-use if the Parties are unable to reach agreement, which motion the Producing Party may oppose.  Information contained or reflected in Designated Material must not be disclosed in conversations, presentations (by Parties, Counsel of Record, Professional Vendors, Outside Consultants, or otherwise), in court, or in other settings that might reveal Designated Material, except in accordance with the terms of this Order.

44.      **Use Of Designated Material By Designating Party.** Nothing in this Order limits any Designating Party's use of its own documents and information, nor prevents the Designating Party from disclosing its own confidential information, documents, or things to any person.  Such disclosure does not affect any designations made pursuant to the terms of this Order, so long as the

disclosure is made in a manner that is reasonably calculated to maintain the confidentiality of the information.

45. **Use Of Designated Material at Depositions.** Except as may be otherwise ordered by the Court, any person may be examined as a witness at depositions and trial and may testify concerning all Designated Material of which that person has prior knowledge. In addition:

(a) a present director, officer, employee, designated Rule 30(b)(6) witness, and/or Outside Consultant of a Producing Party may be examined and may testify concerning all Designated Material that has been produced by that Party.

(b) a former director, officer, agent, and/or employee of a Producing Party may be interviewed, may be examined, and may testify concerning all Designated Material of which he or she has prior knowledge, including any Designated Material that refers to matters of which the witness has personal knowledge that has been produced by that Party and that pertains to the period or periods of his or her prior employment with the Party; and

(c) non-parties may be examined or testify concerning any document containing Designated Material of a Producing Party that appears on its face or from other documents or testimony to have been received from or communicated to the non-party as a result of any contact or relationship with the Producing Party, or a representative of such Producing Party. Any person other than the witness, his or her attorney(s), and any person qualified to receive Designated Material under this Order must be excluded from the portion of the examination concerning such information, unless the Producing Party consents to persons other than qualified recipients being present at the examination. If the witness is represented by an attorney who is not qualified under this Order to receive such information, then prior to the examination, the attorney must be requested to execute the "Acknowledgment and Agreement To Be Bound By Protective Order" attached hereto as Exhibit A, which requires the attorney to maintain the confidentiality of Designated Material disclosed during the course of the examination. In the event that such attorney declines to sign such an agreement, such attorney cannot be shown Designated Material and cannot be present during questioning relating to the Designated Material.

46.     A witness who previously had access to a document designated "CONFIDENTIAL", "OUTSIDE COUNSEL EYES ONLY" or "OUTSIDE COUNSEL EYES ONLY – SOURCE CODE" but who is not under a present non-disclosure agreement with the Producing Party that covers that document, may be shown the document if the witness is advised on the record of the existence of the Protective Order and that the Protective Order requires the Parties to keep confidential any questions, testimony, or documents that are designated as "CONFIDENTIAL", "OUTSIDE COUNSEL EYES ONLY", or "OUTSIDE COUNSEL EYES ONLY – SOURCE CODE."  The witness may not copy, take notes on, or retain copies of any Designated Material used or reviewed at the deposition.  The witness may not take out of the deposition room any exhibit that is marked "CONFIDENTIAL", "OUTSIDE COUNSEL EYES ONLY" or "OUTSIDE COUNSEL EYES ONLY – SOURCE CODE."  The Producing Party of any Designated Material used at the deposition may also require that the transcript and exhibits not be copied by the witness or his counsel, that no notes may be made of the transcript or the exhibits, and that the transcript and exhibits may only be reviewed by the witness in the offices of one of the counsel representing a Party in this case (or in the offices of another firm acting for one of the counsel representing a Party in this case and under the supervision of one of the attorneys who is bound by the terms of this Order).

**K.      Procedure for Designating Material**

47.     Subject to the limitations set forth in this Order, a Designating Party may designate as "CONFIDENTIAL" information the Designating Party believes in good faith meets the definition set forth in Paragraph 3, above.  A Designating Party may designate as "OUTSIDE COUNSEL EYES ONLY" information the Designating Party believes in good faith meets the definition set forth in Paragraph 4, above.  A Designating Party may designate as "OUTSIDE COUNSEL EYES ONLY – SOURCE CODE" information the Designating Party believes in good faith meets the definition set forth in Paragraph 5, above.  A Designating Party may designate as "OUTSIDE COUNSEL EYES ONLY – PROCESS RECIPE" information the Designating Party believes in good faith meets the definition set forth in Paragraph 6, above.  A Designating Party

may designate as "SUBJECT TO PROSECUTION BAR" information the Designating Party believes in good faith meets the definition set forth in Paragraph 41, above.

