# EXHIBIT 1

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

VLSI TECHNOLOGY LLC,

                    Plaintiff,

      v.

INTEL CORPORATION,

                    Defendant.

Case No. 1:18-cv-00966-CFC-CJB

---

## OPENING EXPERT REPORT OF DR. THOMAS M. CONTE
## REGARDING INFRINGEMENT OF U.S. PATENT NO. 7,246,027

---

## <u>OUTSIDE COUNSEL EYES ONLY</u>

**MAY ALSO CONTAIN INFORMATION DESIGNATED "OUTSIDE COUNSEL EYES ONLY" AND/OR "SUBJECT TO PROSECUTION BAR" BY INTEL**

186.    Further, I reserve the right to supplement or amend my opinions set forth in this Report upon the Court's issuance of any additional order construing any claim terms in the '027 Patent.

## XIII.  **ACCUSED PRODUCTS**

187.    The term "Accused Products" as used in this Report is expressly intended to encompass products that fall within the following "Accused Families": Intel Ivy Bridge, Haswell, Broadwell, Skylake (including Kaby Lake, Coffee Lake, Amber Lake, and Whiskey Lake), Cannon Lake, and Ice Lake, including both client and server products where applicable. I may refer to an Accused Product and an Accused Family interchangeably, but unless specified my use of Accused Product is intended to include all products within the Accused Family to which the product belongs.

188.    By claim, the Accused Products are:

| Patent Claim | Accused Products for Claim |
|---|---|
| Claim 1 | Ivy Bridge, Ivy Bridge Server, Haswell, Haswell Server, Broadwell, Broadwell Server, Skylake, Skylake Server, Kaby Lake, Coffee Lake, Amber Lake, Whiskey Lake, Cannon Lake, Ice Lake |
| Claim 3 | Ivy Bridge, Ivy Bridge Server, Skylake, Skylake Server, Kaby Lake, Coffee Lake, Amber Lake, Whiskey Lake, Cannon Lake, Ice Lake |
| Claim 5 | Ivy Bridge, Ivy Bridge Server, Skylake, Skylake Server, Kaby Lake, Coffee Lake, Amber Lake, Whiskey Lake, Ice Lake |
| Claim 8 | Ivy Bridge, Ivy Bridge Server, Haswell, Haswell Server, Broadwell, Broadwell Server, Skylake, Skylake Server, Kaby Lake, Coffee Lake, Amber Lake, Whiskey Lake, Cannon Lake, Ice Lake |
| Claim 10 | Ivy Bridge, Ivy Bridge Server, Skylake, Skylake Server, Kaby Lake, Coffee Lake, Amber Lake, Whiskey Lake, Cannon Lake, Ice Lake |

**OUTSIDE COUNSEL EYES ONLY**

| Claim 18 | Ivy Bridge, Ivy Bridge Server, Haswell, Haswell Server, Broadwell, Broadwell Server, Skylake, Skylake Server, Kaby Lake, Coffee Lake, Amber Lake, Whiskey Lake, Cannon Lake, Ice Lake |
|---|---|

189.   The Accused Products include the test versions of the above products that were analyzed in Intel's facilities before the commercial launch of the product, as well as all products that incorporated the Accused Products, as well as all subsequent Intel products based on and incorporating pertinent portions of the described microarchitecture that as well as any other products that include any feature that is architected in, or operates in, materially the same infringing manner described in this Report. Each of these products are processors which include integrated circuits. *See, e.g.*, 2019-12-15 Zelikson Dep. Tr. 59:3-15. The Accused Products also further include the wafers, or other sourcing of the Accused Products. The analysis and optimization of these test versions of the processors are a necessary step in the commercial release of a processor.

190.   I expect to provide an overview of the architectural features, and associated functionality, within the Intel Accused Families. In the course of addressing these matters, I expect to rely on evidence including architectural specifications, Intel's source code and RTL, deposition testimony, Intel presentations and public data, and the other documents referenced in this Report. Examples of the features I expect to discuss as part of this overview are set forth in other sections of this Report. In addition, some of the concepts surrounding the architecture of Intel's products are described in Intel documents and other publications cited herein or in VLSI's Paragraph 4(c) Disclosures, which are incorporated herein by reference. I expect that I may discuss the subjects described in these documents and in the Disclosures.

**OUTSIDE COUNSEL EYES ONLY**

## XV.  INFRINGEMENT ANALYSIS ELEMENT-BY-ELEMENT

372.    I understand that claims 1, 3, 5, 8, 10, and 18 of the '027 Patent have been asserted by VLSI as infringed by Intel in this Litigation. I present my analysis as to whether the Accused Products infringe the Asserted Claims of the '027 Patent.

373.    Based on my analysis, the Intel Accused Products infringe the Asserted Claims of the '027 Patent, both directly and indirectly.

374.    Below I examine claim-by-claim and element-by-element whether the Asserted Claims of the '027 Patent are infringed by the Accused Products. It is my opinion that each of those Accused Products infringes the claims of the '027 Patent as set forth below and throughout this Report, as well as set forth in VLSI's Paragraph 4(c) Contentions and the documents cited therein, herein incorporated by reference. The Intel products included in the '027 Accused Products (i.e. the processors operating within a system or components thereof, as discussed in Section XIII ("Accused Products" above) further independently infringe the '027 Patent by virtue of structures present on the chips in those products and the ███████████████████████ the Accused Products for the '027 Patent should be understood to encompass such elements in addition to the finished products that contain the chips.

### A.    Representative Accused Product

375.    My element-by-element infringement analysis is intended to apply to all Accused Products. To the extent that I cite any evidence that is specific to a particular product, it is intended to be representative of the functionality of the ITD Compensation in all of the Accused Products across each Accused Family and/or when discussing Load Line Compensation to be representative of the Load Line Compensation functionality in the Load Line Compensation Accused Products, except where expressly stated to the contrary. For example, with respect to ITD Compensation, Intel witnesses have testified that ITD Compensation is ███████████████████

**OUTSIDE COUNSEL EYES ONLY**

each product. *See, e.g.,* Section XIV ("ITD Compensation and Load Line Compensation in the Accused Products"); 2019-10-23 Gunther Dep. Tr. 69:5-72:8; 2019-11-12 Shulman Dep. Tr. 60:8-19. Intel's technical documentation confirms the ███████████████████████. I have also personally reviewed the source code that Intel has produced in this litigation, which resides[18] on the source code review computers at the Los Angeles office of WilmerHale, Intel's outside counsel, and on a review computer[19] provided to me remotely on May 15, 2020 through Intel's monitored remote-viewing computers in light of travel restrictions and stay at home orders in response to the global pandemic. With respect to ITD Compensation, ███████████████████████ ███████████████████ for the purpose of their infringement, unless expressly called out within my analysis. Similarly, with respect to Load Line Compensation, there are ████████████████ ████████████████████████████ for the purpose of their infringement, unless expressly called out within my analysis. Accordingly, for the purposes of my analysis, I treat each of the products accused of ITD Compensation as representative of all of the Accused Products, and treat each of the products accused of Load Line Compensation as representative of all of the Load Line Compensation Accused Products.

376.    Additionally, each Accused Product within single Accused Family or Subfamily is representative of all other Accused Products within that Family or Subfamily. █████████████ ████████████████████████████████████████████████████████ ███████████████████████████████. Based on my years of experience in the field, this is standard practice in the industry.

---

[18] The code previously resided on such computers and I have no reason to believe that the code was removed, although I cannot confirm as much due to state and stay at home orders.

[19] However, the AML code which was present on the code computers at WilmerHale have been deleted from the remote review computers. I am not aware of a particular reason for why Intel removed already-produced code.

**OUTSIDE COUNSEL EYES ONLY**

> "Q. Are you aware of any effort by Intel to remove ITD compensation from its products since this litigation was initiated?
> A. I am not aware of any activities on that."

2020-01-31 Rotem Dep. Tr. 123:2-7 (objections omitted).

### F.    Intel's Litigation Misconduct

761.    I have been told that one of the factors that can be considered in determining whether a party has engaged in willful infringement includes the accused infringer's litigation misconduct. I understand that litigation misconduct may include acts of deception, conceal, or delay. It appears to me that during the litigation process Intel has engaged in acts of deception, conceal, and delay. I understand from counsel that Intel engaged in significant litigation misconduct.

762.    It appears, for example, that Intel has repeatedly attempted to conceal its infringement of patents-in-suit by refusing to produce, or substantially delaying the production of, pertinent information such as source code and core technical documents related to the products I address in this Report and find infringing. All of this despite the Court's admonition in this case on June 18, 2019:

> "So I mean I'm a little concerned with some of the timing of some of the concessions that Intel has made. As I read it, the last minute extension hanging over it. So on the other hand, you don't have search terms until May 21st. That's not that long ago. But I do think, unfortunately, I think I kind of have to have a hammer over your head. . . . I mean, I don't know. It should be something like, if you are going to wait until August, then you get sanctioned if there are any documents that weren't produced that are discovered in September or October, because you could have used as an excuse, well, you know, we were in a rush to get stuff out. I mean, what does it take to make sure a party produces in timely fashion documents?"

2019-06-18 Hearing Tr. 51:22-52:12.

763.    I also understand that on many occasions Intel has refused to produce, or has substantially delayed the production of, core technical documentation regarding the products that

**OUTSIDE COUNSEL EYES ONLY**

I address in this Report and find to infringe VLSI's patents. For example, I have reviewed the timeline of events summarized in the bullet lists below by counsel, after which the Court granted VLSI's motion to compel production of many of these documents:

- July 24, 2019, VLSI serves its Fifth Set of Requests for Production.

- Intel requests a 21-day extension for its objections and responses. *See* 2019-08-13 Crudo email to VLSI.

- VLSI, on August 15, 2019: "Notwithstanding the tone and unfounded accusations of your e-mails on this subject—and the 30 days that Intel is already afforded by the Federal Rules to respond to VLSI's timely served Fifth Set of Requests for Production—VLSI agrees purely as a courtesy to a 14-day extension for Intel to serve its written objections and responses to the Fifth Set. Given that extension, we expect that Intel will complete its production of responsive documents no later than its service of those objections and responses." 2019-08-15 Slusarczyk email to Crudo.

- After Intel served its objections and responses, VLSI responds on September 8, 2019: "I write concerning the broad and severe deficiencies in Intel's Objections and Responses to VLSI's Fifth Set of Requests for Production ('RFPs'). In flagrant disregard of its discovery obligations, Intel flatly refuses to conduct any search whatsoever in response to 65 of the 97 RFPs in this set, including for VLSI RFP Nos. 189-203, 208-209, 211, 213-215, 217, 223-226, 229-231, 233-240, 243-250, 254-256, 258, 261, 264, 267, 270-274, 277-279, and 281-285.