48.     Except as provided above in Section E with respect to "OUTSIDE COUNSEL EYES ONLY – SOURCE CODE" and Section F with respect to "OUTSIDE COUNSEL EYES ONLY – PROCESS RECIPE", any Material (including physical objects) made available by a Producing Party for initial inspection by counsel for the Receiving Party prior to producing copies of selected items will be subject to this Order and must initially be considered, as a whole, to constitute "OUTSIDE COUNSEL EYES ONLY".  The Producing Party will have ten (10) calendar days from the inspection to review and designate the appropriate documents as "CONFIDENTIAL" or "OUTSIDE COUNSEL EYES ONLY" prior to furnishing copies to the Receiving Party.

49.     Except as otherwise provided in this Order or as otherwise stipulated or ordered, Material that qualifies for protection under this Order must be designated in accordance with this Section K before the Material is disclosed or produced.

50.     Designation in conformity with this Order requires:

(a)     For information in documentary form (apart from transcripts of depositions or other pretrial or trial proceedings), the Producing Party must, for each document that contains Designated Material, affix the label "CONFIDENTIAL", "OUTSIDE COUNSEL EYES ONLY", "OUTSIDE COUNSEL EYES ONLY – SOURCE CODE" or "OUTSIDE COUNSEL EYES ONLY – PROCESS RECIPE" and, if appropriate, "SUBJECT TO PROSECUTION BAR", on each page of the document.

(b)     For testimony given in deposition or in other pretrial or trial proceedings, the Designating Party must specify any portions of the testimony that it wishes to designate as "CONFIDENTIAL", "OUTSIDE COUNSEL EYES ONLY", "OUTSIDE COUNSEL EYES ONLY – SOURCE CODE" or "OUTSIDE COUNSEL EYES ONLY – PROCESS RECIPE" and, if appropriate, "SUBJECT TO PROSECUTION BAR". In the case of depositions, the Designating Party may also designate any portion of a deposition transcript as "CONFIDENTIAL", "OUTSIDE COUNSEL EYES ONLY," "OUTSIDE COUNSEL EYES ONLY – SOURCE

CODE," "OUTSIDE COUNSEL EYES ONLY – PROCESS RECIPE," and, if appropriate, "SUBJECT TO PROSECUTION BAR", by informing the reporter and the opposing party in writing within thirty (30) calendar days of receipt of the deposition transcript of the designations to be applied. All deposition transcripts not marked during the deposition will nonetheless be treated as "OUTSIDE COUNSEL EYES ONLY" until the thirty (30) day period has expired. The entire transcript of a deposition at which "OUTSIDE COUNSEL ONLY – SOURCE CODE" or "OUTSIDE COUNSEL EYES ONLY – PROCESS RECIPE" Material was disclosed will be treated as "OUTSIDE COUNSEL EYES ONLY – SOURCE CODE" or "OUTSIDE COUNSEL EYES ONLY – PROCESS RECIPE" until the thirty-day period has expired. Transcript pages containing Designated Material must be separately bound by the court reporter, who must affix to the top of each such page the legend "CONFIDENTIAL", "OUTSIDE COUNSEL EYES ONLY" or "OUTSIDE COUNSEL EYES ONLY – SOURCE CODE", or "OUTSIDE COUNSEL EYES ONLY – PROCESS RECIPE" as instructed by the Designating Party. Subject to the Court's preferences, the parties will work together to make arrangements for making such designations to exhibits, testimony, and other Material used during hearings, pre-trial proceedings, and during the trial of this case.