  Intel's broad refusal to comply with its discovery obligations is striking given that Intel asked 'VLSI [to] agree to an unconditional 14-day extension for serving written objections and responses' to these RFPs, which VLSI granted. See Crudo Email to Slusarczyk (Aug. 14, 2019). Intel said it needed the extension because it could not produce the requested documents by 'the August 23 document production deadline,' saying 'to the extent that additional materials need to be produced in response to the RFPs, Intel will identify a reasonable timeframe for production in its written objections and responses.' *Id.* It now appears that Intel requested this extension in bad faith, seeking only to delay resolution of this dispute. Intel did not need a 14-day extension just to refuse to comply with its discovery obligations for more than two thirds of the RFPs served." 2019-09-08 Abernethy Letter to Crudo.

**OUTSIDE COUNSEL EYES ONLY**

- VLSI, on September 20, 2019: "When we met and conferred last Friday, Intel promised to provide timely updates on its investigations into VLSI's requests, which VLSI served back in July. We have yet to receive a single such update, or a response to the more general questions we first asked almost two weeks ago about whether Intel will amend its responses to clarify whether it has searched for and produced documents responsive to the full scope of each July request.

  This delay is unacceptable. It has been nearly two months since Intel received VLSI's requests, and yet when the parties met and conferred last Friday, none of the multiple Intel lawyers on the phone knew whether Intel had conducted any investigation into nearly every RFP VLSI identified. . . . Intel should have completed this investigation at least a month ago, on the original deadline for responding to VLSI's requests, and certainly by the extended deadline weeks ago. It cannot continue to delay." 2019-09-20 Proctor email to Counsel.

- VLSI, on October 11, 2019, in a letter brief to the Court in support of its motion to compel production of these documents: "Only after asking fundamental questions about the RFPs (which were generally already answered by the precise wording of the RFPs themselves), Intel agreed for the first time to eventually undertake some further analysis and perhaps investigation—more than a month and a half late. Then, on the eve of VLSI's deadline for filing this letter brief, Intel agreed to revise its responses for half of the RFPs where it originally refused even to search, to now claim that it has 'conducted a reasonably diligent investigation' and will still not be producing even a single document. (Ex. 9, 2019-10-10 Crudo Letter to Proctor.) This claim defies belief. Any 'reasonably diligent' search would have turned up at least some number of documents, which means any search Intel did conduct was inadequate. VLSI therefore requests that the Court compel Intel to produce documents responsive to these RFPs, as it should have done months ago." D.I. 336 at 3.

764.    I understand that Intel also interfered with VLSI's efforts to identify and depose Intel witnesses with relevant knowledge. For example, on August 30, 2019, VLSI served Intel with deposition topics. In the ensuing weeks, Intel designated witnesses on only a handful of those deposition topics. It was only on November 6, 2019, just two weeks before the then-end of fact discovery, that Intel served its objections and responses to many of VLSI's Rule 30(b)(6) topics

**OUTSIDE COUNSEL EYES ONLY**

and began to slowly identify witnesses on the many remaining topics while refusing to produce witnesses on many others.

- "There is only one month remaining in fact discovery, and Intel has still not designated witnesses for *sixty* 30(b)(6) topics that VLSI served on August 30, including at least Topics 1-5, 9, 13, 24-26, 28-29, 32-34, 38, 41-42, 44-46, 51-53, 55, 57-59, 61-72, 77-79, 82, and 84-99. Moreover, despite designating a handful of witnesses to testify regarding Topics 6-8, 10-12, 35-40, 43, 47-49, 54, 60, and 83, Intel has still not designated witnesses to testify on those topics as they pertain to every asserted patent, accused feature, and/or accused product." 2019-10-22 Wen email to Crudo.

- VLSI, on October 29, 2019: "We have not received a response to my below email, and Intel still has not provided witnesses for many of VLSI's 30(b)(6) topics. Please provide 30(b)(6) designees for each of VLSI's remaining topics by October 31, 2019, or provide a time this week to meet and confer." 2019-10-29 Wen email to Crudo.

- "Please confirm that Intel will be designating witnesses to testify on each and every one of VLSI's 30(b)(6) topics (including each of the patents, accused products, accused features, and prior art products implicated by VLSI's 30(b)(6) topics). If Intel is refusing to provide witnesses for any of these topics, please let us know by Monday, November 4 so that VLSI can seek relief from the Court." 2019-10-31 Wen email to Crudo.

- "In Intel's Seventh and Eighth Supplemental Initial Disclosures— which Intel served on February 12, 2020 and March 5, 2020, respectively—Intel disclosed a number of its own witnesses for the first time in this case. … These disclosures were untimely. As the Federal Rules required, Intel served its original Initial Disclosures more than a year ago, on November 6, 2018. See Fed. R. Civ. P. 26(c) (requiring initial disclosures 'within 14 days after the parties' Rule 26(f) conference'). Intel should have disclosed the above witnesses at that time, because as Intel's own descriptions make clear, each witness is an "'individual likely to have discoverable information."' Fed. R. Civ. P. 26(a)(1)(A)(i)." 2020-03-31 Abernethy Letter to Thompson at 1-2. Some of these individuals were disclosed "just two days before the fact discovery cutoff" and others "after the fact discovery cutoff, effectively mak[ing] it impossible for VLSI to depose these witnesses within the normal fact discovery period." *Id.* at 2.

**OUTSIDE COUNSEL EYES ONLY**

- "Prior to Mr. Rotem's deposition, Intel purported to designate him as a Rule 30(b)(6) witness for 26 Topics relating to the '026 and '027 Patents. See Tran Email to Abernethy (Jan. 24, 2020). However, despite Intel's purported designation, Mr. Rotem testified that he was not designated or competent to testify regarding at least Topics 30, 31, 35, 36, 37, 39, 44, 45, 47, 49, and 55. See, e.g., Rotem Dep. Tr. 28:20-31:11 (Topics 30 and 31); 31:12-35:5 (Topics 35, 36, and 37); 35:11-38:5 (Topics 39, 44, and 45); 38:10-17 (Topics 47 and 49); 39:15-40:7 (Topic 55).
  Intel's improper designations for Mr. Rotem are highly prejudicial to VLSI, as Intel has deprived VLSI of any Rule 30(b)(6) witness knowledgeable of the above Topics as they relate to the '026 or '027 Patents." 2020-03-31 Abernethy Letter to Thompson at 3.

765.    As another example, I understand that Intel interfered with VLSI's ability to depose Intel employees located outside of the U.S., including by not telling VLSI that the employee was going to be visiting United States while designating that employee for a deposition in Israel:

- "With respect to the Israel depositions, Intel's proposed November 7 date for Mr. Zelikson is not realistic for us given the November 5 *Markman* hearing in this case in Delaware. Can Mr. Zelikson instead be available on November 11, 12, or 18? Please hold the proposed dates for Messrs. Shulman and Rotem in the meanwhile so that we can coordinate the deposition logistics for all three of these Israel-based witnesses." 2019-09-12 Slusarczyk email to Crudo.

- Intel responded: "We have determined that Mr. Zelikson has very limited availability and that the proposed November 7 date is the only date he has available for which it would be feasible to cover all three depositions of the Israel witnesses in a single trip.
  Please confirm by Friday, September 27, whether VLSI intends to take the depositions of Messrs. Zelikson, Shulman, and Rotem on November 7, 12, and 14, respectively." 2019-09-20 Crudo email to Slusarczyk.

- "VLSI confirms the deposition dates for Nadav Shulman (November 12, 2019) and Efraim Rotem (November 14, 2019) in Haifa, Israel.
  As already explained, VLSI is not available to depose Mr. Zelikson in Israel on November 7, 2019, particularly given the November 5 Markman hearing in Delaware. Please propose alternative dates for Mr. Zelikson's deposition. To help accommodate his schedule, VLSI is willing to conduct the deposition on a weekend if need be, such as on Sunday November 10 or Sunday November 17, for example." 2019-09-24 Abernethy email to Crudo.

**OUTSIDE COUNSEL EYES ONLY**

- "Intel previously indicated that the witnesses it was offering for deposition in Israel had no plans to visit the United States any time prior to the close of fact discovery in this case. We were thus surprised and disappointed to learn that Efraim Rotem was in San Francisco last Monday (10/28) having dinner with Intel witness Alon Naveh, without Intel having alerted VLSI to Mr. Rotem's travel plans. See Naveh Dep. Tr. (Rough) at 16:6-17:3.
  VLSI is no longer available to depose Mr. Rotem in Israel on 11/14. Please provide a date for Mr. Rotem's deposition within the window of 12/2-12/4 or 12/6-12/10, so that his deposition can be conducted on the same Israel trip as Mr. Zelikson's 12/5 deposition. Alternatively, please provide a date when Mr. Rotem is available for deposition in the United States." 2019-11-03 Abernethy email to Crudo.

- Intel responded: "Mr. Rotem is available for a deposition on December 18 in Israel. Please confirm that this date works for VLSI." 2019-11-08 Crudo email to Abernethy.

- "Given that opening expert reports are presently due on December 23, 2019, the proposed December 18 date is not a reasonable time for Mr. Rotem's deposition. . . . Intel's apparent refusal to work with VLSI to efficiently schedule depositions for Intel witnesses in Israel is troubling. Intel could have made Mr. Rotem available for deposition in California when he visited San Francisco on or around 10/28, yet Intel failed to inform VLSI of his travel, despite Intel's prior representation that Mr. Rotem had no plans to visit the United State prior to the close of fact discovery. In light of this, Intel's vague assertions of Mr. Rotem's unavailability are insufficient. Please provide an explanation for why Intel purportedly cannot make Mr. Rotem available for deposition in Israel anywhere within the window of 12/2-12/10, so that his deposition could be taken on the same Israel trip as Mr. Zelikson's 12/5 deposition.
  If Intel is unwilling to make Mr. Rotem and Mr. Zelikson available for deposition in Israel at dates that could reasonably fall within a single trip, then VLSI is not inclined to consent to Intel producing either of these witness in Israel to the extent that Intel intends to designate them to testify on any Rule 30(b)(6) topics. See Scheduling Order ⁋ 4(e)(ii) ('Location of Depositions') (requiring Rule 30(b)(6) witnesses to be made available for deposition in Delaware, absent a prior Court order or agreement of the parties). Accordingly, please either provide date(s) that could reasonably accomplish Mr. Zelikson's and Mr. Rotem's depositions on a single Israel trip, or provide dates when Intel will make these witnesses available for deposition in Delaware to the extent Intel intends to designate either witness for any Rule 30(b)(6) topics." 2019-11-12 Abernethy Email to Crudo.