   (c) For information produced in a form other than documentary, and for any other tangible items, the Producing Party must affix in a prominent place on the exterior of the container or containers in which the information or thing is stored the label "CONFIDENTIAL", "OUTSIDE COUNSEL EYES ONLY", "OUTSIDE COUNSEL EYES ONLY – SOURCE CODE" or "OUTSIDE COUNSEL EYES ONLY – PROCESS RECIPE" and, if appropriate, "SUBJECT TO PROSECUTION BAR".

**L.** **No Waiver of Privilege**

  51. The production or disclosure of documents or information subject to the attorney-client privilege, work product immunity or any other applicable privilege will not constitute a waiver of, nor a prejudice to, any claim that such or related material is privileged, or protected by the work product immunity or any other applicable privilege, provided that the Producing Party notifies the Receiving Party in writing after discovery of such production or disclosure. The

Parties agree that absent compelling evidence to the contrary, the Parties have taken reasonable steps to prevent disclosure; therefore, if privileged documents are disclosed, the disclosure will be deemed inadvertent. Such produced or disclosed documents or information, including all copies thereof distributed to others (e.g., experts, consultants, vendors) must be returned to the Producing Party immediately upon request, and the Receiving Party must immediately destroy any notes or other writing or recordings that summarize, reflect, or discuss the specific content of such privileged documents. No use may be made of such documents or information, including at deposition or at trial, nor may such documents or information be shown to anyone who has not already been given access to them subsequent to the request that they be returned. The Receiving Party may move the Court for an Order compelling production of any such produced or disclosed document or information, but the motion may not assert as a ground for production the fact of the production or disclosure, nor may the motion disclose specific content or otherwise use the specific content of the produced document or information in any way in connection with any such motion.

**M.    Failure to Designate**

52.     A failure to designate qualified information, documents, or things as "CONFIDENTIAL", "OUTSIDE COUNSEL EYES ONLY", "OUTSIDE COUNSEL EYES ONLY – SOURCE CODE", "OUTSIDE COUNSEL EYES ONLY – PROCESS RECIPE", or "SUBJECT TO PROSECUTION BAR" does not, standing alone, waive the Designating Party's right to secure protection under this Order for such Material. Upon discovery of an inadvertent failure to designate, a Producing Party may notify the Receiving Party in writing that the Material is to be designated as "CONFIDENTIAL", "OUTSIDE COUNSEL EYES ONLY", "OUTSIDE COUNSEL EYES ONLY – SOURCE CODE", "OUTSIDE COUNSEL EYES ONLY – PROCESS RECIPE" and, if appropriate, "SUBJECT TO PROSECUTION BAR". Upon receipt of such notice, the Receiving Party must make all reasonable efforts to ensure that the Material is treated in accordance with the terms of this Order, subject to the right to challenge the propriety of such designation(s). The Producing Party must provide substitute copies of documents bearing the confidentiality designation. Any Receiving Party must also make all reasonable efforts to retrieve

any documents from anyone who had received the documents prior to the notification to the Receiving Party of the inadvertent failure to designate and who is no longer permitted to access the documents under the new designation.

**N.** **Filing Designated Material**

53. Designated Material shall be filed under seal in conformance with the Court's rules and procedures.

**O.** **Challenges to Confidentiality Designations**

54. The Parties will use reasonable care when designating documents or information as "CONFIDENTIAL", "OUTSIDE COUNSEL EYES ONLY", "OUTSIDE COUNSEL EYES ONLY – SOURCE CODE", "OUTSIDE COUNSEL EYES ONLY – PROCESS RECIPE" and/or "SUBJECT TO PROSECUTION BAR." Nothing in this Order prevents a Receiving Party from contending that any or all information, documents, or things designated as "CONFIDENTIAL" Material, "OUTSIDE COUNSEL EYES ONLY" Material, "OUTSIDE COUNSEL EYES ONLY – SOURCE CODE" Material, "OUTSIDE COUNSEL EYES ONLY – PROCESS RECIPE" Material and/or "SUBJECT TO PROSECUTION BAR" Material have been improperly designated. A Receiving Party may at any time request that the Producing Party cancel or modify the confidentiality designation with respect to any document or information contained therein, subject to the procedure in Paragraph 55.