**OUTSIDE COUNSEL EYES ONLY**

766.     I understand that Intel repeatedly interfered with depositions VLSI attempted to obtain from witnesses who were not parties to this case. And in the case of one third party (Cadence), the Court granted VLSI's motion for a protective order where Intel failed to give VLSI fair notice of the deposition. *See*, *e.g.*:

- "It has now been almost six weeks since we alerted Intel to VLSI's intention to depose Mr. Kang, and a full month since Intel reasserted that, even though Mr. Kang is no longer employed by Intel, VLSI should contact Mr. Kang only 'through counsel of record for Intel.' (2019-09-04 Intel's Fourth Supplemental Initial Disclosures at 5; id. at 3.) Yet in this time, Intel has still failed to respond to our simple request: either confirm that Intel will accept service of a subpoena for Mr. Kang, or confirm that it will not and provide the last known address for Mr. Kang so that we may subpoena him directly." 2019-10-04 Stohl email to Counsel.

- "Intel is not acting in good faith regarding the scheduling of these depositions. Intel served a deposition subpoena on Cadence on February 28, 2019. Intel was then silent on the issue for over eight months. Then, on November 6, 2019, just two weeks before the end of fact discovery, you suddenly inform us for the first time that Intel plans to depose Cadence after all—in just 9 days. You then flatly refuse to work with VLSI to find a mutually agreeable deposition date, without providing any reasonably justification for Intel's refusal. Moreover, you have not yet even informed us which Cadence individual(s) will be deposed, whether they will be deposed concurrently or sequentially, or any other details regarding the logistics of the deposition. Intel's conduct is improper and unprofessional." 2019-11-09 Abernethy email to Counsel.

767.     I understand that Intel also stated that a certain employee would testify on particular topics, and only days before the deposition Intel stated the employee would testify on other topics instead:

- "VLSI objects to Intel's designation of Mr. Shulman to testify on 15 topics relating to the '026 Patent. Intel has consistently and for months represented that Mr. Shulman was knowledgeable only on products and features accused of infringing the '027 Patent, not the '026 Patent. E.g., April 1, 2019 Email from Crudo to VLSI re: ESI Search Terms (identifying Mr. Shulman as an ESI custodian for the '027 Patent, but not the '026 Patent); May 9, 2019 Letter from Crudo to Abernethy re: ESI Search Terms (same); May 16, 2019 Letter

**OUTSIDE COUNSEL EYES ONLY**

from Crudo to Abernethy re: ESI Search Terms (same).

Intel's decision to belatedly designate Mr. Shulman on topics relating to the '026 Patent, just a week before VLSI's counsel must travel to Israel for his deposition, is highly prejudicial and appears to be an attempt to improperly prevent VLSI from sending the appropriate attorneys to Mr. Shulman's deposition." 2019-11-09 Wen email to Driscoll.

768.    I understand that Intel also improperly tried to inject argumentative positions in neutral discovery filings to the Court:

- "Intel's inclusion of a paragraph of argument in the joint letter is improper. The appropriate time for Intel to oppose VLSI's motion is in its opposition brief, not in the joint letter. An updated and simplified joint letter is attached. Please confirm that Intel consents to its filing." 2019-11-06 Abernethy email to Counsel.

769.    I understand that Intel also "caved" on discovery requests right before the discovery issues were set to be brought to the Court's attention:

- "Accordingly, VLSI asks yet again that Intel please expressly confirm that, for all of Intel's responses to VLSI RFPs relating to 'Intel's ME,' Intel does in fact *agree to both actively search for and produce* responsive documents and things relating to all of the Accused Products and ME versions identified in VLSI's Paragraph 4(c) Disclosures, including documents and things relating to versions ME6-ME10. Please also confirm that Intel will promptly supplement its written RFP responses to make this clear. Intel's practice of repeatedly purporting to amend its written discovery responses by merely making vague statements in disparate letters and emails is improper, as it makes it unduly burdensome and impractical for VLSI to accurately track what Intel has and has not agreed to with respect to specific discovery requests." 2019-08-22 Abernethy Letter to Crudo, at 3.

- Intel responded: "Finally, even though they were not called for by VLSI's document requests, rather than burden the Court, Intel intends to make a production of ███████████ ████████████████████████ shortly. We believe that this production will moot category nos. 1, 3, and 6 enumerated in the joint letter. We have therefore removed those categories from the letter, consistent with the attached redline edits." 2019-11-07 Crudo email to Abernethy.

**OUTSIDE COUNSEL EYES ONLY**

- "After over a month of delay by Intel following my October 1 letter, and ten days after our October 28 meet and confer at which Intel offered no change in its positions, Intel has now agreed for the first time to make an unspecified production in relation to my October 1 letter. This is yet another instance in a long and disturbing pattern of Intel refusing to meet its discovery obligations, delaying resolution as long as it possibly can, then caving at the last possible minute to avoid court intervention. *See, e.g.*, 2019-06-18 Hearing Tr.51:22-52:3 (Court noting that it was 'concerned with some of the timing of some of the concessions that Intel has made' and saying that 'I think I kind of have to have a hammer over your head.')." 2018-11-07 Abernethy Email to Crudo.

770.    As another example of this behavior, I understand Intel "caved" on its opposition to producing certain documents from another case when faced with court intervention:

- VLSI served the following Request for Production: "All expert reports of Dr. Mangione-Smith served in *Intel Corp. v. Future Link Systems LLC*, No. 14-cv-377-LPS (D. Del.)."

- Intel responded: "Intel responds that it will not separately search for and produce such documents in response to this Request."

- In a letter brief to the Court in support of its motion to compel production of these documents VLSI stated: "VLSI is entitled to consider Dr. Mangione-Smith's analysis. It may also reveal other relevant discovery Intel has not yet provided. Intel has identified no burden in producing the reports. Ex. 20 at 8; Ex. 23 at 6; Ex. 15 at 39. VLSI requests the Court order Intel to produce all documents responsive to RFP No. 180 by July 9, 2019." D.I. 173, at 3.

- Then, Intel responded to VLSI's letter ot the Court, telling the Court that: "VLSI's request for Dr. Mangione-Smith's expert reports from the *Future Link* case is part of its ongoing effort to require Intel to produce *all* documents from that case—the request VLSI raised in the parties' meet-and-confer on June 11. Although these expert reports would be of little, if any, relevance to the issues in this case given that they relate to a patent not asserted here, to resolve this issue, Intel will agree to produce them as soon as it can address any third-party confidentiality obligations." D.I. 178, at 3.

771.    As another example, I understand that Intel persisted in asking VLSI to dismiss with prejudice its assertion of the '633 Patent after the Court construed certain claims of the patent, despite the fact that VLSI already elected not to assert any claims of the '633 Patent in response to

**OUTSIDE COUNSEL EYES ONLY**

the Court's case narrowing order. VLSI repeatedly explained that it was not required to dismiss the '633 Patent with prejudice, which wasted resources that could have been spent in other aspects of this case. For example, as VLSI explained to Intel in a letter dated March 12, 2020:

> For that reason, among others, VLSI respectfully declines your request to "dismiss its claims with respect to the '633 patent with prejudice." Intel is welcome defend itself in this case by developing, and then one day presenting to a jury, the merits of its defenses. The Court—as well as VLSI—has afforded Intel every opportunity to move forward in that endeavor. But Intel's campaign to pressure VLSI into giving up its day in court is not an appropriate way to resolve the parties' dispute, regardless of how many lawyers Intel might have or how many billions of dollars Intel might receive for products that use VLSI's technology. Intel's enormous size does not entitle Intel to demand that a smaller company like VLSI dismiss its case, let alone that it do so "with prejudice." Your letter provides no basis for that demand.
> …
> Finally, you provide—and have—no basis to allege that "VLSI's allegations of infringement with respect to the '633 patent are untenable in light of the Court's construction." Letter, at 2. Indeed, Intel's cornerstone ███ ██████████ describes the accused technology as a ██████████████ VLSI is reviewing the import of the Court's claim construction on its analysis, and disagrees with your unsupported allegations.4 For the time being, however, in view of the Court's case-narrowing protocol, we urge Intel to focus on the claims actually elected by VLSI and make good on its promise to the Court to use that narrowing to make this case "as efficient and manageable as possible."
> …
> We ask that Intel stop sending heated letters of the sort I've been forced to respond to again here—especially when, like your February 19 letter, they have not a shred of truthful support in the record. Instead, we would appreciate if Intel and its large number of lawyers focus on the merits of this case so that it can be brought to a just and speedy conclusion. Please contact me if you have any questions or suggestions about how we can accomplish that in a collegial fashion. 2020-03-12 Slusarczyk letter to Stern.

### G.   Intel's Substantive Defenses Lacked Merit

772.   As discussed in this Report, Intel's non-infringement assertions lack merit, including for the reasons set forth in Sections XIV ("ITD Compensation and Load Line

**OUTSIDE COUNSEL EYES ONLY**

Compensation in the Accused Products") and XV ("Infringement Analysis Element-By-Element") which demonstrate that every element are present and practiced by the Accused Products.

773.    Similarly, the invalidity defenses that Intel has raised to the '027 Patent have for the most part been extremely unspecific and provided without appropriate explanation. As was explained to Intel long ago, to no avail, "Intel's Invalidity Contentions fail to identify how the prior art supposedly teaches or discloses the various claim elements of VLSI's patents. For example, the claim charts Intel provided are devoid of any meaningful claim-element-by-claim-element discussion or analysis. Instead, the charts consist almost entirely of recitation of the claim language and copied-and-pasted excerpts from the prior art references, with little or no explanation as to how or why Intel contends the cited materials relate to the claim limitations." 2019-03-20 Slusarczyk Letter to Amrhein, at 1. This and other reasons why Intel's contentions are unavailing and unreasonable are set forth in VLSI's Responses to Intel's Interrogatory No. 14, which is incorporated herein by reference. If Intel is permitted to and does provide more specific contentions about these issues, I will address those arguments in a separate report regarding the validity of the Asserted Claims, which is hereby incorporated by reference. Intel's positions about validity, however, appear to lack merit.

## H.    Intel's History Of Misconduct

774.    As noted in prior sections, Intel points to its Code of Conduct as a basis for its belief that it does not infringe—namely because patent infringement would go against its Code of Conduct. *See also, e.g.,* 2019-08-16 Schooler Dep. Tr. 163:2-164:1 ("I can tell you that from the top of the company, our CEO is insistent that if it's not done ethically, it's not worth doing. … 'If it's not -- It's not worth doing if it's not done ethically," backed up by the fact that we have a policy around code of conduct, because we invest so much money in it, and reciprocating that respect to the rest of the technology community. So the culture from the top, the code that we live by, the

**OUTSIDE COUNSEL EYES ONLY**

values that support the company create a foundation of noninfringement. I mean, so we don't

infringe."); 2019-09-05 Krishnamoorthy Dep. Tr. 268:3-19 ("Q. So it's your opinion that Intel does

not infringe this patent because Intel has a policy of not infringing patents, is that correct? A. You

can say that.") (objection omitted).