55. A Party is not obligated to challenge the propriety of a "CONFIDENTIAL", "OUTSIDE COUNSEL EYES ONLY", "OUTSIDE COUNSEL EYES ONLY – SOURCE CODE", "OUTSIDE COUNSEL EYES ONLY – PROCESS RECIPE" and/or "SUBJECT TO PROSECUTION BAR" designation at the time made, and the failure to do so does not preclude a subsequent challenge thereto. Such a challenge must be written, must be served on counsel for the Producing Party, and must particularly identify by Bates number and set forth for each such document the specific reason the Receiving Party believes the designation is improper for the document that the Receiving Party contends should be designated differently. If a Receiving Party challenges a confidentiality designation of a Producing Party, the Receiving Party will treat the document(s) subject to the challenge according to the terms of the Producing Party's original

confidentiality designation until the challenge is resolved. The Parties must use their best efforts to resolve such disputes promptly and informally. If agreement cannot be reached after informal negotiation, the Parties must meet and confer by telephone (voice mail messages are insufficient) or in person prior to filing any motion. The Receiving Party may request that the Court cancel or modify a "CONFIDENTIAL", "OUTSIDE COUNSEL EYES ONLY", "OUTSIDE COUNSEL EYES ONLY – SOURCE CODE", "OUTSIDE COUNSEL EYES ONLY – PROCESS RECIPE" and/or "SUBJECT TO PROSECUTION BAR" designation. Until the Court rules on the challenge, all parties shall continue to afford the Material in question the level of protection to which it is entitled under the Designating Party's designation.

**P.**     **Other Proceedings**

56.     By entering this Order and limiting the disclosure of information in this case, the Court does not intend to preclude another court from finding that information may be relevant and subject to disclosure in another case. Any person or party subject to this Order who becomes subject to a motion to disclose another party's information designated "CONFIDENTIAL", "OUTSIDE COUNSEL EYES ONLY", "OUTSIDE COUNSEL EYES ONLY – SOURCE CODE" or "OUTSIDE COUNSEL EYES ONLY – PROCESS RECIPE" pursuant to this Order must promptly notify that party of the motion so that the party may have an opportunity to appear and be heard on whether that information should be disclosed.

57.     Specifically, if a Receiving Party is served with a subpoena or a court order that would compel disclosure of any information, documents, or things designated in this action as "CONFIDENTIAL", "OUTSIDE COUNSEL EYES ONLY", "OUTSIDE COUNSEL EYES ONLY – SOURCE CODE", or "OUTSIDE COUNSEL EYES ONLY – PROCESS RECIPE" the Receiving Party must so notify the Designating Party in writing (by email or courier such as FedEx) as soon as reasonably possible and in any event, before any compliance under such subpoena or Court order is requested or required. Such notification must include a copy of the subpoena or order. The Receiving Party also must immediately inform in writing the party who caused the subpoena or order to issue that some or all of the Material covered by the subpoena or order is the subject of this Protective Order. In addition, the Receiving Party must deliver a copy

of this Protective Order promptly to the party in the other action that caused the subpoena or order to issue. The purpose of imposing these duties is to alert the interested parties to the existence of this Protective Order and to afford the Designating Party in this case an opportunity to protect its confidentiality interests in the court from which the subpoena or order issued. The Designating Party must bear the burdens and the expenses of seeking protection in that court of its Designated Material. Nothing in these provisions should be construed as authorizing or encouraging a Receiving Party in this action to disobey a lawful directive from another court.

**Q.      Unauthorized Disclosure of Designated Material**

58.      If a Receiving Party learns that, by inadvertence or otherwise, it has disclosed Designated Material to any person or in any circumstance not authorized under this Order, the Receiving Party must immediately (i) notify in writing the Designating Party of the unauthorized disclosures, (ii) use its best efforts to retrieve all copies of the Designated Material, (iii) inform the person or persons to whom unauthorized disclosures were made of all the terms of this Order, and (iv) request such person or persons to execute the "Acknowledgment and Agreement to Be Bound" attached hereto as Exhibit A.