775.    In addition to be a circular argument (including because Intel directs its employees

to *not* look at the patents which would allow for them to respect others' patent rights), Intel must

rely on its own commitment to its Code of Conduct. However, I have been alerted to numerous

instances of Intel's repeated flouting of the prescripts in its Code—as well as U.S. federal, state,

and international law—as shown in the examples below.

- **Corruption and Insider Trading**: Intel's Code prohibits illegal behavior, including that "[a]ny employee who is aware of material, non-public information regarding Intel or any other company must not" "[d]isclose that information to others who may buy or sell securities because of the information." 89607DOC00050830 at -843; *id*. at -841 ("Intel's policy is to comply with all anti-corruption laws" and not to "participate in or facilitate corrupt activity of any kind."). However, at least one former Intel executive "admitted [to] supplying secret details about Intel's investments" to a third party to trade on the provided information. *See* "Ex-Intel executive sentenced in NY for fraud," Associated Press Financial Wire (Sept. 25, 2012), https://www.yahoo.com/news/ex-intel-executive-sentenced-ny-fraud-234138775.html. The executive, Rajiv Goel, also formerly provided inside information about Intel's quarterly earnings to the same third party who made more than $2 million capitalizing on the illegally gotten information. "Former Intel Executive Rajiv Goel Sentenced in Manhattan Federal Court for Insider Trading," FBI Archives, https://archives.fbi.gov/archives/newyork/press-releases/2012/former-intel-executive-rajiv-goel-sentenced-in-manhattan-federal-court-for-insider-trading.

- **Violation of 14th Amendment Age Discrimination**: Intel's Code alleges that Intel does not discrimination on any unlawful basis, including age, and that Intel follows "these principles in all areas of employment." 89607DOC00050830 at -845. Intel's adherence to its non-discriminatory practice however has been under investigation by the Equal Employment Opportunity Commission investigation after it laid off people over 40 at 2.5 times the rate of younger

**OUTSIDE COUNSEL EYES ONLY**

employees. "Age discrimination: Intel investigation drags on for years, worker protections lag," "https://www.oregonlive.com/silicon-forest/2019/12/age-discrimination-intel-investigation-drags-on-for-years-highlighting-legal-pitfalls.html".

- **Violation of 14th Amendment Gender and Racial Discrimination**: Intel's Code alleges that Intel does not discrimination on any unlawful basis, including gender and race, and that Intel follows "these principles in all areas of employment." 89607DOC00050830 at -845. However, Intel settled a "gender and racial discrimination lawsuit" in late-2019 (while the present litigation was in progress) with the Department of Labor for $5 million for having allowed a group of its employees "to discriminate against its Hispanic, African-American and female employees." "Intel settles a gender and racial discrimination lawsuit," https://www.lawless-lawless.com/blog/2019/10/intel-settles-a-gender-and-racial-discrimination-lawsuit.shtml.

- **Antitrust & Employment Violation**: Intel's Code sets forth that Intel employee must "adhere to antitrust laws." 89607DOC00050830 at -841. Despite this, Intel and other companies colluded to prevent their employee movement. In particular, Intel was sued for "conspiring to limit competition and keep wages down for engineers, programmers and other technical staff," resulting in a $324.5 million dollar settlement. "Apple, Google, Intel, Adobe to pay $325 million to settle hiring lawsuit," Reuters (May 23, 2014), https://www.reuters.com/article/us-apple-google-settlement-idUSBREA4M0MY20140523.

- **Antitrust Patent Licensing Violation**: Despite Intel's Code disallowing antitrust violations, Intel settled an antitrust case brought by AMD in which Intel was accused of antitrust violations related to patent licensing. AMD's press release summarized the terms of the settlement as including "a payment of $1.25B … to AMD, [in addition to which] Intel agreed to abide by an important set of ground rules that continue in effect until November 11, 2019. Intel also entered into a Consent Decree with the United States Federal Trade Commission in October of 2010 that continues in effect until October 29, 2020 that imposes further restrictions and requirements intended to foster competition in the x86 semiconductor market." "Intel Antitrust Rulings," AMD.com, https://www.amd.com/en/corporate/antitrust-ruling. Further, as part of the agreement, Intel agreed to not provide inducements to customers contingent upon "locking out AMD to secure total Intel exclusivity" or otherwise disadvantaging AMD in the market.

**OUTSIDE COUNSEL EYES ONLY**

- **Korean Antitrust Violation**: Intel's Code sets forth that Intel employee must "adhere to antitrust laws." 89607DOC00050830 at -841. Intel has violated this rule in numerous jurisdictions including Korea. The Korean Fair Trade Commission found that "Intel offered a total of $370 million dollars to Samsung Electronics and Trigem Computer between 2001 and 2005, on the condition that neither company buy processors from AMD," effectively blocking AMD from the market. *See* Joel Hruska, "Intel fined $26 million for Korean antitrust violations," Ars Technica (June 5, 2008), https://arstechnica.com/gadgets/2008/06/south-korea-fines-intel-for-anticompetitive-behavior/.

- **Japanese Antitrust Violation**: As noted in the prior section, Intel has a policy to follow the law, including antitrust laws. However, Japanese authorities have found that Intel has violated these laws. In particular, "JFTC [Fair Trade Commission of Japan] ruled that Intel violated Japanese antitrust laws and hurt competition in the country's processor market." "Intel and antitrust: A brief history," Network World (Dec. 16, 2009), https://www.networkworld.com/article/2239461/intel-and-antitrust--a-brief-history.html#:~:text=March%208%3A%20JFTC%20ruled%20that%20Intel%20violated%20Japanese,and%20hurt%20competition%20in%20the%20country%27s%20processor%20market.

- **Illicit Relationships**: Intel employees—including its former CEO—have engaged in inappropriate relationships, which are expressly prohibited by the Code of Conduct. Brian Krzanich engaged in a relationship with an employee, which resulting in his resignation. According to Intel in a news release, "the relationship was in violation of the company's non-fraternization policy, which applies to all managers." Barbara Ortutay, "Intel CEO out after consensual relationship with employee; Firm says he broke rule against staff fraternization," The Boston Globe (June 22, 2018), at 1. Although Mr. Krzanich wrote in the Code's introduction that the Code "sets the expectations for integrity and ethics that I expect all employees to follow," it appears that its employees do not uphold those expectations. 89607DOC00050830 at -831.

- **False Advertisement**: Intel settled a class action suit alleging that Intel used "false and misleading advertising by inflating claims about the Pentium 4 microprocessor's performance." "Intel To Pay Millions To Settle Pentium 4 False Ad Suit," Law360 (July 17, 2014), https://www.law360.com/articles/558423/intel-to-pay-millions-to-settle-pentium-4-false-ad-suit. Intel was alleged to have engaged in the false advertising scheme to "to show that it was better than AMD Athlon Thunderbird." "Intel Settles Pentium 4 Lawsuit

**OUTSIDE COUNSEL EYES ONLY**

by Paying $15 to Customers," Nasdaq (Nov. 5, 2014), https://www.nasdaq.com/articles/intel-settles-pentium-4-lawsuit-by-paying-%2415-to-customers-analyst-blog-2014-11-05. This is despite Intel's Code of Conduct which not only states that it will "comply with all [the] laws of the many countries in which it does business," but also that "[i]n our marketing and in our interactions with customers and potential customers, we always represent Intel products and services fairly and accurately." 89607DOC00050830 at -839-840.

776.    Intel's arguments that it does not infringe because to do so would be against its Code of Conduct and U.S. law are unsupported.

## XX.    BENEFITS INTEL RECEIVES ATTRIBUTABLE TO PATENTED INVENTIONS

777.    If asked, I will explain some ways in which Intel benefits from its use of the Asserted Claims of the '027 Patent, including demonstrating methods by which this gain can be quantified.

778.    As part of my analysis to determine the value of the Accused Functionalities within the Accused Products to Intel, I have performed a number of analyses on the fuse data produced by Intel, including by using a tool created by Intel █████████████████████████ by the Accused Products.

### A.    Power and Performance Analyses

779.    As discussed throughout this Report, the use of ITD Compensation and Load Line Compensation in the Accused Products provide power and performance benefits to Intel. This is done through the Accused Functionalities' use of analog and digital variation parameters over the alternative of using predetermined parameters based on the worst case scenario for all products.

780.    Intel itself has acknowledged these significant benefits as discussed throughout my Report. As just one example, an Intel presentation analyzing the opportunities associated with ITD compensation identifies █████████████████████████████

**OUTSIDE COUNSEL EYES ONLY**



93000DOC00036261 at -264.

781.    Other documentation describes a the ███████████████

███████████████████████



**OUTSIDE COUNSEL EYES ONLY**

### 1.    Fuse Variability Analysis

782.    The use of ITD Compensation and Load Line Compensation in connection with analog and digital variation parameters in the Accused Products allow each individual chip produced by Intel to function in accordance with the physical properties of that particular chip. I understand that VLSI requested statistical measures of these physical properties for different product families and I understand that these measures were not produced.

783.    Instead, Intel provided a large set of unlabeled data files that purport to be ████████████ This data was produced in directories including:



785.    I will explain that Intel's production of fuse data is incomplete and improper. For example, certain product families only have a subset of all physical chips manufactured available for review. Other products, such as Ivy Bridge, have a subset of the actual fuse data available for any chip. Finally, I will explain that insufficient documentation has been provided about the format of this data, requiring me to make inferences about how it is stored. While my experience validates these inferences as reasonable and I have confirmed that they allow me to extract values that are

**OUTSIDE COUNSEL EYES ONLY**

consistent with Intel's documentation, to the extent that these inferences are incorrect, I reserve the right to supplement my analysis once Intel provides complete discovery.

786. ███████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████ The fact that these fuses were encoded in this manner at all was not apparent from the fuse files and was withheld from VLSI for months, wasting massive resources. To date, a complete explanation for the encoded data has not been produced and as such I cannot interpret them at this time. Incomplete additional information was provided by Intel with less than two weeks remaining before the submission of this report. 2020-07-20 Thompson Email to VLSI (suggesting only, for the first time, that VLSI "try the following information to decompress the ████████████ In addition to being incomplete, this information was withheld until it was too late to be usable. Unpacking the fuse data can take many days due to the encoding process' complexity and size of the data. I have attempted to complete this process before filing this Report, but it was not possible for me to do so, and therefore Intel's decision about how to produce these data and its untimely explanation of how to decode them prevented me from analyzing fuses produced with ████████████ before finalizing this Report. Again, I reserve the right to supplement my analysis once Intel provides complete discovery and sufficient time has been available to use that discovery.