**R.      Export Control of Designated Material**

59.      A Receiving Party may not transmit or transport or communicate Designated Material designated as "CONFIDENTIAL", "OUTSIDE COUNSEL EYES ONLY", "OUTSIDE COUNSEL EYES ONLY – SOURCE CODE", and/or "OUTSIDE COUNSEL EYES ONLY – PROCESS RECIPE" to any person, location, or vendor outside of the United States, without the written agreement of the Producing Party or an order of the Court. This provision is not intended to prevent the Receiving Party's Counsel of Record from transporting Designated Material abroad for use in depositions (or the foreign equivalent) or related proceedings provided, however, that: (i) use in any foreign deposition(s) is otherwise consistent with the provisions of this Protective Order; (ii) Counsel of Record undertakes reasonable precautions at all times to ensure the security of Designated Material when being transported and used abroad; and (iii) any material transported outside of the United States for depositions must be securely transported back United States after

the deposition is complete or provided to counsel for the Producing Party conclusion of the deposition.

**S.**     <u>**Non-Party Use of This Protective Order**</u>

60.     A non-party producing information or Material voluntarily or pursuant to a subpoena or a court order may designate such Material or information in the same manner and will receive the same level of protection under this Protective Order as any Party to this lawsuit.  Non-parties must use reasonable care when designating documents or information as "CONFIDENTIAL", "OUTSIDE COUNSEL EYES ONLY", "OUTSIDE COUNSEL EYES ONLY – SOURCE CODE", "OUTSIDE COUNSEL EYES ONLY – PROCESS RECIPE" and/or "SUBJECT TO PROSECUTION BAR".  Nothing in this Order prevents a Receiving Party from contending that any or all information, documents, or things designated as "CONFIDENTIAL" Material, "OUTSIDE COUNSEL EYES ONLY" Material, "OUTSIDE COUNSEL EYES ONLY – SOURCE CODE" Material, "OUTSIDE COUNSEL EYES ONLY – PROCESS RECIPE" Material and/or "SUBJECT TO PROSECUTION BAR" Material have been improperly designated.  The procedure for challenging a nonparty's confidentiality designations will be the same procedure as set forth in Section O, above.

61.     A non-party's use of this Protective Order to protect its "CONFIDENTIAL" Material, "OUTSIDE COUNSEL EYES ONLY" Material, "OUTSIDE COUNSEL EYES ONLY – SOURCE CODE" Material or "OUTSIDE COUNSEL EYES ONLY – PROCESS RECIPE" Material does not entitle that non-party access to "CONFIDENTIAL" Material, "OUTSIDE COUNSEL EYES ONLY" Material, "OUTSIDE COUNSEL EYES ONLY – SOURCE CODE" Material or "OUTSIDE COUNSEL EYES ONLY – PROCESS RECIPE" Material produced by any Party in this case.

**T.**     <u>**Duration**</u>

62.     Even after the termination of this action, the confidentiality obligations imposed by this Order will remain in effect until a Designating Party agrees otherwise in writing or a court order otherwise directs.

## U.    Final Disposition

63.    Unless otherwise ordered or agreed in writing by the Producing Party, within sixty (60) calendar days after the final disposition of this action, each Receiving Party must destroy or return all Designated Material to the Producing Party. As used in this paragraph, "all Designated Material" includes all copies, abstracts, compilations, summaries, or any other form of reproducing or capturing any of the Designated Material. The Receiving Party must submit a written confirmation of the return or destruction to the Producing Party (and, if not the same person or entity, to the Designating Party) by the 60-day deadline. Notwithstanding this provision, Counsel of Record may retain an archival copy of all pleadings, motion papers, briefs and supporting materials, deposition transcripts (including exhibits), transcripts of other proceedings (including exhibits), written discovery requests and responses, any documents or materials filed or used in court, exhibits offered or introduced into evidence at trial, legal memoranda, correspondence, or attorney work product, even if such materials contain Designated Material. Counsel of Record may also retain an archival copy of attorney work product found in e-mail. Counsel of Record must make best efforts to delete all other e-mail that contains Designated Material.