787. Despite these challenges, I was able to successfully analyze the chip-to-chip variation for parameters of interest for many product families. I used a custom analysis tool to parse each fuse string by decompressing it, extracting each column that stores fuse data, placing the columns in the correct order using data in the header, extracting each column into binary digits, and finally placing those binary digits into their appropriate location in the complete fuse array for

**OUTSIDE COUNSEL EYES ONLY**

that product. These locations were not provided to me, so I was forced to determine them through experimentation.

788.    I understand that Intel provided VLSI's counsel with ███████████████ ████████████████████ I used that mapping to then process each fuse string and search for a large number of fuses of interest. For each processor, I extracted each fuse of interest and maintained a set of counters mapping each potential value for each fuse of interest with the number of processors that has that value set in that particular fuse. This set of counters, forming a histogram, was saved along with other metadata for each fuse report. If asked, I may rely on this data, and visualizations of this data. Exemplary data has been produced on the remote source code inspection systems at /home/shared/vlsi_productions/production2/fuse.

789.    ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████

790.    I then combined the histogram data from different fuse report files that were produced separately into a single, batched histogram for each product family or subfamily. Finally,

**OUTSIDE COUNSEL EYES ONLY**

I generated a human viewable report from each histogram. This report shows, for each analyzed fuse, statistical measures including ██████████████████████████ ████████████████████████████████. It also produces a graph of the ████████████████████ of fuses that have a large range of values. If asked, I may rely on these reports. Exemplary reports, including a list of fuses analyzed, have been produced on the remote source code inspection systems at /home/shared/vlsi_productions/production2/fuse/reports.

### 2.   Guard Band Measurement

791.     As discussed throughout this Report, the use of ITD Compensation and Load Line Compensation in the Accused Products provide power and performance benefits to Intel. This is achieved through the Accused Functionalities' use of analog and digital variation parameters over the alternative of using predetermined parameters based on the worst-case scenario for all products.

792.     The magnitude of this benefit for any given chip is the difference between the power and performance of a chip using this safe, worst-case scenario parameter and the power and performance of a chip using that chip's actual parameters. The difference between the safe, worst-case and the actual or expected parameter is called a "guard band." The average guard band required by the population of manufactured chips can correspond to the average power savings or performance improvement the Accused Products receive by practicing the claims of the '027 Patent.

793.     To determine this average guard band, I inspected the fuse histograms discussed above. I determined the difference between the mean value of each parameter and the value that would be safe to allow operation of 99% of the chips in the population. For each parameter, I excluded chips that had a value of zero for that parameter. This cutoff point was selected to exclude

**OUTSIDE COUNSEL EYES ONLY**

the small (less than 1%) number of fuse data points that appear to be invalid, while computing a conservative determination of the benefit Intel receives from its infringement. First, this estimate is conservative because it does not include the cost to Intel due to discarding these products.

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

Decreasing the number of chips that would fit within the guard band would result in Intel having to discard an even larger number of processors that they actually sold to the public, which would come with additional lost revenue. Increasing it would increase the guard band, and thus would increase the power and performance benefit I calculate based on Intel's infringement of the '027 Patent.

794.    I then converted these calculated guard bands into physical units. For example, I determined a guard band related to the Analog Variation Parameter. For each thermal sensor on any given microprocessor family, I computed the guard band, in degrees Celsius, that would be required if each chip had that particular thermal sensor calibrated identically from chip-to-chip. This guard band was computed by multiplying the mean thermal sensor slope by the difference between the mean thermal sensor hot calibration value and the thermal sensor hot calibration value that would result in safe ITD-correction for 99% of parts with non-zero fuses. ██████████████

███████████████████████████████████████████████████████

██████████████████

795.    Similarly, I determined a guard band related to a relevant Digital Variation Parameter. This guard band was selected as the fraction by which the IA domain's ITD slope would need to be increased from its mean non-zero value to result in safe operation for 99% of parts.

796.    ████████████████████████████████████████████████

███████████████████████████████████████████████████████

- 340 -                    **OUTSIDE COUNSEL EYES ONLY**

███████████████████████████████████████████████████████

████████████████████████ In fact, no Ivy Bridge version of the PCU simulation system was produced at all, despite numerous requests for this and other tools. *See, e.g.,* 2019-12-10 Proctor Letter to Crudo; 2020-06-19 Monnin Email to Tran. This limited my ability to directly calculate the impact of Ivy Bridge's ITD parameter variability on its power consumption. However, I will explain that Ivy Bridge's thermal sensor variability ████████████████████████████████████████ ██████████████████████████████████████. I will also explain that my qualitative examination of the distribution of Ivy Bridge's actual fused ITD parameters showed that ██████████████████████████████████, and therefore I expect Ivy Bridge's use of a Digital Variation Parameter in connection with ITD to ████████████████████ ████████

797.    Together, to determine these guard bands, I examined the fuse data from over ████ ████████ processors and computed guard bands using the over ████████ variation parameters contained therein. These guard bands, associated count data, and a complete list of fuses considered in my analysis have been made available on the remote source code review server at location /home/shared/vlsi_productions/production2/fuse/reports. I expect to rely on these and other produced materials on the source code review server in any presentation of my analysis, and reserve the right to display my analysis and results at any trial. I also reserve the right to supplement my analysis once Intel provides complete discovery regarding the underlying fuse data and sufficient time has been available to use that discovery.

798.    To determine the guard bands that would be required for a specific family, I selected the guard bands required for the fuse report within that specific family that showed the largest guard band. This guard band represents a conservative estimate for the guard band that would be required for the entire family. I will explain that it is conservative, for example, because it does

**OUTSIDE COUNSEL EYES ONLY**

not factor in variation from chip-to-chip within a given family for chips that appear in different fuse reports.

799.    I determined the per-family guard bands as follows:



800.    As noted throughout this Report, although there are additional parameters (namely fuses) through which Intel infringes the Asserted Claims of the '027 Patent in the practice of the Accused Functionalities, I have focused on a few and have limited my quantification analysis to only a few fuses to provide examples of the power savings attributable to Intel's infringement.

801.    As I discuss above, Intel's production of fuse data has been deficient. This has prevented me from analyzing all processors manufactured for certain product families and has prevented me from determining appropriate guardbands for certain other product families at all within the available time and with the limited resources available. For example, fuse reports for product families including ███████████████████████████████████████, which I was able to analyze, as well as in ████████████, which as I explain above, remain unavailable at this time. Additionally, all fuse reports for ██████████████ ████████████████████████████████████ and thus are unavailable at this time.

**OUTSIDE COUNSEL EYES ONLY**

Nevertheless, I expect that my assessment of the power impacts of additional guardbands applies to these products as well, for reasons discussed throughout this report, including that these products appear to infringe in similar ways. Finally, no complete fuse reports, presenting the entire fuse array, were produced at all for Ivy Bridge Server or Haswell Server. But because Intel's engineers have testified that ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ██████████████████████████████████████████.

802.    To the extent that Intel completes its discovery obligations by providing fuse statistics for these products in a useful or complete format, such as those that Intel's witnesses have testified that they use internally, I reserve the right to supplement my analysis. Krishnamoorthy Depo. Tx. at 116:25-117:6. Additionally, to the extent that Intel provides sufficient material to decode the format they've already provided, sufficient time to use it in a decoding process, or access to a sufficiently fast computer system to perform that decoding, I also reserve the right to supplement my analysis.

**3.      Fox2 Analysis**

803.    ██████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████.

████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

**OUTSIDE COUNSEL EYES ONLY**

804. ███████████████████████████

███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████

805. ███████████████████████████████

███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
█████████████████

806. ███████████████████████████████

███████████████████████████████████████████
███████████████████████████████████████████
███████████

807. ███████████████████████████████

███████████████████████████████████████████
███████████████████████████████████████████

**OUTSIDE COUNSEL EYES ONLY**

████████████████████████████████████████████

████████████

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

808.    ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████

**a.    Intel Considers Fox2 To Be Reliable And Accurate**

809.    ████████████████████████████████████████

████████████████████████████████████████████████

████████

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

**OUTSIDE COUNSEL EYES ONLY**



**OUTSIDE COUNSEL EYES ONLY**

93000DOC05077089 at -119.

811.    ███████████████████████████████████████████

███████████████████████████████████████████████████████

██████ .

        b.      **Fox2 Simulations**

812.    ███████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████

813.    To determine the power savings provided to each Accused Product, I constructed a model that uses Fox2 to simulate a number of otherwise identical, typical, Skylake-based microprocessors with increasing guard bands for both the thermal sensor calibration and ITD compensation. Additionally, I configured Fox2 to ████████████████████████████████████ ███████████████████████████████████████████ . I also generated various visualizations of this data. This data, visualizations of this data, and other simulation output have been made available on the remote source code review server at location /home/shared/vlsi_productions/production2/variation_params/. I incorporate this material and all other produced materials on the source code review server into my report here and anywhere I refer to those materials. I expect to use these materials to demonstrate that Intel practices each element of at least Claims 1, 3 and 18, through at least its testing during manufacturing (both on chip and in system testing including Fox2), product demonstrations, and its use of each of the Accused Products accused of infringing those claims. For example, I will demonstrate using these materials that Intel practices a method for power supply optimization of an integrated circuit,

**OUTSIDE COUNSEL EYES ONLY**

determining an analog variation parameter representative of an integrated circuit fabrication process variance of the integrated circuit, determining an operational temperature associated with the analog variation parameter, determining an adjustment signal for a power supply voltage level of the integrated circuit based on the analog variation parameter with respect to the operational temperature, adjusting a regulation signal of a DC-to-DC converter based on the adjustment signal to optimize power consumption of the integrated circuit, determining a digital variation parameter, determining the adjustment signal based on the digital variation parameter and the analog variation parameter with respect to the operational temperature.

814.    Additionally, I expect to use these materials to demonstrate that each of the Accused Products practice each element of at least Claims 8 and 10 through at least Intel's testing during manufacturing (both on chip and in system testing), product demonstrations, and its use of Accused Products when placed within a functioning system. For example, I will show that Fox2 simulates a system that comprises an apparatus for increasing power supply efficiency of an integrated circuit, a processing module, a memory operably coupled to the processing module, wherein the memory stores operational instructions that cause the processing module to: determine an analog variation parameter representative of an integrated circuit fabrication process variance of the integrated circuit, determine an operational temperature associated with the analog variation parameter, determine an adjustment signal for a power supply voltage level of the integrated circuit based on the analog variation parameter and the operational temperature, adjust a regulation signal of a DC-to-DC converter based on the adjustment signal to optimize power consumption of the integrated circuit, and wherein the memory further stores operational instructions that cause the processing module to determine the adjustment signal by determine a digital variation parameter and determine the adjustment signal based on the digital variation parameter and the analog variation parameter with respect to the operational temperature.