## V.    Miscellaneous

64.    Any of the notice requirements herein may be waived, in whole or in part, but only by a writing voluntarily and explicitly agreeing to such waiver signed by the Counsel of Record for the Party against whom such waiver will be effective.

65.    This Order is entered without prejudice to the right of any Party to apply to the Court at any time for additional protection or to relax or rescind the restrictions of this Order, when convenience or necessity requires. No Party waives any right it otherwise would have to object to disclosing or producing any information, documents, or things on any ground not addressed in this Protective Order. Similarly, no Party waives any right to object on any ground to the use in evidence of any of the Material covered by this Protective Order. The Court will take appropriate measures to protect Designated Material at trial and any hearing in this case.

66.    This Order does not diminish any existing obligation or right with respect to Designated Material, nor does it prevent a disclosure to which the Designating Party consents in writing before the disclosure takes place.

67.    The United States District Court for the District of Delaware is responsible for the interpretation and enforcement of this Protective Order.  All disputes concerning Designated Material produced under the protection of this Protective Order will be resolved by the United States District Court for the District of Delaware.  Every individual who receives any Designated Material agrees to subject himself or herself to the jurisdiction of this Court for the purpose of any proceedings related to performance under, compliance with, or violation of this Order.

68.    <u>Injunctive Relief.</u>  Every individual who reviews Designated Material acknowledges that a breach of this Order may result in immediate and irreparable injury for which there is no adequate remedy at law.  A party may immediately apply to obtain temporary, preliminary, and permanent injunctive relief against a violation or threatened violation of this Order.

Dated: March 12, 2019

FARNAN LLP

/s/ Brian E. Farnan
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 N. Market St., 12th Floor
Wilmington, DE 19801
Telephone : (302) 777-0300
Fax : (302) 777-0301
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

*Attorneys for Plaintiff*

Respectfully submitted,

MORRIS, NICHOLS, ARSHT &TUNNELL LLP

/s/  Jack B. Blumenfeld
Jack B. Blumenfeld (#1014)
Jeremy A. Tigan (#5239)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@mnat.com
jtigan@mnat.com

*Attorneys for Defendant*

SO ORDERED, this 13th day of March, 2019.

The Honorable Colm F. Connolly

**EXHIBIT A**

**ACKNOWLEDGMENT AND AGREEMENT TO BE
BOUND BY PROTECTIVE ORDER**

I, _____ [print or type full name], state:

1.      I reside at _____ ;

2.      My present employer is _____ ;

3.      My present occupation or job description is _____ ;

4.      I have been informed of and have reviewed the Protective Order entered in the matter of *VLSI Technology LLC v. Intel Corp.*, Civil Action No. 1:18-cv-00966-CFC in the United States District Court for the District of Delaware and I will not divulge any information, documents, or things that are subject to the Protective Order except in accordance with the provisions of the Order;

5.      I agree to be subject to the authority and jurisdiction of the United States District Court for the District of Delaware in the event of any violation or dispute related to this agreement;

6.      I state under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


Executed on _____, 20__.      _____

                                                                                    Signature

**EXHIBIT B**

**CERTIFICATION OF OUTSIDE CONSULTANT**

I, _____, state:

      1.     I have read the Protective Order ("Order") in the matter of *VLSI Technology LLC v. Intel Corp.*, Case No. 1:18-cv-00966-CFC, dated March 12, 2019, and understand and will abide by its terms.

      2.     I am not a current or anticipated officer, director, or employee of a Party or of a Party's competitor.

      3.     If at any time after I execute this Certificate of Outside Consultant and during the pendency of the litigation I become an employee or competitor of a Party, I will promptly inform the counsel for the Party who retained me in this litigation. I will not thereafter review any Designated Materials marked as "OUTSIDE COUNSEL EYES ONLY" or "OUTSIDE COUNSEL EYES ONLY – SOURCE CODE" unless and until the Parties agree or the Court orders otherwise.

      4.     I will not use any Designated Material for any purpose other than this litigation.

      5.     I agree to be subject to the authority of the District Court of the District of Delaware in the event of any dispute related to this certification.