**OUTSIDE COUNSEL EYES ONLY**

815.    For example, I will show using final PCU variables, output PCU tracking files, statistics outputs, sampler outputs, and graphs of the above, that the simulated PCU, running instructions from the PCU memory, sends optimal voltage requests to a DC-to-DC voltage regulator, that it determines fuse values from a fuse array, that it uses fused thermal sensor parameters to determine the measured core temperature, and that it uses that measured core temperature and fused ITD parameters to adjust the requests sent to the DC-to-DC voltage regulator.

816.    █████████████████████████████████████

████████████  ██  ████████████████████  ██  ████████

████████████████████████████████████████████

█████████████████████████  █  ████████████████████████

███████████████████████████████

817.    █████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████.

818.    █████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████

**OUTSIDE COUNSEL EYES ONLY**

819.    The system was set to run the ███████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████ The sampled parameters were also modified to visualize the behavior of ITD compensation and thermal sensor calibration. I may rely on these visualizations to demonstrate the infringement and damages of the '027 patent.

820.    I disabled the load line compensation by setting the load-line impedance to zero to isolate the benefit of ITD compensation.

821.    ████████████████████████████████████████████████████████

█████████████████████████████

822.    This workload is run for temperature guard bands from ██████ The average voltage regulator voltage and total chip power was extracted from each output's statistics.csv file. The results were visualized with a spreadsheet.

823.    ███████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████ ██ ██ ███ ███ ████ ████ ██ ███

████████████████████████████████ ██ ██ ████

████.

824.    ████████████████████████████████████████████████████

█████████████████████████████████████████████

825.    The configuration file again simulates a ████████████████████████

██████████. The simulated processor now uses the default fuses for thermal sensor calibration.

- 350 -                                    **OUTSIDE COUNSEL EYES ONLY**

Again, the system was set to run the ██████████████████████████████

███████████████████████████████████████████████████████

████████████████████████ The sampled parameters were also modified to visualize

the behavior of ITD compensation and thermal sensor calibration. I may rely on these

visualizations in trial to demonstrate the infringement and damages of the 027 patent.

826.   The workload was run again while overriding each value for ITD_SLOPE from 15

to 30, inclusive. ██████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████. The results were visualized with a spreadsheet. ████████████

███████████████████████████████████████████████████████

████████████████████████████   ████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████.

4.      **Summary Of Results**

827.   Based on the analysis described above, I can estimate the power savings Intel

achieves by infringing claims 1, 8, and 18, and the further power savings Intel achieves by

infringing claims 3, 5, and 10 as follows:



**OUTSIDE COUNSEL EYES ONLY**



828.    Based on the analysis described above, I expect each of the Accused Products to obtain at ▮▮▮▮▮▮▮▮▮ benefit from Intel's infringement of claims 1, 8, and 18.

829.    Based on the analysis described above, I expect each of the Accused Products to obtain ▮▮▮▮▮▮▮▮▮ benefit from Intel's infringement of claims 3, 5, and 10. These benefits are additive to the benefits the Accused Products obtain from infringing claims 1, 8, and 18.

830.    These benefits are fully apportioned to be coextensive with the claims. As discussed further below, Intel could not have obtained these benefits without infringing the '027 patent. These calculations also exclude features and aspects of the products that are not accused of infringing. To the extent Intel argues that any further apportionment is required, I expect to respond.

831.    The benefits I have calculated herein are exemplary. Intel also obtains additional benefits from its infringement, as discussed throughout my Report that I have not calculated. For

**OUTSIDE COUNSEL EYES ONLY**

example, Intel obtains power savings benefits from its infringement that relates to load line compensation. These benefits are additive to the benefits calculated here.

## B. **Intel Testing Systems**

832.    I was asked to determine the performance benefit and power savings that Intel's products gain by implementing several features. In this report, I have used materials from Intel's production to do so.

833.    Based on my experience, my education, and the analysis I have performed in this case, it is my opinion that the results I reached in my work in this case were correct and reliable. It is possible that Intel has in-house tools that would have significantly eased, or possibly improved my analysis. For example, Intel uses the tools described below to test and debug its products. I understand that VLSI has attempted to obtain the software and information sufficient to run these and other tools in this case for several over a year.

834.    I understand VLSI served multiple Requests for Production to Intel related to Intel's simulation and debug tools. For example, I understand in Request for Production No. 197, VLSI requested, "Any systems, including, for example, debugging systems that would allow VLSI to inspect the operation of an Accused Product's PCU, and all Documents Relating To any such systems."   Below is my understanding related to the VLSI's requests and the parties' correspondence related to these each tool.

835.    I understand Intel made no production pursuant to VLSI's Request for Production No. 197, and stated that it was refusing to do so on the grounds that production was not proportional to the needs of the case. I understand VLSI responded that simulations requested are relevant to both VLSI's infringement and damages analyses. I understand that pursuant to numerous orders from the Court requiring Intel to provide it with updates on their investigation into this Request, Intel represented that it was still working with individuals who may be knowledgeable "to

**OUTSIDE COUNSEL EYES ONLY**

880. █████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

881. █████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

**OUTSIDE COUNSEL EYES ONLY**



1.     **Lack Of Commercially Acceptable Design Arounds Or Noninfringing Alternatives in Accused Products**

882.     Furthermore, quality assurance, validation and testing requirements, in addition to the required development work, manufacturing changes, and timing requirements associated with the foregoing, would have made it extremely difficult or even impossible for Intel to have designed around the '027 Patent in a manner that would have been commercially acceptable to Intel at the time of the hypothetical negotiation, which would have occurred at approximately the time ███ ████████████████████████████████████████████ of the first infringing products for the '027 Patents—which appears to have been for the ██████████████—which would have been in or around early-October 2010.[42] If asked, I expect to discuss these facts and circumstances as well, in explaining these additional challenges Intel would have faced if, rather than obtain a license, it had sought to implement a design around for any of these three patents at the time of the hypothetical negotiation.

---

[42] My opinion is the same regardless of precisely when the negotiations would have occurred. I understand that ████████████████████████████████████████████████, as discussed below. I understand that the hypothetical negotiations would have to have occurred prior to this "first infringement."

**OUTSIDE COUNSEL EYES ONLY**

I have identified as the approximate date of first infringement. Intel typically tapes in multiple versions of a product around the same time period as shown by the above-referenced documentation.

## XXI.   CONCLUSION

893.   Based on the above evidence and rationale, the Intel Accused Products infringe Asserted Claims 1, 3, 5, 8, 10, and 18 of the '027 Patent, both directly and indirectly.

894.   My opinions as stated in this Report may be modified at a later time if relevant new information is obtained in discovery or if any relevant new development occurs relevant to the above-captioned litigation. I reserve the right to respond to and/or rely upon any testimony, opinions, evidence, assertions, issues and/or arguments offered or raised by any party, or by any party's expert reports and disclosures. I also reserve the right to respond to and/or rely upon any materials reviewed or analyzed by any party's experts. I further reserve the right to amend this Report under such conditions or other appropriate circumstances. In particular, I understand that Intel may serve an expert report concerning some of the issues addressed by this Report. I therefore may supplement or amend my Report or opinions in response to additional discovery or other events and may prepare a rebuttal report in response to any expert report submitted by Intel addressing any of the topics in this Report. I further reserve the right to supplement or amend this Report in the event that I am provided with any additional documents or materials produced by Intel in this case.

DATED: July 31, 2020

Thomas M. Conte, Ph.D.

**OUTSIDE COUNSEL EYES ONLY**

# EXHIBIT 2

US007246027B2

(12) **United States Patent**
May et al.

(10) **Patent No.:** **US 7,246,027 B2**
(45) **Date of Patent:** **Jul. 17, 2007**

(54) **POWER OPTIMIZATION OF A MIXED-SIGNAL SYSTEM ON AN INTEGRATED CIRCUIT**

(75) Inventors: **Marcus W. May**, Austin, TX (US); **Matthew D. Felder**, Austin, TX (US)

(73) Assignee: **Sigmatel, Inc.**, Austin, TX (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **11/078,150**

(22) Filed: **Mar. 11, 2005**

(65) **Prior Publication Data**

US 2006/0217920 A1     Sep. 28, 2006

(51) **Int. Cl.**
*G01K 1/00*          (2006.01)

(52) **U.S. Cl.** .................................... **702/130**

(58) **Field of Classification Search** ............... 702/130, 702/117, 121, 124, 60, 64; 377/19, 20; 438/14, 438/17, 18
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,563,928 A * 10/1996 Rostoker et al. .............. 377/20
* cited by examiner

*Primary Examiner*—John Barlow
*Assistant Examiner*—Xiuqin Sun
(74) *Attorney, Agent, or Firm*—Garlick Harrison & Markison; Kevin L. Smith

(57) **ABSTRACT**

A method and apparatus for conserving power of a mixed-signal system-on-a-chip having analog circuitry, involving determination of an analog variation parameter that is representative of an integrated circuit fabrication process variance of the integrated circuit, and an operational temperature associated with the analog variation parameter. With the analog variation parameter and the operational temperature, an adjustment signal is determined for a power supply level of the integrated circuit, such that power consumption of the integrated circuit is optimized. Further, in mixed-signal integrated circuits with digital and analog circuitry, a digital variation parameter is determined, where the adjustment signal determination is based on the digital variation parameter and the analog variation parameter with respect to the operational temperature. With such a method and apparatus, power consumption is optimized on an IC-by-IC basis such that power consumption of each IC is optimized.

**21 Claims, 10 Drawing Sheets**



external sources 34

host computer 36

video decoder 38

memory stick 40

wireless modem 42

camcorder image sensor 44

battery-operated system on a chip 12

multimedia application 46

processing module 30

on-chip memory 32

input multimedia data 48

output multimedia data 50

connector 20

high-speed interface 28

bus 25

$V_{DD}$

multimedia module 24

DC to DC converter 26

display 18

rendered output data 52

inductor 16

battery 14

input device 22

input signals 54

multiple function battery operated device 10

INTEL 1001

US 7,246,027 B2

15

FIGS. **12a**, **12b**, and **12c** provide a logic diagram of a method for conserving power of a system-on-a-chip that begins at step **302** where the analog variation parameter is determined, representing fabrication process variations to the IC. Step **304** determines the operational temperature T of the integrated circuit. At step **306**, determination of the analog voltage level ($AV_{DD}$) signal is conducted based on the analog variation parameter with respect to the operational temperature T.

At step **308**, if a digital component is present on the integrated circuit, or present for a shared power supply with the analog component of the integrated circuit, then the method proceeds to step **352** (see FIG. **12b**). If not, indicating that either there is no digital component for the power supply to allocate appropriate energy resources (either by not being present, or the digital component has a devoted power channel), the method proceeds to step **310** where the power consumption of the IC is optimized by adjusting the supply voltage $V_{DD}$ to the analog voltage level $AV_{DD}$ signal. The process then can be repeated by returning to step **302**.