      6.     I state under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on _____, 20__.    _____

                                                      Signature

**EXHIBIT C**

**LITIGATION MANAGER ACKNOWLEDGMENT AND AGREEMENT
TO BE BOUND BY PROTECTIVE ORDER**

I, _____, state:

    1.    I reside at _____.

    2.    My present employer is _____.

    3.    I have read the Protective Order ("Order") in the matter of *VLSI Technology LLC v. Intel Corp.*, Case No. 1:18-cv-00966-CFC, dated March 12, 2019, and understand and will abide by its terms.

    4.    I meet the Order's requirements for a Litigation Manager.

    5.    I will not divulge any confidential information or material to persons other than those specifically authorized by the Order. I will not use Designated Material in any manner not expressly allowed by the Order.

    5.    I agree to be subject to the authority of the District Court of the District of Delaware in the event of any dispute related to this agreement.

    7.    I state under penalty of perjury under the laws of the United States that the foregoing is true and correct.


Executed on _____, 20__.    _____

                                                 Signature

# EXHIBIT D

## CERTIFICATION OF OUTSIDE PROCESS RECIPE CONSULTANT

I, _____, state:

      1.      I have read the Protective Order ("Order") in the matter of *VLSI Technology LLC v. Intel Corp.*, Case No. 1:18-cv-00966-CFC, dated March 12, 2019, and understand and will abide by its terms.

      2.      I am not a current or anticipated officer, director, or employee of a Party or of a Party's competitor, or a current or anticipated consultant involved in product development work for commercial purposes that is directed to structures and methods for the manufacturing and packaging of silicon layers, interconnect layers, and bond pads in computer chips, including, and not limited to, increasing the metal density of die interconnect layers using dummy materials.

      3.      If at any time after I execute this Certificate of Process Recipe Consultant and during the pendency of the litigation I become an employee or competitor of a Party, I will promptly inform the counsel for the Party who retained me in this litigation. I will not thereafter review any Designated Materials marked as "OUTSIDE COUNSEL EYES ONLY" or "OUTSIDE COUNSEL EYES ONLY – PROCESS RECIPE" unless and until the Parties agree or the Court orders otherwise.

      4.      I will not use any Designated Material for any purpose other than this litigation.

      5.      I agree not to perform product development work for commercial purposes that is directed to structures and methods for the manufacturing and packaging of silicon layers, interconnect layers, and bond pads in computer chips, including, and not limited to, increasing the metal density of die interconnect layers using dummy materials, until one year following the final termination of this action (including any appeals).

      6.      I agree to be subject to the authority of the District Court of the District of Delaware in the event of any dispute related to this certification.

      7.      I state under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on _____, 20___.

                                             _____

                                           Signature

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 5, 2021, I caused the foregoing to be electronically filed

with the Clerk of the Court using CM/ECF, which will send notification of such filing to all

registered participants.

I further certify that I caused copies of the foregoing document to be served on August 5,

2021, upon the following in the manner indicated:

Brian E. Farnan, Esquire                                      *VIA ELECTRONIC MAIL*
Michael J. Farnan, Esquire
FARNAN LLP
919 North Market Street, 12th Street
Wilmington, DE 19801
*Attorneys for Plaintiff*

Morgan Chu, Esquire                                          *VIA ELECTRONIC MAIL*
Ben Hattenbach, Esquire
Iian D. Jablon, Esquire
Christopher Abernethy, Esquire
Amy E. Proctor, Esquire
Dominik Slusarczyk, Esquire
S. Adina Stohl, Esquire
Charlotte J. Wen, Esquire
Brian M. Weissenberg, Esquire
Ian Washburn, Esquire
Michael D. Harbour, Esquire
IRELL & MANELLA LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, CA 90067
*Attorneys for Plaintiff*

Ben J. Yorks, Esquire                                        *VIA ELECTRONIC MAIL*
A. Matthew Ashley, Esquire
IRELL &MANELLA LLP
840 Newport Center Drive, Suite 400
Newport Beach, CA 92660-6324
*Attorneys for Plaintiff*

*/s/ Jeremy A. Tigan*
Jeremy A. Tigan (#5239)