If a digital component is present, as determined at step **308** at FIG. **12a**, the method continues to step **352** of FIG. **12b** where processing speed of at least a portion of an integrated circuit is measured to produce measured processing speed. The at least a portion of the integrated circuit includes a speed test circuit, a critical path of the integrated circuit, and/or a replicated circuit of the critical path of the integrated circuit. The measuring of the processing speed may be done as shown in FIG. **12c** as steps **376** through **380**. At step **376**, the at least a portion of the integrated circuit performs a function, which may be, but is not limited to, an add function, a delay line function, a ring oscillation function, a memory retrieval function, and/or a multiplication function. The process then proceeds to step **378** where a number of cycles of a known clock are counted during the performing of function by the at least a portion of the integrated circuit or the number of iterations, or repetitions, of performing the function during a clock cycle to produce a count value. The process then proceeds to step **380** where the count value is equated to the processing speed.

Returning to the main path of the logic diagram of FIG. **12b**, the process continues at step **354** where the measured processing speed is compared with a critical processing speed for the at least a portion of the integrated circuit. The process then proceeds to step **356** where a determination is made as to whether the comparison was favorable. If not, the process proceeds to step **358** where the digital variation parameter is maintained at its current setting.

If the comparison is favorable, then in step **360** the digital variation parameter is the favorable comparison result from step **356**. In one embodiment, the adjusting of the supply voltage may be done by determining a ratio between the measured processing speed and the critical processing speed and proportionally adjusting the supply voltage based on the ratio. In another embodiment, the adjusting the supply voltage may be done by adjusting the feedback of the supply voltage for regulation of an on-chip DC-to-DC converter that produces the supply voltage, or adjusting a reference voltage used for regulation of the on-chip DC-to-DC converter that produces the supply voltage.

In step **362** determination of an adjustment signal as based on the analog variation parameter with respect to the operational temperature against the digital variation parameter. In this instance a comparison is made between the analog variation parameter and the digital variation parameter. The adjustment signal is the favorable result. At step **364** optimization, or reduction, of power consumption of the inte-

16

grated circuit is accomplished by adjusting the supply voltage via the adjustment signal selected as the favorable result.

As one of average skill in the art will appreciate, the measuring, comparing, and adjusting to update the supply voltage may be repeatedly performed, as indicated by the return of the method to step **302** (see FIG. **12a**).

The preceding discussion presents a method and apparatus for conserving power on an IC-by-IC, or chip-by-chip, basis, and over time. In a first aspect, this is achieved by measuring the processing speed of the IC, comparing the measured processing speed with a critical processing speed, and if the measured processing speed is faster than the critical processing speed, decreasing the supply voltage such that the actual processing speed approaches the critical processing speed. In another aspect, power optimization, or conservation, is achieved by determining an analog variation parameter with respect to an operational temperature, decreasing the supply voltage such that a sufficient headroom voltage for analog signal performance is provided. In yet another aspect, the digital variation parameter—as set out as the value representative of the actual processing speed approaches the critical processing speed, is compared with the analog variation parameter. The resulting favorable comparison provides a basis to decrease or optimize the supply voltage. As one of average skill in the art will appreciate, other embodiments may be derived from the teachings of the present invention without deviating from the scope of the claims.

As one of average skill in the art will appreciate, the term "substantially" or "approximately", as may be used herein, provides an industry-accepted tolerance to its corresponding term. Such an industry-accepted tolerance ranges from less than one percent to twenty percent and corresponds to, but is not limited to, component values, integrated circuit process variations, temperature variations, rise and fall times, and/or thermal noise. As one of average skill in the art will further appreciate, the term "operably coupled", as may be used herein, includes direct coupling and indirect coupling via another component, element, circuit, or module where, for indirect coupling, the intervening component, element, circuit, or module does not modify the information of a signal but may adjust its current level, voltage level, and/or power level. As one of average skill in the art will also appreciate, inferred coupling (that is, where one element is coupled to another element by inference) includes direct and indirect coupling between two elements in the same manner as "operably coupled". As one of average skill in the art will further appreciate, the term "compares favorably", as may be used herein, indicates that a comparison between two or more elements, items, signals, etc., provides a desired relationship. For example, when the desired relationship is that signal **1** has a greater magnitude than signal **2**, a favorable comparison may be achieved when the magnitude of signal **1** is greater than that of signal **2** or when the magnitude of signal **2** is less than that of signal **1** (see FIG. **1**).

What is claimed is:

1. A method for power supply optimization of an integrated circuit, comprising:

determining an analog variation parameter representative of an integrated circuit fabrication process variance of the integrated circuit;

determining an operational temperature associated with the analog variation parameter; and

determining an adjustment signal for a power supply voltage level of the integrated circuit based on the analog variation parameter with respect to the operational temperature; and

93006DOC00086778

US 7,246,027 B2

17

adjusting a regulation signal of a DC-to-DC converter based on the adjustment signal to optimize power consumption of the integrated circuit.

**2**. The method of claim **1** further comprises:

updating the adjustment signal by repeating at least one of the determination of the operational temperature and determining the adjustment signal.

**3**. The method of claim **1**, wherein the determining the adjustment signal further comprises:

determining a digital variation parameter; and

determining the adjustment signal based on the digital variation parameter and the analog variation parameter with respect to the operational temperature.

**4**. The method of claim **3** wherein the determining the adjustment signal comprises:

determining a first adjustment signal based on the analog variation parameter;

determining a second adjustment signal based on the digital variation parameter;

comparing the first adjustment signal to the second adjustment signal; and

when the first adjustment signal compares favorably with the second adjustment signal, selecting the first adjustment signal as the adjustment signal, else the second adjustment signal as the adjustment signal.

**5**. The method claim **3**, wherein determining a digital variation parameter comprises:

measuring processing speed of at least a portion of an integrated circuit to produce measured processing speed;

comparing the measured processing speed with a critical processing speed for the at least a portion of the integrated circuit; and

when the measured processing speed compares favorably to the critical processing speed, correspondingly set a value of the digital variation parameter.

**6**. The method of claim **3** further comprises:

adjusting a regulation signal of a DC-to-DC converter based on the adjustment signal.

**7**. The method of claim **6** further comprises:

updating the adjustment signal by repeating at least one of the determination of the operational temperature, the determination of the analog variation parameter, and of the digital variation parameter.

**8**. An apparatus for increasing power supply efficiency of an integrated circuit comprises:

a processing module; and

a memory operably coupled to the processing module, wherein the memory stores operational instructions that cause the processing module to:

determine an analog variation parameter representative of an integrated circuit fabrication process variance of the integrated circuit;

determine an operational temperature associated with the analog variation parameter; and

determine an adjustment signal for a power supply voltage level of the integrated circuit based on the analog variation parameter and the operational temperature; and

adjust a regulation signal of a DC-to-DC converter based on the adjustment signal to optimize power consumption of the integrated circuit.

**9**. The method of claim **8**, wherein the memory further stores operational instructions that cause the processing module to:

18

update the adjustment signal by repeating at least one of the determination of the operational temperature and determine the analog variation parameter.

**10**. The apparatus of claim **8**, wherein the memory further stores operational instructions that cause the processing module to determine the adjustment signal by:

determine a digital variation parameter; and

determine the adjustment signal based on the digital variation parameter and the analog variation parameter with respect to the operational temperature.

**11**. The apparatus of claim **10**, wherein the memory further stores operational instructions that cause the processing module to determine the digital variation parameter by:

measuring a processing speed of at least a portion of an integrated circuit to produce measured processing speed;

comparing the measured processing speed with a critical processing speed for the at least a portion of the integrated circuit; and

when the measured processing speed compares favorably to the critical processing speed, set a corresponding value of the digital variation parameter.

**12**. The apparatus of claim **10**, wherein the memory further stores operational instructions that cause the processing module to:

adjust a regulation signal of a DC-to-DC converter based on the adjustment signal.

**13**. The apparatus of claim **11**, wherein the memory further stores operational instructions that cause the processing module to:

determine a first adjustment signal based on the analog variation parameter;

determine a second adjustment signal based on the digital variation parameter;

compare the first adjustment signal to the second adjustment signal; and

when the first adjustment signal compares favorably with the second adjustment signal, selecting the first adjustment signal as the adjustment signal, else selecting the second adjustment signal as the adjustment signal.

**14**. A comprehensive system-on-a-chip comprises:

a processing core operably coupled to process input digital data and produce therefrom output digital data;

digital interface circuitry operably coupled to provide the input digital data to the processing core and to receive the output digital data from the processing core;

mixed signal circuitry operably coupled to convert input analog signals into the input digital data and to convert the output digital data into output analog signals; and

battery optimization circuitry that includes a DC-to-DC converter and a power conservation circuit, wherein the DC-to-DC converter is operably coupled to convert a battery voltage into a supply voltage that supplies at least one of: the processing core, the digital interface circuitry, and the mixed signal circuitry, wherein the power conservation circuit includes:

processing module; and

memory operably coupled to the processing module, wherein the memory stores operational instructions that cause the processing module to:

determine an analog variation parameter representative of an integrated circuit fabrication process variance of the integrated circuit;

determine an operational temperature associated with the analog variation parameter;

determine a digital variation parameter representative of a processing speed of the integrated circuit; and

93006DOC00086779

US 7,246,027 B2

19

determine an adjustment signal for a power supply voltage level of the integrated circuit based on the analog variation parameter with respect to the operational temperature and the digital variation parameter; and

adjusting a regulation signal of a DC-to-DC converter based on the adjustment signal to optimize power consumption of the integrated circuit.

**15**. The comprehensive system-on-a-chip of claim **14**, wherein the memory further stores operational instructions that cause the processing module to:

update the regulation adjustment by repeating at least one of the determination of the operational temperature and the determination of the analog variation parameter.

**16**. The comprehensive system-on-a-chip of claim **15**, wherein the memory further stores operational instructions that cause the processing module to adjust of the supply voltage by:

determining the digital variation parameter as a ratio between the measured processing speed and the critical processing speed; and

adjusting the supply voltage based on an operational sufficiency of either the digital variation parameter or the analog variation parameter with respect to the operational temperature.

**17**. The comprehensive system-on-a-chip of claim **14**, wherein the memory further stores operational instructions that cause the processing module to measure the processing speed by:

enabling a function to be performed by the at least a portion of the comprehensive system-on-a-chip;

counting at least one of a number of cycles of a known clock during the performing of function by the at least a portion of the integrated circuit and a number of repetitions of the function during a cycle of the known clock to produce a count value; and

equating the count value to the processing speed.

**18**. A method for increasing power supply efficiency of an integrated circuit, comprising:

20

determining an analog variation parameter representative of an integrated circuit fabrication process variance of the integrated circuit; and

determining an adjustment signal for a power supply voltage level of the integrated circuit based on the analog variation parameter; and

adjusting a regulation signal of a DC-to-DC converter based on the adjustment signal to optimize power consumption of the integrated circuit.

**19**. The method of claim **18**, wherein the determining the adjustment signal further comprises:

determining an operational temperature associated with the analog variation parameter; and

determining an adjustment signal for a power supply voltage level of the integrated circuit based on the analog variation parameter with respect to the operational temperature, such that power consumption of the integrated circuit is optimized.

**20**. The method of claim **19** further comprises:

determining a digital variation parameter; and

determining the adjustment signal based on the digital variation parameter and the analog variation parameter with respect to the operational temperature.

**21**. The method of claim **20** wherein the determining the adjustment signal comprises:

determining a first adjustment signal based on the analog variation parameter;

determining a second adjustment signal based on the digital variation parameter;

comparing the first adjustment signal to the second adjustment signal; and

when the first adjustment signal compares favorably with the second adjustment signal, selecting the first adjustment signal as the adjustment signal, else the second adjustment signal as the adjustment signal.

\*    \*    \*    \*    \*

# EXHIBIT 3



INTENSITY, LLC
12730 High Bluff Drive, Suite 300
San Diego, California 92130
*telephone* 858.876.9101

**www.intensity.com**

## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| VLSI TECHNOLOGY LLC, <br><br> Plaintiff, <br><br> v. <br><br> INTEL CORPORATION, <br><br> Defendant. | C.A. No. 18-cv-966-CFC <br><br> **REPORT OF** <br> **Ryan Sullivan, Ph.D.** |

Ryan Sullivan, Ph.D.

July 31, 2020

OUTSIDE COUNSEL EYES ONLY

OUTSIDE COUNSEL EYES ONLY

# 16.   Reasonable Royalty

(312)   The determination of reasonable royalties herein is based upon the entirety of information and analysis contained throughout my report, including attachments and referenced materials.  I have qualitatively and quantitatively addressed the *Georgia-Pacific* factors throughout my report.  Section 15 of my report outlines how I have addressed each *Georgia-Pacific* factor, with references to other parts of my report that provide additional detail on the impact of the factor on the determination of a reasonable royalty.

(313)   As described in Section 13, to calculate Intel's incremental costs directly attributable to implementing the asserted technology in the accused products, I consider Intel's sales and marketing expenditures.  As described in Section 14, to consider Intel's maximum potential contribution to realizing the benefits of the patented technologies beyond its selling and marketing efforts already accounted for, I consider Intel's G&A and R&D expenditures associated with the accused products.  Because the profit and loss data produced by Intel ▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, I calculate the cost apportionment and contribution apportionment by deducting all total spending expenditures from net billings for the accused products.  This approach fully captures both the incremental costs directly attributable to Intel's implementation of the asserted technologies as well as the full benefit of any efforts made by Intel toward realizing the profit benefits of the patented technologies.  In addition, sales and marketing, G&A, and R&D expenses for the accused products reflect the types of data the parties would have considered at the hypothetical negotiations.

(314)   Subtracting total spending from net billings for the accused products under each of the patents-in-suit yields a cost and contribution apportionment factor of ▮▮▮▮ for the '027 patent and ▮▮▮▮ for the '331 patent.  See Attachments E-3 and F-3.

(315)   The revenue benefit to Intel that is attributable to the technology claimed in the '027 patent and associated with products alleged to infringe claims 1, 8, and/or 18 totals ▮▮▮▮▮▮ in the damages period.  See Section 11.6.  Applying the cost and contribution apportionment factor of ▮▮▮▮ to the apportioned revenue benefit results in reasonable royalties for these products of ▮▮▮▮▮▮▮ in the period from 2012-Q3 through 2019-Q4.  See Attachment E-4.[613]

---

[613]   The reasonable royalty of ▮▮▮▮▮▮ for products accused to infringe claims 1, 8, and/or 18 of the '027 patent represents an effective percentage royalty rate on accused sales of ▮▮▮.  See Attachment E-6.  The determination of

---

OUTSIDE COUNSEL EYES ONLY

(316)   The revenue benefit to Intel that is attributable to the technology claimed in the '027 patent and associated with products alleged to infringe claims 3, 5, and/or 10 totals ███████████ in the damages period.  See Section 11.6.  Applying the cost and contribution apportionment factor of ██████ to the apportioned revenue benefit results in reasonable royalties for these products of ████████████ in the period from 2012-Q3 through 2019-Q4.  See Attachment E-4.[614]

(317)   The revenue benefit to Intel that is attributable to the technology claimed in the '331 patent equals ██████████ in the damages period (see Section 12).  Applying the cost and contribution apportionment factor of ██████ to the apportioned per-unit revenue benefit yields a per-unit royalty of ███████  See Attachment F-4.  Multiplying the per-unit royalty by accused units in the damages period results in total reasonable royalties ██████████ for the '331 patent in the period from 2012-Q3 through 2019-Q4.[615]  See Attachment F-5.[616]

(318)   The table below provides a summary of reasonable royalties by asserted patent (see also Attachment G-1):

---

reasonable royalties herein does not require disclosure of accused sales or the effective percentage royalty rate, as the determination of reasonable royalties is based upon apportioned revenue that is specifically attributable to the patented technology.

[614]   The reasonable royalty of ███████████ for products accused to infringe claims 3, 5, and/or 10 of the '027 patent represents an effective percentage royalty rate on accused sales of ██████.  See Attachment E-6.  The determination of reasonable royalties herein does not require disclosure of accused sales or the effective percentage royalty rate, as the determination of reasonable royalties is based upon apportioned revenue that is specifically attributable to the patented technology.

[615]   As described in Sections 6.4 and 9.3, reasonable royalties for the '331 patent are calculated through 2019-Q3 for certain accused products.

[616]   The reasonable royalty of ███████████ for the '331 patent represents an effective percentage royalty rate on accused sales of ██████.  See Attachment F-7.  The determination of reasonable royalties herein does not require disclosure of accused sales or the effective percentage royalty rate, as the determination of reasonable royalties is based upon apportioned revenue that is specifically attributable to the patented technology.

OUTSIDE COUNSEL EYES ONLY



(319)   The royalties determined herein are reasonable and agreeable to all parties at the hypothetical negotiations for several reasons.

(320)   First, royalties reflect the primary benefits that Intel has gained from its alleged use of the patented technologies, consistent with the patent laws under Section 284.   Royalties are commensurate with and reflect the inherent value of the claimed inventions and do not incorporate value that was created by other technologies, assets, or economic factors.

(321)   In addition, royalties are conservative because they do not directly account for all of the benefits provided by the patented technologies.  Indeed, royalties capture the benefits to Intel of increased prices enabled by the patented technologies, yet the patented technologies have also provided Intel with increased demand and improved competitive positioning in the marketplace.  See Sections 5.2 and 5.3.  Moreover, I understand that the '027 patent enables additional benefits, including in connection with load line compensation, that are not included in the power savings values described in Section 11.6, and thus not accounted for in the analysis described herein.

(322)   Second, royalties are apportioned to the incremental value of the economic contributions of the patented technologies.  Royalties recognize that the accused products are complex, with many features and functionalities contributing to their technical capabilities and their commercial performance in the marketplace.   Accordingly, royalties attribute a minimal portion of the accused products to the claimed technologies, and attribute significant value to factors not covered under the asserted patents.  Further, apportioned royalties account for the fact that Intel's pricing is dependent on several factors, only one of which is the contribution of the asserted technologies.  Therefore, the analysis herein is consistent with

Federal Circuit rulings on apportionment which require that royalties be tied to "the claimed invention's footprint in the marketplace[.]"[617]

(323)   Third, royalties account for Intel's contribution to realizing the economic benefits of the patented technologies through its efforts in commercializing the technology and facilitating sales of the accused products.  See Section 14.  As such, royalties account for Intel's selling, development, and administrative contributions associated with the patented technology. Royalties also account for the value of Intel's expertise, efficiencies, and brand.

(324)   Fourth, royalties would not be meaningfully burdensome to Intel.  Intel claims that its products have thousands of features and that it cannot pay a "disproportionate" royalty to license patents that cover a small group of microprocessor features and functionalities. [618] However, as mentioned above, the royalties are apportioned to the incremental value of the economic contributions of the patented technologies and thus do not represent a disproportionate royalty.

(325)   Moreover, I am not aware of any evidence that the royalties would be meaningfully burdensome to Intel for the accused products.[619] ████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████ ████████████ ████████████████████████████████████████████████████

---

[617]   See, for example:

Uniloc USA. Inc. v. Microsoft Corp., 632 F.3d 1292, 1317 (Fed. Cir. 2011).  ("To be admissible, expert testimony opining on a reasonable royalty rate must 'carefully tie proof of damages to the claimed invention's footprint in the market place.' ResQNet, 594 F.3d at 869.")

Ericsson, Inc. v. D-Link Sys., Inc., 773 F.3d 1201, 1226 (Fed. Cir. 2014).  ("When the accused infringing products have both patented and unpatented features, measuring this value requires a determination of the value added by such features. Indeed, apportionment is required even for non-royalty forms of damages: a jury must ultimately 'apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features' using 'reliable and tangible' evidence. Garretson, 111 U.S. at 121, 4 S.Ct. 291. . .  The essential requirement is that the ultimate reasonable royalty award must be based on the incremental value that the patented invention adds to the end product.")

Virnetx, Inc. v. Cisco Sys., Inc., 767 F.3d 1308, 1326 (Fed. Cir. 2014).  ("No matter what the form of the royalty, a patentee must take care to seek only those damages attributable to the infringing features.")

[618]   Defendant Intel Corporation's Eleventh Supplemental and Amended Responses and Objections to Plaintiff VLSI Technology LLC's First Set of Interrogatories (No. 12), 7/17/2020, at Third Supplemental and Amended Response to Interrogatory No. 12, 7/17/2020, at 206.

[619]   Keith Gray, Dep. Tr., 10/25/2019, at 163:15–165:3 . ████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ████████████████████████████

---

OUTSIDE COUNSEL EYES ONLY



(326)   Fifth, I am not aware of any available, commercially acceptable non-infringing alternatives to the asserted technologies that were available to Intel at the time of the hypothetical negotiations.  See Section 5.4.

(327)   Sixth, royalties do not include any value attributable to a competitive bargaining position held by the licensors at the hypothetical negotiations, even though there were likely competitive considerations between the parties at the hypothetical negotiations.  See Section 8.

(328)   Seventh, the royalty analysis accounts for and is consistent with the *Georgia-Pacific* factors, as discussed in Section 15.